UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1)  GORDON ERNST,<br>(2)  DONNA HEINEL,<br>(9)  WILLIAM FERGUSON, and<br>(12) JOVAN VAVIC,<br><br>Defendants | Criminal No. 19-10081-IT<br><br>Violations:<br><br><u>Count 1</u>: Racketeering Conspiracy<br>(18 U.S.C. § 1962(d))<br><br><u>Count 2</u>: Conspiracy to Commit Mail and Wire Fraud and Honest Services Mail and Wire Fraud<br>(18 U.S.C. § 1349)<br><br><u>Counts 3-4</u>: Conspiracy to Commit Federal Programs Bribery<br>(18 U.S.C. § 371)<br><br><u>Counts 5-7</u>: Federal Programs Bribery<br>(18 U.S.C. § 666(a)(1)(B))<br><br><u>Counts 8-16</u>: Wire Fraud and Honest Services Wire Fraud; Aiding and Abetting<br>(18 U.S.C. §§ 1343, 1346 and 2)<br><br><u>Counts 17-18</u>: Mail Fraud and Honest Services Mail Fraud; Aiding and Abetting<br>(18 U.S.C. §§ 1341, 1346 and 2)<br><br><u>Count 19</u>: Money Laundering; Aiding and Abetting<br>(18 U.S.C. §§ 1957 and 2)<br><br><u>Counts 20-22</u>: Filing a False Tax Return<br>(26 U.S.C. § 7206(1))<br><br><u>Forfeiture Allegation</u>:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461)<br><br><u>Racketeering Forfeiture Allegation</u>:<br>(18 U.S.C. § 1963)<br><br><u>Money Laundering Forfeiture Allegation</u>:<br>(18 U.S.C. § 982(a)(1)) |

SECOND SUPERSEDING INDICTMENT

At all times relevant to this Second Superseding Indictment:

### General Allegations

1.     Defendant GORDON ERNST ("ERNST") was a resident of Chevy Chase, Maryland and Falmouth, Massachusetts.   Until January 2018, ERNST was employed as the head coach of men's and women's tennis at Georgetown University ("Georgetown").   In that capacity, ERNST owed a duty of honest and faithful services to Georgetown.

2.     Defendant DONNA HEINEL ("HEINEL") was a resident of Long Beach, California. HEINEL was employed as the senior associate athletic director at the University of Southern California ("USC").   In that capacity, HEINEL owed a duty of honest and faithful services to USC.

3.     Defendant WILLIAM FERGUSON ("FERGUSON") was a resident of Winston-Salem, North Carolina.   Beginning in or about June 2016, FERGUSON was employed as the women's volleyball coach at Wake Forest University ("Wake Forest").   In that capacity, FERGUSON owed a duty of honest and faithful services to Wake Forest.

4.     Defendant JOVAN VAVIC ("VAVIC") was a resident of Rancho Palos Verdes, California.   VAVIC was employed as the head water polo coach at USC.   In that capacity, VAVIC owed a duty of honest and faithful services to USC.

5.     Ali Khosroshahin ("Khosroshahin") was a resident of Fountain Valley, California. Until November 8, 2013, Khosroshahin was employed as the head coach of women's soccer at USC.   In that capacity, Khosroshahin owed a duty of honest and faithful services to USC.

6.     Laura Janke ("Janke") was a resident of North Hollywood, California. Until January 10, 2014, Janke was employed as an assistant coach of women's soccer at USC.   In that

2

capacity, Janke owed a duty of honest and faithful services to USC. Janke reported to Khosroshahin until his departure from USC.

7.     Mikaela Sanford ("Sanford") was a resident of Sacramento, California. Sanford was employed in various capacities for the Edge College & Career Network, LLC and the Key Worldwide Foundation, in Newport Beach, California.

8.     Steven Masera ("Masera") was a resident of Folsom, California. Until December 2017, Masera was employed as an accountant and financial officer for the Edge College & Career Network, LLC and the Key Worldwide Foundation, in Newport Beach, California.

9.     William "Rick" Singer ("Singer") was a resident, variously, of Sacramento and Newport Beach, California. Singer founded and, together with others, operated the Edge College & Career Network, LLC and the Key Worldwide Foundation.

The Enterprise

10.     The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business in Newport Beach, California, founded by Singer in or about 2007 and incorporated in the State of California in or about December 2012.

11.     The Key Worldwide Foundation ("KWF") was a non-profit corporation in Newport Beach, California that Singer established as a purported charity in or about 2012. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax. KWF maintained several bank accounts (collectively, the "KWF charitable accounts").

12.     Together, The Key and KWF constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4) (the "Key Enterprise"), that is, an association in fact of

3

entities engaged in, and the activities of which affected, interstate and foreign commerce. The Key Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

### Other Relevant Entities

13.    Georgetown is a highly selective private university located in Washington, D.C. Georgetown annually receives federal benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

14.    USC is a highly selective private university located in Los Angeles, California. USC annually receives federal benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

15.    Wake Forest is a highly selective private university located in Winston-Salem, North Carolina. Wake Forest annually receives federal benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies and other forms of federal assistance.

16.    The athletic teams of Georgetown, USC, and Wake Forest (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

17.    The Universities are commercial enterprises that, among other things, charge tuition for their services.

### Background on the Athletic Recruitment Process

18.    The Universities each recruit student-athletes with the expectation that those recruits will play for the Universities' athletic teams and thereby contribute to their success. Based on that expectation, the Universities frequently recruit and admit student-athletes even though they have lower grades and standardized test scores than other applicants, including non-recruited athletes.

19.    The admissions offices at the Universities typically allot a set number of admissions slots to each varsity head coach for that coach's recruited athletes, with the understanding that coaches will use those slots to recruit athletes who will contribute to the success of their teams. At USC, for example, recruited student-athletes are typically considered for admission to the university by a designated subcommittee of the admissions department (referred to internally as the "subco"), which gives significant consideration to their athletic abilities and which expects that the prospective student athletes will contribute to the success of the university's athletic teams.

### Overview of the Racketeering Conspiracy

20.    From in or about 2012 and continuing through February 2019, the defendants conspired with others known and unknown to the Grand Jury to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity including mail and wire fraud, honest services mail and wire fraud and money laundering. The principal purposes of the racketeering conspiracy were to facilitate the admission of students to elite universities as purported athletic recruits, to enrich the defendants and Singer personally, and to secure additional funding for designated university accounts that the defendants controlled or that otherwise benefited them professionally.

### Manner and Means of the Racketeering Conspiracy

21.    Among the manner and means by which the defendants, Singer, and coconspirators known and unknown to the Grand Jury carried out the racketeering conspiracy were the following:

a.    Creating athletic "profiles" and admissions packets containing falsified credentials—such as fake honors the students purportedly received, elite athletic teams they purportedly played on, and staged photographs of the students purportedly engaged in athletic activities—to submit in support of the students' college applications;

5

b.      designating applicants as purported recruits for college athletic teams—

even though, in some cases, the applicants did not play the sport they were purportedly recruited

to play—in exchange for bribe payments;

c.      concealing the fraud and bribery from the Universities;

d.      recruiting additional athletic coaches to designate applicants as purported

recruits for competitive college athletic teams in exchange for bribes; and,

e.      concealing the nature and source of the quid pro quo payments by funneling

the money through the Key Enterprise's accounts.

