UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>      v. )<br>)<br>(1)    GORDON ERNST, )<br>(2)    DONNA HEINEL, )<br>(9)    WILLIAM FERGUSON, and )<br>(12)  JOVAN VAVIC, )<br>)<br>      Defendants )| Criminal No. 19-10081-IT |

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
JOVAN VAVIC'S SUPPLEMENTAL MOTION TO DISMISS THE
SECOND SUPERSEDING INDICTMENT**

Defendant Jovan Vavic has moved to dismiss the Second Superseding Indictment ("SSI") principally on the grounds that so-called "newly added 'facts'. . . underscore" that the government has failed to state a claim as a matter of law.[1] *See* Dkt. 608 at 1. Vavic's motion ignores or misstates the allegations against him, mischaracterizes legal standards, and seeks to have the Court decide questions of fact that are properly reserved for the jury after trial. Accordingly, as detailed below, Vavic's motion to dismiss is without merit and should be denied.

**BACKGROUND**

The SSI alleges that, in or about 2007, Rick Singer founded the Edge College & Career Network (also known as "The Key") as a for-profit college counseling and preparation business. SSI ¶ 10. In or about 2012, Singer founded the Key Worldwide Foundation ("KWF"), a purported charity, as a non-profit corporation. *Id.* ¶ 11. The SSI alleges that, together, The Key and KWF ("the Key Enterprise") constituted an ongoing organization whose members functioned

---

[1] Defendants Donna Heinel and William Ferguson join in Vavic's motion for the limited purpose of moving to dismiss certain claims, and strike specific allegations, given this Court's recent ruling that admission to universities does not constitute property. *See* Dkts. 620 & 623.

as a continuing unit with a common purpose of achieving the objects of the enterprise, *id.* ¶ 12, which included committing mail and wire fraud, honest services mail and wire fraud, and money laundering in order to: (a) facilitate the admission of students to elite universities as purported athletic recruits, (b) enrich the defendants and Singer personally, and (c) secure additional funding for designated university accounts that the defendants controlled or that otherwise benefited them professionally. *See id.* ¶ 20. To carry out this scheme the defendants allegedly: (a) created athletic profiles and admissions packets containing falsified credentials to submit in support of the student's college applications; (b) designated applications as purported recruits for college athletic teams—even though, in some cases, the applicants did not play the sport they were purportedly recruited to play—in exchange for bribe payments; (c) concealed the fraud and bribery from the universities by, in part, funneling the payments through the Key Enterprise's accounts; and (d) recruited athletic coaches to designate applicants as purported recruits for college athletic teams in exchange for bribes. *See id.* ¶ 21.

The SSI alleges that Vavic was the water polo coach at the University of Southern California ("USC"). *See id.* ¶ 4. It alleges that "Singer and other coconspirators made payments to a bank account at USC that funded Vavic's water polo team, and that therefore benefited Vavic professionally," *id.* ¶ 26, and that Singer also made private school tuition payments totaling nearly $120,000 for Vavic's children under the guise of a fabricated scholarship from KWF. *See id.* ¶ 27. It further alleges that "[i]n exchange for these payments, Vavic designated multiple students as recruits for the USC water polo team, thereby facilitating their admission to USC, and agreed to designate additional students as water polo recruits in the future." *Id.* ¶ 28. And it alleges that Vavic did not inform the university's admissions office that he had agreed to designate applicants as athletic recruits in exchange for the payments to specific university athletic funds, to himself

personally, or to third parties for his benefit, and that the university's admissions office would not have approved such an arrangement." *Id*. ¶ 25. The SSI alleges that, by secretly engaging in this *quid pro quo*, Vavic violated the duty of honest services he owed to USC as his employer. *See id*.

