UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>JOVAN VAVIC et al.,<br><br>     Defendant. | CRIMINAL NO.: 19-CR-10081-IT |

**JOVAN VAVIC'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS, OR AT A MINIMUM, FOR DISCOVERY AND AN EVIDENTIARY HEARING <u>BASED ON CUMULATIVE GOVERNMENT MISCONDUCT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ....................................................................................................3

III.  LEGAL STANDARD.............................................................................................8

IV.   ARGUMENT ........................................................................................................10

      A.    The Government has an Unambiguous, Affirmative Duty to Investigate
            Exculpatory Evidence and Police Its Informants...................................11

      B.    The Government Violated Its Affirmative Duty to Investigate Singer.................16

      C.    The Remedy for this Course of Conduct Should Be Dismissal, or at a
            Minimum, Discovery and an Evidentiary Hearing. ................................18

V.    CONCLUSION.....................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Brady v. Maryland,*
    373 U.S. 83 (1963) ...................................................................................10, 12, 18, 19

*Carriger v. Stewart,*
    132 F.3d 463 (9th Cir. 1997) (en banc) ..............................................................12

*Commonwealth of Northern Mariana Islands v. Bowie,*
    243 F.3d 1109 (9th Cir. 2001) ......................................................................13, 20

*Giglio v. United States,*
    405 U.S. 150 (1972) ........................................................................................10, 12

*United States v. Jones,*
    620 F. Supp. 2d 163 (D. Mass. 2009) .................................................................11

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ..................................................................................11, 12, 16

*LaFrance v. Bohlinger,*
    499 F.2d 29, 35 (1st Cir. 1974) ..........................................................................20

*McCambridge v. Hall,*
    266 F.3d 12 (1st Cir. 2001) ................................................................................12

*Miller v. Vasquez,*
    868 F.2d 1116 (9th Cir.1989) .............................................................................13

*Morris v. Ylst,*
    447 F.3d 735 (9th Cir. 2006) ..............................................................................13

*United States v. Abdelaziz, et al.,*
    19-CR-10080-NMG .................................................................................. *passim*

*United States v. Alvarez,*
    317 F. Supp. 2d 1163 (C.D. Cal. 2004) ...............................................................9

*United States v. Anzalone,*
    923 F.3d 1 (1st Cir. 2019) ....................................................................................9

*United States v. Bernal-Obeso,*
    989 F.2d 331 (9th Cir. 1993) .................................................................... *passim*

*United States v. Bizzack*,
    19-CR-1022-DPW ...................................................................................1

*United States v. Cerna*,
    633 F. Supp. 2d 1053 (N.D. Cal. 2009) ......................................12, 19

*United States v. Doe*,
    125 F.3d 1249 (9th Cir. 1997) .............................................................8

*United States v. Guzman*,
    282 F.3d 56 (1st Cir. 2002) .................................................................9

*United States v. Horn*,
    29 F.3d 754 (1st Cir. 1994) ...........................................................9, 20

*United States v. Merlino*,
    2000 WL 294880 (D. Mass. Mar. 10, 2000)....................................20

*United States v. Monteiro*,
    No. 03-10329-PBS, 2005 WL 8162990 (D. Mass. Oct. 31, 2005)...........9

*United States v. Osorio*,
    929 F.2d 753 (1st Cir. 1991) ...................................................9, 12, 19

*United States v. Price*,
    566 F.3d 900 (9th Cir. 2009) .......................................................12, 19

*United States v. Ross*,
    372 F.3d 1097 (9th Cir. 2004) .............................................................9

**Other Authorities**

Fed. R. Crim. P. 5(f) ...............................................................................10

Fed. R. Crim. P. 16 ................................................................................20

Fed. R. Crim. P. 16(a)(1) .......................................................................11

Fed. R. Crim. P. 16(d)(2)(D).................................................................20

https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-
    proceedings ........................................................................................10

*Justice Manual, Title 9: Criminal,* https://www.justice.gov/jm/jm-9-5000-issues-
    related-trials-and-other-court-proceedings (last visited Feb. 28, 2022)...................15

Local Rule 83.6.5(g) ...............................................................................20

Local Rule 116.1(c) ................................................................................11

Local Rule 116.2 ............................................................................................................11

Mass R. Prof'l Conduct 3.8(d) ......................................................................................11

Special Report, "The Attorney General's Guidelines Regarding the Use of
    Confidential Informants," https://oig.justice.gov/ ......................................13, 14, 15

## I.       <u>INTRODUCTION</u>

One week before trial, pursuant to the letter filed at Docket 1090, Coach Vavic has learned of new evidence which adds to a record of government misconduct that includes the repeated failure to disclose exculpatory evidence, deceiving defendants and the courts regarding the existence of such evidence, allowing star cooperator Rick Singer to destroy evidence, and now, the failure to investigate Singer's apparent criminal conduct, despite being on notice of the same and naming him as a government witness in the forthcoming trial.  *See* Vavic's Motion to Dismiss, or in the Alternative, to Suppress the "Consensual" Wiretap Recordings Based on a Course of Government Misconduct, Dkt. 901; *see also United States v. Abdelaziz, et al.*, 19-CR-10080-NMG, Defendants' Motion to Dismiss Indictment with Prejudice, Dkt. 970.   In the Court's words, more exculpatory information has now "trickled out."  *See* Dkt. 1062 at 7 (underscoring that "the court is concerned…about the government's disclosure of information").