Acts in Furtherance of the Racketeering Conspiracy

22.     On various dates between approximately 2012 and February 2019, the defendants,

Singer, and coconspirators known and unknown to the Grand Jury committed and caused to be

committed the following acts, among others, in furtherance of the racketeering conspiracy:

23.     Parents paid Singer to bribe coaches and university administrators to designate their

children as recruited athletes, and as part of other favored admissions categories, in violation of

the duty of honest services the coaches and administrators owed to their employers, thereby

facilitating the children's admission to the Universities.

24.     As part of the scheme, Sanford and Janke helped fabricate athletic "profiles" and

other documents for some of the children to bolster their college applications by exaggerating their

athletic abilities or making them appear to be highly successful high school athletes when in fact

they were not.

USC

25.     At USC, Singer bribed VAVIC, HEINEL, and others to designate students as

recruited athletes.   Neither VAVIC nor HEINEL informed the university's admissions office that

6

they had agreed to designate applicants as athletic recruits in exchange for payments to specific university athletic funds, to themselves personally, or to third parties for their benefit, and the university's admissions office would not have approved such an arrangement.   By secretly engaging in this *quid pro quo*, VAVIC, HEINEL, and others violated the duty of honest services they owed to USC as their employer.

> *VAVIC*

26.     Singer and other coconspirators made payments to a bank account at USC that funded VAVIC's water polo team, and that therefore benefited VAVIC professionally.

27.     Singer made private school tuition payments totaling nearly $120,000 for VAVIC's children—under the guise of a purported scholarship—via checks drawn on one of the KWF charitable accounts and sent to the children's school via U.S. Mail.

28.     In exchange for these payments, VAVIC designated multiple students as recruits for the USC water polo team, thereby facilitating their admission to USC, and agreed to designate additional students as water polo recruits in the future.

29.     VAVIC did not disclose to USC that the private school tuition payments and the payments Singer and other coconspirators made to the USC water polo team were in exchange for designating the children of Singer's clients as purported water polo recruits.

30.     As one example, on or about October 4, 2013, VAVIC advised Singer that he needed an athletic profile for USC Applicant 1, the son of one of Singer's clients, and that it "needs to be a good resume."

31.     On or about January 21, 2014, VAVIC e-mailed Singer asking if USC Applicant 1 was "still interested in USC."   Singer replied affirmatively, noting that the "family is ready to

help."   VAVIC confirmed that he would present USC Applicant 1 to the subcommittee for athletic admissions with his "top walkons."

32.     On or about February 26, 2014, VAVIC e-mailed a USC athletics administrator an athletic profile that contained falsified water polo credentials for USC Applicant 1.   In a second e-mail that day, VAVIC wrote that USC Applicant 1 "would be the fastest player on our team, he swims 50 y in 20 [seconds], my fastest players are around 22 [seconds], this kid can fly."   In fact, USC Applicant 1's father had previously acknowledged to Singer that his son's "skill level" would, "[o]bviously," be "below" that of the "other freshman," and he questioned whether his son may be "so weak as to be a clear misfit at practice."

33.     On or about February 28, 2014, the USC subcommittee for athletic admissions approved USC Applicant 1's admission as a water polo recruit based on VAVIC's designation and the falsified athletic credentials.

34.     On or about April 16, 2014, Singer caused The Key to issue a $100,000 cashier's check to "USC Men's Water Polo."   The check identified the "Purpose/Remitter" as USC Applicant 1's family.

35.     As another example, on or about August 27, 2015, VAVIC sent Singer an e-mail indicating that the private school tuition for each of his two children was approximately $19,000 per child for the 2015-16 school year.   Singer directed Masera to "pay these from our foundation as scholarships."

36.     On or about August 28, 2015, Masera caused KWF to mail a check to VAVIC's children's school in the amount of $37,970.

37.     On or about September 23, 2015, Singer e-mailed Janke asking her to make a water polo "profile" for USC Applicant 2, the child of another client.   In fact, USC Applicant 2 did not

8

play water polo competitively.   Singer wrote: "[c]harge me whatever you want.   Jovan [VAVIC] and I have already spoken."

38.     On or about September 30, 2015, Janke sent two water polo profiles containing falsified credentials to Singer, telling him that "Jovan [VAVIC] can choose which one he prefers."

39.     On or about October 1, 2015, Singer instructed USC Applicant 2 to send an e-mail to VAVIC.   Singer directed her to falsely write: "Coach VAVIC per our discussion I am sending you copies of my Transcript, Unofficial Test Scores and Water Polo Profile.   I would like to reiterate that I would love an opportunity to play goalie for you and attend USC."

40.     USC Applicant 2 sent the e-mail to VAVIC as directed, and on or about October 2, 2015, VAVIC forwarded it to his assistant coach with the instruction to "add [USC Applicant 2] for the subco, we need another goalie," and to also designate USC Applicant 2 for a "books" scholarship.

41.     On or about January 28, 2016, USC Applicant 2 was presented to the subcommittee for athletic admissions as a recruited water polo player based on a fraudulent athletic profile that falsely stated that she was a "top 10 goalie in the 2016 recruiting class," who would be a "great addition to our team and to USC."

42.     On or about January 28, 2016, USC Applicant 2 was admitted to USC as a water polo recruit but did not join the USC water polo team.

43.     On or about August 3, 2016, VAVIC e-mailed Singer the tuition amounts for his children for the 2016-17 school year, which totaled $39,900.   Singer responded that he would send the payment "by the end of this week."

44.     On or about August 4, 2016, Singer caused KWF to mail a check to VAVIC's children's school in the amount of $39,900.

9

45.     In a telephone call on or about August 3, 2018, Singer told VAVIC that he had been asked by an employee of the school why he was paying the tuition for one of VAVIC's two children.   Singer told VAVIC that he had responded: "[B]ecause we've got an amazing young man in our foundation, we fund amazing kids.   And he was selected to be funded just like, um, the rest, and his brother.   So it's not really your worry."

46.     In the same call, Singer told VAVIC that he had a client, USC Applicant 3, whom he was planning to submit as a water polo recruit through coconspirator HEINEL, although Singer had not yet brought this candidate to HEINEL.   Singer and VAVIC then discussed whether USC Applicant 3 should be presented to the subcommittee for athletic admissions by VAVIC, instead of HEINEL, because that way Singer could "have money funded to" VAVIC.   VAVIC responded that it would be "easier for me to squeeze her in possibly November, when I squeeze in all of my top 7-8 kids, so maybe she can kind of get lost in the shuffle . . . ."