The SSI also contains the following specific examples of Vavic's participation in this corrupt *quid pro quo* scheme:

- *First*, in January 2014, after Singer told Vavic that USC Applicant 1's "family is ready to help," Vavic confirmed that he would present USC Applicant 1 to the subcommittee for athletic admissions as his "top walkons." *See id*. ¶ 31. The next month, Vavic emailed a USC athletics administrator an athletic profile that contained falsified water polo credentials for USC Applicant 1 and wrote that USC Applicant 1 "would be the fastest player on our team, he swims 50 y[ards] in 20 [seconds], my fastest players are around 22 [seconds], this kid can fly." *See id*. ¶ 32. Two days later, the subcommittee approved USC Applicant 1's admission as a water polo recruit based on Vavic's designation and the falsified athletic credentials. *See id*. ¶ 33. Singer thereafter caused The Key to issue a $100,000 cashier's check to "USC Men's Water Polo," and the check identified the "Purpose/Remitter" as USC Applicant 1's family. *See id*. ¶ 34.

- *Second*, in September 2015—one month after Singer caused KWF to pay the private school tuition for Vavic's two children as purported scholarships, *see id.* ¶¶ 35 & 36—Singer e-mailed a co-conspirator asking her to make a water polo "profile" for USC Applicant 2, who did not play water polo competitively, stating: "[c]harge me whatever you want. Jovan [Vavic] and I have already spoken." *See id*. ¶ 37. In October 2015, at Singer's direction, USC Applicant 2 falsely emailed Vavic: "[P]er our discussion I am sending you copies of my Transcript, Unofficial Test Scores and Water Polo Profile. I would like to reiterate that I would love an opportunity to play goalie for you and attend USC." *See id*. ¶ 39. The next day, Vavic forwarded USC Applicant 2's e-mail to an assistant coach with instructions to "add [USC Applicant 2] for the subco, we need another goalie," and to designate USC Applicant 2 for a "books" scholarship. *See id*. ¶ 40. In January 2016, the subcommittee approved USC Applicant 2's admission as a water polo recruit based on Vavic's designation and the falsified athletic profile. *See id*. ¶¶ 41-42. Singer thereafter caused KWF to pay another year's worth of school tuition for Vavic's children, once again disguising the payments as purported scholarships. *See id*. ¶¶ 43-44.

- *Third,* in an August 2018 call (that was intercepted pursuant to a court-authorized wiretap), Singer and Vavic discussed USC Applicant 3, whom Singer was planning to submit as a water polo recruit through co-defendant Donna Heinel. *See id*. ¶ 46. Singer and Vavic discussed whether USC Applicant 3 should be presented to the subcommittee by Vavic, rather than Heinel, because that way Singer could "have money funded to" Vavic. *Id*. Vavic responded that it would be "easier for me to squeeze her in possibly in November, when I squeeze in all my top 7-8 kids, so maybe she can kind of get lost in the shuffle[.]" *Id*.

- *Fourth,* in a consensually recorded telephone call in January 2019, Vavic confirmed that he remained willing to recruit additional children to the water polo team in exchange for the fabricated scholarships for his sons. *See id.* ¶ 47. Vavic also told Singer that in facilitating the purported recruitments, he needed "something" to show that "this guy's a legit-- or a girl is a legit player." *See id.*

- *Fifth*, Vavic assisted Singer in recruiting other coaches to participate in the scheme. For example, after co-defendant Ali Khosroshahin, the USC's women's soccer coach, expressed reluctance about joining the conspiracy, Vavic told him, in sum and substance, to "just do it." *See id.* ¶ 48. Vavic encouraged Khosroshahin to tell the USC admissions office that Singer's candidates were his best recruits. *See id.* Thereafter, Khosroshahin joined the conspiracy, and Singer directed payments totaling approximately $350,000 to a private soccer club he controlled, in exchange for Khosroshahin designating four children of Singer's clients as purported recruits for the USC women's soccer team, despite the fact that none of those children played competitive soccer. *See id.* ¶ 49.

The SSI charges Vavic with racketeering conspiracy (Count One); conspiracy to commit mail and wire fraud and honest services mail and wire fraud (Count Two); conspiracy to commit federal programs bribery (Count Three); and wire fraud and honest services wire fraud (Count Sixteen) based primarily on the above allegations.