Specifically, the letter filed at Docket 1090 points to concrete evidence that the government has long been on actual notice that Singer was involved in a variety of additional criminal activities—including money laundering with his brother, convicted felon Cliff Singer; hiding millions of dollars in missing funds; and the consequent provision of required financial disclosure forms that were likely inaccurate.  Yet, the letter reveals, despite having actual notice of this conduct, the prosecution team consistently deviated from standard procedures—and their constitutional obligations—by not investigating these activities or making timely, thorough inquiries of Singer and others, including Cliff Singer.  All the while, the government continued to utilize Singer to perpetuate its headline-grabbing allegations; to extract guilty pleas from multiple defendants; and to obtain two convictions at trial—including pursuant to representations in court proceedings that were either incomplete or inaccurate. *See*, *e.g.*, *United States v. Bizzack*,

19-CR-1022-DPW.[1]

The government's response to this newly disclosed evidence—both to a request for discovery and investigation, sent by undersigned counsel the day Docket 1090 was filed, *see* Exhibit A,[2] and in the Response to Docket 1090, filed with the Court today, *see* Dkt. 1092— merely confirms that the government has failed to execute its constitutional duty to investigate Singer's conduct, and deviated from established practice, particularly given the nature of its notice of Singer's potential crimes.

What is more, the government has now confirmed that it will *not* investigate further, despite the concrete, specific information proffered in Docket 1090—by, for example, seeking records from the banks, reviewing government databases for related information, and interviewing Rick and Cliff Singer about the at-issue conduct, including acts which are discussed on the calls intercepted by the government itself, *see infra*.  Instead, the government suggests that the burden to investigate Singer—who is not only its star cooperator, but listed as a government trial witness—lies with the defense.  *See* Exhibit A, Response at 2 ("To the extent you seek additional information about the allegations in Mr. Kendall's letter, we suggest that you address your request to Mr. Kendall.").  This position reflects a fundamental misunderstanding of the government's *affirmative* duty to seek out exculpatory and impeachment information—

---

[1] As the letter recounts, the government delayed disclosure of the October 1, 2018 Singer note discussed below, and it was not disclosed until February 2020, months after the Bizzack sentencing.  With respect to the Bizzack sentencing, the government did not disclose to the Court that the $20,000 invoice containing Mr. Bizzack's name was created after Mr. Singer became a Confidential Informant ("CI") and was, in fact, an artifact of his cooperation. *See* Bizzack Tr. dated October 19, 2019 at 17:8-18:1, 34:7-35:3.  There were no names listed on any invoices until after Mr. Singer became a CI.  It was the FBI that had insisted Mr. Singer have Ms. Heinel put "more detail" on her invoices. *See Abdelaziz* Trial Tr. Day 10 at 110:19-110:25.

[2] Given the proximity to trial, Coach Vavic made a request for supplemental discovery and investigation on the matters outlined in the letter, which was transmitted to the government promptly upon review of Docket 1090. *See* Exhibit A.

particularly where this information relates to the potential criminal conduct of its own confidential informant, and especially where the defense, indisputably, lacks the resources to uncover this evidence itself.  *See* Dkt. 1090 (explaining that "[d]efense counsel does not have the investigative resources and subpoena power that are available to the government" to further investigate the Singers' ties to the bank accounts).

Contrary to the government's position, it is well-established that the prosecution team is constitutionally required not only to produce impeachment material that falls in its lap, but also to discover impeachment material that is reasonable available.  This obligation is heightened where, as here, the government has invited "the perils of using [a] rewarded criminal" to do its bidding, and it is equally well-established—as the government's own Department of Justice policies reflect—that "the government stands uniquely positioned to guard against perfidy" in this context, and must therefore thoroughly vet and carefully police its informants.  *See United States v. Bernal-Obeso*, 989 F.2d 331, 337 (9th Cir. 1993).  Willful blindness, as exhibited here, is the very antithesis of what the Constitution, and the government's own policies, require.

At this juncture, the record of cumulative misconduct—despite admonitions from two courts, including this Court—warrants extraordinary relief:  dismissal  of  the  indictment or, at a minimum, an order for discovery and a pre-trial evidentiary hearing.  These measures are essential to preserve the integrity of this proceeding and to deter future prosecutorial misconduct—particularly given the cumulative nature of the government misconduct in this case, the government's misconception about its duty to investigate, and its refusal to do so pursuant to Docket 1090.

## II.      BACKGROUND

Defendants in the compendium of "Varsity Blues" cases, including Coach Vavic, have

repeatedly asked the government to disclose exculpatory and impeachment evidence—including, specifically, evidence related to the consensual recordings, and evidence that Singer characterized payments to the universities as donations, not bribes. The government has repeatedly denied that such evidence existed.

Yet is now clear that, for 16 months before disclosure, the government was aware of Singer's notes showing he told his clients their payments would be donations—not bribes—and that federal agents pressured him to lie to create false inculpatory evidence on the calls. *See* Dkt. 901, 902 at 12.