47.     In a telephone call with Singer on or about January 2, 2019, Singer asked VAVIC if he would purport to recruit additional children of Singer's clients to the USC water polo team, and thereby facilitate their admission to USC, because of, "essentially, what we've done in the past, with the scholarships for your boys." VAVIC replied: "Absolutely."   VAVIC told Singer that in facilitating the purported recruitment of Singer's clients, he needed "something" to show that "this guy's a legit – or girl is a legit player."

48.     VAVIC also assisted Singer to recruit other coaches to participate in the scheme. For example, after Khosroshahin, the USC women's soccer coach, expressed reluctance about joining the conspiracy, VAVIC told him, in sum and substance, to "just do it."   VAVIC encouraged Khosroshahin to tell the USC admissions office that Singer's candidates were his best recruits.

49.     Khosroshahin and his assistant coach, Janke, thereafter joined the conspiracy, and

Singer directed payments totaling approximately $350,000 to a private soccer club they controlled,

in exchange for which Khosroshahin and Janke designated four children of Singer's clients as

purported recruits for the USC women's soccer team, despite the fact that none of those children

played competitive soccer.

50.     Khosroshahin, in turn, helped Singer recruit additional coaches, including

FERGUSON, to participate in the scheme.

*HEINEL*

51.     Between 2014 and 2018, Singer's clients made payments totaling more than $1.3

million to the USC Women's Athletic Board and other USC accounts that HEINEL designated.

Generating money for these accounts benefited HEINEL professionally.   The payments, which

amounted to between $50,000 and $100,000 per student, were typically made via checks sent to

HEINEL by U.S. Mail or a private, interstate commercial carrier.

52.     Beginning in the fall of 2017, Singer also entered into a sham consulting agreement

with HEINEL pursuant to which, beginning in or about July 2018, he directed payments of $20,000

per month to HEINEL personally via checks drawn on one of the KWF charitable accounts and

sent to HEINEL via U.S. Mail from the District of Massachusetts and elsewhere.

53.     In a telephone call on or about October 24, 2018, HEINEL told Singer that he was

"up to date" with his monthly payments, and advised him that she would submit her next monthly

invoice on November 1, 2018.

54.     On or about January 3, 2019, Singer mailed a $20,000 payment, from the District

of Massachusetts, to HEINEL in California.

11

55.    In exchange for the payments to the USC accounts she designated and to herself personally, HEINEL helped facilitate the admission of more than two dozen students to USC as purported athletic recruits, even though many of those students had fabricated athletic credentials and some did not even play the sports they were purportedly being recruited to play.  HEINEL did not disclose this *quid pro quo* arrangement to the USC admissions office because she knew the university would have rejected it.  To that end, on a 2018 form requiring her to list her outside athletics-related income, HEINEL reported receiving payments from KWF, but falsely described them as "[s]peaking engagement[ ]" fees.

56.    As one example, in or about September 2016, HEINEL agreed with Singer to facilitate the purported recruitment of USC Applicant 4 to the USC women's crew team even though she knew that USC Applicant 4 was not a legitimate crew recruit.

57.    On or about September 20, 2016, Singer instructed Janke to create a falsified athletic profile of USC Applicant 4 for HEINEL to use, and to describe her as a crew coxswain.

58.    In a subsequent e-mail exchange, Singer provided Janke with a falsified list of regattas to include on the fake profile.

59.    On or about October 5, 2016, Singer sent the fake profile to HEINEL.  The profile included a picture of USC Applicant 4 posing on a rowing ergometer.

60.    On or about October 7, 2016, Singer reported back to Janke that HEINEL wanted a photo of USC Applicant 4 in a "boat" and asked Janke to find examples online where it is "tough to see the face."

61.    Janke provided Singer with a number of different options—none of which depicted USC Applicant 4—one of which Singer sent to HEINEL.

62.     On or about October 27, 2016, the subcommittee for athletic admissions granted USC Applicant 4 conditional acceptance to USC, pursuant to which she would be admitted to the university on the condition that she met certain requirements, including that she register with the NCAA and meet all NCAA eligibility requirements.

63.     On or about October 29, 2016, Singer instructed USC Applicant 4's father to send a $50,000 check, payable to USC Athletics, to HEINEL at her office address.   HEINEL received the check on or about November 2, 2016.

64.     Thereafter, HEINEL agreed with Singer to facilitate the purported recruitment of USC Applicant 4's younger sister, USC Applicant 5, to the USC women's crew team even though she knew that USC Applicant 5 was not a legitimate crew recruit.

65.     In or about December 2017—after USC Applicant 5 was conditionally admitted to USC as a purported women's crew recruit—her father mailed HEINEL a second $50,000 check payable to an athletic department account that HEINEL designated.

66.     On or about March 29, 2018, after USC admissions officers questioned why USC Applicant 5 had been designated as a crew recruit, HEINEL falsely told admissions that the crew coach had seen USC Applicant 5 "cox for the men's team . . . and thinks she has talent."   HEINEL also falsely told admissions that USC Applicant 4 had been "on crew" in the fall but did not continue due to problems with the coach.

67.     As another example, HEINEL agreed with Singer to facilitate the purported recruitment of USC Applicant 3, referenced above, to USC's women's water polo team even though HEINEL knew that she was not a legitimate water polo recruit.

68.     On or about September 21, 2018, HEINEL sent Singer an e-mail requesting a more detailed explanation of USC Applicant 3's high school grades.

69.     On or about October 25, 2018, HEINEL e-mailed Singer to ask why USC Applicant 3 had an "incomplete" on her high school transcript.

70.     In a telephone call later that same day, HEINEL told Singer that she would simply "white out" the incomplete on the transcript before presenting USC Applicant 3 to the subcommittee for athletic admissions.

71.     On or about November 1, 2018, HEINEL caused USC Applicant 3 to be presented to the subcommittee for athletic admissions as a water polo player. USC Applicant 3's athletic profile showed fictitious accolades, including that she placed fifth in the Junior Olympics, was a starting goalkeeper for a club water polo team, that she was captain of that club team, and that she had been selected for the Marin County (California) "first team" in both 2017 and 2018. Notes on the profile falsely stated that USC Applicant 3 had great "international experience," that she was a "high caliber walk on in a much needed goalie position," and that she would serve a "back-up goalie" to the starting USC goalie.

72.     The next day, on or about November 2, 2018, after presenting USC Applicant 3 as a recruited water polo player, HEINEL called Singer to make sure that USC Applicant 3 was "a legit water polo player." HEINEL asked Singer whether USC Applicant 3 "start[ed] at all" on her high school team or whether she was a "backup."

73.     As yet another example, HEINEL agreed with Singer to facilitate the purported recruitment of another student, USC Applicant 6, to the USC women's beach volleyball team, even though she knew that USC Applicant 6 was not a legitimate beach volleyball recruit.

74.     In a telephone call on or about October 5, 2018, HEINEL told Singer that she wanted to make sure it "doesn't get out" that USC Applicant 6 and the child of another Singer client were being admitted to USC as purported athletic recruits.