## ARGUMENT

Vavic contends that the SSI should be dismissed principally because "the newly-added 'facts'"—namely, the allegations about the January 2019 call in which Vavic and Singer discussed their scheme—demonstrate that Singer's tuition payments for Vavic's children were gratuities and not bribes. *See* Dkt. 608 at 3-5. But the Court has already considered and rejected a nearly identical claim. And Vavic's argument misreads the plain language of the SSI and impermissibly conflates the government's burden at the pleading stage with its burden of proof at trial.[2]

---

[2] Vavic also moves to dismiss parts of certain claims, and strike specific allegations, in the wake of this Court's ruling that admission to universities does not constitute property for purposes of the federal fraud statutes. *See United States v. Ernst,* No. 19-CR-10081-IT, -- F. Supp. 3d --, 2020 WL 6871040, at *5-8 (D. Mass. Nov. 23, 2020). While the government respectfully disagrees with the Court's ruling for the reasons set forth in its prior briefing, *see, e.g.* Dkt. 367 at 41-44, the government agrees that, in light of the Court's ruling, the following language may be stricken from the SSI: ¶¶ 104 ("mail and wire fraud, and"); 151(a) ("Title 18, United States Code, Section 1341

I.  **Legal Standard**

The Federal Rules of Criminal Procedure state that an indictment must provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). "While detailed allegations might well have been required under common-law pleading rules, they surely are not contemplated by Rule 7(c)(1)." *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (internal citation omitted). "An indictment need not say much to satisfy [Rule 7(c)(1)'s] requirements—it need only outline 'the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense.'" *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) (quoting *United States v. Guerrier*, 669 F.3d 1, 3 (1st Cir. 2011)). While there is no prescribed formula, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself," provided that the statutory language is "accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (internal quotation omitted).

"[T]he government need not recite all of its evidence in the indictment." *United States v. Innamorati*, 996 F.2d 456, 477 (1st Cir. 1993). Accordingly, a motion to dismiss is not "an occasion to force the government to defend the sufficiency of its evidence to be marshalled in support of proving the charged offense." *United States v. Rodriguez-Rivera*, 918 F.3d 32, 35 (1st

---

(relating to mail fraud)"); 151(c) ("Title 18, United States Code, Section 1343 (relating to wire fraud)"); 154(a) ("mail fraud and . . . to obtain money and property, to wit, admissions to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and"); 154(b) ("wire fraud and . . . to obtain money and property, to wit, admissions to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and"); and 162 & 164 ("for obtaining money and property, to wit, admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and").

Cir. 2019). Rather, courts entertaining a motion to dismiss an indictment must "take the facts alleged in the indictment as true, mindful that the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (citation omitted).

## II. The SSI Sufficiently Alleges that the Scholarship Payments Were Bribes, Not Gratuities

The federal bribery statutes—including honest services fraud and federal programs bribery—criminalize bribes, not gratuities. *See, e.g., United States v. Fernandez*, 722 F.3d 1, 6 (1st Cir. 2013). "The essential difference between a bribe and an illegal gratuity is the intention of the bribe-giver to effect a *quid pro quo*," *id*. at 19 (quoting *United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993)—that is, an agreement to exchange a thing of value for official action. *See United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999). The fact that the official actions may take place in the future—including after payment is received—is of no moment, because bribes include payments "made with the intent to retain the [payee's] services on as 'as needed' basis, so that whenever the opportunity presents itself the [payee] will take specific actions on the payor's behalf." *United States v. Bryant*, 655 F.3d 232, 241 (3d Cir. 2011) (quotation omitted); *accord United States v. Kincaid-Chauncy*, 556 F.3d 923, 942 n.15 (9th Cir. 2009), *abrogated on other grounds by United States v. Skilling*, 561 U.S. 358 (2010). As this Court already held, "the central inquiry is whether there has been an intent to give or receive something of value *in exchange for* an official act." *Ernst*, 2020 WL 6871040, at *18 (emphasis in original).

Vavic contends that the SSI does not allege a bribe because the payments he received were gratuities, not bribes. In support of this argument, he relies on the SSI's allegation that, during a consensually recorded January 2019 call, "Singer asked Vavic if he would purport to recruit

6

additional children of Singer's clients to the USC water polo team, and thereby facilitate their admission to USC, because of, 'essentially, what we've done in the past, with the scholarships for your boys.'" SSI ¶ 47. Vavic claims, based on this allegation, "that the January 2 agreement was consummated 'because of'—not 'in exchange for'—the 'past' and 'done' scholarship payments." Dkt. 608 at 8. He argues that the indictment thus alleges a mere gratuity, not a bribe, because the agreement to act was reached on this call—in January 2019—after Singer had already paid him. *See id.* at 9 ("[T]he alleged January 2 agreement to commit a future act 'because of' payments 'past' and 'done' is not an 'exchange'—and thus not a *quid pro quo* bribe prerequisite to charge honest services fraud or federal programs bribery.").