It is also apparent that the government had, and failed to promptly disclose, numerous interview reports that reflect similar exculpatory admissions by Singer about the nature of the donations—as well as the nature of the tuition payments made through his foundation for Coach Vavic's star water-polo-player children, which Singer described as a "gesture" "in case he needed [Vavic] in the future" and not, in contravention of the government's allegations here, a bribe.[3]  *See* Ex. B at 12-13.

Finally, it is now well-established that the government had, but delayed for over two-and-a-half years in producing, material, exculpatory evidence related to the consensual recordings.

_____

[3] While the exculpatory interview with Singer occurred on September 27, 2018, at the outset of his cooperation, the 302 was not disclosed until March 31, 2020. *See* Exhibit C. The timing of this exculpatory interview is significant, as Singer's characterizations of the tuition payments as a "gesture" occurred *before* the "loud and abrasive" directive that Singer "bend the truth" to make payments appear to be bribes.

   This government-scripted attempt to "bend the truth" was on display in the subsequent January 2, 2019 consensually recorded call, on which Count XIV is based, in which Singer asks Coach Vavic:  "I just want to make sure…I've been able to go through Donna … to help us with getting some kids in.  But if I come across somebody that's a water polo player … 'cause I know … they have to be a water polo player, for you … then …it's still OK for me to holler at you, *because* – essentially, what we've done in the past, with the scholarships for your boys. Correct?"

This course of conduct was previously detailed in Vavic's Motion to Dismiss, Dkt. 901, and in Defendants' Motion to Dismiss Indictment with Prejudice, Dkt. 970, in *United States v. Abdelaziz, et al.*, 19-CR-10080-NMG (attached hereto, in relevant part, as Exhibit B), and is expressly incorporated herein by reference.

By way of overview, the evidence that has ultimately came to light reveals the lengths to which the government went to generate incriminating evidence—and to hide those efforts from the defense.   For example, in Singer's notes of the "[l]oud and abrasive" discussion with agents, he wrote that he "asked for a script if they want me to ask questions and retrieve responses that are not accurate." *See* Ex. B at 11.   Assistant United States Attorney Eric Rosen then wrote an e-mail with a "script" that Singer followed closely during a subsequent call with defendant Bill McGlashan. *See id.* at 11-12.

On or about the same day that Singer wrote his notes, October 1, 2018, there was also an inadvertently recorded conversation among Singer, his attorney, Rosen, and other members of the prosecution team, in which Rosen provided detailed instructions for what Singer should say—and not say—on future recorded calls with Donna Heinel.   *See* Ex. B, attached exhibit II (10/1/18 Call Tr., Ex. II).   Among other things, Rosen instructed Singer to "tone . . . down" mention of admission candidates' athletic abilities on recorded calls because "all of these people aren't getting recruited by USC" and "*that's the message that we sort of want to get across*." *Id.* at 2 (emphasis added).   Yet, mid-way through the call, AUSA Rosen realized that Singer had used his personal phone (which was being recorded by the investigators and would thus be discoverable) instead of his government-supplied "burner" phone (which was not being recorded).   *Id*. at 3.   Flustered, Rosen insisted that Singer immediately end the call and re-join on an unmonitored line:   "Rick, *you hang up right now*." *Id.* (emphasis added).   The October 1

recording thus shows the government's efforts to shield its tactics from disclosure to the defense.

Further, it is also now clear that the government allowed Singer to destroy potentially exculpatory evidence. For over a year, the government knew Singer was actively deleting relevant iMessages throughout his cooperation—but it failed to stop him, recover the messages, or secure the phones. *See* Ex. B, attached exhibits (3/13/20 Letter, Ex. GG at 3-4; Gardner Decl., Ex. PP at 3. 3/11/19 Excerpt, Ex. FF; Ex. H at 2-3). And although Singer used at least four phones while working as an informant, the government recorded calls on only one of them— even though it knew Singer was using the others to call alleged co-conspirators as well as his brother, convicted felon Cliff Singer. *See* Ex. B, attached exhibits (10/23/18 FD-1023, Ex. HH at 1 ("CHS used this unauthorized phone to call…Cliff Singer[.]"); *see id.* ("CHS used a taxi driver's phone on CHS's way home on September 24, 2018 to call Cliff Singer."); *id.* at 4 ("CHS *talked to Cliff Singer at length on an unauthorized phone*") (emphasis added); Ex. GG at 3-4).

Finally, it is now apparent—as overviewed in the letter filed at Docket 1090—that the government knew that Singer claimed to have laundered money with his brother, Cliff Singer— the same person that Singer admitted to speaking with "*at length*" on an "*unauthorized phone*." *See* Ex. B, attached exhibit HH (emphasis added).

For example, in a government-intercepted July 26, 2018 call with government cooperator, and former Yale soccer coach, Rudy Meredith, Singer tells Meredith:

> I do have a brother…he's in the credit card business…he makes a lot of money but he also makes a lot of cash . . . the only way you can do it is if you were to buy houses and re-do them…*you can't put the cash in the bank*…so like he goes on vacation all the time…And *he just takes cash everywhere he goes…That's what he has to do because he can't put it in the bank*…
>
> *He invests in a lot of our stuff.*  And what he does is like *when we're doing the Oakland Soldier gig*…and we have to put four or five hundred thousand dollars into the facility to upgrade it … *we'll pay the contractors cash*.