14

75.     In a telephone call on or about October 31, 2018, HEINEL told Singer, in substance, that the payment for USC Applicant 6 should be directed to USC Women's volleyball because HEINEL was "raising money" for a new "terra-flex floor."

Georgetown

76.     Singer paid ERNST bribes, falsely labeled as "consulting" fees, totaling more than $2 million. Singer typically made the payments from one of the KWF charitable accounts and sent them to ERNST via U.S. Mail, including on at least one instance in June 2018, when Singer caused a $100,000 check to be mailed to ERNST's residence in the District of Massachusetts.

77.     In exchange for the bribes, ERNST agreed to designate numerous applicants as purported recruits for the Georgetown tennis team, including some who did not play tennis competitively.

78.     As an example, Georgetown Applicant 1 applied to Georgetown in or about October 2012. The application included false claims about Georgetown Applicant 1's tennis achievements.

79.     In or about December 2012, Georgetown Applicant 1 received a "likely letter" indicating that Georgetown had reviewed her application at ERNST's request and that she had a "greater than 95% chance" of admission to the university.

80.     On or about January 16, 2013, Singer wrote an e-mail to the parents of Georgetown Applicant 1 stating that he needed to "collect monies to put into an escrow account for [Georgetown Applicant 1's] acceptance to Georgetown. As agreed to once the Likely Letter comes we need to have a deposit of --- you have two distribution amounts based on your foundation? Normally a family provides us no less than half – 125 upon acceptances of the Likely

15

and the other half within a week of the final acceptance." The next day, Masera wrote to the parents of Georgetown Applicant 1 and directed them to make the check payable to KWF.

81.     Between on or about April 4, 2013 and on or about July 2, 2013, the parents of Georgetown Applicant 1 caused their charitable foundation to pay KWF a total of $275,000.

82.     Between on or about September 5, 2012 and on or about September 6, 2013, Singer caused The Key, and later KWF, to pay Ernst $244,000 in monthly installments, part of which was for the admission of Georgetown Applicant 1.

83.     As another example, on or about August 19, 2015, at Singer's instruction, Georgetown Applicant 2 forwarded to ERNST an e-mail Singer had drafted on his behalf containing falsified information about his purported tennis abilities. In fact, Georgetown Applicant 2 did not play competitive tennis.

84.     ERNST forwarded the e-mail to a Georgetown admissions officer.

85.     On or about August 21, 2015, ERNST sent an e-mail from the District of Massachusetts to the same admissions officer confirming his intent to use "three spots" ERNST had been allocated to recruit tennis players to the Georgetown team. ERNST did not disclose to Georgetown that he had allocated all three spots to the children of Singer's clients, including Georgetown Applicant 2, in exchange for bribes, despite the fact that none of them played competitive tennis.

86.     On or about April 22, 2016, Masera sent an e-mail to Georgetown Applicant 2's father attaching an invoice in the amount of $400,000 for a purported "private contribution" to KWF.

87.     On or about April 24, 2016, Georgetown Applicant 2's father made a purported contribution of $400,000 to KWF as payment for Georgetown Applicant 2's admission to Georgetown as a purported tennis recruit.

88.     Singer, in turn, caused KWF to issue a series of payments to ERNST in exchange for designating Georgetown Applicant 2 and the children of other Singer clients as purported recruits to the Georgetown tennis team.

89.     On or about June 24, 2018, ERNST sent an e-mail to Singer attaching a "Consulting Fee Invoice." The invoice, which was for $100,000, falsely stated that ERNST had consulted on behalf of the "Counting Stars Program," and asked for a check to be made payable to ERNST and mailed to his home in Falmouth, Massachusetts. In fact, the invoice was for a bribe payment.

90.     Thereafter, Singer caused KWF to issue a $100,000 check made payable to ERNST. The memo line on the check read: "2018 Consulting fees for Counting Stars."

### Wake Forest

91.     On or about February 10, 2016, Khosroshahin introduced Singer by e-mail to FERGUSON, who had recently been terminated as a coach by USC. Khosroshahin described Singer as someone who has "delivered everything that he has said," and further wrote: "I believe this relationship can be mutually beneficial." FERGUSON thereafter agreed to work with Singer by seeking out additional university athletic coaches who would agree to designate applicants as purported athletic recruits in exchange for purported donations to athletic programs.

92.     On or about February 28, 2016, FERGUSON updated Singer about his efforts to recruit coaches at several universities to participate in the scheme. For example, FERGUSON wrote: "Talked to the Miami coach and he's interested. He's not quite sure how much he can

17

do. He said he doesn't have many. I got the [r]ead that he'[d] do it if it were real easy, but I don't think he'll work at it too much. I will follow up w[ith] him in a couple days."

93.    In or about June 2016, FERGUSON was hired to be the head coach of women's volleyball at Wake Forest.

94.    Thereafter, FERGUSON agreed with Singer to designate Wake Forest Applicant 1 as a recruit to the women's volleyball team in exchange for a quid pro quo payment.

95.    On or about January 10, 2017, Singer sent an e-mail to Wake Forest Applicant 1's parents that FERGUSON "is going to have 20 kids on his roster this upcoming year" and "is not against taking one more that can help the program financially but wants to be frank."

96.    On or about February 16, 2017, Wake Forest placed Wake Forest Applicant 1 on the wait list for admission to the university.

97.    On or about March 21, 2017, Singer caused an individual associated with the Key Enterprise to e-mail Wake Forest Applicant 1's high school transcripts to FERGUSON.

98.    On or about March 24, 2017, FERGUSON e-mailed colleagues in the Wake Forest Athletics Department to designate Wake Forest Applicant 1 as a volleyball recruit.   FERGUSON did not disclose that he had agreed to recruit Wake Forest Applicant 1 in exchange for a purported $100,000 contribution divided among two Wake Forest accounts FERGUSON designated and a private volleyball camp FERGUSON controlled.

99.    On or about May 1, 2017, Wake Forest admitted Wake Forest Applicant 1 as a recruited student-athlete.

100.    In or about June and July 2017, Singer caused KWF to send payments totaling $100,000 to the accounts FERGUSON had designated, including $10,000 to the Wake Forest

18

Deacon Club, $40,000 to Wake Forest Women's Volleyball, and $50,000 to a private volleyball camp FERGUSON controlled.

101.   FERGUSON thereafter caused funds from the private volleyball camp to be transferred to his personal bank account, and used the money for personal expenses.

102.   FERGUSON did not disclose the $50,000 payment to his volleyball camp to Wake Forest, in violation of his contractual obligation to disclose to Wake Forest all income from any outside employment or other activities.

### The Fraud Conspiracy

103.   From in or about 2007 through in or about February 2019, the defendants conspired with others known and unknown to the Grand Jury to use bribery and other forms of fraud to facilitate the admission of Singer's clients to selective colleges and universities in the District of Massachusetts and elsewhere.