Vavic's argument simply recasts the arguments he, and his co-defendants, made in their prior motions to dismiss the indictment based on the timing of Singer's payments—which this Court rejected. Then, Vavic argued that Singer's payments could not have been bribes because they were in exchange for the designation of "future" recruits. *See* Dkt. 334 at p. 17 n.3 ("[T]o the extent the government alleges that the designation of unspecified 'future' recruits constitutes an honest services fraud violation . . . this would not suffice for an additional reason. Namely, to prove a bribe or kickback, the [g]overnment must do more than prove that a payment was made or a thing of value was given only to cultivate a business relationship or express gratitude for something already done.") (citations omitted). Now, he argues that "one cannot agree and intend to perform a future act 'in exchange' for payment when the at-issue payments are 'past' and 'done' at the time of the agreement." Dkt. 608 at 3. Likewise, Vavic's co-defendants previously argued that "absent allegations concerning an agreement for a payment – or a payment – made in advance of and in exchange for [Defendants'] presentation to [the athletic subcommittee], the government has not adequately charged [Defendants]" with bribery." *See Ernst*, 2020 WL 6871040, at *18.

7

The Court found that those arguments ran "afoul of binding precedent," *id*., noting that although "the timing of the payments may very well constitute evidence that the payments constituted a gratuity as opposed to a bribe. . . this is an argument to be presented to the jury to rebut the government's assertion of a *quid pro quo*; it does not go to the sufficiency of the pleadings." *Id*. at *18 n.11.

Vavic's contentions also fail because they misstate the allegations against him. The SSI does *not* allege that Vavic and Singer entered into a conspiratorial agreement in January 2019, as Vavic suggests. Rather, it alleges that they entered into an agreement years earlier, pursuant to which "Singer and other coconspirators made payments to a bank account at USC that funded Vavic's water polo team" as well as "private school tuition payments totaling nearly $120,000 for Vavic's children," and that "*[i]n exchange for these payments*, Vavic designated multiple students as recruits for the USC water polo team . . . and *agreed to designate additional students as water polo recruits in the future*." SSI ¶¶ 26-28 (emphasis added). The SSI provides examples of specific students that Vavic recruited as part of the illicit *quid pro quo*, *see id.* ¶¶ 30-46, and describes a January 2019 call in which Vavic articulated his continued willingness to designate students as purported recruits in return for the payments Singer made. *See id*. ¶ 47. The SSI does not allege that the call gave rise to a new, post-payment agreement, but instead cites the call as an admission of Vavic's intent in entering into the agreement he and Singer had previously reached, and of his continued intent to honor that agreement.

At bottom, Vavic's argument is thus little more than a renewed attempt to have the Court decide questions of fact that are properly reserved for the jury. *See* Dkt. 608 at 10 n.6 (listing evidence, not SSI allegations, that Vavic cites to support his interpretation of the January 2019 call). But as the First Circuit has repeatedly made clear, the issue on a motion to dismiss is not

whether the government can carry its burden of proof, but "solely whether the allegations in the indictment are sufficient to apprise the defendant[s] of the charged offense[s]." *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir.2012); *see also United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2012) ("What counts in situations like this are the charging paper's allegations, which we must assume are true. Consistent with that rule, courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations.") (internal quotations and citations omitted); *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) ("The problem with [defendant's] argument is that it fails to attack the facial validity of the indictment and instead challenges the government's substantive case."). The SSI indisputably places Vavic on notice of the charges against him, and his "attempt to sink a facially valid indictment with a motion to dismiss that targets the strength of the government's *evidence* misfires." *Guerrier*, 669 F.3d at 3 (emphasis in original).