*See* Exhibit D (emphases added).

Subsequent government-intercepted calls reflect Singer's dealings with brother Cliff to move and use cash to pay for contracting work, corroborating Singer's statements to Meredith. *See* Exhibit E (Rick Singer leaves Cliff Singer a voicemail on 9/21/18, monitored and summarized by prosecution team members, as follows:  "*Rick said to bring $40k in cash with him* on Wednesday.") (emphasis added); Exhibit F (Rick Singer calls Cliff Singer on 8/23/18, monitored and summarized by prosecution team members, as follows:  "Brief *discussion of leaving a large amount of money* at a front desk.") (emphasis added); Exhibit G (Rick Singer calls a second person on 8/31/18, and discusses the work at "Soldiertown,"  referenced in the call with Meredith, including that "the floor guy and the painting guy *will be paid in cash only*.") (emphasis added); Exhibit H (Rick Singer calls Cliff Singer on 6/16/18, monitored and summarized by prosecution team members, as follows: "Rick asks if Cliff has cash underneath his (unknown), Rick laughs and says he figured he did.  Cliff references using 'that stuff' for this job so its not just sitting around collecting dust…*Cliff says that he plans to pay all the contractors cash so they don't have to declare anything and they could get a deal*.") (emphasis added).

Yet, in the scores of interviews with Singer, the government never once asked about his apparent illegal activities with Cliff Singer—in contravention of standard procedures—nor, it seems, did it interview or investigate Cliff Singer himself.  *See* Docket 1090 ("Mr. Singer had an extensive series of interviews memorialized in agents' reports.  The government produced hundreds of pages of Singer interview reports, handwritten notes and related attachments.  None of the reports dated prior to August 2021 memorializes questioning of Mr. Singer about money laundering or hidden assets.").

This is true even *after* the government learned that Singer, by his own admission, "talked to Cliff Singer at length on an unauthorized phone."  *See* Ex. B, attached exhibit HH.  And this is true, as Docket 1090 recounts, despite the government apparently being on notice that Singer moved millions of dollars out of a U.S. bank account used for his side-door activities, funds that remain unaccounted for.  *See* Dkt. 1090 at 3 ("In a recent trial, a FBI financial analyst testified that Mr. Singer collected over $25 million in domestic bank accounts used for his side-door activities and several millions of dollars had been transferred from these accounts but not tracked down.");  *see also Abdelaziz* Trial Tr. Day 14 at 97:9-12 & 96:11-21; *see also id.* 35, 79, 80-81, 93-95 (confirming that the FBI financial analyst did not trace monies that Singer might have used for his personal benefit, leaving about $6 million that appears to be untraced and unaccounted for).  Notably, while Singer's plea agreement describes "gain or loss from the offenses of conviction and related conduct [] more than $25,000,000 but not more than $65,000,000,"  the government's Response describes a far lesser amount in recovered funds. *See* Dkt. 1092 ("[T]he government has thus far obtained – through forfeiture or voluntary payments toward an anticipated forfeiture judgment – more than $6.5 million from Mr. Singer and entities associated with him.  These recoveries do not include additional non-cash assets that the government has seized.").

In short, "[t]his quid quo pro—where Mr. Singer cooperated despite his misgivings and the government looked the other way while Mr. Singer further concealed his assets—surely was not lost on Mr. Singer."  Dkt. 1090.

### III.   <u>LEGAL STANDARD</u>

 "The district court may dismiss an [indictment] based on outrageous government conduct if the conduct amounts to a due process violation."  *United States v. Doe*, 125 F.3d

1249, 1253 (9th Cir. 1997).  This Court may also "exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of a due process violation."  *United States v. Ross*, 372 F.3d 1097, 1109 (9th Cir. 2004); *United States v. Anzalone*, 923 F.3d 1, 5-6 (1st Cir. 2019) ("[C]ourts may dismiss criminal charges in response to outrageous government misconduct.").  Indeed, federal courts possess inherent supervisory authority to formulate remedies to address the "violation of a recognized right, preserve judicial integrity, and deter illegal conduct." *United States v. Osorio*, 929 F.2d 753, 763 (1st Cir. 1991) (citation omitted).

The First Circuit has made clear that it will "consider unleashing the supervisory power in criminal cases '[w]hen confronted with extreme misconduct and prejudice,' in order 'to secure enforcement of "better prosecutorial practice and reprimand of those who fail to observe it."" *United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994) (citation omitted). These powers include broad discretion to impose sanctions and formulate remedies." *Id.* at 766; *see also United States v. Monteiro*, No. 03-10329-PBS, 2005 WL 8162990, at *5 (D. Mass. Oct. 31, 2005) (ordering disclosure of "all [relevant] materials"). And in "rare and extreme circumstances," the court may "dismiss criminal charges as a sanction for government misconduct." *United States v. Guzman*, 282 F.3d 56, 59 (1st Cir. 2002) (citation omitted).