### Objects and Purposes of the Fraud Conspiracy

104.   The principal objects of the fraud conspiracy were to commit mail and wire fraud, and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346.   The principal purposes of the conspiracy were to facilitate the admission of applicants to colleges and universities, to enrich the defendants and Singer personally, and to secure additional funding for designated university accounts that the defendants controlled or that otherwise benefited them professionally.

### Manner and Means of the Fraud Conspiracy

105.   Among the manner and means by which the defendants, Singer, and coconspirators known and unknown to the Grand Jury carried out the fraud conspiracy were the following:

a.      Creating athletic "profiles" and admissions packets containing falsified credentials—such as fake honors the students purportedly received, elite athletic teams they purportedly played on, and staged photographs of the students purportedly engaged in athletic activities—to submit in support of the students' college applications;

b.      designating applicants as purported recruits for college athletic teams— even though, in some cases, the applicants did not play the sport they were purportedly recruited to play—in exchange for payments that were effectively bribes;

c.      concealing the fraud and bribery from the Universities;

d.      recruiting additional athletic coaches to designate applicants as purported recruits for competitive college athletic teams in exchange for bribes; and,

e.      concealing the nature and source of the quid pro quo payments by funneling the money through the Key Enterprise's accounts.

### Acts in Furtherance of the Fraud Conspiracy

106.    On various dates between approximately 2007 and February 2019, the defendants, Singer, and coconspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the fraud conspiracy:

107.    Georgetown Applicant 3 applied to Georgetown in or about November 2008.   The application included numerous false claims about Georgetown Applicant 3's purported tennis achievements, including the claim that she was ranked "at the top" of her "age bracket in Japan."

108.    In or about December 2008, Georgetown Applicant 3 received a "likely letter" indicating that Georgetown had reviewed her application at ERNST's request and that she had a "greater than 95% chance" of admission to the university.

109.   In or about March 2009, Georgetown Applicant 3's father caused two checks, totaling $75,000 and made payable to ERNST personally, to be mailed to ERNST in Maryland.

110.   In or about April 2009, after Georgetown Applicant 3 was formally admitted to Georgetown, her father sent ERNST an additional $75,000.

111.   Singer, and coconspirators known and unknown to the Grand Jury also committed and caused to be committed the acts set forth in paragraphs 22 through 102 of this Second Superseding Indictment, among others, in furtherance of the fraud conspiracy.

### The USC Federal Programs Bribery Conspiracy

112.   From in or about 2007 through in or about February 2019, HEINEL and VAVIC, being agents of USC, conspired with Singer and others known and unknown to the Grand Jury to solicit and accept bribes in exchange for securing the admission of applicants to USC as purported athletic recruits.

### Object and Purpose of the USC Federal Programs Bribery Conspiracy

113.   The principal object of the USC bribery conspiracy was to commit federal programs bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B).   The principal purposes of the conspiracy were to facilitate the admission of applicants to USC, enrich HEINEL and VAVIC personally, and secure additional funding for designated accounts HEINEL and VAVIC controlled at USC, or that otherwise benefited them professionally.

### Manner and Means of the USC Federal Programs Bribery Conspiracy

114.   Among the manner and means by which HEINEL, VAVIC, Singer and coconspirators known and unknown to the Grand Jury carried out the USC federal programs bribery conspiracy were the following:

a.      Soliciting and accepting bribes in exchange for designating applicants as purported athletic recruits;

b.      Fabricating athletic "profiles" containing falsified athletic credentials—such as fake honors the students purportedly received, elite athletic teams they purportedly played on, and staged photographs of the students purportedly engaged in athletic activities—to submit in support of the students' USC applications; and,

c.      Concealing the bribes and other falsities from USC.

### Overt Acts in Furtherance of the USC Federal Programs Bribery Conspiracy

115.    On various dates from in or about 2007 through in or about February 2019, HEINEL, VAVIC and coconspirators known and unknown to the Grand Jury committed and caused to be committed the overt acts set forth in paragraphs 25 through 75, among others, in furtherance of the USC federal programs bribery conspiracy.

### The Georgetown Federal Programs Bribery Conspiracy

116.    From in or about 2007 through in or about July 2018, ERNST, being an agent of Georgetown, conspired with Singer and others known and unknown to the Grand Jury to solicit and accept bribes in exchange for securing the admission of applicants to Georgetown as purported tennis recruits.

### Object and Purpose of the Georgetown Federal Programs Bribery Conspiracy

117.    The principal object of the Georgetown bribery conspiracy was to commit federal programs bribery, in violation of Title 18, United States Code, Section 666(a)(1)(B).  The principal purposes of the conspiracy were to facilitate the admission of applicants to Georgetown and to enrich ERNST personally.

Manner and Means of the Georgetown Federal Programs Bribery Conspiracy

118.    Among the manner and means by which ERNST, Singer and coconspirators known and unknown to the Grand Jury carried out the Georgetown bribery conspiracy were the following:

a.    Accepting and soliciting bribes in exchange for designating applicants as purported tennis recruits, with little or no regard for their tennis abilities;

b.    Fabricating athletic credentials—such as fake honors the students purportedly received and tournaments the students played in—to submit in support of the students' Georgetown applications; and,

c.    Concealing the bribes and other falsities from Georgetown.

Overt Acts in Furtherance of the Georgetown Federal Programs Bribery Conspiracy

119.    On various dates from in or about 2007 through in or about February 2019, ERNST, Singer and coconspirators known and unknown to the Grand Jury committed and caused to be committed the overt acts set forth in paragraphs 76 through 90 and 106 through 111, among others, in furtherance of the Georgetown federal programs bribery conspiracy.

ERNST's Georgetown Federal Programs Bribery

120.    In or about the spring and summer of 2014, ERNST solicited a bribe of approximately $200,000 from the father of Georgetown Applicant 4 in exchange for designating Georgetown Applicant 4 as a purported recruit to the Georgetown tennis team, even though she was not a highly ranked tennis player and would not have been recruited by Georgetown.

121.    In May 2014, ERNST attended a reunion at Brown University in Providence, Rhode Island with the father of Georgetown Applicant 4 and a third individual, Tennis Recruiter 1.

122. ERNST agreed to pay Tennis Recruiter 1 $10,000 to act as a middle-man in the bribery deal, and indicated that the father of Georgetown Applicant 4 would also pay Tennis Recruiter 1 for his role in the scheme.

123. On or about July 21, 2014, the father of Georgetown Applicant 4 advised his daughter's college counselor that he "had a good chat" with ERNST and that ERNST was "willing to energetically recruit her onto the squad."

124. On or about October 13, 2014, Georgetown Applicant 4 submitted her application to Georgetown.

125. On or about November 15, 2014, the father of Georgetown Applicant 4 texted ERNST to ask if his daughter should proceed with her scheduled Georgetown interview. ERNST responded that she should have the interview and tell the interviewer: "Gtown is where I want to be and really want to be part of their tennis team."

126. On or about December 9, 2014, Georgetown advised Georgetown Applicant 4 that, at ERNST's request, the Committee on Admissions had reviewed her application and had rated her admission as "likely," and that she therefore had a greater than 95 percent chance of being admitted to Georgetown.