### III. The SSI Sufficiently Alleges Bribes Both in the Form of Purported Scholarships for Vavic's Children and Payments to a USC Account that Funded Vavic's Water Polo Team

Next, Vavic argues that the SSI fails to allege a bribe because "the SSI's new allegations as to Vavic demonstrate that the only purported 'exchange' of money involved *accounts that were owned by USC*[.]" Dkt. 608 at 5. First, as detailed above, that is not true. The SSI alleges that Vavic received more than $120,000 in the form of payments made "under the guise of a purported scholarship" to pay for his children's private school tuition, *see* SSI ¶ 27, including over $37,000 per year in 2015 and 2016, when Vavic recruited USC Applicant 2, *see id*. ¶¶ 35-44. Based on these allegations alone, the SSI sufficiently alleges a factual basis for the bribery allegations. *See Ernst*, 2020 WL 6871040, at *18 (finding no need to address whether payments to university

9

accounts constitute bribes because indictment alleged that Vavic's co-conspirators also received bribe payments to non-university accounts).

But, even if the SSI only alleged bribes in the form of payments to a university account, that would be enough. A bribe is simply "a payment (or other benefit) given in exchange for an employee's provision of influence or favorable treatment from his employer." *United States v. DeMizio*, 2012 WL 1020045, at *10 (E.D.N.Y. Mar. 26, 2012), *aff'd* 741 F.3d 373 (2d Cir. 2014); *see also Sun-Diamond*, 526 U.S. at 405. ("Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act . . . . In other words, for bribery there must be a *quid pro quo*— a specific intent to give or receive something of value *in exchange* for an official act.") (emphasis in original). The law is clear that payments to third parties, including even employer universities or third-party charities, may qualify as bribes or kickbacks. *See, e.g.*, *United States v. Sidoo*, 468 F. Supp. 3d 428, 445 (D. Mass. 2020) ("Payments made to accounts controlled by university insiders, even if such payments were ultimately received by the universities, may still constitute a benefit to those insiders who exercise control over the accounts."); *see also DeMizio*, 741 F.3d at 381-82 (rejecting argument that "private-sector scheme does not qualify as a kickback unless the defendant employee himself or herself receives the payoff" and further noting that a scheme is "no less a kickback scheme when the employee directs the third party to share its profits with an entity designated by the employee in which the employee has an interest"); *United States v. Hausmann*, 345 F.3d 952, 954 (7th Cir. 2003) (kickback arrangement required payments to "individuals who had provided miscellaneous personal services to [the defendant] or his relatives . . . and . . . charities that [the defendant] supported"). Accordingly, whether Singer's payments were sent to a bank account controlled by Vavic, a charity of Vavic's choice, Vavic's children's school, or a USC fund over which Vavic exercised discretion, is irrelevant. So long as the money was paid with corrupt

intent—as a *quid pro quo* for recruiting students as athletes based on false credentials—it was a bribe.[3]

Moreover, even if some form of personal benefit to the coaches were required, the SSI alleges it: the payments went to a university account over which the coaches had discretion or that otherwise benefitted them professionally. *See, e.g.,* SSI ¶¶ 20 ("The principal purposes . . . were to facilitate the admission of students to elite universities as purported athletic recruits, to enrich the defendants and Singer personally, and to secure additional funding for designated university accounts that the defendants controlled or otherwise benefited from professionally.") & 26 ("Singer and other coconspirators made payments to a bank account at USC that funded Vavic's water polo team, and therefore benefited Vavic professionally"). The SSI thus alleges, explicitly, that the payments were a "thing of value" to Vavic. And that proposition is supported by longstanding authority holding that the term "'thing of value' is defined broadly to include 'the value which the defendant subjectively attaches to the items received.'" *United States v. Renzi*, 769 F.3d 731, 744 (9th Cir. 2014) (quoting *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir.1986)). "[A]ny payment that the defendant subjectively believes has value . . . constitutes a thing 'of value.'" *United States v. Crozier*, 987 F.2d 893, 901 (2d Cir. 1993).