In particular, as relevant here, it may be appropriate to dismiss an indictment as a sanction for the government's refusal to provide discovery regarding informants, where the government's representations regarding informants are unreliable, where the government either does not know or misleads the defense about informants, and where the government attempts to insulate itself from inspection by simply refusing to inquire. *United States v. Alvarez*, 317 F. Supp. 2d 1163, 1166 (C.D. Cal. 2004); *see also Bernal-Obeso*, 989 F.2d at 337

(in a case involving the government's failure to properly discover and disclose impeachment information regarding a criminal informant, specifically leaving open the remedy of dismissing the indictment for outrageous government conduct).

## IV.   **ARGUMENT**

The government's self-executing constitutional, procedural, and ethical disclosure obligations are well-established.  Under federal law, including Rule 5(f) of the Federal Rules of Criminal Procedure, the Supreme Court's decisions in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, the government has a continuing obligation to disclose to the defendant in a timely manner all information or evidence that may be reasonably considered either: (1) relevant to the defendant's guilt or punishment; or (2) favorable to the defendant on the issue of guilt or punishment.

As the Department of Justice Manual itself makes clear,[4] the disclosure obligation extends to information that is inconsistent with or tends to negate a defendant's guilt as to any element of the offenses with which a defendant is charged, as well as information that casts doubt on the credibility or accuracy of any witness or evidence that the government anticipates using in the prosecution.  Further, the obligation applies to favorable materials regardless of whether the information itself would constitute admissible evidence; irrespective of the government's assessment of the credibility or weight of the information; and without regard to how the withholding of such evidence might be viewed, with the benefit of hindsight, as affecting the outcome of the proceeding.  Where doubt exists as to the relevance or favorability of the information to the defense, the prosecution must resolve all such doubts in favor of full disclosure.

---

[4] *See* https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings.

Because of the government's "enduring difficulty in discharging its duty to disclose material exculpatory information to defendants in a timely manner," this Court has promulgated Local Rules to serve as a "road map" for complying with *Brady*. *United States v. Jones*, 620 F. Supp. 2d 163, 168-70 (D. Mass. 2009). Local Rule 116.2 requires the Government to disclose any "information that would tend to directly to negate the defendant's guilt concerning any count in the indictment or information" and "any information that tends to cast doubt on the credibility or accuracy of any witness or evidence that the government anticipates calling or offering in its case-in-chief[.]" The ethical rules are in accord. *See also* Mass R. Prof'l Conduct 3.8(d) (similar). And Local Rule 116.1(c) requires that the Government also provide all information specified in Federal Rule of Criminal Procedure 16(a)(1), which includes "papers, documents, data, photographs, [or] tangible objects" if the item is in the government's control and is "material to preparing the defense."

### A.     The Government has an Unambiguous, Affirmative Duty to Investigate Exculpatory Evidence and Police Its Informants

It is well-established that "[t]he use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril." *Bernal-Obeso*, 243 F.3d at 333. Accordingly,

> [a] prosecutor who does not appreciate the perils of using rewarded criminals risks compromising the truth-seeking mission of our criminal justice system. Because the government decides whether and when to use such witnesses, and what, if anything, to give them for their service, the government stands uniquely positioned to guard against perfidy. By its actions, the government can either contribute to or eliminate the problem. Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard our system against treachery.

*Id.* at 333-34.

Likewise, it is beyond dispute that the government is required not only to turn over exculpatory and impeachment that falls in its lap, but also to discover such information when it is

11

known to others acting on the government's behalf.  *See Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995)  ("[T]he individual prosecutor *has a duty to learn* of any favorable evidence known to the others acting on the government's behalf in the case[.]") (emphasis added).

Evidence is suppressed by the government where it is in the possession of a government agent and the prosecutor fails to exercise due diligence in identifying and producing it.  *United States v. Price*, 566 F.3d 900, 908-09 (9th Cir. 2009).  The prosecutor need not be personally aware of the evidence.  "Because the prosecution is in a unique position to obtain information known to other agents of the government, *it may not be excused from disclosing what it does not know but could have learned*."  *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (en banc); *see also Kyles*, 514 U.S. at  437-38, *Giglio,* 405 U.S. at 154; *McCambridge v. Hall,* 266 F.3d 12, 22 (1st Cir. 2001).  "[A] prosecutor is required to use due diligence—*affirmative due diligence*—to gather *Brady* material from known and plausible sources of exculpatory information and then to turn over any *Brady* material that is found."  *United States v. Cerna*, 633 F. Supp. 2d 1053, 1061 (N.D. Cal. 2009).  Further, the duty to inquire about *Brady* material is heightened where a prosecutor has a "specific reason" to suspect that *Brady* material may reside at a source, or where defense counsel makes a "narrowly defined and well directed request . . . explaining why exculpatory material might be found in a certain file."  *Id.*  "The disclosure obligation exists, after all, not to police the good faith of prosecutors, but to ensure the accuracy and fairness of trials by requiring the adversarial testing of all available evidence bearing on guilt or innocence."  *Carriger*, 132 F.3d at 479-80.

In the context of confidential informants, in particular, the government has a duty to investigate the conduct of an informant when it is on notice that the informant's activities would lead to exculpatory evidence for the defense.  *See Osorio*, 929 F.2d at 761-62 ("The government,

as represented by its prosecutors in court, is under a duty of inquiry regarding information concerning the criminal past of its cooperating witnesses … when … a specific discovery request is made and granted."); *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir.1989) ("[A] bad faith failure to collect potentially exculpatory evidence would violate the due process clause."); *see also Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) ("When a prosecutor suspects perjury, the prosecutor must at least investigate."). "A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts."  *Commonwealth of Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001).