127. On or about May 8, 2015, after his daughter was formally admitted to Georgetown, the father of Georgetown Applicant 4 withdrew $200,000 from a bank in Florida and flew to Massachusetts.

128. On or about May 15, 2015, the father of Georgetown Applicant 4 met with Tennis Recruiter 1 in the District of Massachusetts and gave him approximately $180,000 in cash for ERNST, as well as $20,000 in cash for himself.

24

129.    Tennis Recruiter 1 then drove to Falmouth, Massachusetts where he met ERNST's spouse and gave her $170,000. Tennis Recruiter 1 kept $10,000 for himself per his prior agreement with ERNST as set forth in paragraph 122.

130.    Between approximately October 2015 and June 2016, Tennis Recruiter 1, acting at ERNST's request, repeatedly asked Georgetown Applicant 4's father when he would pay ERNST the rest of what he owed.

131.    On or about July 15, 2016, ERNST himself texted the father of Georgetown Applicant 4 that they should "square up soon." He added: "My dad very sick and I need to chip in and help my mom."

132.    On or about July 27, 2016, ERNST made plans to meet the father of Georgetown Applicant 4 at a Starbucks in Mashpee, Massachusetts, to secure an additional payment toward the agreed-upon bribe.

133.    In or about the summer of 2017, ERNST solicited a bribe of approximately $100,000 from Tennis Recruiter 1 in exchange for designating Georgetown Applicant 5 as a recruit to the Georgetown tennis team in the event that he was denied "early action" admission to Georgetown.

134.    On or about October 8, 2017, Georgetown Applicant 5 e-mailed ERNST to thank him for the "opportunity and time to watch the men's practice and also for letting me stay overnight. It was a great experience at Georgetown during my stay and I would love to join the school and be a contributing member of the team." ERNST forwarded the e-mail to Tennis Recruiter 1.

135.     On or about October 19, 2017, Georgetown Applicant 5 e-mailed Tennis Recruiter 1 that he had applied "Early Action" to Georgetown.   Tennis Recruiter 1 forwarded the e-mail to ERNST.

136.     On or about November 15, 2017, a member of the Georgetown admissions office e-mailed ERNST to request the names of "players whom you are definitely recruiting" and a "list of all of the players that you would like to have admitted, but aren't on your official list?"   ERNST responded that he was recruiting four individuals (three of whom were clients of Singer). In addition, ERNST noted that Georgetown Applicant 5 was applying to Georgetown "early" and merited a "shout out."

137.     On or about December 16, 2017, ERNST learned that Georgetown Applicant 5 had been admitted early action to Georgetown.

138.     On or about May 15, 2018, the uncle of Georgetown Applicant 5 wired $110,000 from a bank account in South Korea to Tennis Recruiter 1's bank account in the District of Massachusetts.   Tennis Recruiter 1 thereafter wired $60,000 to ERNST with a notation that the wire was for "consulting fees."

139.     In or about August 2018, the uncle of Georgetown Applicant 5 gave Tennis Recruiter 1 $50,000 in cash, and Tennis Recruiter 1, in turn, gave $30,000 to ERNST.

140.     Also during the summer of 2017, ERNST solicited a bribe of approximately $220,000 from the father of Georgetown Applicant 6 in exchange for designating her as a purported recruit to the Georgetown tennis team.

141.     Beginning on or about August 31, 2017, and continuing for several months thereafter, the father of Georgetown Applicant 6 paid ERNST $110,000, over the course of several installments, as partial payments toward the agreed-upon bribe amount.

142. On or about November 15, 2017, ERNST e-mailed a Georgetown admissions officer identifying Georgetown Applicant 6 as one of "[his] recruits so far" and requesting that she and three other recruits, all of whom were Singer's clients, receive "likely letters."

143. On or about February 28, 2018, Georgetown sent Georgetown Applicant 6 a letter indicating that her admission had been rated as "likely," and that she had a greater than 95 percent chance of being admitted to the university.

144. In or about the summer of 2018, after Georgetown Applicant 6 was formally admitted to Georgetown, her father gave ERNST a check in the amount of $34,955 made payable to a private high school in Bethesda, Maryland, that ERNST's older daughter attended, and a second check, in the amount of $10,580, made payable to a private primary school in Washington D.C. that ERNST's younger daughter attended. The father of Georgetown Applicant 6 also gave ERNST cash in or about July 2018, and sent him a check in the amount of $25,000 in or about August 2018.

Ernst's False Tax Returns

145. Pursuant to the Internal Revenue Code and attendant regulations, individual taxpayers generally are required to report their income, attendant tax obligations, and, where appropriate, any claim for a refund on a U.S. Individual Income Tax Return, Form 1040, which must be filed annually with the Internal Revenue Service (IRS).

146. ERNST and his spouse caused their tax preparer to prepare Form 1040s on their behalf for the tax years 2015, 2017 and 2018.

147. On or about March 30, 2016, ERNST's tax preparer, who was located in the District of Massachusetts, electronically filed Form 1040 for the 2015 tax year on ERNST's behalf. ERNST electronically affirmed, under "penalties of perjury," that he had reviewed the information on the return and that it was "true, correct, and complete" to the best of his

knowledge.  As ERNST knew, however, the return was false in that it failed to report the $170,000 in cash Tennis Recruiter 1 had given ERNST's spouse in 2015 as partial payment of the bribe to ERNST to designate Georgetown Applicant 4 as a tennis recruit.

148.  On or about March 15, 2018, ERNST's tax preparer electronically filed Form 1040 for the 2017 tax year on ERNST's behalf.  ERNST electronically affirmed, under "penalties of perjury," that he had reviewed the information on the return and that it was "true, correct, and complete" to the best of his knowledge.  As ERNST knew, however, the return was false in that it did not include the $110,000 ERNST received in 2017 from the father of Georgetown Applicant 6 in exchange for designating Georgetown Applicant 6 as a tennis recruit.

149.  On or about September 19, 2019, ERNST's tax preparer electronically filed ERNST's Form 1040 for the 2018 tax year in the District of Massachusetts.  ERNST electronically confirmed, under "penalties of perjury," that he had reviewed the information on the return and that it was "true, correct, and complete" to the best of his knowledge.  As ERNST knew, however, the return was false in that it did not include the $110,000 ERNST received as a bribe from the father of Georgetown Applicant 6 in 2018, or the $30,000 ERNST received that same year from Tennis Recruiter 1.

COUNT ONE
Racketeering Conspiracy
(18 U.S.C. § 1962(d))

The Grand Jury charges:

150.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-102 of this Second Superseding Indictment.