Thus, for example, it is well-established that campaign contributions can constitute bribes—even in the absence of evidence that the money was directed to the candidate's pocket—because they can be used for "all manner of self-promotion" to secure the candidate's

---

[3] By Vavic's logic, it would have been criminal for him to receive money *personally* in exchange for secretly recruiting the children of Singer's clients—even if he had turned around and donated all the money to his USC water polo program—but not criminal for him to engage in the same secret *quid pro quo*, as long as he steered the money directly to the water polo program, without a pit-stop in his bank account. Such a distinction makes little sense, and the law does not demand such formalism. Both instances involve using the same payment to secretly induce an employee to breach his duty of honest services.

professional position. *United States v. McGregor*, No. 2:10CR186-MHT, 2011 WL 1576950, at *4 (M.D. Ala. Apr. 4, 2011); *see also United States v. Terry*, No. 1:10CR390, 2011 WL 5008415, at *5 (N.D. Ohio Oct. 19, 2011) ("The jury could most certainly have concluded that the defendant personally benefited from this assistance [in the form of campaign contributions and other benefits] as it was arguably instrumental in the defendant's bid to retain his seat as a common pleas judge."); *United States v. Vila*, No. CRIM 3:08CR297-PJB, 2009 WL 79189, at *4 (D.P.R. Jan. 9, 2009) ("It hardly seems plausible to suggest that the viability of a wire fraud prosecution should turn on a distinction as meaningless as whether a candidate personally receives a gift of two thousand dollars or whether that gift is instead made out to the candidate's political committee. Either way, the candidate reaps 'personal gain.'"). Notably, the candidate need not embezzle or misappropriate the funds to reap that benefit. *See, e.g.*, *Evans v. United States*, 504 U.S. 255, 257-59 (1992) (affirming Hobbs Act conviction of public official who attempted to claim the payment he received was a campaign contribution.); *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) (same, for honest services fraud conviction); *United States v. Whitfield*, 590 F.3d 325, 353 (5th Cir. 2009) (same, for federal programs bribery). As the Sixth Circuit explained in *Terry*,

> That a bribe doubles as a campaign contribution does not by itself insulate it from scrutiny. No doubt, a contribution is more likely to be a duty-free gift than a bribe because a contribution has a legitimate alternative explanation: The donor supports the candidate's election for all manner of possible reasons. But the prosecution may rebut that alternative explanation, and context may show that an otherwise legitimate contribution is a bribe.

707 F.3d at 613 (citation omitted).

Vavic does not address this authority, much less explain how the unauthorized form of fundraising found to be criminal in these cases is any different from his unauthorized acceptance

of money into a USC account for his professional benefit. Instead, he cites a series of Seventh Circuit cases applying a "private gain" requirement the Seventh Circuit adopted pre-*Skilling* to limit the reach of honest services fraud. *See United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998). But even the Seventh Circuit has acknowledged that its test "has come in for its share of criticism," *Sorich*, 523 F.3d at 708, and has explained that "[b]y 'private gain' we simply mean illegitimate gain, which usually will go to the defendant, but need not. . . . Robin Hood may be a noble criminal, but he is still a criminal," *id*. at 709-10.

In any event, the cases Vavic cites are also inapt for other reasons. In *United States v. Thompson*, for example, in which the court reversed the honest services fraud conviction of a state procurement officer who steered a state contract to a company her boss favored, the defendant was not accused of taking a bribe or receiving a kickback from a third party. 484 F.3d 877, 879 (7th Cir. 2007) ("[N]o *quid pro quo* was entailed."); *id.* at 881 ("Neither Thompson nor anyone else in state government was accused of taking a bribe or receiving a kickback."); *id.* at 883 (distinguishing cases involving "payoffs outside proper channels"). Nor did she act in exchange for political contributions by the contract recipient. *Id.* (observing that "[t]his would be a hard case" if she had). Rather, she merely "pursue[d] the public interest as [she] understood it," apparently in the hope that it would result in improved job security and a salary increase. *Id.* at 882, 884. In the absence of a *quid pro quo*, the court concluded that neither "peace of mind" from added job security nor "a raise approved through normal civil-service means" qualified as private gain under the Seventh Circuit standard. *Id.* at 882–84. The court affirmed this holding in *Sorich*, which was similarly devoid of a bribe or kickback. *See* 523 F.3d at 708-09. These cases, in other words, have nothing to do with whether professional benefits obtained by an employee as a result of a secret *quid pro quo* violate her duty of honest services.