Thus, in *Bernal-Obeso*, the court held that "egregious wrongdoing by the government" may amount to outrageous government conduct calling for dismissal of the indictment.  989 F.2d at 337 (citing *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991)).  There "the trouble . . . started when the government responded late to a defense pretrial discovery request for information about [the informant]" and the misconduct was two-fold: (1) the informant lied to the government about his criminal record, and (2) the government failed to investigate the misconduct on its own, leaving it to the defense to discover the misconduct.  *Id.* at 332, 334-36.

Given the widely-recognized "perils of using rewarded criminals" to do the government's bidding, *see id.* 333, the Department of Justice itself establishes clear policies governing the affirmative duty to vet and police the unauthorized conduct of informants.  *See*, *e.g.*, Department of Justice's Office of the Inspector General's September 2005 Special Report, "The Attorney General's Guidelines Regarding the Use of Confidential Informants," https://oig.justice.gov/ sites/default/files/archive/special/0509/ chapter3.htm (last visited Feb. 28, 2022) ("[W]hen the FBI formalizes a relationship with a confidential informant, both the investigative benefits and the risks are substantial. Accordingly, the administrative and operational rules and procedures

employed by the FBI ensure careful evaluation and oversight of informants and that appropriate expertise from both the FBI and DOJ is employed to evaluate informants who present the greatest risks and benefits to the interests of the government.").  In particular, pursuant to "Confidential Informant Guidelines," FBI Special Agents and their supervisors propose, approve, and operate confidential informants pursuant to a series of steps encompassing a "suitability review" as well as "ongoing oversight over these types of informants"—including "an exchange of information between the field offices that operate the informants and senior FBI and DOJ officials who test various assertions about the CI's reliability and productivity, the scope of any FBI-authorized 'otherwise illegal activity,' the implications for the FBI's relationship with the informant of any unauthorized illegal activity by the CI, and the various risks attendant to maintaining a relationship with particular informants."  *Id.*

If an informant has engaged in unauthorized illegal activity ("UIA"), "the FBI's originating field office must respond to seven questions from the FBI's Human Intelligence Unit (HIU) (formerly the Asset/Informant Unit in the Criminal Investigative Division) that focus on whether, in the judgment of the SAC, the informant nevertheless remains suitable." *Id.*  "The SAC must also address other important issues triggered by the UIA, including whether the case agent or handler has attempted to intercede on behalf of the informant or to make any recommendations to state or local authorities regarding the informant's case." *Id.*   "The Guidelines recognize that if a confidential informant commits unauthorized illegal activity, the FBI and DOJ should immediately reevaluate the informant's continuing suitability." *Id.*  Further, "[t]he Guidelines require that the unauthorized illegal activity must immediately be brought to the attention of senior FBI field office and Headquarters personnel, as well as the U.S. Attorney, so that a careful reevaluation is made of the informant's suitability in the following

circumstances." *Id.*

"If these steps are not taken and the informant continues to operate, serious complications may develop, including situations where prosecution of the informant is jeopardized because the informant claims the government acquiesced in the continuing illegal activity." *Id.*[5]  Further, "[w]hen the FBI fails to afford the required notice, fails to document activities or events involving informants in accordance with the Confidential Informant Guidelines, or is not candid with prosecutors concerning informant-related issues, the informants or other subjects of criminal prosecutions may claim that the government's failure to provide exculpatory or impeachment information arising from the informant's activities amounts to a violation of their constitutional rights."  *Id.*; *see also* United States Department of Justice, *Justice Manual, Title 9: Criminal,* https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings (last visited Feb. 28, 2022), Policy 9-5.001(B)(2) ("The credibility of cooperating witnesses or informants will always be at issue if they testify during a trial …The entire informant/source file, not just the portion relating to the current case, including all proffer, immunity and other agreements, validation assessments, payment information, and other potential witness impeachment information should be included within this review.").

---

[5] One of the more notorious of such cases regarding government mismanagement of confidential informants is the Bulger-Flemmi matter, in which FBI agent John Connolly, Jr. was sentenced to 10 years in prison for racketeering, obstruction of justice, and making false statements to investigators—all stemming from his mishandling of two FBI informants, Stephen "the Rifleman" Flemmi and James "Whitey" Bulger.  In a 10-month evidentiary hearing, the court heard evidence that Connolly and FBI Supervisory Special Agent John Morris had filed false reports of information purportedly provided to them by the informants, *ignored evidence that the informants were extorting others*, caused the submission of false applications for electronic surveillance, and disclosed other confidential law enforcement information to the informants. Among the district court's findings of fact in its opinion was a condemnation of the FBI's failure to follow the Confidential Informant Guidelines. *Id.*

**B.      The Government Violated Its Affirmative Duty to Investigate Singer**

Here, the government was put on notice that Singer claimed to have laundered money with his brother, Cliff Singer—the same person that Singer admitted to speaking with "at length" on an "unauthorized phone," and, apparently, that he moved millions of dollars out of a U.S. bank account used for his side-door activities.   Therefore, the government had an affirmative duty to investigate.  *See Kyles*, 514 U.S. at 438 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case[.]").  This is particularly true where, as here, the cooperator plays a central role in a sweeping investigation that results in scores of individuals being charged with, and ultimately convicted of, federal criminal offenses that decimated lives and careers—and courts, including this Court, have relied on Singer's sworn declaration in ruling that the consensual calls are admissible.