151.    From in or about 2012 through February 2019, in the District of Massachusetts, and elsewhere, the defendants,

> (1) GORDON ERNST,
> (2) DONNA HEINEL,
> (9) WILLIAM FERGUSON, and
> (12) JOVAN VAVIC,

being persons associated with or employed by The Key Enterprise, an enterprise engaged in, and the activities of which affected interstate and foreign commerce, conspired with others known and unknown to the Grand Jury to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5); consisting of multiple acts indictable under:

> a.  Title 18, United States Code, Section 1341 (relating to mail fraud);
>
> b.  Title 18, United States Code, Sections 1341 and 1346 (relating to honest services mail fraud);
>
> c.  Title 18, United States Code, Section 1343 (relating to wire fraud);
>
> d.  Title 18, United States Code, Sections 1343 and 1346 (relating to honest services wire fraud); and
>
> e.  Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments).

152.    It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

COUNT TWO
Conspiracy to Commit Mail and Wire Fraud
and Honest Services Mail and Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury further charges:

153.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-111 of this

Second Superseding Indictment.

154.    From in or about 2007 through in or about February 2019, in the District of

Massachusetts, and elsewhere, the defendants,

> (1) GORDON ERNST,
> (2) DONNA HEINEL,
> (9) WILLIAM FERGUSON, and
> (12) JOVAN VAVIC,

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a.  mail fraud and honest services mail fraud, that is, having devised and intending to
    devise a scheme and artifice to defraud and to obtain money and property, to wit,
    admission to the Universities, by means of materially false and fraudulent pretenses,
    representations, and promises, and to defraud and deprive the Universities of their right
    to the honest and faithful services of their athletic coaches and university administrators
    through bribes and kickbacks, did, for the purpose of executing and attempting to
    execute the scheme, deposit and cause to be deposited any matter and thing whatever
    to be sent and delivered by any private and commercial interstate carrier, in violation
    of Title 18, United States Code, Sections 1341 and 1346; and,

b.  wire fraud and honest services wire fraud, that is, having devised and intending to
    devise a scheme and artifice to defraud and to obtain money and property to wit,
    admission to the Universities, by means of materially false and fraudulent pretenses,

31

representations, and promises, and to defraud and deprive the Universities of their right to the honest and faithful services of their athletic coaches and university administrators through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

All in violation of Title 18, United States Code, Section 1349.

COUNT THREE
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury further charges:

155.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this

Second Superseding Indictment.

156.    From in or about 2007 through in or about February 2019, in the District of

Massachusetts, and elsewhere, the defendants,

(2)    DONNA HEINEL, and
(3)    JOVAN VAVIC,

conspired with others known and unknown to the Grand Jury to commit an offense against the

United States, to wit, federal programs bribery, that is, being an agent of an organization, namely

USC, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to

accept, anything of value from any person, intending to be influenced and rewarded in connection

with any business, transaction and series of transactions of USC involving anything of value of

$5,000 or more, where USC received benefits in excess of $10,000 under a Federal program

involving a grant, contract, subsidy, loan guarantee, insurance and other form of federal assistance

in any one-year period, in violation of Title 18, United States Code, Section 666(a)(1)(B).

All in violation of Title 18, United States Code, Section 371.

## COUNT FOUR
### Conspiracy to Commit Federal Programs Bribery
### (18 U.S.C. § 371)

The Grand Jury further charges:

157.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-110 and 116-119 of this Second Superseding Indictment.

158.    From in or about 2007 through in or about August 2018, in the District of Massachusetts, and elsewhere, the defendant,

### (1) GORDON ERNST,

conspired with others known and unknown to the Grand Jury to commit an offense against the United States, to wit, federal programs bribery, that is, being an agent of an organization, namely Georgetown, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of Georgetown involving anything of value of $5,000 or more, where Georgetown received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan guarantee, insurance and other form of federal assistance in any one-year period, in violation of Title 18, United States Code, Section 666(a)(1)(B).

All in violation of Title 18, United States Code, Section 371.

34

COUNTS FIVE - SEVEN
Federal Programs Bribery
(18 U.S.C. § 666(a)(1)(B))

The Grand Jury further charges:

159.    The Grand Jury re-alleges and incorporates by reference paragraphs 1, 13, 16-19, and 120-144 of this Second Superseding Indictment.

160.    On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendant,

(1) GORDON ERNST,

being an agent of an organization, namely, Georgetown, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of such organization, involving anything of value of $5,000 or more, where Georgetown received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan guarantee, insurance and other forms of federal assistance in any one-year period, in violation of Title 18, United States Code, Section 666(a)(1)(B).

| COUNT | APPROXIMATE DATES | TOTAL APPROXIMATE PAYMENT | TRANSACTION |
|---|---|---|---|
| 5 | 2014-2016 | $200,000 | Recruitment of Georgetown Applicant 3 |
| 6 | 2017-2018 | $100,000 | Agreement to recruit Georgetown Applicant 4 |
| 7 | 2017-2018 | $220,000 | Recruitment of Georgetown Applicant 5 |

COUNTS EIGHT - SIXTEEN
Wire Fraud and Honest Services Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343, 1346 and 2)

The Grand Jury further charges:

161.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-111 and 115

of this Second Superseding Indictment.

162.    On or about the dates set forth below, in the District of Massachusetts, and

elsewhere, the defendants set forth below, having devised and intending to devise a scheme and

artifice to defraud and for obtaining money and property, to wit, admission to the Universities, by

means of materially false and fraudulent pretenses, representations, and promises, and to defraud

and deprive the Universities of their right to the honest and faithful services of their athletic

coaches and university administrators through bribes and kickbacks, did transmit and cause to be

transmitted, by means of wire communications in interstate and foreign commerce, writings, signs,

signals, pictures and sounds for the purpose of executing the scheme to defraud, to wit:

| COUNT | DEFENDANT | APPROXIMATE DATE | INTERSTATE WIRE |
|---|---|---|---|
| 8 | GORDON ERNST | Aug. 21, 2015 | E-mail to Georgetown admissions officer |
| 9 | GORDON ERNST | June 24, 2018 | E-mail to Singer requesting payment of $100,000 |
| 10 | DONNA HEINEL | Sep. 21, 2018 | E-mail to Singer regarding USC Applicant 3 |
| 11 | DONNA HEINEL | Oct. 5, 2018 | Telephone call with Singer |
| 12 | DONNA HEINEL | Oct. 24, 2018 | Telephone call with Singer |
| 13 | DONNA HEINEL | Oct. 25, 2018 | E-mail to Singer |
| 14 | DONNA HEINEL | Oct. 25, 2018 | Telephone call with Singer |
| 15 | DONNA HEINEL | Oct. 31, 2018 | Telephone call with Singer |
| 16 | JOVAN VAVIC | Jan. 2, 2019 | Telephone call with Singer |

All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.

COUNTS SEVENTEEN - EIGHTEEN
Mail Fraud and Honest Services Mail Fraud; Aiding and Abetting
(18 U.S.C. §§ 1341, 1346 and 2)

The Grand Jury further charges:

163.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-119 of this Second Superseding Indictment.