13

The sole case that Vavic cites in which the Seventh Circuit applied *Thompson* to a fact pattern involving a bribe or kickback is *United States v. Blagojevich*, involving efforts by the former governor of Illinois to exchange a Senate seat for a job in the President's Cabinet, or a private-sector job, or a donation to a fund Blagojevich would control. 794 F.3d 729, 734 (7th Cir. 2015). But that case also does not help Vavic's cause. Blagojevich's convictions were reversed because the jury instructions did not distinguish exchanging the official act for a private-sector job or donation to a fund Blagojevich would control—which the Seventh Circuit found *would have* qualified as "private benefit"—from exchanging it for a public post, which the court found was simply a "political logroll . . . the swap of one official act for another." *Id.* at 734. *Blagojevich* thus has no bearing here.

Ultimately, Vavic's argument is that his scheme could not have constituted bribery because the universities benefited from it financially. But there is no requirement that an employer be harmed *financially* by either honest services fraud or federal programs bribery. As the Supreme Court noted in *Skilling*, in describing the development of the "honest services" doctrine: "Unlike fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other, the honest-services theory targeted corruption that lacked similar symmetry." 561 U.S. at 400. "*Even if the scheme occasioned a money or property gain for the betrayed party*, courts reasoned, actionable harm lay in the denial of that party's right to the offender's 'honest services.'" *Id*. (emphasis added). Likewise, "after *Skilling*, Section 1346 requires a Defendant to act in exchange for a bribe or kickback, but whether such actions benefited or harmed the employer who enjoyed a right to the honest services of its employee, is irrelevant." *United States v. Tanner*, No. 17 CR. 61 (LAP), 2018 WL 1737235, at *6 (S.D.N.Y. Feb. 23, 2018), *aff'd*, 942 F.3d 60, 65 (2d Cir. 2019); *see also United States v.*

*Black*, 530 F.3d 596, 600 (7th Cir. 2008) (rejecting proposition that gain must "be at the expense of the persons (or other entities) to whom the defendants owed their honest services" as "a no harm-no foul argument"), *vacated and remanded on other grounds*, 561 U.S. 465 (2010); *Sorich*, 523 F.3d at 709-10 ("In the case of a successful scheme, the [entity to whom the duty of honest services is owed] is deprived of its servants' . . . honest services *no matter who receives the proceeds*.") (internal quotation omitted; emphasis added); *United States v. Rybicki*, 354 F.3d 124, 145-46 (2d Cir. 2003) (en banc) (noting that "actual or intended economic or pecuniary harm to the victim need not be established. The only intent that need be proven in an honest services fraud is the intent to deprive another of the intangible right of honest services.") (citation, internal quotation marks and alteration omitted). Here, the question whether the payments by Singer and his clients were a *quid pro quo* intended to defraud USC of Vavic's honest services is one of fact for the jury. *See Sidoo*, 468 F. Supp. 3d at 444 (holding that the question of "[w]hether the defendants possessed the requisite intent is an issue of fact for the jury."); *see also Ernst*, 2020 WL 6871040, at *18 ("Here, the Superseding Indictment explicitly alleges such a *quid pro quo* and thus is not subject to dismissal for failing to allege an offense."). Accordingly, Vavic's argument for dismissal on this basis also fails.[4]

---

[4] Vavic's arguments for dismissal of the RICO conspiracy and federal program bribery conspiracy mirror his arguments for dismissal of the honest services fraud charges, and fail for the same reasons.

## CONLUSION

For the foregoing reasons, Vavic's motion should be denied.

                    Respectfully submitted,

                    ANDREW E. LELLING
                    United States Attorney

By:  */s/ Justin D. O'Connell*
      JUSTIN D. O'CONNELL
      LESLIE A. WRIGHT
      KRISTEN A. KEARNEY
      STEPHEN E. FRANK
      KARIN M. BELL

Date:  January 26, 2021                Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                    */s/ Justin D. O'Connell*
                    JUSTIN D. O'CONNELL
Date:  January 26, 2021                Assistant U.S. Attorney