Despite Singer's principal role and his known misconduct, the government failed to make a suitable inquiry into his apparent criminal conduct with Cliff Singer—much less, it seems, independently and thoroughly investigate it in accordance with Department of Justice polices.  This is so even though the defense made repeated, focused discovery requests for this information.  *See* Dkt. 1090 ("During 2020 and 2021, myself and other defense counsel in the *Sidoo* case repeatedly asked the government to disclose information concerning Mr. Singer's assets.  After months of delays, the government provided a financial disclosure form, which does not disclose his overseas assets.").

Indeed, the government's Response confirms the inadequacy of the government's boilerplate inquiry—prompted by defense counsel's request.  *See* Dkt. 1092 at 2 ("[W]hen counsel for Mr. Abdelaziz inquired about Mr. Singer's finances in August 2021, the government specifically asked Mr. Singer whether he had concealed, transferred or liquidated any assets that he owned, controlled, or held in his name or another's name, since he became a government

cooperator in September of 2018.  He denied doing so.  He also denied having any interest in any

other property that had not been disclosed to the government.").  In other words, despite Singer's

documented credibility issues, destruction of evidence,  and obstruction of justice—issues so

significant that the government opted not to call him as a witness in the *Abdelaziz* trial—the

government simply took Singer at his word.  It did not even ask him about the specific, concrete

evidence of apparent criminal conduct documented in its own intercepted recordings and

summarized by members of the prosecution team, *see* Exhibits D-I—much less independently

"test various assertions about the CI's reliability," as its own procedures required.  Yet this

information, including as outlined in the letter, is plainly material and exculpatory, more so still,

given that Singer is on both parties' witness lists for trial.

       In this context, there is a serious question whether Singer has effectively received a

tacit—and heretofore undisclosed—promise, reward or inducement for his cooperation because

the government was on notice of such misconduct and deviated from accepted practices by not

investigating these issues.  *See* Dkt. 1090 ("This quid quo pro—where Mr. Singer cooperated

despite his misgivings and the government looked the other way while Mr. Singer further

concealed his assets—surely was not lost on Mr. Singer.").  Such a "quid pro quo" has

significant ramifications at this juncture of the proceedings—particularly given the importance of

this evidence, the still-undeveloped record, and the government's position that it will *not*

investigate further.  *Cf.* Dkt. 1090 ("Defense counsel does not have the investigative resources

and subpoena power that are available to the government.  I do not mean to imply that the above

is or is not an exhaustive list of Mr. Singer's undisclosed assets or bank relationships, or a

complete description of William and Cliff Singer's contacts with each bank.  Obviously, I am not

able to confirm this information with the banks or any law enforcement database.") *with* Exhibit

A, Response at 2 ("To the extent you seek additional information about the allegations in Mr. Kendall's letter, we suggest that you address your request to Mr. Kendall.").

In particular, this newly disclosed information could well affect the integrity of any actions Singer has taken or refrained from—including as relevant to this Court's recent order on the government's motion for order regarding consensual recordings (Dkt. 1079)—by, for example, constituting a corrupt inducement for Singer's signed consent forms relating to the consensual calls.  In this way, the government's failure to investigate—consistent with its constitutional obligations and its own policies—may have defrauded the courts, including this Court, of material information that bears directly on an evidentiary ruling concerning a cornerstone of the government's case.  *See* Dkt. 1079 (crediting Singer's sworn declaration in ruling that the government had "satisfied its burden of demonstrating that the calls need not be suppressed" over Vavic's objection that "the credibility of Singer's assertions must be put to the test" at an evidentiary hearing, *see* Dkt. 1068 at 2).

### C.     The Remedy for this Course of Conduct Should Be Dismissal, or at a Minimum, Discovery and an Evidentiary Hearing.

Two courts, including this Court, have already admonished the government about its *Brady* obligations.  In *Abdelaziz*, the Court held that "the government should have produced Singer's October 2nd note much sooner than it did" and "[t]he government's failure to do so *was irresponsible and misguided*."  *See* Dkt. 1169 at 3  at 8 (emphasis added).

And here, this Court held that "the government should have promptly produced the [consensual call] documents, rather than insisting that the motion to suppress was untimely, that defense counsel somehow had limited their request to records relating to telephone calls, and that Vavic and the court should simply accept government counsel's summary of the facts."  Dkt. 1062 at 6.   In so holding, the Court emphasized that the government "should have disclosed the

information that eventually trickled out," underscored that "the court is concerned…about the government's disclosure of information," and ordered the government "to provide Vavic with the discovery requested," "to ensure that there are no further surprises relating to the consensual recordings." Dkt. at 7-8.

Now, one week before trial, we are faced with "further surprises"—including "surprises" which bear directly on this Court's ruling on the consensual call issue. While the Court ultimately determined that there was "no actual prejudice to warrant dismissal of the indictment" from the government's eleventh hour disclosure because Coach Vavic had adequate time to fully and thoroughly litigate the issues, this time, by contrast, there is clear prejudice. Among other things, as noted above, the state of the record is still undeveloped—and the government has declined to investigate further. Yet, the government cannot, as it is seeking to do, "avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts." *Bowie*, 243 F.3d at 1118.

In this context—where the government had concrete, specific notice of potential criminal acts; failed to investigate, despite repeated defense requests; and has now doubled down on its refusal to investigate in response to Coach Vavic's letter—the government's conduct amounts to a due process violation. *See Price*, 566 F.3d at 909 ("[I]f the prosecutor either failed to disclose the information or *failed to discover that his agent knew of or possessed it*, a *Brady* violation occurred.") (emphasis added); *Cerna*, 633 F. Supp. 2d at 1061("[A] prosecutor is required to use due diligence—*affirmative due diligence*—to gather *Brady* material," a duty heightened where a prosecutor has a "specific reason" to suspect that *Brady* material may reside at a source, or where defense counsel makes a "narrowly defined and well directed request."); *Osorio*, 929 F.2d at 761-62 ("The government, as represented by its prosecutors in court, is under a duty of inquiry

19

regarding information concerning the criminal past of its cooperating witnesses … when … a specific discovery request is made and granted.").

And the instant violation is more serious still because it is part of a cumulative pattern of conduct that includes the repeated failure to disclose exculpatory evidence, deceiving defendants and the courts regarding the existence of such evidence, allowing star cooperator Rick Singer to destroy evidence, and now, the failure to investigate Singer's apparent criminal conduct, despite notice of the same.  At this juncture, dismissal is thus appropriate.  *Bernal-Obeso*, 989 F.2d at 336 ("egregious wrongdoing by the government" in this context may amount to outrageous government conduct calling for dismissal of the indictment); *see also Horn*, 29 F.3d 754, 760 (exercise of supervisory powers to dismiss an indictment may be appropriate in the context of "'extreme misconduct and prejudice,' in order 'to secure enforcement of "better prosecutorial practice and reprimand of those who fail to observe it").

If the Court concludes, however, that the current record does not warrant dismissal, it should at a minimum order discovery and affirmative investigation pursuant to Coach Vavic's pending discovery request.  *See* Ex. A; Fed. R. Crim. P. 16(d)(2)(D) (court may "enter any other order that is just under the circumstances" for violations of Rule 16's disclosure obligations); L.R. 83.6.5(g) (in matters of alleged attorney misconduct, "[t]he presiding judge shall order such discovery as may be reasonably necessary to ensure that the proceeding is fair to all parties"). In particular, Coach Vavic requests that the Court order Singer to execute a waiver and request for documents for each of the banks listed in Docket 1090, and the government to review its databases for records related to these accounts and Rick or Cliff Singer.

Further, given the proximity to trial and the importance of these issues—including as the newly-revealed information bears on this Court's Order on the consensual recordings—Coach

Vavic also respectfully requests a pre-trial evidentiary hearing to resolve the material dispute between the parties. *See* Dkt. 1092; *LaFrance v. Bohlinger*, 499 F.2d 29, 35 (1st Cir. 1974) (courts must "protect[] the accused against pretrial illegality by denying to the government the fruits of its exploitation of any deliberate and unnecessary lawlessness on its part" and conduct necessary inquiry when presented with substantial claim of such conduct); *United States v. Merlino*, 2000 WL 294880, at *2-3 (D. Mass. Mar. 10, 2000) (granting hearing where defendant identified material disputes).

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Jovan Vavic respectfully requests that the Court dismiss the Indictment, or at a minimum, order discovery and calendar a pre-trial evidentiary hearing.

Dated: February 28, 2022                    Respectfully submitted,

                                            /s/ Stephen G. Larson
                                            Stephen G. Larson (admitted *pro hac vice*)
                                            slarson@larsonllp.com
                                            Koren L. Bell (admitted *pro hac vice*)
                                            kbell@larsonllp.com
                                            Paul A. Rigali (admitted *pro hac vice*)
                                            prigali@larsonllp.com
                                            **LARSON LLP**
                                            555 South Flower Street, Suite 4400
                                            Los Angeles, California 90071
                                            Phone:  213-436-4888 - Fax: 213-623-2000

                                            Irwin B. Schwartz (BBO #548763)
                                            ischwartz@blaschwartz.com
                                            Nicholas R. Cassie (BBO #672698)
                                            ncassie@blaschwartz.com
                                            BLA Schwartz, PC
                                            One University Avenue, Suite 302B
                                            Westwood, Massachusetts 02090
                                            Phone: 781-636-5000 - Fax: 781-636-5090

                                            *Attorneys for Defendant JOVAN VAVIC*

## RULE 7.1 CERTIFICATION

Undersigned counsel certifies that counsel for both parties have met and conferred in a good faith effort to resolve this dispute without success.

                                    /s/ Stephen G. Larson
                                     Stephen G. Larson

## CERTIFICATE OF SERVICE

I, Stephen G. Larson, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF, and paper copies will be sent to those indicated as non-registered participants on February 28, 2022.

                                    /s/ Stephen G. Larson
                                     Stephen G. Larson