164.     On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendants set forth below, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property, to wit, admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive the Universities of their right to the honest and faithful services of their athletic coaches and university administrators through bribes and kickbacks, did for the purpose of executing and attempting to execute such scheme, knowingly cause to be delivered by mail and by any private commercial interstate carrier according to the direction thereon, the following payments, to wit:

| COUNT | DEFENDANT | APPROXIMATE DATE | MAILING |
|-------|-----------|------------------|---------|
| 17 | GORDON ERNST | June 2018 | $100,000 payment from KWF to Ernst |
| 18 | DONNA HEINEL | Jan. 3, 2019 | $20,000 payment from KWF to Heinel |

All in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## COUNT NINETEEN
### Money Laundering; Aiding and Abetting
### (18 U.S.C. §§ 1957 and 2)

The Grand Jury further charges:

158.    The Grand Jury re-alleges and incorporates by reference paragraphs 1, 8-13, 16, 18-19, 20-24, 76-90, and 108-111 of this Second Superseding Indictment.

159.    On or about January 7, 2015, in the District of Massachusetts, and elsewhere, the defendant,

### (1) GORDON ERNST,

did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, that is a wire transfer of $113,062.37 from PNC Bank account x6522 to an account at Leader Bank in order to purchase a home in Falmouth, Massachusetts, where such property was derived from specified unlawful activity, that is, wire fraud and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, mail fraud and honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346, and federal programs bribery, in violation of Title 18, United States Code, Section 666.

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS TWENTY – TWENTY-TWO
### Filing a False Tax Return
### (26 U.S.C. § 7206(1))

The Grand Jury further charges:

160.    The Grand Jury re-alleges and incorporates by reference paragraphs 120 through 149 of this Second Superseding Indictment.

161.    On or about each of the dates set forth below, in the District of Massachusetts, and elsewhere, the defendant,

### (1)   GORDON ERNST,

did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the tax year set forth below, which was verified by a written declaration that it was made under the penalties of perjury and which was filed with the Director, Internal Revenue Service, and which return the defendant did not believe to be true and correct as to every material matter in that it underreported the defendant's total income by failing to disclose income the defendant had received in that tax year.

| COUNT | TAX YEAR | APPROXIMATE DATE OF FILING |
|-------|----------|----------------------------|
| 20    | 2015     | March 30, 2016             |
| 21    | 2017     | March 15, 2018             |
| 22    | 2018     | September 19, 2019         |

All in violation of Title 26, United States Code, Section 7206(1).

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

162. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 371, 666, 1349, 1341, 1343, 1346, or 2, set forth in Counts Two through Eighteen of this Second Superseding Indictment, the defendants,

> (1) GORDON ERNST,
> (2) DONNA HEINEL,
> (9) WILLIAM FERGUSON, and
> (12) JOVAN VAVIC,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

   a. Chevy Chase country club membership, as owned by Ernst;

   b. 25 Gang Way, Unit 25, Falmouth, MA 02540, as owned by Ernst;

   c. All funds on deposit in Vanguard SEP IRA account number ending in x9912, held in the name of Gordon M. Ernst;

   d. $3,435,053.78, to be entered in the form of a forfeiture money judgement against Ernst;

   e. $160,000, to be entered in the form of a forfeiture money judgement against Heinel;

   f. $50,000, to be entered in the form of a forfeiture money judgment against Ferguson;

   g. $119,445, to be entered in the form of a forfeiture money judgment against Vavic;

   h. $6,160.56 seized on March 12, 2019 from Wells Fargo bank account number ending in x5954, held in the name of Bill Ferguson Volleyball Camps LLC;

     i.  $28,681.67 seized on March 12, 2019 from PNC Bank account number ending in x6522, held in the name of Gordon M. Ernst and another;

     j.  $18,264.53 seized on March 12, 2019 from PNC Bank account number ending in x6905, held in the name of Gordon M. Ernst and another; and,

     k.  All funds on deposit up to $650,000 in Merrill Lynch bank account number ending in x8442, held in the name of Gordon Ernst and another.

163.    If any of the property described in Paragraph 162, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

     c.  has been placed beyond the jurisdiction of the Court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 162 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## MONEY LAUNDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

The Grand Jury further finds:

164.   Upon conviction of the offense of money laundering in violation of Title 18, United States Code, Sections 1957 and 2, as set forth in Count Nineteen of this Second Superseding Indictment, the defendant,

### (1) GORDON ERNST,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

    a.   25 Gang Way, Unit 25, Falmouth, MA 02540 as owned by Ernst;

165.   If any of the property described in Paragraph 164, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of the defendant --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 164 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

RACKETEERING FORFEITURE ALLEGATION
(18 U.S.C. § 1963(a))

The Grand Jury further finds:

166.     Upon conviction of the offense in violation of Title 18, United States Code, Section

1962(d), set forth in Count One of this Second Superseding Indictment, the defendants,

> (1) GORDON ERNST,
> (2) DONNA HEINEL,
> (9) WILLIAM FERGUSON, and
> (12) JOVAN VAVIC,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

   a. any interest the defendant has acquired or maintained in violation of Title 18,
      United States Code, Section 1962;

   b. any interest in, security of, claim against, or property or contractual right of
      any kind affording a source of influence over, any enterprise established,
      which the defendant operated, controlled, conducted, or participated in the
      conduct of, in violation of Title 18, United States Code, Section 1962; and

   c. any property constituting, or derived from, any proceeds which the defendant
      obtained, directly or indirectly, from racketeering activity or unlawful debt
      collection in violation of Title 18, United States Code, Section 1962.

The property to be forfeited includes, but is not limited to, the following assets:

   a. Chevy Chase country club membership, as owned by Ernst;

   b. 25 Gang Way, Unit 25, Falmouth, MA 02540, as owned by Ernst;

   c. All funds on deposit in Vanguard SEP IRA account number ending in x9912,
      held in the name of Gordon M. Ernst;

   d. $2,444,963.78, to be entered in the form of a forfeiture money judgement
      against Ernst;

   e. $160,000, to be entered in the form of a forfeiture money judgement against
      Heinel;

   f. $50,000, to be entered in the form of a forfeiture money judgment against
      Ferguson;

43

g.  $119,445, to be entered in the form of a forfeiture money judgment against Vavic;

h.  $6,160.56 seized on March 12, 2019 from Wells Fargo bank account number ending in x5954, held in the name of Bill Ferguson Volleyball Camps LLC;

i.  $28,681.67 seized on March 12, 2019 from PNC Bank account number ending in x6522, held in the name of Gordon M. Ernst and another;

j.  $18,264.53 seized on March 12, 2019 from PNC Bank account number ending in x6905, held in the name of Gordon M. Ernst and another; and,

k.  All funds on deposit up to $650,000 in Merrill Lynch bank account number ending in x8442, held in the name of Gordon Ernst and another.

167.  If any of the property described in Paragraph 166, above, as being forfeitable pursuant to Title 18, United States Code, Section 1963(m), as a result of any act or omission of the defendant --

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m) to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 166 above.

All pursuant to Title 18, United States Code, Section 1963.

A TRUE BILL

_____
FOREPERSON

_____
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: September 1, 2020
Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK