# EXHIBIT B

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

    v.

DAVID SIDOO, et al.,

        Defendants.

Case No. 19-cr-10080-NMG

*Leave to File 35-Page Brief*
*Granted on 3/19/20*

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS INDICTMENT WITH PREJUDICE OR, IN THE ALTERNATIVE, FOR SUPPRESSION OF EVIDENCE BASED ON GOVERNMENTAL MISCONDUCT AND FOR DISCOVERY AND AN EVIDENTIARY HEARING

## ORAL ARGUMENT REQUESTED

suppression of the tainted recordings. Suppression is essential because the recordings are highly inflammatory, prejudicial, and deliberately misleading—especially in light of Singer's other statements to Defendants and the Government that the payments were *not* bribes. The Court should also order an evidentiary hearing to uncover the full truth about the recordings and the Government's efforts to fabricate and conceal evidence. These measures are essential to preserve the integrity of this proceeding and to deter future prosecutorial misconduct.

## BACKGROUND

Last March, the Government charged Defendants with conspiring with Singer to secure the admission of their children to various colleges through bribery, testing fraud, and other means. The initial complaint and superseding indictments highlight Singer's recorded calls to Defendants as the evidentiary centerpiece of the Government's case. *See, e.g.*, ECF Nos. 3-3 to 3-5 ¶¶ 192-93, 219-20, 285-86, 445-49; ECF No. 732 ¶¶ 122, 132-33, 163-64.

The Government must prove that Defendants knowingly bribed employees of the schools or testing services. *See United States v. Berroa*, 856 F.3d 141, 154, 157 (1st Cir. 2017). Defendants have thus repeatedly asked the Government to disclose exculpatory evidence, including evidence that Singer told them the payments were *donations* to benefit the schools, rather than *bribes* to benefit corrupt school officials. In response, the Government has repeatedly denied such evidence existed. Those denials were false: We now know the Government was aware of Singer's notes showing he told his clients their payments would be donations—not bribes—and that federal agents pressured him to lie to create false inculpatory evidence on the calls. And we now know the Government had, and failed to disclose, numerous interview reports that reflect similar exculpatory admissions by Singer about the nature of the donations made by his clients.

## I. THE DENIALS

On May 30, 2019, the Government told Defendants that it knew of "no information or

materials" constituting "exculpatory evidence" under Local Rule 116.2(b)(1).  5/30/19 Letter, Ex.
B at 7.  At the initial status conference, defense counsel challenged the Government's narrow view
of its *Brady* obligations—specifically as relating to Singer's representations to clients.  Counsel
explained that "[i]f Rick Singer was telling other parents that the money that they were giving to
Key Worldwide was going to go to the athletic programs, we think that's exculpatory."  ECF No.
396 at 10.  When the Government disagreed, defense counsel emphasized the "chasm[]" between
the parties, noting that "[i]f money went to a school, whatever the discussions, it's not a bribe, at
least not a bribe within the ambit of the Government's allegations in this case."  *Id.* at 13.
Magistrate Judge Kelley then "urge[d] the Government" to turn over information if Defendants
provided "any arguable reason" why it was exculpatory.  *Id.* at 14.

Over the following months, the Government obtained guilty pleas from multiple
defendants.  Meanwhile, the remaining Defendants asked the Government to produce specific
categories of evidence bearing on their lack of intent, including evidence that Singer (1) told his
clients their payments would fund school-related programs, and (2) did not describe their payments
as "bribes" or otherwise use language suggesting impropriety.  9/27/19 Letter, Ex. C at 2.
Defendants also requested all statements the Government made to Singer about what he should
say to his clients in consensually recorded conversations, as well as any criticisms or comments
the Government made to him about those conversations.  *Id.* at 5.

The Government rejected Defendants' requests as a "fishing expedition" seeking "evidence
that is quintessentially *not Brady*."  10/31/19 Letter, Ex. D at 1-2.  The Government later noted,
however, that it had "re-reviewed" its FBI 302 Reports and decided to produce written summaries
of evidence to individual Defendants—though it still maintained that "[none] of the information
. . . constitutes *Brady* material."  11/27/19 O'Connell Letter, Ex. E at 1.  The Government then

provided individual Defendants with cursory "in sum and in substance" summaries of what Singer allegedly said during his FBI interviews, including that he had told certain clients that their "money would be directed to a USC program." *E.g.*, 11/27/19 Kearney Letter, Ex. F at 1.

Ultimately, the Government's recalcitrance prompted Defendants to file multiple motions to compel between November 2019 and February 2020. *See* ECF Nos. 648, 693, 699, 703, 865. In response, the Government doubled down and asserted that it "has scrupulously adhered to its discovery obligations in this case, and gone well beyond those requirements." ECF No. 736 at 1. It also represented that "virtually all the evidence the defendants seek either *does not exist* or *has already been produced*." *Id.* at 4 (emphasis added).

But then on January 28, 2020—the day Defendants were originally supposed to file their *Brady* replies—the Government suddenly handed over new information. *See* 1/27/20 Letter, Ex. G (pre-dated). These disclosures contained statements by multiple FBI interviewees, including statements by Singer that various Defendants thought their payments "went directly to USC's program" and that his clients "typically do not know that [former USC official Donna] Heinel is involved until the time of the[ir] first payment." *Id.* at 3. These statements are exculpatory because they help show that Defendants thought their payments were legitimate and went to *USC*—for the school's benefit—not to a corrupt official for her own personal benefit.

The Government offered no explanation for its delay in producing the exculpatory information, though its sur-reply revealed that the information had been in its possession for at least two months. *See id.*; ECF No 834 at 1. And the Government once again reiterated that it was "*not* withholding exculpatory evidence." ECF No. 834 at 2.

## II. THE REVELATION

On February 19, 2020, while their motions to compel remained pending, Defendants sent the Government a letter about major deficiencies in its production of materials from Singer's cell

phone. *See* 2/19/20 Letter, Ex. H. One week later, the Government produced the materials precipitating this motion: contemporaneous notes that Singer kept on his iPhone describing his interactions with the Government. *See* 2/26/20 Letter, Ex. I. The notes memorialize Singer's interactions with agents on October 2, 2018, about recorded calls that they directed him to make to his clients in order to induce inculpatory statements to be used against them in this case.

Singer's notes state that investigators (1) intimidated him into lying on recorded calls with clients to fabricate inculpatory evidence; (2) directed him to omit exculpatory information he had previously told his clients; and (3) wanted to "nail" Defendant Gordon Caplan—who later pleaded guilty and was sentenced to prison—"at all costs." In Singer's own words:

> Loud and abrasive call with agents. **They continue to ask me to tell a fib and not restate what I told my clients as to where there money was going -to the program not the coach and that it was a donation and they want it to be a payment.**
>
> I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking the questions. **Essentially they are asking me to bend the truth** which is what they asked me not to do when working with the agents and Eric Rosen.
>
> **Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools. This time about asking each person to agree to a lie I was telling them.**
>
> Spoke to [Parent A] which is a referral from Gordon Caplon [sic]. They want to **nail Gordon at all costs**. [Parent A] told me his daughter is a good runner 19 minute 3 mile good enough for recruited walk on or walk on to Wash U and Cornell. Explained the side door but very late and I probably could not do it at this stage.
>
> The agents told me to get him to take another school I had a relationship **just to entrap him** despite him never asking for any other school.
>
> When I told them Gordon texted me that [REDACTED] did not get extended time and the reasons why they still wanted me to ask him for a payment to take the SAT through WHCP even when he was not approved **just to nail him**. I said that is ludicrous as he will not entertain because she was not approved.

Ex. A at 1 (emphasis added).

Other evidence reveals what prompted the agents' "loud and abrasive" instructions that Singer to "bend the truth" and "not restate" to parents that he had told them the payments would

be donations.  On October 2, Singer had a recorded call with a prospective client to explain the "side door" arrangement.  On that call, Singer repeatedly referred to donations to *coaches*. 10/02/18 Tr., Ex. J at 7-8.  But when the client interrupted Singer and asked him to clarify ("what did you mean by donation to the coach?"), Singer responded that the donation would actually go "to the program."  *Id.* at 12-13 (confirming that the donation would be "specific to the program" and would pay for "training facilities or what have you").  This sort of exculpatory exchange—in which Singer confirmed that the payments were *not* bribes—is exactly what the agents did not want showing up on the recorded calls.  And so they ordered Singer to "bend the truth" to avoid "restat[ing]" his exculpatory characterization of the payments in subsequent calls. Ex. A at 1.

In its February 26 transmittal letter, the Government admitted it had possessed Singer's notes since October 2018 and that prosecutors "saw all or part of" the paragraphs quoted above "on or about October 28, 2018."  Ex. I at 1.  But the Government claimed that at that time it "believed the notes were privileged and did not review them further," and that it "initiated a privilege review process" *a full year later*, in August 2019.  *Id.*  The Government asserted that it was finally producing the notes because "Singer's counsel agreed to waive privilege."  *Id.*  The Government did not deny that the notes accurately describe Singer's interactions with the agents.

Given the gravity of the misconduct reflected in the notes—and the Government's failure to disclose them—Defendants immediately brought these issues to the Court in various filings and at the February 27, 2020 status conference.  *See* ECF Nos. 875, 881, 882, 886; 2/27/20 Conf. Tr., Ex. K at 9.  Defendants also sought clarification from the Government about the substance of the notes and its decision to withhold them.  *See* 2/28/20 Letter, Ex. L; 3/13/20 Letter, Ex. M.

## III.    THE EXCUSES

The Government addressed the notes at the February 27 status conference and in a March 9 letter.  *See* Ex. K at 15-20; 3/9/20 Letter, Ex. N.  Once again, the Government did not deny

6

Singer's core assertion that federal agents pressured him to lie on the recorded calls and instructed him not to mention the truthful exculpatory statements he had previously made to his clients.

The Government's March 9 letter admits that two prosecutors saw the notes in October 2018. Ex. N at 2. It explains that Singer consented to the Government searching the phone with the notes on October 5, 2018, and that Singer's attorney separately agreed "that the [G]overnment could search the . . . phone without a taint protocol" on October 11, 2018. *Id.* at 1. Then, around October 28, AUSA Justin O'Connell—who later derided Defendants' *Brady* requests as a "fishing expedition"—reviewed "part of" the October 2 note. *Id.* at 2. He emailed an "excerpt[]" of the note to AUSA Eric Rosen and the FBI agents handling the investigation. *Id.* The Government's letter claims that Rosen and O'Connell "did not further review" the notes because they believed the notes "were written by Singer at the behest of his attorney and may be privileged." *Id.* at 2.

The Government's letter also says that on "October 9, 2018," the prosecution team was "assigned . . . a taint AUSA," *id.* at 1, presumably to handle privilege determinations. But neither Rosen nor O'Connell sent the notes to this taint AUSA in October 2018 or otherwise ensured their review. *See id.* at 1-2. Instead, they waited until October 2019 and then sent the notes to Singer's attorney so *he* could review the notes for privilege. *Id.* at 2. Singer's attorney did not review those notes—and the Government did not follow up with him—until February 2020. *Id.* The Government's taint AUSA only "reviewed the Singer Notes *for the first time*" on February 19, 2020, the same day Defendants sent their letter about Singer's phone. *Id.* at 2-3 (emphasis added).

Subsequent communications between defense counsel and Singer's counsel indicate that in late February 2020, AUSA Amanda Strachan (a member of the taint team) concluded the notes should be shared with Defendants. According to Singer's counsel, Strachan told him that "portions of . . . the October 2, 2018 [note], *on its face* appeared to be potential *Brady* or *Giglio* material and

*should be disclosed to the defense.*"  3/11/20 Email, Ex. O at 1 (emphasis added).

## IV.    THE FRUITS OF THE MISCONDUCT

Singer's notes reveal the Government's efforts to fabricate inculpatory evidence against Defendants, including by drafting scripts to guide Singer during calls.  And other evidence in the case shows that Singer followed the Government's directions and further undermines the substance of the recordings.  Consider the following examples:

**John Wilson.**  Before and during his cooperation with the Government, Singer portrayed his methods as legitimate to Wilson and his family.  *See* Wilson Affidavit, Ex. QQ.  On a September 28, 2018 FaceTime videocall with the Wilsons (*see* 10/5/18 iPhone Report, Ex. P)— after Singer's cooperation began—Singer made highly exculpatory statements that continued to reassure Wilson of the propriety of the side-door program.  Singer told them side-door donations, like Wilson's 2014 contribution to USC's water-polo program (and *not* its coach), were a legitimate and prevalent aspect of college admissions that allowed schools to fund their programs. Ex. QQ at 1-2.  He explained that schools can admit applicants with the necessary academic credentials even if they lack the athletic abilities necessary to compete on the schools' varsity teams, and simply require those students to work as assistant managers or in other support roles. *Id.* at 2-3.  The Government made no record of this FaceTime call, even though Singer made the call from an FBI office building during a break in a multi-day interview conducted by half a dozen Boston agents and prosecutors.  *See* 11/24/20 Emails, Ex. RR at 1-2.

Starting September 29, 2018, and continuing for weeks after the Government's "loud and abrasive" instructions to "bend the truth," Ex. A at 1, Singer began interjecting incriminating phrases on calls that the Government *did* record.  An October 15, 2018 call included this exchange:

> SINGER:    So I know when . . . we get the girls in, it's a done deal and you're
> gonna take care of your part of it, you're gonna make the payments
> *to the schools* and the -- *to the coaches*.  And that's what I need . . .

|          |                                                                                      |
|----------|--------------------------------------------------------------------------------------|
|          | so I'm not worried about that.                                                       |
| WILSON:  | Uh, uh, help me understand the logistics?  I thought I make the payment to you and you made the payment *to the school*. |
| SINGER:  | Correct.  That's correct.                                                             |
| WILSON:  | Oh you said that *I* make the payments *to the schools*.                              |

10/15/18 Wilson Tr., Ex. Q at 9 (emphasis added); *see* 9/29/18 Wilson Tr., Ex. SS at 6-7.  Singer's references to payments going "to the coaches" are misleading and paint a false picture given his earlier statements to Wilson that, as before, his payments would go to the university.  That is precisely what Government agents wanted when they told Singer to "bend the truth" and get "each person to agree to a lie."  Ex. A at 1.[1]

**Gamal Abdelaziz.**  On October 25, 2018, Singer called Abdelaziz and tried to get him to agree that "$300,000, um, was paid to . . . Donna Heinel at USC to get [Abdelaziz's daughter] into school."  10/25/18 Abdelaziz Tr., Ex. R at 4.  But that same week, Singer *told* the Government that "ABDELAZIZ did not know about HEINEL" and "knew the money was going to the school."  10/31/18 FD-1023, Ex. S at 2.  Indeed, FBI notes describe Singer as saying:  "Donna diverted some of the money.  *Gamal didn't know about Donna*."  10/31/18 Notes, Ex. UU at 9 (emphasis added).  Singer's comments on the call were simply a trap to generate fake evidence.[2]

---

[1]  Singer also strategically intermingled comments confirming to Wilson that the funds were intended for school *programs*—not school officials.  On a November 5, 2018 call, Singer explained that "women's lacrosse is always looking for help," and that "[w]omen's fencing, [is] looking for help," and that these programs' need for donations enabled Singer to facilitate admissions.  11/5/18 Wilson Tr., Ex. TT at 7.  At the same time, however—and consistent with the Government's instructions—Singer also interjected seemingly incriminating comments about paying a "coach."  *Id.* at 3 ("I have to pay the coach"); *id.* ("we'll pay the coach"); *id.* at 7 ("we pay the coach, we get it done").  Wilson, who had previously given to a school only for the benefit of a program and not to a coach, remained oblivious to this misdirection, continuing to understand "the coach" as a shorthand for the coach's *program*.  *See id.* at 8 ("Does [the coach] care about budget this year versus next year?"); *cf. id.* at 6 ("And if I pull the trigger, that means I have to commit to him and *pay* (inaudible) *Stanford*?" (emphasis added)).  No doubt the Government will portray its orchestrated recording as evidence of Wilson somehow acknowledging guilt.

[2]  Similar facts and a similar scenario underlie Singer's calls with Diane and Todd Blake.

*Lori Loughlin.*    On November 29, 2018, Singer called Loughlin and similarly used language to make it seem she knew the donations were bribes.  Singer fabricated an IRS audit and stressed that he "ha[d] not told [the IRS] anything about [Loughlin's daughters] going through the side door, through crew, even though they didn't do crew to get into USC . . . all [he] told them was that you guys made a donation to our foundation to help underserved kids."  11/29/18 Loughlin Tr., Ex. T at 2-3.  Loughlin answered "[u]m-hmm"—and that she was "confused."  *Id.*  The Government has repeatedly characterized Loughlin's response as an admission of wrongdoing.  *See, e.g.*, ECF No. 736 at 8.  But in a recorded call that Loughlin made to Singer three months later—after her daughters' high school received a grand jury subpoena for their academic records, and that was not directed by agents seeking to fabricate evidence—Loughlin made clear she did *not* know the payments were bribes or have any idea that Singer had engaged in wrongdoing: "Yeah, no, no, I—I had questions about [U]SC.  I was like, 'Well, maybe the way they got in you're not supposed to get in like that, I don't know, like can you,' but Moss was like, '*No, you can make a donation, it's OK*, like I don't know.'  Uh, yeah I don't know.  But it's all on the up-and-up (inaudible) right?"  3/4/19 Loughlin Tr., Ex. U at 5 (emphasis added).

*Robert Zangrillo*.    In September 2018, Singer told the Government that his insider contact at New York University "did not take any money personally for getting a student into NYU.  Instead, [she] wanted help with fundraisers she had for athletics or help paying bills related to NYU athletics."  9/26/18 FD-1023, Ex. V at 5.[3]  Singer also insisted that his contact "did not get money for helping the ZANGRILLO kid get into NYU."  Ex. V at 5.  But after the Government's "loud and abrasive" directions on October 2, Singer tried to bait Zangrillo into agreeing to the

---

[3]  *See also* 11/29/18 FD-1023, Ex. VV at 3 ("The payments to NYU were not a quid pro quo for getting students into NYU. . . .  The money goes to her program and fundraising.")

exact opposite, telling him: "I'm just going to say [to the IRS] that . . . [Zangrillo's daughter] didn't get in[to] NYU and no payment was made to my contact at NYU . . . [w]hich we know it was." 10/25/18 Zangrillo Tr., Ex. W at 3. Singer also said that he would not tell the IRS that they "essentially paid Donna Heinel . . . at USC to help [the daughter] get in." *Id.* Both assertions squarely contradict what Singer had told the Government about the payments.

*Bill McGlashan*. On October 24, 2018, Singer placed a recorded call to McGlashan in which he tried to get McGlashan to agree to the following:

> [a]As you know, when families pay for . . . either takin' the test or goin' through the side door, all the money goes through my foundation, *and then I pay it out to whoever needs to get paid,* like I did for, you know [McGlashan's son] when he took the [ACT test] . . . So I paid half of it to Mark [Riddell] and half of it to West Hollywood College Prep through my foundation, so that the family essentially has no connection back to what has happened.

10/24/18 McGlashan Tr., Ex. X at 4 (emphasis added). In fact, McGlashan knew nothing about any diversion of money from Singer's foundation to pay bribes. As Singer told the Government, he "did not go into detail about the testing" with McGlashan. 11/9/18 FD-1023, Ex. Y at 2. And as to the side door, which McGlashan decided not to pursue, Singer told him in a recorded call that payments would be made to "[USC] Women's Athletics," not to Singer's foundation, much less to a corrupt university official. 7/30/18 McGlashan Tr., Ex. Z at 9.

Singer's false statements in the October 24 call were carefully scripted by AUSA Rosen. In Singer's notes of the "[l]oud and abrasive" discussion with agents three weeks earlier, he wrote that he "asked for *a script* if they want me to ask questions and retrieve responses that are not accurate." Ex. A at 1 (emphasis added). Rosen then wrote an e-mail with a "McGlashan script" that Singer followed closely during the October 24 call. McGlashan Script, Ex. AA. Singer parroted Rosen's scripted statements about the payments nearly verbatim:

> As you know, when families pay me for either the testing like you did or this side-door, it goes into my Foundation, and then I pay out to whoever needs to be paid

**like I did with you, right? – I wrote checks to Mark and Igor** after the exam, that way there is no connection between you and them, RIGHT????

*Id.* This false suggestion—that McGlashan knew things that Singer had carefully hidden from him—plainly sought to manufacture evidence of knowledge where none existed.

## V.    THE FURTHER DISCLOSURES

In the wake of the disclosure of Singer's notes, the Government has indicated it will produce some of the exculpatory materials requested by Defendants. *See* ECF No. 918. The extent of the Government's newfound willingness to abide by *Brady* remains to be seen. But the additional disclosures reviewed so far only broaden the scope of the Government's misconduct.

For one, recently produced witness reports confirm that Singer repeatedly told the Government that he misled his clients about his scheme—and that the Government has improperly been withholding this information all this time. Consider the following representative examples of clearly exculpatory information the Government withheld for almost a year after it was obligated to produce all *Brady* material: On September 21, 2018, Singer told the Government that "[i]nitially all the payments to USC went to the programs." 9/21/18 FD-1023, Ex. BB at 3. A week later, he told the Government that specific parents "think they are going through [Singer's] relationships but . . . do not know exactly where the money is going." 9/27/18 FD-1023, Ex. CC at 3. On October 31, 2018, Singer told the Government another parent "did not know the money was going to [Georgetown's coach]; he believed it was going to the Georgetown tennis program," Ex. S at 2, and that a parent "did not review . . . [Singer's fake] athletic profile"—Singer "just sent it to USC.," *id.* at 3. On November 1, 2018, Singer told the Government another "family thought they were making a donation to the Georgetown tennis program." 11/1/18 FD-1023, Ex. DD at 4, and that he told another client "that the money was going to USC," *id.* at 5. And when the Government finally asked—in *December 2019*—about what Singer told Defendants Giannulli and Loughlin,

Singer said that they "thought their payment of $50,000 went directly to USC's program" and that "their $200,000 payment went to [Singer's] [f]oundation." 12/6/19 FD-1023, Ex. EE at 2.

The recent disclosures also show that the Government knowingly allowed Singer to destroy potentially exculpatory evidence. For over a year, the Government knew Singer was actively deleting relevant iMessages throughout his cooperation—but it failed to stop him, recover the messages, or secure the phones. *See* 3/13/20 Letter, Ex. GG at 3-4; Gardner Decl., Ex. PP at 3. 3/11/19 Excerpt, Ex. FF; Ex. H at 2-3. And although Singer used at least four phones while working as an informant, the Government recorded calls on only *one* of them—even though it knew Singer was using the others to call alleged co-conspirators. *See* 10/23/18 FD-1023, Ex. HH; Ex. GG at 3-4.

The disclosures also reveal the lengths to which the Government went to micromanage the substance of Singer's recorded consensual calls to generate incriminating evidence—and to hide those efforts from Defendants. As discussed, AUSA Rosen literally drafted a "script" for Singer to use to entrap Defendant McGlashan. *Supra* at 11-12. And the Government recently produced an inadvertently recorded conversation among Singer, his attorney, Rosen, and other members of the prosecution team on October 1, 2018, in which Rosen provided detailed instructions for what Singer should say—and *not* say—on future recorded calls with Heinel. *See* 10/1/18 Call Tr., Ex. II. Among other things, Rosen instructed Singer to "tone . . . down" mention of admission candidates' athletic abilities on recorded calls because "all of these people aren't getting recruited by USC" and "*that's the message that we sort of want to get across*." *Id.* at 2 (emphasis added). In other words—just as with the events recounted in the October 2 note—the Government was coaching Singer to avoid mention of accurate but exculpatory material that would muddy the black-and-white picture of wrongdoing it sought to create through Singer's calls.

13

The October 1 recording also shows the Government's efforts to shield its fabrication of evidence from Defendants.  Mid-way through the call, AUSA Rosen realized that Singer used his personal phone (which was being recorded by the investigators and would thus be discoverable) instead of his government-supplied "burner" phone (which was not being recorded).  *Id.* at 3. Clearly flustered, Rosen insisted that Singer immediately end the call and re-join on an unmonitored line:  "Rick, you hang up *right now*."  *Id.* at 3 (emphasis added).

## ARGUMENT

### I.  THIS COURT HAS INHERENT AUTHORITY TO IMPOSE SANCTIONS AND REMEDY GOVERNMENT MISCONDUCT

Federal courts possess inherent supervisory authority to formulate remedies to address the "violation of a recognized right, preserve judicial integrity, and deter illegal conduct."  *United States v. Osorio*, 929 F.2d 753, 763 (1st Cir. 1991).  The First Circuit has made clear that it will "consider unleashing the supervisory power in criminal cases '[w]hen confronted with extreme misconduct and prejudice,' in order 'to secure enforcement of "better prosecutorial practice and reprimand of those who fail to observe it."'"  *United States v. Horn*, 29 F.3d 754, 760 (1st Cir. 1994).  These powers include broad discretion to impose sanctions and formulate remedies, including "suppression of tainted documents."  *Id.* at 766; *see also United States v. Monteiro*, 2005 WL 8162990, at *5 (D. Mass. Oct. 31, 2005) (ordering disclosure of "all [relevant] materials"). And in "rare and extreme circumstances," the court may "dismiss criminal charges as a sanction for government misconduct."  *United States v. Guzman*, 282 F.3d 56, 59 (1st Cir. 2002).

### II.  THE GOVERNMENT'S RECENT DISCLOSURES REVEAL SERIOUS MISCONDUCT

#### A.  The Government's Disclosures Include Credible Contemporaneous Proof That Federal Agents Coerced Singer Into Fabricating Evidence

"[I]f any concept is fundamental to our American system of justice, it is that those charged

# EXHIBIT A



| 17 | Created:<br>10/6/2018<br>02:03(UTC+0) | |
| 18 | Created:<br>10/1/2018<br>16:27(UTC+0)<br>Modified:<br>10/11/2018<br>23:41(UTC+0) | |

Oct 2

Loud and abrasive call with agents. They continue to ask me to tell a fib and not restate what I told my clients as to where there money was going -to the program not the coach and that it was a donation and they want it to be a payment.
I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking the ques ions. Essentially they are asking me to bend the truth which is what they asked me not to do when working with the agents and Eric Rosen.

Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools. This time about asking each person to agree to a lie I was telling them.

Spoke to ███ which is a referral from Gordon Caplon. They want to nail Gordon at all costs. ███ told me his daughter is a good runner 19 minute 3 mile good enough for recruited walk on or walk on to Wash U and Cornell. Explained the side door but very late and I probably could not do it at this stage.

The agents told me to get him to take another school I had a relationship just to entrap him despite him never asking for any other school.

When I told them Gordon texted me that ███ did not get extended time and the reasons why they s ill wanted me to ask him for a payment to take the SAT through WHCP even when he was not approved just to nail him. I said that is ludicrous as he will not entertain because she was not approved.

5962

SINGER-PHONE-000536



Oct 5

SINGER-PHONE-000537



Bill McGlashan

Spoke about the SAT but want ▮▮▮ the son for side door which I explained is no longer as Bill's friends are helping not only to get ▮▮▮ into the Dr Dri program but now helping get into USC. So nothing her but SAT.

SINGER-PHONE-000538

# EXHIBIT B



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

May 30, 2019

All Defense Counsel of Record in
*United States v. David Sidoo et al.*

> Re: *United States v. David Sidoo et al.*
> Criminal No. 19-CR-10080-NMG

Dear Counsel:

Pursuant to Fed. R. Crim. P. 16 and Rules 116.1(C) and 116.2 of the Local Rules of the United States District Court for the District of Massachusetts, the Government provides the following automatic discovery in the above-referenced case. **Please note that like in many complex cases, the Government anticipates that there will be supplemental discovery under the automatic discovery rules that will be provided when it is acquired, processed, and reviewed by the Government. This process is ongoing and additional discovery will be distributed on a rolling basis to all defendants pursuant to Local Rule 116.7 (duty to supplement discovery). The next delivery of discovery will be on or about June 30, 2019.**

A.     Rule 16 Materials

This letter is intended to supplement the May 12, 2019 letter that provided a specific breakdown of the discovery being provided to defendants on the hard drive and an accompanying DVD, as well as the May 29, 2019 letter regarding two additional volumes of discovery provided on a thumb drive estimated to be delivered to defense counsel by May 31, 2019.

1.     Statements of Defendant under Rule 16(a)(1)(A) & (a)(1)(B)

a.     Written Statements

The Government has provided two databases of e-mails which contain written statements by the defendants that the Government intends to use in its case-in-chief.

b.     Recorded Statements

Consensual tape recordings were made of the defendants. These recordings are available for your review and copies are enclosed on the previously provided hard drive. There are two

indexes of all the recordings also available on the hard drive.

    c.      <u>Grand Jury Testimony of the Defendant</u>

The defendants did not testify before a grand jury in relation to this case.

    d.      <u>Oral Statements to Then Known Government Agents</u>

Other than statements made by Robert Zangrillo, Elisabeth Kimmel, and Mossimo Giannulli, the Government is unaware of any oral statements made by the defendants before or after arrest, in response to interrogation by a person then known to the defendant to be a Government agent, which the Government intends to use at trial. The Government will fully review FBI 302 reports as they come in and are produced to the Government, and will supplement these disclosures as needed. The statements of Zangrillo, Kimmel, and Giannulli have been provided separately to counsel for each of these defendants.

2.      <u>Defendant's Prior Record under Rule 16(a)(1)(D)</u>

The Government is unaware at this time of any prior criminal record of the defendants.

3.      <u>Documents and Tangible Objects under Rule 16(a)(1)(E)</u>

The Government has provided two e-mail databases as well as a database of records. The Government intends to supplement these items in future disclosures as items are produced or obtained by the Government. These items are material to the preparation of the defendants' defense and are intended for use by the Government as evidence in its case-in-chief at trial. The Government anticipates that additional e-mails will be provided in the future.

4.      <u>Reports of Examinations and Tests under Rule 16(a)(1)(F)</u>

There presently are no reports of physical or mental examinations or scientific tests or experiments made in connection with this case.

B.      <u>Search Materials under Local Rule 116.1(C)(1)(b)</u>

Numerous search warrants were executed on e-mail accounts and cellular telephone providers in connection with this case. Indexes of all the searches and accompanying legal process have been included on the hard drive. Copies of the search warrants, seizure warrants, applications, affidavits, and returns have also been provided.

In addition, multiple consent searches of Rick Singer's telephone were conducted by the FBI. Although these materials are not required to be produced by Local Rule 116.1(C)(1)(b), and despite that none of the defendants have standing to contest the searches of Singer's phone, the Government has provided copies of the written Consent to Search forms obtained in relation to these searches.

C.    Electronic Surveillance under Local Rule 116.1(C)(1)(c)

Wire and electronic communications, as defined in 18 U.S.C. § 2510, of the defendants relating to the charges in the indictment were intercepted pursuant to court-authorized electronic surveillance signed by District Court Judge Allison D. Burroughs.

The Government has provided copies of the applications for authorization to intercept communications relating to the charges contained in the indictment in which the defendants were named as an interceptee or pursuant to which the defendants were intercepted. Copies of the supporting affidavits of FBI Special Agent Laura Smith, the court orders authorizing the interceptions, and the court orders directing the sealing of intercepted communications under 18 U.S.C. § 2518(a) have also been provided.

D.    Consensual Interceptions under Local Rule 116.1(C)(1)(d)

The hard drive provided by the Government contains a written description of interceptions (as the term "intercept" is defined in 18 U.S.C. § 2510(4)) of wire and oral communications relating to the charges contained in the indictment made with the consent of one of the parties to the communication ("consensual interceptions") in which the defendant was intercepted or which the Government intends to offer as evidence in its case-in-chief. The Government has also provided an index of the recordings made on the consensual and non-consensual wiretap ("singer_pertinent_sessions.xlsx") as well as a separate index of recordings made through other recording devices ("Singer Recordings Log"). The conversations on these recordings are in English.[1]



---

[1] There are one or two recordings that feature a Chinese speaker, although these have been translated.









**F.**    Identifications under Local Rule 116.1(C)(1)(f)

The Government has no information indicating that the defendants were the subject of an investigative identification procedure used with a witness the Government anticipates calling in its case-in-chief involving a line-up, show-up, photo spread, or other display of an image of the defendants. In the event the Government becomes aware that such a procedure was used, we will advise you at that time and provide you with copies of any tangible evidence reflecting, used in, or memorializing the identification procedure.

**G.**    Exculpatory Evidence under Local Rule 116.2(B)(1)

With respect to the Government's obligation under Local Rule 116.2(B)(1) to produce "exculpatory evidence" as that term is defined in Local Rule 116.2(A), the Government is aware of no information or materials relating to this case of the types described in Local Rule 116.2(B)(1).

**H.**    Other Matters

The Government is aware of its continuing duty to disclose newly discovered additional evidence or material that is subject to discovery or inspection under Local Rules 116.1 and 116.2(B)(1) and Rule 16 of the Federal Rules of Criminal Procedure. The Government will continue to produce automatic discovery as it becomes available to the Government.

The Government requests reciprocal discovery pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure and Local Rule 116.1(D).

These materials are produced pursuant to the terms of the protective order entered by the Honorable M. Page Kelly, United States Magistrate Judge, on or about May 2, 2019. *See* D.E. 377. Accordingly, the Government requests that you treat all of these materials in accordance with that order.

*     *     *

Please call the undersigned Assistant U.S. Attorney at 617-748-3412 if you have any questions.

Very truly yours,

ANDREW E. LELLING
United States Attorney

By: *Eric S. Rosen*
Eric S. Rosen
Assistant U.S. Attorney

# EXHIBIT C

September 27, 2019

Eric S. Rosen, Justin D. O'Connell, Leslie A. Wright, and Kristen A. Kearney
Assistant United States Attorneys
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

*United States v. Sidoo et al.*, No. 19-cr-10080

Dear Counsel,

The government has taken the position that it possesses no exculpatory evidence or information within the meaning of Local Rule 116.2(b)(1). *See* May 30, 2019 letter from Eric S. Rosen. Apparently relying on that position, the government has failed to disclose any FBI form 302 memoranda, and has not disclosed any information originating from witness interviews or grand jury testimony. However, the categories of evidence and information described in this letter—whether contained in contemporaneous documents (e.g., emails, text messages, Skype messages or other instant messages, or audio recordings) or learned from witnesses (e.g., interviews, depositions, or grand jury testimony)—are exculpatory under Local Rule 116.2(a)(1), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Brady*'s progeny. We therefore ask that you produce these categories of evidence and information forthwith, as Local Rules 116.2(b)(1) and 116.1(c)(1) required their production 28 days from our clients' May 2019 arraignments.

Our requests refer to the time period prior to March 2019. They use the following definitions (in which "includes" and "including" denote inclusion without limitation):

- "Advised" includes stated, suggested, recommended, told, gave information, offered, or made a representation, directly or indirectly.

- "Clients" includes Rick Singer's actual client, potential clients to whom he sought to provide services, and persons he claims to have been his clients; it includes the student applicants and any family members or guardians with whom Singer interacted or claimed to have interacted.

- "Colleges" includes all colleges, graduate schools, and universities relevant to this matter, including all colleges, graduate schools, and universities to which Clients applied, and all colleges, graduate schools, and universities with whom Rick Singer communicated or claimed to have communicated about student admissions.

- "Educational institutions" includes Colleges, high schools, and public school districts.

- "Evidence" includes documents, recordings, or information in any form.

- "The Key" includes The Edge (d/b/a The Key), the Key Worldwide Foundation, and all related organizations.

AMERICAS 101120415

- "Payments" includes all transfers of money, however described and for whatever purpose.

- "Rick Singer" includes all persons affiliated or working, directly or indirectly, with Rick Singer or The Key.

- "Personnel" of a College excludes any individual who, at the time of the relevant acts or events, was receiving funds for personal use from Rick Singer; but otherwise includes staff of the athletics department, the admissions office, the advancement office, and the president's office.

The categories of Evidence we request (divided among topical headings for convenience only) are the following:

*Evidence Regarding Rick Singer's Representations*
*to Clients*

1.  All Evidence that Rick Singer advised Clients that Payments from Clients to The Key would be (a) transferred, directly or indirectly, to Educational Institutions; (b) used, directly or indirectly, to fund academic, athletic, or other school-related programs; or (c) used solely for charitable purposes.

2.  All Evidence that Rick Singer advised Clients that Payments from Clients to a College athletic coach, whether directly or via The Key, would ultimately benefit (a) the athletic team or program with which the coach was affiliated; or (b) another athletic team or program at the College.

3.  All Evidence that Rick Singer advised Clients that the term "side door" referred to preferential admissions treatment for prospective students whose families had, either directly or indirectly, made or agreed to make a payment to a program of the College.

4.  All Evidence that Rick Singer (a) advised Clients that any College or College staff knew about, approved of, or authorized any "side door" arrangement; or (b) otherwise gave Clients incorrect information about the scope or nature of his relationships with Colleges or College staff.

5.  All Evidence that, in communications with Clients, Rick Singer (a) characterized Payments to any coach, athletic program, or College as lawful, permissible, legitimate, or "above board"; (b) otherwise described such Payments in any way tending to indicate that the Payments would be made in good faith or would not violate the law; or (c) did not describe Payments to Colleges as "bribes" or using other language suggesting impropriety.

6.  All Evidence that Rick Singer advised Clients that Colleges afforded athletic coaches the discretion to (a) utilize preferential admission "slots" based on factors other than athletic skill; or (b) allocate preferential admission "slots" to prospective students who would not necessarily participate in NCAA competition.

7.      With regard to all Payments that the Government categorizes as "bribes," all Evidence that (a) the relevant Clients intended the Payment to be transferred to a College; (b) the relevant Clients were told that the Payment would be transferred to the College; or (c) the Payment actually was transferred to the College.

8.      All Evidence that Rick Singer introduced any misrepresentations into the admissions materials of any applicant (including any "common app" or athletic resume) without the Client's knowledge or without the applicant's knowledge; including all Evidence that Rick Singer had control over the final submission of the admissions materials of any applicant (including any "common app" or athletic resume).

9.      All evidence that Rick Singer, Mark Riddell, or others altered ACT scores, SAT scores, or any other test scores without the Clients' knowledge or without the applicants' knowledge.

10.     All evidence that Rick Singer or his employees misrepresented themselves as Clients in communications with the College Board or the Educational Testing Service.

11.     All statements Singer made to anyone regarding his representations to Clients (a) about what any Payments were for, or where any Payments would go; (b) about the Colleges' awareness or lack of awareness regarding the purpose of the Payments; or (c) about any incorrect information in the admissions materials of any applicant (including any "common app" or athletic resume).

12.     All Evidence that Rick Singer discouraged Clients from speaking to College employees about Payments that the Client or Rick Singer had made to the Colleges or to any College programs.

13.     All Evidence that Rick Singer diverted any portion of Payments from Clients, without the Clients' knowledge, (a) for himself or for The Key; or (b) to pay money to a College employee personally, rather than to the College or one of its programs.

14.     All Evidence that Rick Singer advised Clients that they should route money to help fund academic, athletic, or other school programs at Educational Institutions through The Key, as opposed to delivering the money directly to the Educational Institutions.

15.     All Evidence that Rick Singer wanted Clients to make Payments through The Key, rather than directly to Colleges or College programs, because this enabled him to divert a portion of the Payments, without the Client's knowledge, to himself, to The Key, or to an athletic coach personally.

*Evidence Regarding Colleges' Knowledge of and Attitudes Toward the Alleged Conduct*

16.     All Evidence that any College's Personnel understood or agreed that whether a prospective student-athlete would receive preferential admissions treatment would not necessarily be determined solely based on the prospective student-athlete's athletic skill.

17.    All Evidence that any College's Personnel were aware that prospective students whose families had made Payments, or had agreed to make Payments, to any of the College's athletic programs, either directly or indirectly, had been promised or afforded (a) slots on College athletic teams; or (b) any other form of preferential admissions treatment.

18.    All Evidence that any College coach or other employee was (a) encouraged to recruit prospective students whose families could or likely would make donations to the College or its sports programs (whether directly or through a third party), either as potential student-athletes or as team managers and support staff; or (b) rewarded or praised for doing so.

19.    All Evidence that, at any College, the acceptance rate for prospective students whose families could or likely would make donations to the College was higher than the overall acceptance rate.

20.    All Evidence of communications between Rick Singer and the administration, admissions department, or advancement office at any College.

21.    All Evidence of communications between any College's athletic department staff and that College's advancement office or admissions office concerning the potential for donations by an applicant's or student's family.

22.    All Evidence relating to the fundraising-related practices, procedures, or cultures at any College.

23.    All Evidence of any College soliciting donations from the parents of any applicant or student-athlete.

24.    All Evidence that admissions staff at any College were aware that the admissions materials of any applicant (including any "common app" or athletic resume) contained a misrepresentation.

*Additional Categories of Evidence*

25.    All Evidence concerning any inquiries or investigations by or on behalf of a College, including compliance or internal audit reports, concerning Rick Singer's activities, including (a) an unredacted copy of UCLA's July 2014 report of a compliance investigation relating to student-athlete admissions; (b) an unredacted copy of Georgetown University's internal investigation into Gordon Ernst's recruitment practices; and (c) any investigation report prepared in connection with Rick Singer's activities by or on behalf of USC.

26.    All Evidence concerning any inquiries or investigations by or on behalf of a College, including compliance or internal audit reports, concerning (a) interactions between the College's athletics department and its advancement office; (b) interactions between the College's admissions office and its advancement office; or (c) any individuals that have entered into cooperation agreements with the government.

27. All statements Singer made to financial advisors, employers, or other referral sources to persuade them to refer Clients to him.

28. All Evidence concerning benefits or things of value Singer gave to or received from financial advisors, employees, or other of his referral sources as part of his referral relationship with them.

29. All statements Singer made to Clients, defendants, or alleged conspirators in which he is alleged to have warned them of the Government investigation in violation of his obligations to the Government.

30. All statements the Government made to Singer as to what he should say to Clients, defendants or alleged coconspirators in his conversations with them, and any criticisms or comments the Government made to him about such conversations.

31. For every prospective government witness, including every individual identified in the government's "no-contact" letter of July 1, 2019:  a written description of all promises, rewards, and inducements given to the witness; a copy of any promise, reward, or inducement reduced to writing; a copy of the witness's criminal record; and a written description of any criminal cases pending against the witness.

32. All Evidence concerning communications between Rick Singer and Donna Heinel that occurred outside the presence of Clients (see, e.g., ECF No. 3-3, ¶ 187, No. 1:19-mj-6087).

\* \* \* \* \*

Each of the requests is continuing in nature.  We request prompt notice in the event that any responsive evidence or information comes to the government's attention at any time.

If the government declines to provide any category of evidence and information that this letter requests, please (within 14 days) state the basis for your position in writing.  If the government takes the position that it has already produced evidence or information that this letter requests, please (within 14 days) so confirm in writing, identify the Bates ranges corresponding to each request, and agree to produce as soon as practicable any additional responsive evidence or information that may come within your possession in the future.

Sincerely,

Counsel to the defendants

# EXHIBIT D



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 31, 2019

**VIA E-MAIL**
Counsel of Record

   Re: *United States v. David Sidoo, et al.*
      Case No. 19-cr-10080-NMG

Dear Counsel:

  We write in response to your letters of: (a) September 27, 2019, requesting purported *Brady* material; (b) September 27, 2019, concerning other discovery matters; and (c) October 11, 2019, concerning purported technical production issues.  We address each letter, in turn, below.

### PURPORTED *BRADY* REQUESTS

  Your letter of September 27, 2019, styled as a request pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), and Local Rule 116.2, requests that the government produce "[a]ll evidence" regarding:  (a) William "Rick" Singer's representations to clients; (b) the "Colleges' Knowledge of and Attitudes Toward the Alleged Conduct;" and (c) various topics including internal investigations conducted by the victim colleges.

  *Brady* and its progeny do not create a general right to criminal discovery.  *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one.").  Rather, *Brady* obligates the government "to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment."  *United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011).  "The government is primarily responsible for deciding what evidence it must disclose to the defendant under *Brady*."  *Id.* at 268.  The government is familiar with its *Brady* obligations, has complied with them, and will continue to do so.

  Your sweeping requests for "all evidence" in a variety of generic categories amount to little more than fishing expedition.  None of your requests articulates – let alone with specificity – what specific evidence the defendants expect to find, why the defendants believe that evidence would be found in the requested materials, or why that evidence would be favorable and material to the defendants.  *See Prochilo*, 629 F.3d at 268 (defendant's *Brady* request "cannot consist of mere

speculation," and defendant "should be able to articulate with some specificity what evidence he hopes to find in the requested materials, why he thinks the materials contain this evidence, and finally, why this evidence would be both favorable to him and material"). To the contrary, your requests appear, on their face, to seek evidence that is quintessentially <u>not</u> *Brady*, insofar as it is immaterial to guilt or punishment, affirmatively inculpatory, and/or within the defendants' knowledge.

For example, many of your requests seek information about alleged representations that Singer made to "Clients," which you define to include, among others, "actual client[s], potential clients . . . and persons [Singer] claims to have been clients." *See, e.g.*, Requests 1-7, 11-12, 14-15. To the extent that Singer made representations to actual or potential clients who are not defendants in this case, such representations are, on their face, irrelevant to this case. Likewise, many of your requests seek information about purported representations concerning "Colleges," which you define to include, *inter alia*, "all colleges, graduate schools, and universities with whom Rick Singer communicated or claimed to have communicated about student admissions." *See, e.g.*, 4, 6, 12, 15. But, of course, the defendants are charged with conspiring to defraud specific colleges and universities through bribery and fraud. Evidence concerning Singer's communications with colleges and universities the defendants did *not* conspire to defraud – while conceivably *inculpatory* to the extent it suggests, for example, that the defendants chose the targeted colleges because there was an available bribe opportunity – is not favorable to the defendants, nor is it material to their punishment. Still other requests seek information concerning "Educational institutions," which you define to include not just colleges and universities with whom Singer communicated or claimed to have communicated about student admissions (whether or not those communications concerned the defendants) but also high schools and public school districts (regardless of whether the defendants' children attended those schools or lived in those school districts). Such requests are wildly overbroad.

Even to the extent the requests are narrowed to concern the defendants themselves, and the colleges and universities they conspired to defraud, several requests seek information that is affirmatively inculpatory, such as evidence that Singer and his employees misrepresented themselves as the defendants in communications with the College Board and the Educational Testing Service, discouraged the defendants from speaking to college employees about their payments, or advised defendants to route money through The Key. *See, e.g.*, Requests 9, 12, 14. Several requests seek information about events that occurred "without the [defendants'] knowledge" or that was otherwise unknown to them and/or that occurred after they agreed to commit the charged offenses. *See, e.g.*, Requests 8-10, 13, & 15-32. Such information is neither relevant nor material to the defendants' knowledge or intent at the time they are alleged to have committed the charged crimes. Likewise, several requests seek information concerning where the bribe payments were directed or how they would be spent. *See, e.g.*, Requests 1-3, 7, 11-15, 17. This information is also neither relevant nor material to whether the defendants understood the payments to be bribes or kickbacks. *See, e.g.*, *United States v. DeMizio*, 741 F.3d 373, 382 (2d Cir. 2014) (rejecting "contention that a payment in a private-sector scheme does not qualify as a kickback unless the defendant employee himself or herself receives the payoff") (favorably citing *United States v. Hausmann*, 345 F.3d 952, 954 (7th Cir. 2003), for proposition that kickbacks could include payments to charities defendant supported). And several requests seek information concerning statements allegedly made to the defendants. *See, e.g.*, Requests 1-15 & 29. Such

evidence, to the extent it exists, would of course be known to the defendants and would therefore not fall within the scope of *Brady*. *See United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002) ("*Brady* applies to material that was known to the prosecution but unknown to the defense").

If, after reviewing the discovery, you continue to have a non-speculative basis to believe there is specific evidence in the government's possession that is favorable and material to the defendants, we would be happy to discuss those specific requests further. *See, e.g., United States v. Rose*, 11-10062-NMG, 2012 WL 1744757, at *4 (May 16, 2012) (holding that a "defendant must make some showing that the [purported *Brady*] material in question could contain favorable, material evidence," and "[t]hat showing cannot be based on speculation.") (internal quotations omitted).

## OTHER DISCOVERY MATTERS

*Expert Witnesses*:  Inasmuch as no trial date has yet been set, we believe it is premature to discuss a timetable for expert disclosures.

*Protective Order*:  You indicate that the defendants intend to ignore the designation of certain documents under the protective order by making "appropriate redactions of the relevant information."  The government objects to your unilateral decision to circumvent the express terms of the protective order in the absence of additional information allowing us to assess whether your practice is sufficient. Please provide a list of documents you consider to be governed by this approach, and how you propose to handle those documents.

*Table of Contents*:  The government has complied with the requirements of Local Rule 116.10 by providing multiple indices that identify the origin, type, and location of documents within the larger production.  In addition, as you are aware, all discovery has been produced in a manageable electronic format on either hard drives or discs, which have been organized into labeled folders that include load-ready files so the defendants can uses that data in searchable electronic databases.  Each production, moreover, has been accompanied by detailed letters describing the documents provided in the production, the location of the information on the hard drive or discs, and the corresponding Bates range for the information.  Under such circumstances, the government need not produce more detailed indexes.  *See, e.g., United States v. Cadden*, No. 14-10363-RGS, 2015 WL 13683814 (D. Mass. July 13, 2015) (denying request for more detailed indexes where government had produced detailed cover letters and searchable data in a production of over 8 million pages).

*Heinel Search Warrant*:  The government produced to the defendants the search warrant application, affidavit, and order related to the search of a University of Southern California e-mail account identified as dheinel@usc.edu.  *See* USAO-LP-000468 through USAO-LP-000559.  The government has produced all records and data it seized pursuant to Attachment B of that search warrant.

**TECHNICAL ISSUES**

With respect to the technical issues you have identified in the government's productions, we believe it makes sense to schedule a call between technical staff from your law firms and our office.  Please provide the contact information for your representative.  We note, however, that many of the issues you raise – *e.g.*, missing metadata fields, missing native Excel files, etc. – appear to be a product of the way materials were produced to the government by third-parties.  The defendants have the materials in the same format in which the government received them.

With respect to the financial records that have been produced, the government will re-produce those documents with Bates numbers.  Finally, with respect to the mobile phone text messages, the government has produced all text messages in its possession between the defendants and Singer.  The reports included in the government's production identify the participants in each text exchange, the content of the text, if available, as well as the date and time of each text.  We believe this satisfies the government's Rule 16 obligations.  *See, e.g., United States v. Murray*, No. 3:18-cr-30018-MGM, 2019 WL 1993785, *7 (D. Mass. May 6, 2019) (denying defense request for text message metadata from cooperator's cellphone).

\*       \*       \*

The government reiterates its request for reciprocal Rule 16 discovery.

> Sincerely,
>
> ANDREW E. LELLING
> United States Attorney
>
>
> By:      */s Justin D. O'Connell*
> Eric S. Rosen
> Justin D. O'Connell
> Kirsten A. Kearney
> Leslie A. Wright
> Assistant U.S. Attorneys

4

# EXHIBIT E



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

November 27, 2019

<u>VIA E-MAIL</u>
Counsel of Record

      Re:    *United States v. David Sidoo, et al.*
              <u>Case No. 19-cr-10080-NMG</u>

Dear Counsel:

      We write in response to your letter of November 15, 2019.

      In our prior correspondence, we explained our position that your requests pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), and Local Rule 116.2 are improper, insofar as they are vastly overbroad and seek information that is either inculpatory, immaterial, within your clients' knowledge, or some combination of the above.

      In response, you have demanded that we advise you of the "universe of requests that . . . do not seek exculpatory evidence," and the "universe of requests seeking evidence that, to the government's knowledge, the government does not possess." We do not believe that *Brady* requires the government to do so. To the contrary, it is the defendants' burden, in making such requests, to specify as to each request what evidence you hope to find, why you think it exists, and why such evidence would be both favorable to the defendants and material. *See United States v. Prochilo*, 629 F.3d 264, 268 (1st Cir. 2011). You have not even attempted to meet this burden. Accordingly, we believe we have satisfied our meet-and-confer obligations.

      Notwithstanding the foregoing, we have re-reviewed the FBI 302 reports of witness interviews in light of your requests. Although we do not believe that any of the information contained therein constitutes *Brady* material, we are writing to counsel for each of the defendants

under separate cover to provide certain additional disclosures in an abundance of caution.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:    */s Justin D. O'Connell*
Eric S. Rosen
Justin D. O'Connell
Kirsten A. Kearney
Leslie A. Wright
Assistant U.S. Attorneys

# EXHIBIT F



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

November 27, 2019

<span style="text-decoration: underline;">Via E-Mail</span>
Brian Kelly, Esq.
Nixon Peabody LLP
53 State Street
Boston, MA 02109-2835

      Re:    *United States v. Gamal Abdelaziz,*
               <u>No. 19-cr-10080-NMG</u>

Dear Mr. Kelly:

      As we have indicated to you under separate cover, we have re-reviewed the FBI 302 reports of witness interviews in this case and – although we do not believe that any of the information set forth below is exculpatory – we are disclosing it to you in an abundance of caution.

- Rick Singer has advised the government, in sum and in substance, that: (a) of the $300,000 that Abdelaziz wired to KWF, Singer was going to pay $200,000 to Donna Heinel and keep $100,000 in KWF; (b) ▮▮▮▮ Abdelaziz played basketball, but, for purposes of facilitating her admission to the University of Southern California ("USC"), Singer made her appear to be a better player than she was; (c) Singer charged Abdelaziz more than he typically charged parents for the USC side door, because ▮▮▮▮ Abdelaziz's poor academic record made it more difficult for Heinel to secure her admission through the sub-committee process; (d) Abdelaziz knew from Singer that his payment would go to someone at USC who, in exchange for the money, would facilitate his daughter's admission to USC; (e) Singer told Abdelaziz that the money would be directed to a USC program associated with the individual at USC who helped get his daughter admitted to the university; (f) Singer subsequently agreed with Heinel to redirect a total of $400,000 to Heinel personally, in monthly installments of $20,000, in exchange for her assistance in securing the admission of Abdelaziz's daughter and the children of Singer's other clients; and (g) half of the agreed-upon $400,000 payment was for Heinel's assistance with Abdelaziz's daughter.

We are aware of the continuing nature of our discovery obligations, and we will continue to make additional disclosures as required. We reiterate our request for reciprocal Rule 16 discovery.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:  */s/ Kristen A. Kearney*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant U.S. Attorneys

# EXHIBIT G

**From:** "Rosen, Eric (USAMA)" <Eric.Rosen@usdoj.gov>
**Sent:** Jan 28, 2020 6:02 PM
**To:** "McManus, Dylan (USAMA) [Contractor] 3" <Dylan.McManus2@usdoj.gov>; "Allen J. Ruby" <allen.ruby@skadden.com>; "Andrew E. Tomback" <andrew.tomback@whitecase.com>; "Brian T. Kelly" <bkelly@nixonpeabody.com>; "David E. Meier" <dmeier@toddweld.com>; "David S. Schumacher" <DSchumacher@health-law.com>; "David Z. Chesnoff" <dzchesnoff@cslawoffice.net>; "Eoin P. Beirne" <ebeirne@mintz.com>; George Vien <gwv@dcglaw.com>; "Jack P. DiCanio" <jack.dicanio@skadden.com>; "Jack W. Pirozzolo" <jpirozzolo@sidley.com>; "John C. Hueston" <jhueston@hueston.com>; "Jordan R.C. Kearney" <JKearney@health-law.com>; Josh Ruby <jnr@dcglaw.com>; "Joshua C.H. Sharp" <jsharp@nixonpeabody.com>; "Mark E. Robinson" <merobinson@mintz.com>; "Martin G. Weinberg" <owlmcb@att.net>; "Matthew L. Schwartz" <mlschwartz@bsfllp.com>; "Megan A. Siddall" <msiddall@mosllp.com>; "Michael K. Loucks" <michael.loucks@skadden.com>; Michael Kendall <michael.kendall@whitecase.com>; "Nicholas C. Theodorou" <ntheodorou@foleyhoag.com>; Patric Hooper <phooper@health-law.com>; "Viscounty, Perry (OC-SF)" <PERRY.VISCOUNTY@LW.com>; "R. Robert Popeo" <rrpopeo@mintz.com>; Reuben Camper Cahn <rcahn@kelleranderle.com>; "Richard A. Schonfeld" <rschonfeld@cslawoffice.net>; "Berkowitz, Sean (CH)" <Sean.Berkowitz@lw.com>; "Seth B. Orkand" <sorkand@mosllp.com>; "Stephen H. Sutro" <SHSutro@duanemorris.com>; "Tracy A. Miner" <tminer@mosllp.com>; "Trach, William (BN)" <William.Trach@lw.com>; Yakov Malkiel <yakov.malkiel@whitecase.com>; "Blanco, Allison (OC)" <Allison.Blanco@lw.com>
**Cc:** "O'Connell, Justin (USAMA)" <Justin.O'Connell@usdoj.gov>; "Wright, Leslie (USAMA)" <Leslie.Wright@usdoj.gov>; "Kearney, Kristen (USAMA)" <Kristen.Kearney@usdoj.gov>
**Subject:** RE: 19-CR-10080-NMG Discovery Production

Please see attached. Eric

Eric S. Rosen
Assistant United States Attorney
District of Massachusetts
Tel: +1 617 748 3412
E-Mail: eric.rosen@usdoj.gov



**U.S. Department of Justice**

**Andrew E. Lelling**
*United States Attorney*
*District of Massachusetts*

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

January 27, 2020

**VIA E-MAIL**
Counsel of Record

      Re:    *United States v. David Sidoo, et al.*
              Case No. 19-cr-10080-NMG

Dear Counsel:

     We write to supplement our earlier correspondence based on our continued review of FBI 302 interview reports.

-               , former Assistant Director of Development and Director of Development at USC, has advised the government, in sum and in substance, that it was atypical to have anonymous donors for athletics, but that it happened one or two times. Compliance sat in on all meetings because they needed to be looped in.



- Kirk Brennan, Director of Undergraduate Admission at USC, has advised the government, in sum and in substance, that the USC crew team recruits transfer students.

- Al Checchio, Senior Vice President of Advancement at USC, has advised the government, in sum and in substance, that the "VIP list" is not a guarantee of admission, but might help if there were a "tie" between applicants.





- Erica Muhl, Dean of the Iovine & Young Academy (IYA) at USC, has advised the government, in sum and in substance, that she did not talk to William McGlashan about joining the board of IYA, but had a general conversation with Paul Wachter about McGlashan writing checks. According to Muhl, Wachter told her that McGlashan had the resources to donate, but did not push it. Muhl reported that Jimmy Iovine recommended McGlashan's son and indicated that William McGlashan "could be helpful," but Muhl does not know if he meant about his project or because he was wealthy.

- Rick Singer has advised the government, in sum and in substance, that:

  o Singer's standard pricing to get a student accepted to USC through the side was $250,000 – with $50,000 paid to Heinel/USC and $200,000 paid to KWF. The families that do the side door believe their children are getting accepted through a sport, although they typically do not know that Heinel is involved until the time of the first payment, which went to Heinel. The families then typically believe that Heinel instructs Singer on where to send the remaining $200,000, with the families believing that all the money is going to someone as part of the admission deal.



With respect to the side door, Mossimo Giannulli was "running the show" but Lori Loughlin "got on it" because Mossimo Giannulli was not responding. Singer stated that Giannulli and Loughlin thought their payment of $50,000 went directly to USC's program, which as the checks indicate was USC Athletics and the Galen Center gift account. They thought their $200,000 payment went to KWF. Singer told Giannulli and Loughlin in sum and substance that the $250,000 they paid for each of their daughters was paid to get them into USC. Singer did not recall exactly what he said to Giannulli and Loughlin regarding the money. Singer did recall telling the Giannullis that the first $50,000 for each girl went to USC. It was Singer's belief that the Gianullis knew that part of the $200,000 sent to KWF was going to a USC program. They did not specifically discuss the amount of money

4

that would go to a USC program out of the $200,000. The Giannullis understood the money was part of the deal and it had to be paid in order to get the girls into USC.



- , USC's former tennis coach, has advised the government, in sum and in substance, that USC sometimes used third parties to recruit kids, but mostly for international students.

- Sarah Trudell, USC Central Advancement, has advised the government, in sum and in substance, that the purpose of tagging an applicant as a "VIP" was to keep a list of future donors, be responsive to relationships, and share with admissions that these people were important. The VIP list was shared with Kirk Brennan and Tim Brunold. Brennan let Trudell know the status of the students and if they were accepted. Trudell reported that her office was "similar to a concierge service," and sometimes people reached out in hopes of positive outcomes for admission. Trudell added that it was "very standard process" for Mark Benioff to recommend an applicant to Al Checcio, and Checchio would say that Trudell would handle it. Trudell had a conversation with Lynn Miles, Associate Dean of IYA, about the possibility of William McGlashan being a board member and she believed that Erica Muhl met with McGlashan about that possibility.



We are aware of the continuing nature of our discovery obligations, and we will continue to make additional disclosures as required. We reiterate our request for reciprocal Rule 16 discovery.

Sincerely,

ANDREW E. LELLING
United States Attorney


By:       */s Justin D. O'Connell*
           Eric S. Rosen
           Justin D. O'Connell
           Kirsten A. Kearney
           Leslie A. Wright
           Assistant U.S. Attorneys

# EXHIBIT H



NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Brian Kelly**
*Partner*
T 617-345-1135
bkelly@nixonpeabody.com

Exchange Place
53 State Street
Boston, MA 02109-2835
617-345-1000

February 19, 2020

Eric Rosen, Esq.
Assistant United States Attorney
John Joseph Moakley United State Courthouse
1 Courthouse Way
Boston, MA 02110

Dear AUSA Rosen:

Among the almost two million documents your office produced to us in this matter are seven documents which purport to be extractions of Rick Singer's cellphones. The index you provided for these seven documents is copied below. We write to request further information regarding these documents. In particular, we are concerned that: (1) your production is incomplete; (2) Mr. Singer has committed further acts of obstruction of justice which the government has not disclosed; and (3) the government has permitted Mr. Singer to destroy exculpatory evidence to which the defendants are entitled under the United State Constitution, the Federal Rules of Criminal Procedure, and the District of Massachusetts Local Rules.

| No. | Name | Description | Bates |
|---|---|---|---|
| 1 | AppleDev.2019-04-08.20-04-58 | Various text messages sent and received by Rick Singer between 10/7/2016 and 10/5/2018 | SINGER-PHONE-000001-SINGER-PHONE-000080 |
| 2 | AppleDev.2019-04-08.20-10-41 | Various text messages sent and received by Rick Singer between 10/1/2018 and 10/5/2018 | SINGER-PHONE-000081 |
| 3 | AppleDev.2019-04-08.20-25-58 | Various text messages sent and received by Rick Singer between 10/7/2016 and 11/28/2018 | SINGER-PHONE-000082-SINGER-PHONE-000181 |
| 4 | AppleDev.2019-04-08.20-47-07 | Various text messages sent and received by Rick Singer between 10/7/2016 and 1/2/2019 | SINGER-PHONE-000182-SINGER-PHONE-000275 |
| 5 | AppleDev.2019-04-08.21-04-59 | Various text messages sent and received by Rick Singer between 10/7/2016 and 3/11/2019 | SINGER-PHONE-000276-SINGER-PHONE-000468 |
| 6 | AppleDev.2019-04-08.21-18-45 | Various text messages sent and received by Rick Singer between 10/26/2018 and 2/20/2019 | SINGER-PHONE-000469-SINGER-PHONE-000470 |
| 7 | Logical.2019-04-08.20-12-49 | Various text messages sent and received by Rick Singer between 9/28/2018 and 10/22/2018 | SINGER-PHONE-000471-SINGER-PHONE-000494 |

Eric Rosen, Esq.
February 19, 2020
Page 2

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

As background, our concerns are primarily related to Mr. Singer's iMessages. iMessages are a type of text message between users of iPhones which typically display as blue, rather than green, on iPhones. Given the prevalence of iPhones, it is likely that the vast majority of Mr. Singer's text communications occurred by iMessage rather than SMS text message. Although court-ordered wiretaps can intercept regular SMS text messages, we understand that they cannot intercept iMessages. There were no iMessages provided to defendants in Title III disclosures or in disclosures from the consensual interceptions; they were provided to defendants only in the seven documents referenced above.

First, we would appreciate if you could provide further description of the documents listed above. Are all of the extractions of the same device? If not, which devices are the extractions from? Why are seven different reports provided? In particular, what is the difference between reports one, three, four, and five, all of which appear to provide iMessages from the same phone number during overlapping time periods?

Second, there was a surprisingly small number of iMessages provided to the defendants, considering that this was likely Mr. Singer's primary method of text communication. Has the government only provided the defendants with some portion of the iMessages extracted from Mr. Singer's phone, or has it provided all of the iMessages extracted from Mr. Singer's phone? Have the Assistant United States Attorneys assigned to this case reviewed all of the iMessages so that they can verify that none of the non-produced iMessages contain *Brady* information? The reasons set forth in Mr. Zangrillo's Motion for Production of Exculpatory Evidence Regarding Title III Interceptions and Consensual Recordings (Dkt. 681) apply equally to disclosure of all communications (including iMessages) extracted from Mr. Singer's mobile devices, and defendants hereby request all such communications.

Third, we note that it appears **all of Mr. Singer's iMessages prior to late September 2018 have been deleted.**[1] The government noted in a previous filing that it first approached Mr. Singer on September 21, 2018, and that Mr. Singer began cooperating with the government in late September 2018. *See* Dkt. 736 at 32. Defendants were not provided with any type of report showing when these messages were deleted, and hereby request such a report. Even without this information, however, the obvious implication is that Mr. Singer destroyed a substantial amount of evidence after being approached by government investigators and/or agreeing to cooperate. This is, of course, not only a violation of Mr. Singer's cooperation agreement, but also a federal crime punishable by up to twenty years in prison. *See, e.g.*, 18 USC § 1519. The decision not to prosecute Mr. Singer for deleting these iMessages is a "promise, reward, or inducement" and therefore should have been disclosed to defendants within twenty-eight days of arraignment, as required by *Brady* and the Local Rules. *See* Local Rule 116.2(b)(1)(C). Defendants hereby

---

[1] In the extraction format provided by the government, defendants are able to see the to/from and date information of deleted messages, but the content field is empty.

Eric Rosen, Esq.
February 19, 2020
Page 3

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

request that the government provide defendants a list of all of Mr. Singer's crimes that the government has decided it will not prosecute.

Fourth, we note that it appears **a substantial number—approximately 250— of Mr. Singer's iMessages after late September 2018 (after Mr. Singer became a cooperator) have been deleted, including messages with defendants in this case.** *See, e.g.*, SINGER-PHONE-000104 (deleted record of October 13, 2018 iMessage conversation with Felicity Huffman); SINGER-PHONE-000094 (deleted record of November 1, 2018 iMessage conversation with ▮▮▮▮▮▮▮▮▮); SINGER-PHONE-000091 (deleted record of November 25, 2018 iMessage conversation with ▮▮▮▮); SINGER-PHONE-000281 (deleted record of March 7, 2019 iMessage conversation with ▮▮▮▮▮▮); SINGER-PHONE-000185 (deleted record of December 2, 2018 iMessage conversation with ▮▮▮▮▮▮). It appears Mr. Singer was violating his cooperation agreement when he deleted these text messages and that such deletion was a federal crime punishable by up to twenty years in prison. *See, e.g.*, 18 USC § 1519. The decision not to prosecute Mr. Singer for deleting these iMessages is a "promise, reward, or inducement" and therefore should have been disclosed to defendants within twenty-eight days of arraignment, as required by *Brady* and the Local Rules. *See* Local Rule 116.2(b)(1)(C). Again, defendants request that the government provide defendants a list of all of Mr. Singer's crimes that the government has decided it will not prosecute.

Fifth, defendants request all call logs extracted from Mr. Singer's phones. The call logs may constitute *Brady* for the reasons set forth in Mr. Zangrillo's Motion for Production of Exculpatory Evidence Regarding Title III Interceptions and Consensual Recordings (Dkt. 681) and, in any case, are required to be disclosed pursuant to Fed. R. Crim. P. 16(a)(1)(E) because they are material to preparing our defense. Relatedly, defendants request all metadata regarding Mr. Singer's FaceTime audio and video calls, including call logs and records of any deletions. As you are aware, FaceTime calls cannot be intercepted by the technology the government uses for Title III interceptions and consensual interceptions. However, we know that Mr. Singer used FaceTime technology on *at least* one occasion subsequent to his cooperation agreement.

Sixth, defendants request the full extraction reports for Mr. Singer's phones. The defendants must be able to review the full extraction reports because the extraction reports may show remnants of metadata from deleted messages. As you are aware, when a text message is deleted, the metadata remnants on an extraction report (usually referred to as "carved strings") can include the content of text messages without any corresponding to/from or date information. Because the government provided the defendants with an extraction report showing only messages to/from certain individuals, defendants cannot be assured that text messages lacking to/from information, but nonetheless required to be produced pursuant to *Brady* and/or Fed. R. Crim P. 16(a)(1)(E), have in fact been produced.

Eric Rosen, Esq.
February 19, 2020
Page 4

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

Seventh, defendants request that the government explain what efforts it undertook to recover the messages that Mr. Singer illegally deleted from his phone both before and after becoming a cooperating witness. What methods did the government use to recover the destroyed evidence or did the government simply hand Mr. Singer back his phone knowing full well that doing so would make it difficult or impossible to recover the data that Mr. Singer deleted? At the very least, the destroyed evidence was *Jencks* material. Defendants have serious concerns that, while Mr. Singer was a cooperating witness (and de facto government agent), the government became aware that Mr. Singer destroyed evidence, knew that such evidence was exculpatory (or at the very least subject to disclosure under the Rules of Criminal Procedure, the Local Rules, or *Jencks*), but took no steps to recover the destroyed evidence.

Thank you for your prompt attention to these matters.

Very truly yours,

Brian Kelly
*Counsel for Gamal Abdelaziz*

Michael Kendall
*Counsel for John Wilson*

David Meier
*Counsel for Todd and Diane Blake*

Tracy Miner
*Counsel for Homayoun Zadeh*

Robert Popeo
*Counsel for Elisabeth Kimmel*

B.J. Trach
*Counsel for Mossimo Giannulli and Lori Loughlin*

George Vien
*Counsel for Mossimo Giannulli*

Martin Weinberg
*Counsel for Robert Zangrillo*

# EXHIBIT I



**U.S. Department of Justice**

**Andrew E. Lelling**
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*                    *John Joseph Moakley United States Courthouse*
                                                     *1 Courthouse Way*
                                                     *Suite 9200*
                                                     *Boston, Massachusetts 02210*

February 26, 2020

VIA E-MAIL
Counsel of Record

        Re:        College Admissions Cases

Dear Counsel:

        Enclosed at Bates numbers SINGER-PHONE-000495-000803 please find copies of the
"Notes" from William "Rick" Singer's iPhone.  These copies include numerous duplicates,
because they were extracted from the phone over multiple dates during Singer's proactive
cooperation, but we are producing them to you in their entirety.[1]

        During the investigation, members of the prosecution team learned that Singer had taken
notes on his iPhone about his interactions with the government.  Specifically, on or about October
28, 2018, members of the team saw all or part of the first four paragraphs under the entry for
October 2, 2018, and the entry on October 6, 2018 (SINGER-PHONE-000536). At that time, the
government believed the notes were privileged and did not review them further. In August 2019,
the government initiated a privilege review process.  This week, Singer's counsel agreed to waive
privilege over the notes, and so we are now producing them.

        We intend to disclose the remaining iPhone content shortly, once the privilege review is
complete.

_____

        [1] The extractions occurred on or about October 5, 2018, October 23, 2018, November 1,
2018, November 29, 2018, January 3, 2019, February 15, 2019, February 28, 2019, and March
11, 2019.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:    */s Eric S. Rosen*
Eric S. Rosen
Justin D. O'Connell
Kirsten A. Kearney
Leslie A. Wright
Assistant U.S. Attorneys

cc:    The Hon. M. Page Kelley
U.S. Magistrate Judge

# EXHIBIT J

1   **Call Date:**  2018-10-02

2   **Call Duration:**  15:29

3   **Call Begin [    ] Call End [    ]**

4   **Call Participants:**

5        ████████████

6        Rick Singer

7   **File Name:**  ████ 8802 2018-10-02 12-22-52 09363-001

8   **Bates No.:**

9

10  [00:00:00]

11  SINGER:   Hello?

12  ████:   Hi.  Is this Rick?

13  SINGER:   Yes, sir.

14  ████:   Hey, Rick.  This is ████████████, callin' you from

15       ████████.  We've, uh, exchanged a bunch of emails the last

16       few days.

17  SINGER:   Yes, sir.  How was your trip home?

18  ████:   Um, it was pretty smooth, I guess.  Uh, not too

19       troublesome.  How's everything with you?

20  SINGER:   Very good, sir.  Sir, do you live in Boca?

21  ████:   Yeah.

22  SINGER:   OK.

23  ████:   I, uh, moved down here from  ████████  a few years

24       ago.  Uh, is this a good time to take a few minutes?

1   SINGER:   Sure.  Sure.  Go ahead, sir.

2   ██████:   OK.

3   SINGER:   Yes.

4   ██████:   All right.  Um, g-- (inaudible) just 2 seconds, all

5        right?  Just 2 seconds.  (pause) Anyway, I just thought

6        I'd reach out to you 'cause we were havin' such a hard

7        time connectin'.  Um, I guess, uh, Gordon Caplan -- I, I

8        used to live in   ██████   and, uh, moved down here a few

9        years ago, and so he and his wife are, uh, are, are very

10       friendly with me and my wife, and he --

11  SINGER:   Terrific.

12  ██████:   -- put me in touch with you.

13  SINGER:   Terrific.

14  ██████:   And, um, [00:01:00] we have a, a daughter who's a

15       senior in high school, and in the process of applyin' to

16       colleges.  And --

17  SINGER:   OK.

18  ██████:   -- she's lookin' at a wide range but sort of

19       startin' to narrow it down.  And I was askin' Gordon, you

20       know, uh, if -- what he knew about what I can do to

21       sorta, you know, help my daughter's cause a little bit,

22       and, uh, he suggested I connect with you.  He wasn't

23       terribly specific about it, but, (laughs) you know, it

24       was kinda one of those, "I know him very well and speak

1        very frankly with him."  And I said, you know, "My

2        daughter's shootin' pretty high, and I'd love to see her

3        get into one of these schools, and if -- I wish I could

4        figure out how to help the cause a little."  And he said,

5        "I know someone, you know, you oughtta talk to, just tell

6        him what's on your mind, and, uh, and maybe he could be

7        helpful to you."  He didn't explain very much, um...  He

8        didn't tell me much about your background or, you know,

9        how all this comes together, but he told me, um, he's had

10       some dealings with you and, and suggested we connect.

11       Uh, does all that make sense?

12  SINGER:   OK.  Yep, that all makes sense.  It's terrific.  So

13       tell me a little bit about your daughter -- grades,

14       scores, [00:02:00] what her aspirations are -- and then I

15       can explain kinda how the process may or may not work.

16  ████████:   OK.  So, um, (clears throat) she goes to a school

17       called ████████ down here --

18  SINGER:   OK, I know it very well.

19  ████████:   -- in ████████ .

20  SINGER:   Yeah.

21  ████████:   OK.  Good reputation and all that.  Um, she's a

22       pretty solid student.  She's, uh, got a ████ GPA.  She's

23       got a ████ on the ACT, which is OK but not spectacular.

24       Um, she's -- her big thing is running.  She's a, a pretty

1        competitive runner.  Her, um -- you know, we've

2        researched it some.  Her times are, uh, in cross country

3        and l-- and middle-distance track -- but cross country

4        being the stronger of the 2 -- she's, um, w-what -- and

5        ████████████████████████████████████████████████████

6        ███████████████████████████████  or however that works,

7        so, you know, uh, uh, she's part of a very strong

8        program.  However, you know --

9   SINGER:   (overlapping dialogue; inaudible) mile time?

10  ████████:   Uh, I'm sorry, I couldn't hear you there.

11  SINGER:   What's her 3-mile time?

12  ████████:   Yeah, so -- yeah, her 5K is, uh, █████████████

13       And, you know, we've researched it quite a bit, and where

14       that shakes out is for the real strong D1 schools she'd

15       be a stretch, but for the D3 schools she's very

16       competitive, you know.  Um, so --

17  SINGER:   (overlapping dialogue; inaudible) --

18  ████████:   -- kinda just figured out...  (inaudible)?

19  SINGER:   I said relatively.

20  ████████:   Yeah, so, you know, um, she's reached out to a bunch

21       of the coaches and all that kind of thing.  Um, you know,

22       we've been told -- I don't know how much -- you know, m-

23       my wife is, uh, ████████  and so my daughter character--

24       you know, I guess, is, is categorized as ████████ .  You

1   know, maybe that helps to some degree.  I, I don't know

2   enough about it.  Um, but the bottom line is, uh, she has

3   narrowed down to a couple of schools.  In part-- uh, in

4   particular, one is Washington University.  And, um, she's

5   actually up at, uh, Cornell, uh, with my wife right now,

6   um, which, uh, Coach (inaudible) Gordon went, as you

7   probably know.  And she's gonna be applying early

8   decision, I guess, in just about a month.  And so, um,

9   [00:04:00] you know, her times are good but not

10  necessarily gonna cause the coach to pound the table on

11  her behalf, you know.  Um --

12  SINGER:  Right.

13  ████:  -- her GPA is solid.  Uh, her ACT is OK.  Uh, you

14  know, altogether I think she has a good application but

15  she doesn't have a kind of application where -- you know,

16  we're not applyin' to, you know, Harvard and Stanford and

17  Yale.  You know, um, schools like Cornell and Wash U are,

18  are probably -- I-I don't know, I'm, I'm being told, you

19  know -- slight stretches, but not ridiculous.  And so

20  that's kind of the category we're in, and that's what got

21  to my conversation with Gordon, which, which --

22  SINGER:  Got it.

23  ████:  -- leads us here.

24  SINGER:  Got it.  So does she have subject tests (inaudible)?

1    ████████:   No, she's, um -- I think she's kind of steered her,

2         her, uh, uh, game plan around not having to take them.  I

3         guess at Cornell there's different schools, and some you

4         need 'em and some you don't, and, uh, I forget the

5         specifics of all that, but, um, she was tryin' to not do

6         the subject tests.

7    SINGER:   And the reason why they have the subject tests,

8         [00:05:00] ████████, is because her grades are inflated, and

9         --

10   ████████:   Right.

11   SINGER:   -- so that's why they, they use the subject tests,

12        and that's why...  You have 3 schools of kids that apply:

13        you have kids with SATs with subject tests, ACTs with

14        subject tests, and ACTs without.  So usually the kids who

15        are without, um, there's a reason for it, and you

16        already, you know, stated it, that she probably wouldn't

17        perform exceptionally well on 'em.  So (inaudible).  So

18        that makes it a little more difficult in admissions --

19   ████████:   Mm.

20   SINGER:   -- um, especially when you have a ████on the ACT,

21        which is -- which is, for Wash U, very low, and --

22   ████████:   Right.

23   SINGER:   -- Cornell very low, um, unless you're gonna apply

24        as an in-state resident, and/or the School of Ag.  Um, so

 1        back to your point, um, Wash U, great school.  Best

 2        option of getting is to apply ED, no doubt [00:06:00]

 3        about it.  Um, I would say that without some sort of help

 4        at Cornell, um, she's probably not gettin' in, either.

 5        She'll probably get deferred.  Um, and she can't -- and

 6        she's not strong enough to run in the Ivies, 'cause that

 7        -- that's not a very fast time.  So, so the way -- the

 8        way...  And, and, again, I don't know if I can do this at

 9        this point, because it's pretty late in the --

10  █████:    Mm.

11  SINGER:    -- process, and Wash U will tell you that they

12        really, um...  They help their student athletes, but they

13        c-- they, they don't make any guarantees, um, that kids

14        can get in.  But what we can do, if you want to, um,

15        attempt to try to do this, is I can call, you know, those

16        schools, or other schools, and see if they are willing

17        to, [00:07:00] um, create a side door through athletics

18        whereupon your daughter is com-- is relatively

19        competitive from a running perspective, and could be a

20        recruit-- you know, could be a walk-on --

21  █████:    Right, (inaudible).

22  SINGER:    -- um, and then the, the program and the school

23        would help her with admissions, um, and you'd make a

24        donation to, um, to the coach, um -- I mean, to the

1       program and the coach, essentially, because they need

2       help.

3  ████:   Hmm.

4  SINGER:   Um, and, you know, that donation is gonna range

5       from, uh, from every school to be very different.  You

6       know, uh, a Cornell, it's probably over $1,000,000; a

7       Wash U is $500,000 to $1,000,000, if that can be done.

8       So that would be the process.  Um, and then you'd apply

9       early, they would flag her as a [00:08:00] student

10      athlete, which she is, uh, but she may not be at the

11      level in which, um, she'd be a recruitable student

12      athlete.  They would help her and support her, 'cause

13      you're giving some support, um, to the pro-- to, to the

14      coach.

15  ████:   Mm-hmm.

16  SINGER:   Um, so that's kinda how it may or may not work at

17      this point, uh, because, you know, we're a month away,

18      and, um, some of those spots are given away.  But there

19      is a possibility that I can get engaged in that and see

20      if it's possible.

21  ████:   OK, well, I appreciate that.  So, make sure I

22      understand what you're sayin' -- and I, I get what you're

23      sayin' about the times.  I think we've figured out that

24      wherever she goes she would be a walk-on, but at Wash U

1      she could sorta definitely walk on and be one of the

2      decent runners on the team.  At Cornell, she could

3      probably walk on and maybe, you know, not be quite middle

4      of the pack but just below, um, and it's a little bit

5      more of a stretch, but it, like, you know -- other places

6      we've looked at, like, you know, Tufts and Chicago, her

7      times are very good.  [00:09:00] She just doesn't like

8      those schools, as much.  And Duke and --

9  SINGER:    Sure.

10  ████████:    -- UVA and Vandy, you know, forget it.  I mean, the

11      times are, you know, a good --

12  SINGER:    Right.

13  ████████:    -- (inaudible) lower, you know?

14  SINGER:    Right.

15  ████████:    So we, we get all that.  Um, the thing with the

16      subject tests, just (inaudible) -- my understanding from

17      her, at least how she ar-- expressed it to me, is more

18      "I'm too busy, I don't want to study for more tests," and

19      if what you're sayin' is maybe part of it was she was

20      fearing the scores she'd put out, that could be, too.  I

21      just -- uh, not to my knowledge, but I --

22  SINGER:    Yeah, my --

23  ████████:    -- understand what you're sayin'.

 1   SINGER:   -- my, my guess -- my guess, that's the case,

 2        normally.  Um --

 3   ████:   Mm.

 4   SINGER:   -- it's not just...  Because those tests -- like,

 5        she could take the math and the literature test, and

 6        she's already in math right now, and the literature test

 7        is just reading comprehension, poems and, uh, regular

 8        reading passages.  So, um, you know, the-they're very

 9        difficult.  Uh, they're, they're not easy, and they're --

10   ████:   Right.

11   SINGER:   -- meant to be difficult, to be able to align with

12        grades and scores.  So we are where we are, right?

13   ████:   Right.

14   SINGER:   Um, and (inaudible) -- you know, this is -- this is

15        [00:10:00] where you gotta go.  So, um, again, this may

16        be a pathway to go where I try to create a, a side door

17        for you, um --

18   ████:   Mm-hmm.

19   SINGER:   -- through athletics.  Um, but there will be a

20        donation to the coach, uh --

21   ████:   Sure.

22   SINGER:   -- who is -- who is gonna provide the help of

23        getting her in.  Um, and, again, I -- you tell me, hey,

24        let's move forward and let me go and do some checking, I

1    could do that and get back to you, but at this point, um,

2    it's kinda -- the ball's in your court.

3    █████:   So let me...  OK, but let me make sure I just

4    understand what you're sayin'.  So when you say a side

5    door, I, I understand how a donation will help the cause.

6    When you say a donation to the coach, you're talkin'

7    about a donation in connection with playing sort of the,

8    the athletic card?

9  SINGER:   Yeah, that's correct.

10   █████:   All right, so, in other words, a donation straight

11   to the development folks doesn't get their attention as

12   much?

13 SINGER:   Um, well, the problem is, um, you could go to the

14   development, but development, [00:11:00] um -- and that's

15   an option; there's no doubt about it -- development won't

16   give you -- w-- um, is just gonna be able to provide a

17   asterisk for you, that this is a family who is a

18   potential giver, right?  And that may or may not work.

19   The problem is, is that wealthy folks like you, um -- and

20   not sayin' that you wouldn't do this -- they get some

21   help and then they don't support, right?  Because at the

22   end of the day, there's no link to -- there's no

23   guarantor there.  So that's why -- what they do is

24   they'll, um, they'll figure out who you are, what you've

1        done in the past, how -- what your giving patterns are,

2        and then they will, um, decide if they can be of some

3        help.  So they will go to folks and ask them if they can

4        get support.  Usually, your donation in that particular

5        scenario is going to be, um, through the 5X of what I

6        just talked about.

7    ████:   [00:12:00] You mean if you just go flat out to

8        development as opposed to through the coach?

9    SINGER:   That's correct.

10   ████:   Through the 5X because you're not making use of the

11       athletic angle.

12   SINGER:   Where the athletic angle has a potential spot that

13       they get to use, right?

14   ████:   Right.

15   SINGER:   Because there's recruitable athletes.

16   ████:   Right.

17   SINGER:   Um, she's not gonna be a --

18   ████:   What if she --

19   SINGER:   Go ahead, I'm sorry.

20   ████:   I'm sorry, but what did you mean by donation to the

21       coach?

22   SINGER:   Um, essentially, um, that donation is going to the -

23       - you know, to the program, and --

24   ████:   Right.

1   SINGER:   -- essentially, the coach is using up one of his

2        spots --

3   ███████:   I see.

4   SINGER:   -- um, for that, if, if they have a spot.  Or they

5        may go and if they've used up their spots they may write

6        a letter of support for that student athlete because this

7        is somebody they got late who they think would be an

8        attractive candidate, um, to the team and to the school.

9   ███████:   I see.  So, in other words, you make a donation that

10       helps for, like, I don't know, the, the, the training

11       facilities or [00:13:00] what have you, but it's specific

12       to the program.

13  SINGER:   That is correct, yes, sir.

14  ███████:   Understood.  OK.  Um, I, I think I've got it.  And

15       are you sayin' that, um, your understanding is this is

16       generally pretty doable, taking into account it might be

17       too late, or you'd be just exploring whether it's, you

18       know, even a possibility at those 2 schools?

19  SINGER:   Oh, they're always -- they're always doable.  If you

20       had called me 3 months ago, I -- this would've already

21       been done.

22  ███████:   Oh, shit --

23  SINGER:   Um --

24  ███████:   -- I didn't realize.

1   SINGER:   Right?  Because, you see, again, everybody who's

2         recruiting kids and getting their spots, um, have already

3         made their offers or talked to the kids over the summer,

4         so now, you know, to the coach -- I'm a coach at X

5         university; I gotta get --

6   █████:   Right.

7   SINGER:   -- my kids, right?  And I gotta get 'em to --

8   █████:   Right.

9   SINGER:   -- apply early, so, you know, we're in that mix.

10        So, to be frank with you, I don't know.  Um, all I can do

11        is go forward and, and make some inquiries, uh --

12  █████:   OK.

13  SINGER:   -- but you have to be willing to make that kind of

14        commitment, um, [00:14:00] if they were to say "Let's go

15        forward."

16  █████:   Sure, understood.  And, um, just generally speaking,

17        do you know if one of the 2 schools is generally more

18        amenable than the other in, in this scenario?

19  SINGER:   Um, you know, frankly, I don't know, because here's

20        what you're dealing with:  in those -- in, in the cross

21        country and then -- we're talkin' track and field, 'cause

22        then they flip over, usually --

23  █████:   Right.

1   SINGER:   -- um, it could be the same coach.  It could be

2         different coaches but all the same staff when it gets to

3         c-- when it gets to track.  So, um -- and there may be

4         more play in the track side than there is the cross

5         country side.  Um, frankly, I, I, I have no idea at this

6         point.

7   ████:   Gotcha.  All right, all right.  Um, well, look, I

8         appreciate the feedback, uh, quite a bit.  My wife and

9         daughter will be back tonight from Cornell, and we're

10        gonna have a sit down, and I wanna see if she can, uh,

11        you know, lock down on one, and then what I'm gonna do is

12        call you back and, uh, you know, we'll take a run at this

13        and, you know, [00:15:00] see if there's, uh, an angle

14        for us.  Uh, but obviously I gotta tell ya which school,

15        right?  So, um...  Does that make sense, if we just leave

16        it that way?

17  SINGER:   Yes, sir.

18  ████:   I'll get back to you within a day or 2?

19  SINGER:   Yes, sir.

20  ████:   All right.  Well, look, I really appreciate the

21        feedback on all this.  So, um, I'll get back to you as

22        soon as I can.  Is that cool?

23  SINGER:   Appreciate it.  Have a great day, sir.

24  ████:   Uh, uh, thanks so much.  You, too.

1   SINGER:   All right, bye-bye.

2   ████ :   All right, take care.  Bye-bye.

3   SINGER:   Bye-bye.

4   ████ :   Hello?  Hey, (inaudible), how are ya?

5   [00:15:29]

6

7                         END OF AUDIO FILE

# EXHIBIT K

1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3     _____

4     UNITED STATES OF AMERICA,

5                         Plaintiff,        Criminal Action
                                            No. 19-cr-10080-NMG
6     v.
                                            February 27, 2020
7     DAVID SIDOO, et al.,

8                         Defendants.        Pages 1 to 26

9     _____

10

11
                      TRANSCRIPT OF STATUS CONFERENCE
12              BEFORE THE HONORABLE NATHANIEL M. GORTON
                      UNITED STATES DISTRICT COURT
13              JOHN J. MOAKLEY U.S. COURTHOUSE
                           ONE COURTHOUSE WAY
14              BOSTON, MASSACHUSETTS   02210

15

16

17

18

19

20                    JOAN M. DALY, RMR, CRR
                        Official Court Reporter
21              John J. Moakley U.S. Courthouse
                  One Courthouse Way, Room 5507
22              Boston, Massachusetts   02210
                     joanmdaly62@gmail.com
23

24

25

1    APPEARANCES:

2

     FOR THE GOVERNMENT:

3

             ERIC S. ROSEN, AUSA
4            KRISTEN A. KEARNEY, AUSA
             LESLIE WRIGHT, AUSAU
5            Assistant U.S. Attorneys
             U.S. Attorney's Office
6            John J. Moakley Courthouse
             One Courthouse Way, Suite 9200
7            Boston, Massachusetts 02210
             617.748.3100
8            eric.rosen@usdoj.gov
             kristen.kearney@usdoj.gov
9            leslie.wright@usdoj.gov

10

     FOR THE DEFENDANT DAVID SIDOO:

11

             MARTIN G. WEINBERG, ESQUIRE
12           Martin g. Weinberg, PC
             20 Park Plaza
13           Suite 1000
             Boston, Massachusetts 02116
14           617.227.3700
             owlmcb@att.net

15

     FOR THE DEFENDANTS GREGORY COLBURN and AMY COLBURN:

16

             DAVID S. SCHUMACHER, ESQUIRE
17           Hooper, Lundy & Bookman, P.C.
             470 Atlantic Avenue
18           Suite 1201
             Boston, Massachusetts 02210
19           617.532.2704
             dschumacher@health-law.com

20

             PATRIC HOOPER, ESQUIRE
21           Hooper, Lundy & Bookman, P.C.
             1875 Century Park East
22           Suite 1600
             Los Angeles, California 90067
23           310.551.8165
             phooper@health-law.com

24

25

```
 1    FOR THE DEFENDANT GAMAL ABDELAZIZ:

 2            BRIAN T. KELLY, ESQUIRE
              Nixon Peabody, LLP
 3            100 Summer Street
              Boston, Massachusetts 02110
 4            617.345.1000
              bkelly@nixonpeabody.com
 5

 6    COUNSEL FOR THE DEFENDANTS DIANE BLAKE and TODD BLAKE:

 7            DAVID E. MEIER, ESQUIRE
              MELINDA L. THOMPSON, ESQUIRE
 8            Todd & Weld
              One Federal Street
 9            27th Floor
              Boston, Massachusetts 02110
10            617.720.2626
              dmeier@toddweld.com
11            mthompson@toddweld.com

12
      COUNSEL FOR DEFENDANT I-HSIN CHEN:
13
              REUBEN CAMPER CAHN, ESQUIRE
14            Keller/Anderle LLP
              18300 Von Karman Avenue, Suite 930
15            Irvine, California 92612
              949.476.8700
16            rcahn@kelleranderle.com

17
      COUNSEL FOR DEFENDANTS MOSSIMO GIANNULLI and LORI LOUGHLIN:
18
              GEORGE W. VIEN, ESQUIRE
19            Donnelly, Conroy & Gelhaar, LLP
              260 Franklin Street
20            Boston, Massachusetts 02110
              617.720.2880
21            gwv@dcglaw.com

22            WILLIAM J. TRACH, ESQUIRE
              Latham & Watkins, LLP
23            John Hancock Tower, 27th Floor
              200 Clarendon Street
24            Boston, Massachusetts 02116
              617.880.4514
25            william.trach@lw.com
```

1          SEAN M. BERKOWITZ, ESQUIRE
           Latham & Watkins, LLP
2          330 North Wabash Avenue
           Suite 2800
3          Chicago, Illinois 60611
           312.777.7016
4          sean.berkowitz@lw.com
           (Present telephonically)

5

6     COUNSEL FOR DEFENDANT ELISABETH KIMMEL:

7          R. ROBERT POPEO, ESQUIRE
           CORY S. FLASHNER, ESQUIRE
8          EOIN P. BEIRNE, ESQUIRE
           MARK E. ROBINSON, ESQUIRE
9          Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC
           One Financial Center
10         42nd Floor
           Boston, Massachusetts 02111
11         617.542.6000
           rpopeo@mintz.com
12         csflashner@mintz.com
           ebeirne@mintz.com
13         merobinson@mintz.com

14

      COUNSEL FOR DEFENDANT WILLIAM MCGLASHAN, JR.:
15
           JACK W. PIROZZOLO, ESQUIRE
16         Sidley Austin LLP
           60 State Street
17         34th Floor
           Boston Massachusetts 02109
18         617.223.0304
           jpirozzolo@sidley.com
19
           MARSHALL A. CAMP, ESQUIRE
20         Hueston Hennigan LLP
           523 West 6th Street
21         Suite 400
           Los Angeles, California 90014
22         213.778.4340
           mcamp@hueston.com

23

24

25

1    COUNSEL FOR THE DEFENDANT MARCI PALATELLA:

2          MICHAEL K. LOUCKS, ESQUIRE
           Skadden, Arps, Slate, Meagher & Flom LLP
3          500 Boylston Street
           Boston, Massachusetts 02116
4          617.573.4840
           michael.loucks@skadden.com

5

6    COUNSEL FOR THE DEFENDANT JOHN WILSON:

7          MICHAEL KENDALL, ESQUIRE
           White & Case, LLP
8          75 State Street
           Boston, Massachusetts 02109
9          617.939.9310
           michael.kendall@whitecase.com

10

           ANDREW E. TOMBACK, ESQUIRE
11         White & Case LLP
           1221 Avenue of the Americas
12         New York, New York 10020
           212.819.8428
13         andrew.tomback@whitecase.com

14

     COUNSEL FOR THE DEFNDANT HOMAYOUN ZADEH:

15

           TRACY A. MINER, ESQUIRE
16         Miner Orkand Siddall LLP
           470 Atlantic Avenue
17         4th Floor
           Boston, Massachusetts 02210
18         617.273.8421
           tminer@mosllp.com

19

20   COUNSEL FOR THE DEFENDANT ROBERT ZANGRILLO:

21         MARTIN G. WEINBERG, ESQUIRE
           Law Office of Martin G. Weinberg
22         20 Park Plaza
           Suite 1000
23         Boston, Massachusetts 02116
           617.227.3700
24         marty@martinweinberglaw.com

25

1                P R O C E E D I N G S

2              (The following proceedings were held in open

3    court before the Honorable Nathaniel M. Gorton, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States

6    Courthouse, One Courthouse Way, Boston, Massachusetts, on

7    February 27, 2020.)

8              THE CLERK:  All rise.  Thank you.  You may be

9    seated.  This is criminal action number 19-10080, United

10   States of America versus David Sidoo, et al.  Will counsel,

11   please, identify themselves for the record.

12             MR. ROSEN:  Good morning, Your Honor.  Eric Rosen,

13   Leslie Wright and Ms. Kearney for the government.

14             THE COURT:  Mr. Rosen, Ms. Wright, Ms. Kearney.

15             MR. TRACH:  Good morning, Your Honor.  William

16   Trach for defendants Mossimo Giannulli and Lori Loughlin.

17             THE COURT:  Mr. Trach.

18             MS. MINER:  Good morning, Your Honor.  Tracy Miner

19   on behalf of Homayoun Zadeh.

20             THE COURT:  Ms. Miner.

21             MR. WEINBERG:  Good morning, Your Honor.  Martin

22   Weinberg on behalf of Robert Zangrillo.

23             THE COURT:  Mr. Weinberg.

24             MR. KENDALL:  Good morning, Your Honor.  Mike

25   Kendall from White & Case on behalf of John Wilson.

```
 1              THE COURT:  Mr. Kendall.

 2              MR. POPEO:  Good morning, Your Honor.  Robert Popeo

 3    on behalf of Elisabeth Kimmel.

 4              THE COURT:  Mr. Popeo.

 5              MR. CAHN:  Good morning, Your Honor.  Reuben Cahn

 6    on behalf of Mr. Chen who is present.

 7              THE COURT:  Mr. Cahn.

 8              MR. LOUCKS:  Good morning, Your Honor.  Michael

 9    Loucks for Marci Palatella.

10              THE COURT:  Mr. Loucks.

11              MR. SCHUMACHER:  Good morning, Your Honor.  David

12    Schumacher on behalf of Amy Colburn and Gregory Colburn.  And

13    Patric Hooper is here as well.

14              THE COURT:  Yes.  Mr. Schumacher.

15              MR. PIROZZOLO:  Good morning, Your Honor.  Jack

16    Pirozzolo on behalf of William McGlashan.  And with me is

17    Marshall Camp also on behalf of William McGlashan.

18              THE COURT:  Mr. Pirozzolo.

19              MR. MEIER:  Good morning, Your Honor.  David Meier

20    on behalf of Diane Blake and Todd Blake.

21              THE COURT:  Mr. Meier.

22              MR. VIEN:  Good morning, Your Honor.  George Vien

23    on behalf of Mossimo Giannulli.

24              THE COURT:  Mr. Vien.

25              MR. KELLY:  Good morning, Your Honor.  Brian Kelly
```

1　on behalf of defendant Gamal Abdelaziz.

2　　　　THE COURT:  Mr. Kelly.  Thank you.  I would invite

3　those in the jury box who are attending to also introduce

4　themselves, please.

5　　　　MR. FLASHNER:  Good morning, Your Honor.  Cory

6　Flashner also on behalf of Elisabeth Kimmel.

7　　　　THE COURT:  Mr. Flashner.

8　　　　MR. CAMP:  Good morning, Your Honor.  Marshall Camp

9　on behalf of Bill McGlashan.

10　　　　THE COURT:  Mr. Camp.

11　　　　MR. TOMBACK:  Good morning, Your Honor.  Andrew

12　Tomback of White & Case on behalf of Mr. Wilson.

13　　　　THE COURT:  Mr. Tomback.

14　　　　MR. BEIRNE:  Good morning, Your Honor.  Eoin Beirne

15　also on behalf of Elisabeth Kimmel.

16　　　　THE COURT:  Mr. Beirne.

17　　　　MS. THOMPSON:  Good morning, Your Honor.  Melinda

18　Thompson on behalf of Todd and Diane Blake.

19　　　　THE COURT:  Ms. Thompson.

20　　　　MR. ROBINSON:  Good morning, Your Honor.  Mark

21　Robinson also on behalf of Elisabeth Kimmel.

22　　　　THE COURT:  Mr. Robinson.

23　　　　MR. HOOPER:  Good morning, Your Honor.  Patric

24　Hooper also here on behalf of Greg and Amy Colburn.

25　　　　THE COURT:  Good morning, Mr. Hooper.  We have

1    apparently Mr. Berkowitz on the phone as well.

2            MR. BERKOWITZ:  Thank you, Your Honor.  Sean

3    Berkowitz on behalf of Lori Loughlin and Mossimo Giannulli.

4    I appreciate you allowing me to participate by phone.

5            THE COURT:  Good morning, Mr. Berkowitz.  As we are

6    aware, the defendants Giannulli and Loughlin late yesterday

7    filed a supplemental memorandum regarding trial groups and a

8    motion to postpone setting a trial date.  It was docket

9    number 875.  They make very serious *Brady* violation

10   allegations and charges of prosecutorial misconduct in that

11   pleading.

12           The government of course has not had an opportunity

13   to respond to it.  I am not going to postpone this hearing or

14   my addressing the need to set a schedule for the resolution

15   of this multi-defendant case.  But I am now directing the

16   moving defendants and any other defendant who intends to join

17   them to file on or before Friday March 13 a joint motion to

18   dismiss, to suppress, and/or for sanctions and supporting

19   memoranda based upon the information just brought to the

20   Court's attention to which the government can file its

21   opposition and memorandum, if any, on or before Friday,

22   March 27.

23           I will take that matter under advisement separately

24   from the other matters and may schedule a hearing in early

25   April.  It will not affect any other time deadlines set in

1   this case.

2          Now I am going to proceed with the original purpose

3   of this status conference, which is to discuss trial groups

4   and dates for trial if one is ultimately necessary.  This

5   case, counsel, was indicted in March of last year.  And I

6   recognize that there have been superseding indictments in

7   March, April, and October of 2019 and again last month.  It

8   is also true that there has been production of voluminous

9   discovery in a rolling fashion.  And there are 15 defendants

10  involved in this alleged conspiracy, the very existence of

11  which is contested.

12         I grant you all of that, but this case needs to be

13  resolved expeditiously either by trial or otherwise.  And I

14  mean to make that happen by dealing with the dispositive

15  motions later this spring, and, if necessary, a trial of

16  about one half of the defendants in early October of this

17  year.  It goes without the necessity of citation that the

18  prompt resolution of criminal cases is not only in the

19  interest of those charged with serious crimes, their counsel,

20  and prosecutors, but also the public at large and the

21  criminal justice system generally.

22         It is not only the right of the accused to a timely

23  inquiry into the charges against them but also a fundamental

24  duty of the charging authority and the Court to provide a

25  prompt trial.  I am also fully aware that there are pending

1   discovery issues before Magistrate Judge Kelley and motions

2   pending to dismiss before me.  But I assure you, that those

3   motions will be resolved with or without hearings before the

4   end of June this year.

5          With respect to the grouping of defendants, the

6   government has provided me with no logical reason to adopt

7   either of its proposals.  And I agree with the defendants

8   generally that to the extent possible, the defendants with

9   like charges pending against them and the defendants with

10  familial relationships ought to be tried together to avoid

11  inefficiencies and the introduction of unrelated and possible

12  prejudicial evidence.  That makes sense to me.

13         But I do agree with the government that this case,

14  or at least the first group of the defendants to be tried in

15  this case, ought to go forward in October of this year.  I do

16  not want to try this case three times.  So for the time being

17  I am going to divide the defendants into two groups.  The

18  first group of eight defendants will be the defendants who

19  are charged with making corrupt donations to the University

20  of Southern California to gain admission for their children

21  through the so-called side door and who were not involved in

22  the alleged test cheating or with other universities.

23         Accordingly, group one to be tried in October will

24  be defendants Abdelaziz, the Blakes, Giannulli, Loughlin,

25  Wilson, Zadeh and Zangrillo.  I expect the impanelment of the

1  jury in this case will not be easy and will take several

2  days.  So we will begin impanelment on Monday, September 28,

3  and continue from day to day until the jury is picked.  The

4  trial itself will begin on Monday, October 5, and will

5  proceed day to day thereafter.

6       I believe this trial can be completed in four

7  weeks.  But if it is not, we will keep going, and it will be

8  completed well before Thanksgiving.  As a safety valve, I am

9  going to schedule a status conference some time during the

10  summer, probably late in July, to revisit this schedule and,

11  if necessary, determine whether one or two defendants need to

12  be deferred until a subsequent trial.  But all counsel for

13  the named defendants are to be prepared to try this case as

14  it is currently scheduled.

15       The second trial involving the remaining defendants

16  will begin in January, probably Monday, January 11, 2021, and

17  follow a similar course.  Any motions to sever or oppose

18  these groups must be filed on or before April 1 in accordance

19  with Magistrate Judge Kelley's existing schedule for motions.

20       I am also going to amend the back end for the

21  filing of dispositive motions.  Those motions will be due as

22  originally scheduled on April 1, but the government's

23  opposition memorandum will be due on April 30.  And replies,

24  if any, by May 15.  Hearing on those motions, if any, will be

25  in early June.  Are there any questions, counsel?

1    Hearing none, we will proceed to some other matters

2 that I have in mind.  Let's give them a date for the status

3 conference in late July, avoiding my MDL conflict.

4    THE CLERK:  How about we could do Tuesday the 28th

5 at 3 p.m.?

6    THE COURT:  Tuesday, July 28 at 3 p.m. there will

7 be a status conference here in this courtroom.  Any problem

8 with that date for anybody?  Okay.  I also want to set a

9 final pretrial conference the week before we impanel.  Again

10 I also have to avoid MDL conflict, but early that week.

11    THE CLERK:  Tuesday, September 22 at 3 p.m.

12    THE COURT:  Tuesday, September 22 at 3 p.m.  Any

13 problem with that date?  Okay.  I am concerned about pretrial

14 publicity.  Needless to say, this is a high profile case, but

15 it is not going to be tried in the newspapers or on the

16 Internet.  And counsel are forewarned that if I become aware

17 that counsel for either the government or the defendants is

18 not exercising appropriate constraint in that regard, there

19 will be consequences.

20    And finally, let me say that I have heard from

21 Magistrate Judge Kelley who has informed me that her ruling

22 on production or other matters will be entered forthwith.  Is

23 there anything else that needs to come to my attention at

24 this conference?  Anything anybody wants to bring up?

25 Mr. Weinberg?

1          MR. WEINBERG:  Just, Your Honor, in order for us to

2     have the trial in the fall as scheduled, we would ask the

3     Court to not follow the local rule on schedule which would

4     provide exhibit and witness lists just seven days before

5     trial.  With eight defendants having their own universes of

6     discovery, there's over 3.2 million pages in all, it would

7     help all the parties for Your Honor to set an exhibit

8     production list --

9          THE COURT:  Good point, Mr. Weinberg.  Is there any

10    reason why we can't alter those dates as far as the

11    government is concerned?

12         MR. ROSEN:  No, Your Honor.  I think we should

13    probably confer with each other about applicable dates.

14         THE COURT:  Why don't you do that, Mr. Weinberg,

15    with the government, and give me all of your proposed dates

16    to in limine motions, responses to in limine motions,

17    responses to witnesses and exhibits, the proposed voir dire

18    questions for the jury panel.  All of those in my normal

19    sequence go three weeks, two weeks, and one week before

20    trial.  In this case they can be five, four, and three.

21         MR. WEINBERG:  Thank you, Judge.

22         THE COURT:  I think your point is well taken.  This

23    is too much material to wait until the last week.

24         MR. WEINBERG:  Thank you, sir.

25         THE COURT:  You're welcome.  Anybody else?

1   Anything from the government?

2       MR. ROSEN:  Now that we have a trial date, Judge, I

3   just want to inform the Court that we will be doing a very

4   early production of *Jencks* material in this case, getting

5   everything out.  That will be forthwith provided.

6       THE COURT:  That is appropriate.  I am not going to

7   make this into a motion hearing, but I know this matter that

8   was filed late yesterday afternoon is very serious.  I take

9   it the government is going to have some reasonable

10  explanation for the Court quickly.

11      MR. ROSEN:  Absolutely, Judge.  Just very briefly.

12  The dispositive issue is the fact that in the notes we

13  believe -- First of all, these were taken three or four days

14  after Rick Singer began cooperating with the government.  He

15  obviously wasn't being very forthright.  He was writing these

16  notes.  These were directed to his lawyer.  He sent these

17  notes to his lawyer.  His lawyer afterwards claimed privilege

18  over these notes.

19      In the top portion of the note that was filed, the

20  note that's blacked out, that's Singer's plea colloquy.

21  That's why we carved this aside for a privilege review.

22  Because although we had downloaded his phone --

23  unfortunately, it's blacked out in the filing, but it says,

24  "Thoughts I need to start my plea with.  Where it all

25  started."

1          At that point we hadn't charged anyone in this

2     case, and we were very concerned about inadvertently looking

3     at privileged material that he was sending to his lawyer.  We

4     had a discussion with him later, and we stopped looking at

5     the notes because of that.  All of these notes were sent to

6     his attorney.  The issue in the note that's been flagged by

7     defendants is simply that the payments were going to the

8     program, not the coach, and he would say it was a donation.

9          Judge, that's our theory of the case that we've

10    been proceeding on for the entirety of this case.  We have

11    disclosed that to the defendants on numerous, numerous

12    occasions.  In footnote 17, the very first wiretap affidavit,

13    we say that.  "Investigators analyzing Singer's bank records

14    have seen payments directly to university athletic programs

15    in addition to payments to individual coaches.  I believe

16    that these payments to athletic programs are also payments in

17    furtherance of a fraudulent scheme even though universities

18    are receiving a portion of the money because I believe the

19    universities are unaware that the coaches and/or

20    administrators are recruiting those students in exchange for

21    the monetary payments."

22         We have disclosed this in charging documents.  We

23    have written motion responses in this case stating that, "The

24    parents were told that the money was going to the program and

25    this was still a bribe because these were fake athletes being

1    recruited."

2           Page 21 of docket 736 we write, "Contrary to the

3    defendants' suggestion, the government has never contended

4    that Singer told the Giannullis that their money would be

5    directed to Heinel personally.  Rather the Giannullis are

6    charged with conspiring to bribe Heinel to facilitate their

7    daughter's admission to USC as a fraudulent athletic recruit

8    in exchange to a contribution to a USC fund that benefited

9    Heinel in breach of her duty to honest services to USC."

10          We've disclosed all the evidence, numerous calls,

11   emails, Singer tells his clients that the money is going to

12   the program, and he characterizes this as a donation.

13          In our discovery responses, we have provided the

14   defendants with examples of these calls.  We have written

15   letters to the defense explaining that Singer told the

16   Giannullis and others that the money was going mostly to the

17   program.  I did that most recently at the end of January

18   2020.  The first 50,000 went directly to USC program.  And

19   Singer, to the extent he recalled it, he believed that the

20   Giannullis knew that part of the $200,000 sent to KWF was

21   going to a USC program.  They did not specifically discuss

22   the amount that would go to the USC program out of the

23   $200,000.

24          *Brady* is a rule of fundamental fairness, not a

25   discovery rule.  We cannot suppress what the defendants have

1    already been told because that's obviously within their

2    knowledge.  We have told the defendants several times, and we

3    will continue to do so, that this case is a bribery case

4    about payments to a program that Singer characterized as a

5    donation.  It was a quid pro quo.  Pay the money.  Their kids

6    would be recruited guaranteeing them effective admission for

7    a sport they either didn't play well or, in the Giannullis

8    case, they didn't play at all.

9         Judge, Doug Hodge, Michelle Janavs and Elizabeth

10   Henriquez pled guilty in this court to honest services fraud

11   on the fact that those payments went to the program, and that

12   they understood it was a bribe because they were corrupt

13   payments.  Your Honor accepted those pleas.  That was in

14   their plea colloquies, their PSR's, and their sentencing

15   memos that have been filed.

16        Doug Hodge even wrote an op-ed in the Wall Street

17   Journal saying this as well.  Two have been sentenced based

18   on this.  And in the most recent sentencing involving

19   Michelle Janavs where the parties agreed that the money was

20   going to be used by USC for their program, Your Honor

21   repeatedly referred to this as a bribery case because it is.

22   You pay the money.  You get in as a fake athlete.

23        By the way, just because Singer said the money was

24   going to the program, doesn't mean that that's what the

25   parents took away from it.

1        Marci Palatella, a charged defendant, wrote in a

2   text message to her friend after paying money to the

3   "program", which by the way, was filtered through basically a

4   sham charity, "I don't think most of it went to the school,

5   between us only.  Please never repeat anything."  The notes

6   that we produced are consistent with the government's case

7   and cumulative of other evidence already provided to the

8   defendants.

9        And as Your Honor knows in repeatedly stating that

10   this is a bribery case on these very facts calling something

11   a donation or making it out to the program does not make it

12   legitimate and certainly does not make it a donation.  USC or

13   any school does not have a legitimate admissions process for

14   fake rowers, fake football players, fake pole vaulters, or

15   fake anything whether you call it a donation, a payment, a

16   bribe, or simply nothing at all.  And I direct the defendants

17   to Section 2569 of the --

18        THE COURT:  All right.  I think we've had enough of

19   your response.

20        MR. ROSEN:  What I'm saying is that as soon as we

21   completed the tape review, we turned it over.  Should we have

22   done that earlier?  Absolutely.  We've made a concerted

23   effort.  We're going to produce *Jencks* as soon as possible.

24   We're going to produce all the iPhone images probably early

25   next week.  We're going to get this done, and we're going to

1   get this tried.  I do point out if this was so exonerating

2   for the defendants rather than cumulative, they'd want to try

3   this case.  I want to try this case.

4        THE COURT:  Thank you.  I will give the defendants

5   an equal five minutes to respond.  If each one wants to

6   speak, you understand five minutes total.

7        MR. TRACH:  I understand.  A few things, Your

8   Honor.  First off, in the same way that saying that something

9   is a donation doesn't necessarily make it a donation if

10  there's other evidence that suggests it's a bribe, turning a

11  donation into a bribe doesn't make it a bribe either.  And

12  that's what happened here.  In fact, we know that the U.S.

13  Attorney himself in the press conference announcing this case

14  said this case is not about making donations to a school to

15  help your children get into the school.  That happens.  It's

16  perfectly lawful.  The question comes behind whether this

17  was, in fact, a bribe.

18        And what we have here in this statement is Singer

19  himself, immediately upon cooperating, saying the government

20  wants me to say that these were bribes.  What I told the

21  parents was that these were donations, not bribes.  They want

22  me to lie.  They're yelling at me to get me to say something

23  else, Your Honor.

24        And, yes, Your Honor has sentenced people.  And in

25  those findings you have found based on the information that

1     the government gave you that what was paid was bribes.  What
2     Your Honor didn't have was the fact that Singer himself
3     immediately upon cooperating was saying that, in fact, he
4     told the parents that these payments were legitimate and that
5     they were not, in fact, bribes.  That is not information that
6     the Court had.  That's not information that Judge Woodlock
7     had when he sentenced Mr. Bizzack.  It's not information that
8     any the other judges had who sentenced people.
9            And if you look at what was said about those people
10    in those sentences hearings, Your Honor, it was not that this
11    was generally a bribe because it went to a USC payment, the
12    government stood up and said the payments that were made to
13    the Key Worldwide were made by those defendants with the
14    understandings that those bribes were going to be paid either
15    to the school or to the coaches.  And that's not true.  And
16    they knew it was not true because Singer said that, Your
17    Honor.
18           They did not share that with the Court.  They did
19    not share that with defense counsel who pled guilty.  They
20    did not share that before those people were sentenced, and
21    that is a problem.  And it is a big problem, Your Honor,
22    because it is exonerating information.
23           The fact that somebody made the donation to USC
24    with the goal of getting their children into USC is not a
25    crime.  Everybody admits that that's not a crime.  And

1    calling it a bribe because you made the payments with the
2    expectation that you would get something in response doesn't
3    make it a bribe.  And the fact of the matter is this whole
4    case keys in on what is it that the people who made these
5    donations believed that they were doing in paying money to
6    USC or paying money to the Key Worldwide Foundation.  Were
7    they making legitimate donations that were obviously going to
8    help their kids get into school?  Or were they instead
9    somehow lining somebody's pockets or giving somebody money in
10   exchange for that person corruptly giving them something that
11   they wouldn't get otherwise?  That's the whole case.
12           And the fact is that this evidence demonstrates
13   that it was the former and not the latter.  And that's not
14   anything like what's been produced to us in discovery today.
15   This is exactly what we've been asking for, and we have been
16   told it doesn't exist.  And that is an enormous problem, Your
17   Honor.  And what I would ask is that rather than having us
18   have to file our dispositive motion on this issue that is
19   before you, Your Honor, as instructed on the timeline, that
20   we be permitted to file before Judge Kelley who has this
21   *Brady* issue before her to be able to develop the necessary
22   record that we need to develop on this so we can file an
23   informed motion before Your Honor informed by all the facts,
24   not just what we've received belatedly.
25           MR. KELLY:  Your Honor, one minute left on the

1    clock before AUSA Rosen responds.  Putting aside whether or

2    not these notes are actually privileged and whether you

3    should go to the attorney rather than the cooperating witness

4    to waive the privilege, put that aside.  The note itself

5    talks about a "loud and abrasive call".  We haven't seen that

6    call.  They haven't disclosed that call to us.

7           They have over 50 hours of supposed nonpertinent

8    calls.  They were probably sitting on that.  And that's pure

9    *Brady* if the agent is telling this cooperating witness to lie

10   about our clients.  If that call exists, we would like it.

11          THE COURT:  Wait a minute, counsel.  The Magistrate

12   Judge is going to handle those discovery issues.  This court

13   is going to handle the motion itself under the schedule that

14   I have directed earlier today.

15          MR. KELLY:  Thank you.

16          THE COURT:  Briefly.

17          MR. ROSEN:  There is nothing in these notes that

18   suggest what they were doing is legitimate.  Absolutely

19   nothing.  And the fact is that they blacked out a lot of the

20   portions of the notes where Rick is writing that it wasn't

21   legitimate.  "Spoke to Augustin."  That's Huneeus.  He's pled

22   guilty.  "He wanted to know I was backing Augustin as hard as

23   anything.  I have confirmed I spoke to Donna Heinel, and

24   Augustin will be admitted by the second week of November.

25   Spoke about the fake photo I put on the profile."  That's not

1     legitimate.  A legitimate donation is when you don't get

2     anything for that donation.

3           THE COURT:  All right.  I expect that I will see

4     that in writing later this month.  Is there anything else

5     that needs to -- let me talk to my Deputy a minute.

6           My Deputy brings up a good point.  Is there a

7     necessity for a motion to exclude time?

8           MR. WEINBERG:  We certainly agree this is a complex

9     case.  There are motions pending that would provide a second

10     basis for a speedy trial exception, and there will be motions

11     throughout the next few months.  The defendants all assent

12     to --

13           THE COURT:  Let that not be avoided, counsel.  It

14     needs to be resolved.  Anything else?

15           MR. KENDALL:  Your Honor, I want to take ten

16     seconds.  I know we're imposing on your patience.  Mr. Rosen

17     made directly incorrect statements that are related to my

18     client.  Those documents that he's talking about show that my

19     client's son was they were told he was a great athlete.  He

20     was a member of the U.S. Junior Olympic Development Team.  He

21     was recruited.  He came and he played on the USC team and was

22     a water polo player at USC.  For them to claim that

23     everybody's a false athlete and that's what those documents

24     show, it's just not an accurate picture for the record.

25     Thank you, Your Honor.

1    MR. WEINBERG:  If I could burden the Court for ten

2  more seconds.  This evidence will also reflect that USC is

3  not a victim of wire or mail fraud.  They as an institution

4  that sought these donations and received them and welcomed

5  them.

6    THE COURT:  Thank you, counsel.  We are adjourned.

7    THE CLERK:  All rise.

8    (Court recessed at 12:44 p.m.)

```
 1                  - - - - - - - - - - -

 2                    CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5    transcript of the record of proceedings in the above-entitled

 6    matter to the best of my skill and ability.

 7

 8

 9

10    /s/ Joan M. Daly                February 28, 2020

11

12    _____        _____

13    Joan M. Daly, RMR, CRR          Date
      Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT L

# MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.

### ONE FINANCIAL CENTER
### BOSTON, MASSACHUSETTS 02111

R. ROBERT POPEO
CHAIRMAN

Direct Dial 617 348 1716
rrpopeo@mintz.com

617-542-6000
617-542-2241 fax
www.mintz.com

February 28, 2020

Eric S. Rosen
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210

> Re:    February 26, 2020 Government Disclosure re Singer's Notes – USA v. Sidoo
>        (18-cr-10080-NMG)

Dear Eric,

At yesterday's status conference, the Court ordered the defendants to submit a motion to dismiss, for suppression of evidence, and/or for sanctions on or before March 13, 2020 related to the serious issues raised by the government's disclosure of Singer's notes from his iPhone ("Singer Notes"). On behalf of all defendants, in order to adequately respond to that order, defendants require that the government produce the following materials and respond to the following requests immediately, and no later than March 3, 2020:

1. All consensual audio recordings of any conversations Singer had with the government, including but not limited to any audio recordings of any conversations between Singer and any government agent on or about October 2, 2018.

2. All of the 302s or any other government reports ("Reports") and underlying notes for any conversation any government agent had with Singer, from the time he started cooperating to the present, including any notes or Reports regarding debriefings with or of Singer during the time period of the consensual recordings and any instance(s) in which Singer failed to record any conversation (including any conversations using FaceTime or Skype) during the time period of the consensual recordings.

3. Any and all documents reflecting the creation of a taint team to review the Singer Notes for privilege, the identities of the members of the taint team, the date the taint team received the notes for review, the date the taint team returned any portions of the notes to the prosecution team as non-privileged.

| BOSTON | LONDON | LOS ANGELES | NEW YORK | SAN DIEGO | SAN FRANCISCO | STAMFORD | WASHINGTON |
|---|---|---|---|---|---|---|---|
| 617-542-6000 | +44 20 3868 6112 | 310-586-3200 | 212-935-3000 | 858-314-1500 | 415-432-6000 | 203-388-8464 | 202-434-7300 |
| 617-542-2241 FAX | +44 20 7900 3056 FAX | 310-586-3202 FAX | 212-983-3115 FAX | 858-314-1501 FAX | 415-432-6001 FAX | 203-658-1701 FAX | 202-434-7400 FAX |

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.

February 28, 2020
**PAGE 2**

4. Any and all documents reflecting or, if no document exists, information reflecting the date Singer was arrested and the date Singer began cooperating with the government.

5. To the extent it is not apparent from the Reports to be produced, the names of the participants in each and every call between Singer and any government agent including the call that occurred on or about October 2, 2018.

6. To the extent it is not apparent from the Reports to be produced, the names of any and all individuals present during any and all meetings and/or calls between September 21 and October 2, 2018 between any government agent and Singer including the meeting that occurred in a hotel room which Singer described in his October 2, 2018 note: "Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools."

7. Any Report of an interview of "Liz" regarding the accuracy of the information contained in the Singer Notes.

8. The name(s) of the individual(s) who first saw Singer's notes from October 2, 2018.

   a. The name(s) of the individual(s) from the government who became aware of the existence and substance of Singer's October 2, 2018 notes.

   b. The name(s) of the individual(s) who made the determination that Singer's October 2, 2019 notes were privileged.

   c. The factual information the individual(s) identified above relied upon to make that privilege determination.

   d. The name(s) of the individual(s) who saw Singer's October 2, 2018 notes or otherwise learned of them before the government made the conclusion that they were privileged.

9. The reason(s) why the taint team did not start reviewing Singer's notes from his iPhone until a year after the government made the initial determination that Singer's iPhone notes were privileged.

10. The reason(s) why the taint team took until February 26, 2020 to complete its privilege review of Singer's iPhone notes and produce them to the defendants.

11. The phone numbers of any devices Singer has used or currently uses.

12. The Grand Jury transcripts of any testimony in which Singer testified that his clients' payments constituted bribes or were understood by his clients to be bribes.

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.

February 28, 2020
**PAGE 3**

13. The dates of all communications, and notes of any such communications, through the present, between any government agent and any lawyer for Singer regarding whether there was a claim of privilege over Singer's notes.

14. Any and all correspondence exchanged, through the present, with any lawyer for Singer regarding whether there was a claim of privilege over Singer's notes.

15. We again request, as we did in our letter of October 11, 2019, and the February 19, 2020 letter from Nixon Peabody that the government provides a full extraction of Singer's iPhone or any other mobile device Singer used during the relevant time-period with the metadata intact.

16. Confirm if Singer's phone contained any other messaging applications (such as WhatsApp or Signal) and that the government has reviewed the contents of those applications and has made all required disclosures.

17. Please confirm if the government returned Singer's iPhone or any other mobile device to him, if the device(s) were imaged, and describe the method used to image the device(s).

Sincerely,

*Bob*

R. Robert Popeo

cc: All counsel of record in *Untied States v. Sidoo* (19-cr-10080)

# EXHIBIT M



Donnelly, Conroy & Gelhaar, LLP
260 Franklin Street, Suite 1600
Boston, MA 02110
617.720.2880 ph.
617.720.3554 fx.
www.dcglaw.com

George W. Vien
gwv@dcglaw.com

March 13, 2020

VIA EMAIL

Karin Bell
United States Attorney's Office
District of Massachusetts
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

> Re:   United States v. David Sidoo, et al
>       19-CR-10080-NMG

Dear Karin:

I'm writing in response to your letter of March 9, 2020 in which you provided a chronology relating to the discovery and production of exculpatory information contained on Mr. Singer's telephone. I request you provide the following additional information:

## I.   Taint Procedures

A.   Why did the USAO assign a taint AUSA on October 9, 2018?

B.   If AUSAs O'Connell and Rosen believed that Singer's notes were privileged on or around October 28, 2018, why didn't they send those potentially privileged materials to the taint AUSA? Why were the potentially privileged materials not made available to the taint AUSA for review until August 21, 2019?

C.   After the notes were made available to the taint AUSA on August 21, 2019, why did he not begin to review the phone until February 19, 2020?

D.   Why was AUSA Rosen not walled off from the taint team? Was anyone else on the prosecuting team not walled off from the taint team?

E.   Why were the AUSAs prosecuting the case reviewing the phone on October 28, 2018 when a taint AUSA had been assigned 19 days earlier?

Karin Bell
United States Attorney's Office
March 13, 2020
Page 2

## II.   Emails about Singer's Notes

A.   Which portions of the notes did AUSA O'Connell review on October 28, 2018? Which portion of the notes did AUSA O'Connell include in his email to AUSA Rosen and the case agents? What did he say about the notes? How did AUSA Rosen and/or the agents respond?

B.   Which portion of the notes did the "contract attorney working on the investigation" report to AUSAs Rosen and O'Connell at around the same time? Who is the contract attorney who worked on the investigation? What did the contract attorney say about the notes? How did AUSAs Rosen and/or O'Connell respond?

## III.   Privilege Basis

A.   What was the basis for the government's determination that the notes may be privileged, despite the consent to search, and confirmation from Singer's attorney that the phone could be searched without a taint protocol?

   1.   What "portion" of the notes led the government to this conclusion?

B.   Was there any communication between the Government and Singer's attorney that led to AUSA Rosen's February 1, 2020 e-mail to the taint AUSA, "copying Singer's attorney and AUSA O'Connell, stating that Singer's attorney would redact privileged portions of the Singer Notes and send them back in redacted form?" If there was such communication, when did it occur and what was communicated?

C.   Why did the government ask Singer's attorney on October 9, 2018 to confirm that it could search the 8802 phone without a taint protocol if it did not treat Singer's consent to search the phone as a waiver of Singer's attorney-client privilege?

D.   When and how did the USAO learn that the "notes" were "directed to" Singer's lawyer? When and how did the USAO learn that the "notes" were sent to Singer's lawyer? When and how did Singer's lawyer claim privilege over the notes?

E.   Did anyone on the prosecution team discuss with Singer or his attorney whether Singer's October 5, 2018 consent to searches of his phone implied a waiver of his attorney-client privilege? Did anyone on the prosecution team discuss with Singer or his attorney whether Singer's October 11, 2018 agreement that the government could search the 8802 phone without a taint protocol implied a waiver of his attorney-client privilege? If so, when?

Karin Bell
United States Attorney's Office
March 13, 2020
Page 3

      F.      What led to the execution of the privilege waiver on February 24, 2020?

## III.   **Investigation**

      A.      What did AUSA Rosen do to follow-up on AUSA O'Connell's email on October 28, 2018? Who did Rosen communicate with about Singer's notes?

      B.      Which supervisors did AUSAs Rosen and O'Connell (and other members of the prosecution team) consult about whether to disclose, investigate and otherwise follow up on Singer's notes? What feedback did those supervisors provide?

      C.      Did AUSA Rosen or anyone else on the prosecution team take any steps to investigate the misconduct described in Singer's notes? What steps were taken?

      D.      Has anyone on the prosecution team spoken to Singer or his attorney about the misconduct Singer described in his note? If so, please provide the date of the discussion and a description of it.

## IV.   **Production Requests**

      A.      Please provide all USAO emails referencing Singer's "Oct 2" notes, including the emails referenced in item 7 of your letter and footnote 2 of your letter.

      B.      Please provide any written communications between the Government and Singer's attorney related to Singer's phone, including the assertion of privilege over the contents of Singer's phone.

      C.      Please provide any memorializations of communications between Singer's attorney and anyone on the prosecution team regarding Singer's phone, including the assertion of privilege over the contents of Singer's phone.

      D.      Please provide any documentation supporting item 8 of your letter, i.e., that AUSAs Rosen and O'Connell believed that the notes may be privileged.

Karin Bell
United States Attorney's Office
March 13, 2020
Page 4

      E.      Please provide all correspondence among AUSA Rosen and the taint AUSA
               Looney and AUSA Strachan regarding Singer's phone.

Thank you.

                          Very truly yours,

                          George W. Vien

GWV/lam
cc:  All counsel of record in *United States v. Sidoo* (19-cr-10080)

# EXHIBIT N



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 9, 2020

<u>**SENT VIA E-MAIL**</u>
Counsel of Record

      Re:    *United States v. David Sidoo, et al.*
              Case No. 19-cr-10080-NMG

Dear Counsel:

      We write in response to the February 28, 2020 letter on behalf of all defendants. The following is a chronological account of the government's February 26, 2020 production of notes from Rick Singer's phone ("8802 phone") (collectively "Singer Notes"). This letter is produced pursuant to the agreed-upon protective order.

1. On September 21, 2018, the government approached Rick Singer about cooperating in the investigation of the above-referenced case.

2. On October 5, 2018, Singer signed a consent to search form for the 8802 phone and agents first imaged the phone.[1] The government did not treat Singer's consent to search as a waiver of Singer's attorney-client privilege.

3. On October 9, 2018, AUSA Chris Looney was assigned as a taint AUSA to assist on the above-referenced case.

4. On October 9, 2018, the government asked Singer's attorney to confirm that the government could search the 8802 phone without a taint protocol.

5. On October 11, 2018, Singer's attorney agreed that the government could search the 8802 phone without a taint protocol, noting that he had reviewed the text messages

---

      [1] As noted in the government's February 26, 2020 letter, the phone was imaged on or about October 5, 2018, October 23, 2018, November 1, 2018, November 29, 2018, January 3, 2019, February 15, 2019, February 28, 2019, and March 11, 2019. The government has provided copies of each image.

between himself and Singer.  Singer's attorney said nothing about the notes portion of Singer's phone.

6. On or about October 28, 2018, AUSA Justin O'Connell reviewed a portion of the Singer Notes, including part of the "Oct 2" entry.

7. On October 28, 2018, AUSA O'Connell excerpted a portion of the "Oct 2" entry in the Singer Notes and emailed it to AUSA Eric Rosen and the FBI agents assigned to the above-referenced case.[2]

8. AUSAs Rosen and O'Connell believed that the notes were written by Singer at the behest of his attorney and may be privileged, despite the consent to search.  As a result, they did not further review the Singer Notes.

9. Between March 5, 2019 and April 9, 2019, the government indicted all of the defendants in the above-referenced case.[3]

10. On August 18, 2019, AUSA O'Connell notified AUSA Looney that they were going to have Singer's attorney review certain materials from the 8802 phone for potential privilege, and that Singer's attorney would work with AUSA Looney if he found anything.

11. Between August 20-21, 2019, a taint folder was created containing the eight images of the 8802 phone.  On August 21, 2019, AUSA Looney was granted access to that folder.

12. On October 4, 2019, AUSA Looney produced a copy of the Singer Notes to Singer's attorney to review for potential privilege.

13. From at least December 2019 through February 2020, Singer's attorney was ████████████████████ and did not review the Singer Notes.

14. On February 1, 2020, AUSA Rosen emailed AUSA Looney, copying Singer's attorney and AUSA O'Connell, stating that Singer's attorney would redact privileged portions of the Singer Notes and send them back in redacted form.  AUSA Rosen requested that, after that was done, AUSA Looney confirm that anything privileged had been excised and they would discuss next steps.  AUSA Looney responded that he would look out for a copy from Singer's attorney of the Singer Notes.

---

[2] At or about this time, a contract attorney working on the investigation of the above-referenced case viewed a different portion of the Singer Notes.  The contract attorney reported a portion of what he saw to AUSAs Rosen and O'Connell.

[3] Defendant Sidoo was indicted on March 5, 2019, although the indictment was then under seal, and defendants Amy and Greg Colburn were indicted on March 26, 2019.  The remaining defendants were indicted on April 9, 2019.

15. On February 19, 2020, AUSA Rosen emailed AUSA Looney that the defense group wanted certain materials from the 8802 phone. AUSA Rosen asked AUSA Looney to pull these materials, and make sure any communications between Singer and his attorney were not included.

16. On February 19, 2020, AUSA Looney began reviewing and extracting the requested materials in the 8802 phone. During the course of this project, AUSA Looney reviewed the Singer Notes for the first time.

17. On February 20, 2020, AUSA Looney emailed Singer's attorney and asked for a sense of Singer's attorney's timing (regarding the Singer Notes).

18. Between February 20 and February 24, 2020, AUSA Looney, a taint AUSA supervisor, and Singer's attorney discussed the status of privilege claims regarding the 8802 phone.

19. On or about February 24, 2020, AUSA Looney and the taint AUSA supervisor obtained a privilege waiver from Singer (through Singer's attorney) for the Singer Notes and provided them to the investigative team. On February 26, 2020, the government produced the Singer Notes to defendants.

If you have any questions regarding this timeline, please feel free to contact the undersigned AUSAs at your convenience.

Sincerely,

ANDREW E. LELLING
United States Attorney

By:   */s/ Karin M. Bell*
Eric S. Rosen
Justin D. O'Connell
Kristen A. Kearney
Leslie A. Wright
Karin M. Bell
Assistant U.S. Attorneys

# EXHIBIT O

From: "Donald H.Heller" <dheller@donaldhellerlaw.com>
Date: March 11, 2020 at 8:33:18 PM EDT
To: "Beirne, Eoin" <EPBeirne@mintz.com>
Cc: "karin.bell@usdoj.gov" <karin.bell@usdoj.gov>, "Rosen, Eric (USAMA)" <Eric.Rosen@usdoj.gov>,
"O'Connell, Justin (USAMA)" <Justin.O'Connell@usdoj.gov>, "Wright, Leslie (USAMA)"
<Leslie.Wright@usdoj.gov>, "Kearney, Kristen (USAMA)" <Kristen.Kearney@usdoj.gov>, "Popeo, R. Robert"
<RRPopeo@mintz.com>, "Robinson, Mark" <MERobinson@mintz.com>, "Flashner, Cory"
<CSFlashner@mintz.com>, "McGee-Tubb, Mathilda" <MSMcGee-Tubb@mintz.com>, "Mulcahy, Peter"
<PCMulcahy@mintz.com>
Subject: RE:  Document Preservation Notice - US v. Sidoo, et al.


Eoin, First let me apologize for the delay in responding to your last email. I have been tied up in two other matters
and I am ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Redacted per Protective Order ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

What you classify as "relevant materials", actually describe what is classic attorney-client protected communications
and/or attorney work product. The Supreme Court in Swidler & Berlin v. United States  524 U.S. 399, 403 (1998),
stated the long established rule: "The attorney client privilege is one of the oldest recognized privileges for
confidential communications." [Citations omitted]. "'The privilege is intended to encourage 'full and frank
communication between attorneys and their clients and thereby promote broader public interests in the observance
of law and the administration of justice.'" Ibid, citing, Upjohn Co. v. United States 449 U.S. 383, 389 [1998].

The specific document that is the subject of the defense attack is an October 2, 2018 note created by Mr. Singer on
his Notes Application on his iPhone 7, telephone number ▮▮▮▮ 8802. Unfortunately, the Note of October 2,
2018, and other notes did not have my name on it nor did they contain notation of Attorney Client Privileged.
However, that specific Note and other Notes were emailed directly to me out of the Notes Application using his
email ▮▮▮▮ @gmail.com ▮▮▮▮▮▮@gmail.com>. Unbeknownst to me these Notes were created on the
Notes Application and not typed in the body of an email. All communications including every email account
controlled by Mr. Singer and sent to me by Mr. Singer since September 21, 2018, are Attorney client protected
communications. I have the emails containing all of these particular notes. There has not been a waiver of my
attorney client privilege communications with Mr. Singer by the government's release of Notes in the government's
recent discovery in these Varsity Blues/Admissions cases, rather an example of integrity by government lawyers. I
am sure that the government has or will describe in appropriate pleadings/declarations how these Notes were
released.

My knowledge of when a Taint Team was assigned began on October 4, 2019, when I was contacted by AUSA
Christopher Looney who provided 8 Extracts of Notes taken from Mr. Singer's iPhone 7, telephone number ▮▮▮▮
▮▮ 8802 on eight separate dates and identified as: Singer 2019-01-03 Notes Extract.pdf; Singer 2019-02-15 Notes
Extract.pdf; Singer 2019-02-28 Notes Extract.pdf; Singer 2019-03-11 Notes Extract.pdf; Singer 2018-10-05 Notes
Extract.pdf; Singer 2018-10-23 Notes Extract.pdf; Singer 2018-11-01 Notes Extract.pdf; Singer 2018-11-29 Notes
Extract.pdf. I was to review the same. Unfortunately, Since August 12, 2019, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Redacted per Protective Order ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Any delay
since October was do to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The majority of the Notes released predated my
engagement.

The event that triggered the feeding frenzy occurred by what I perceived to be the integrity, competence and
professionalism of AUSA Amanda Strachan of the Taint Team with the assistance of AUSA Looney.  In a telephone
conversation with Ms. Strachan she related to me that the Notes reviewed did not have my name or were identified
as attorney client communication. True. I pointed that out to her that it was privileged and her response was in
substance was even assuming so, portions of what I understood to be the October 2, 2018, on its face appeared to be
potential Brady or Giglio material and should be disclosed to the defense and whatever value this material possessed
would be something to be determine by a court.

Of course defense lawyers pontificated as to the meaning of the October 2, 2018 Note in pleadings and press comments, including yours truly; however, in the last analysis, the government fulfilled its obligation with integrity. While the competing tension between the attorney client privilege and the government's Brady and its progeny, obligation raises interesting legal issues, the October 2, 2018, appears with additional Singer notes in eight separate iPhone images and extractions, and Ms. Strachan's concerns as to duty I perceived to require a limited waiver of privilege.

It's disappointing to me as a former prosecutor, that the government lawyers are vilified without justification, but that mirrors in many ways the discordant and disconcerting political world we live in, where lies and distortion have replaced factual averments. In the last analysis, Mr. Singer has pleaded guilty to multiple felonies, all involving greed and stupidity and the merging together, since it takes two to tango, of Mr. Singer, the enabling protagonist with wealthy individuals, to wit, parents who for vanity, arrogance and a basis to bring is some cases, had the conceit and arrogance to commit criminal offenses because they had the money do so. The point that is missed in this diversionary attack, is that each of these parents were recorded on wiretaps with Mr. Singer and in subsequent consensual recordings which discussed dollar amounts, vehicles of deceit, to wit, in some case false profiles, falsified SATs and ACT tests and essentially, the res gestae of a quid pro quo, in addition to mail, wire fraud as well as in some cases, tax fraud.

There is no attorney client privilege waiver in this case. If you seek a Rule 17(b) subpoena ex parte, please alert the magistrate judge or the district of Mr. Singer's position. Regards, Don Heller
Donald H. Heller
Donald H. Heller, A Law Corporation
3638 American River Drive
Sacramento, CA 95864
(916) 974-3500
(916) 974-2077 (Direct)
(916) 520-3497 (Fax)
American Board of Trial Advocates (ABOTA), Sacramento Valley Chapter – 2017 Trial  Lawyer of the Year
Member, Executive Committee, Criminal Law Section, California Lawyers Association
Website: www.donaldhellerlaw.com<http://www.donaldhellerlaw.com/>
Attorney/Client Privileged Communication

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication

From: Beirne, Eoin <EPBeirne@mintz.com>
Sent: Thursday, March 05, 2020 6:40 PM
To: Donald H.Heller <dheller@donaldhellerlaw.com>
Cc: karin.bell@usdoj.gov; Rosen, Eric (USAMA) <Eric.Rosen@usdoj.gov>; O'Connell, Justin (USAMA) <Justin.O'Connell@usdoj.gov>; Wright, Leslie (USAMA) <Leslie.Wright@usdoj.gov>; Kearney, Kristen (USAMA) <Kristen.Kearney@usdoj.gov>; Popeo, R. Robert <RRPopeo@mintz.com>; Robinson, Mark <MERobinson@mintz.com>; Flashner, Cory <CSFlashner@mintz.com>; McGee-Tubb, Mathilda <MSMcGee-Tubb@mintz.com>; Mulcahy, Peter <PCMulcahy@mintz.com>
Subject: RE: Document Preservation Notice - US v. Sidoo, et al.

Thanks, Don

I appreciate your confirming receipt of our letter and assume you agree to preserve all relevant materials.  Please let me know if you don't

The government indicated to defense counsel on 2/26/20 that Mr. Singer had waived privilege over notes created on his iPhone.  We would be grateful if you could confirm what the government represented and that Mr. Singer did in fact waive privilege with respect to those notes.

I look forward to speaking further, as I am sure we will.

Best,

Eoin


Eóin Beirne | Member
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center | Boston, MA 02111
Direct: +1.617.348.1707<tel:+1.617.348.1707> | Fax: +1.617.542.2241<tel:+1.617.542.2241>
E-mail: EPBeirne@mintz.com<mailto:EPBeirne@mintz.com>
Web: www mintz.com<http://www.mintz.com/>

[cid:image001.jpg@01D5F7CB.1FEF0EC0]

From: Donald H.Heller <dheller@donaldhellerlaw.com>
Sent: Thursday, March 5, 2020 9:31 PM
To: Beirne, Eoin <EPBeirne@mintz.com>
Cc: karin.bell@usdoj.gov; Rosen, Eric (USAMA) <Eric.Rosen@usdoj.gov>; O'Connell, Justin (USAMA)
<Justin.O'Connell@usdoj.gov>; Wright, Leslie (USAMA) <Leslie.Wright@usdoj.gov>; Kearney, Kristen
(USAMA) <Kristen.Kearney@usdoj.gov>; Popeo, R. Robert <RRPopeo@mintz.com>; Robinson, Mark
<MERobinson@mintz.com>; Flashner, Cory <CSFlashner@mintz.com>; McGee-Tubb, Mathilda <MSMcGee-
Tubb@mintz.com>; Mulcahy, Peter <PCMulcahy@mintz.com>
Subject: RE: Document Preservation Notice - US v. Sidoo, et al.

Dear Eoin, I am in receipt of your email which contained a letter regarding preserving documentation in connection
with my representation of Rick Singer. In my 50 years as a lawyer I have never received such a document. So first
of all, California Business and Professions Code section 6068 (e)(1)  requires me to: ". . . Maintain inviolate the
confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." I'm sure there is a
New York equivalent to 6068 (e)(1), since I'm also a member of the New York bar. I noticed that you
attended  Brooklyn Law School and so did I, the school must have ended instruction on the very important subject of
the attorney-client privilege. As I observed the conduct of defense lawyers in the admissions case, it reminded me of
a rejoinder I learned in the New York County District Attorney's Office years ago from a now Senior District Judge
in Manhattan. It was part of our early training for situations when you oppose a lawyer who moves to personal
attack rather than focus on the evidence, because he has no defense. The retort goes something like this,  "when you
can't win on the law, you try the facts, and when you can't win on either, you try the prosecutor. My attorney/client
privileged communications will remain secret at all peril to myself. What I do know is that no one from the
government side, AUSAs or agents, ever threatened, intimidated or directed my client to lie in my presence. So I
will see you in Court Pal. Donald H. Heller

Donald H. Heller
Donald H. Heller, A Law Corporation
3638 American River Drive
Sacramento, CA 95864
(916) 974-3500
(916) 974-2077 (Direct)
(916) 520-3497 (Fax)
American Board of Trial Advocates (ABOTA), Sacramento Valley Chapter – 2017 Trial  Lawyer of the Year
Member, Executive Committee, Criminal Law Section, California Lawyers Association
Website: www.donaldhellerlaw.com<http://www.donaldhellerlaw.com/>
Attorney/Client Privileged Communication
CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally
privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or
disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If
you are not the intended recipient, please contact the sender and destroy all copies of the communication

From: Beirne, Eoin <EPBeirne@mintz.com<mailto:EPBeirne@mintz.com>>

Sent: Thursday, March 05, 2020 3:36 PM
To: Donald H.Heller <dheller@donaldhellerlaw.com<mailto:dheller@donaldhellerlaw.com>>
Cc: karin.bell@usdoj.gov<mailto:karin.bell@usdoj.gov>; Rosen, Eric (USAMA)
<Eric.Rosen@usdoj.gov<mailto:Eric.Rosen@usdoj.gov>>; O'Connell, Justin (USAMA)
<Justin.O'Connell@usdoj.gov>; Wright, Leslie (USAMA)
<Leslie.Wright@usdoj.gov<mailto:Leslie.Wright@usdoj.gov>>; Kearney, Kristen (USAMA)
<Kristen.Kearney@usdoj.gov<mailto:Kristen.Kearney@usdoj.gov>>; Popeo, R. Robert
<RRPopeo@mintz.com<mailto:RRPopeo@mintz.com>>; Robinson, Mark
<MERobinson@mintz.com<mailto:MERobinson@mintz.com>>; Flashner, Cory
<CSFlashner@mintz.com<mailto:CSFlashner@mintz.com>>; McGee-Tubb, Mathilda <MSMcGee-
Tubb@mintz.com<mailto:MSMcGee-Tubb@mintz.com>>; Mulcahy, Peter
<PCMulcahy@mintz.com<mailto:PCMulcahy@mintz.com>>
Subject: RE: Document Preservation Notice - US v. Sidoo, et al.

Please find attached a revised letter with the correct dates of meetings we understand you attended or participated in.

Thanks and best,

Eoin


Eóin Beirne | Member
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center | Boston, MA 02111
Direct: +1.617.348.1707<tel:+1.617.348.1707> | Fax: +1.617.542.2241<tel:+1.617.542.2241>
E-mail: EPBeirne@mintz.com<mailto:EPBeirne@mintz.com>
Web: www mintz.com<http://www.mintz.com/>

[cid:image003.jpg@01D5F6E6.9316E5C0]

From: Beirne, Eoin <EPBeirne@mintz.com<mailto:EPBeirne@mintz.com>>
Sent: Thursday, March 5, 2020 5:41 PM
To: dheller@donaldhellerlaw.com<mailto:dheller@donaldhellerlaw.com>
Cc: karin.bell@usdoj.gov<mailto:karin.bell@usdoj.gov>; Rosen, Eric (USAMA)
<Eric.Rosen@usdoj.gov<mailto:Eric.Rosen@usdoj.gov>>; O'Connell, Justin (USAMA)
<Justin.O'Connell@usdoj.gov>; Wright, Leslie (USAMA)
<Leslie.Wright@usdoj.gov<mailto:Leslie.Wright@usdoj.gov>>; Kearney, Kristen (USAMA)
<Kristen.Kearney@usdoj.gov<mailto:Kristen.Kearney@usdoj.gov>>; Popeo, R. Robert
<RRPopeo@mintz.com<mailto:RRPopeo@mintz.com>>; Robinson, Mark
<MERobinson@mintz.com<mailto:MERobinson@mintz.com>>; Flashner, Cory
<CSFlashner@mintz.com<mailto:CSFlashner@mintz.com>>; McGee-Tubb, Mathilda <MSMcGee-
Tubb@mintz.com<mailto:MSMcGee-Tubb@mintz.com>>; Mulcahy, Peter
<PCMulcahy@mintz.com<mailto:PCMulcahy@mintz.com>>
Subject: Document Preservation Notice - US v. Sidoo, et al.

Dear Mr. Heller,

Attached is a letter regarding document preservation in connection with your representation of Rick Singer.

Please contact me if you have any concerns.

Best,

Eoin

Eóin Beirne | Member

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center | Boston, MA 02111
Direct: +1.617.348.1707<tel:+1.617.348.1707> | Fax: +1.617.542.2241<tel:+1.617.542.2241>
E-mail: EPBeirne@mintz.com<mailto:EPBeirne@mintz.com>
Web: www mintz.com<http://www.mintz.com/>

[cid:image003.jpg@01D5F6E6.9316E5C0]

_____

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments
to this message are intended for the exclusive use of the addressee(s)
and may contain confidential or privileged information. If you are not
the intended recipient, or the person responsible for delivering the
e-mail to the intended recipient, be advised you have received this
message in error and that any use, dissemination, forwarding, printing,
or copying is strictly prohibited. Please notify Mintz, Levin, Cohn,
Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at
DirectorofIT@Mintz.com<mailto:DirectorofIT@Mintz.com>, and destroy all copies of this message and any
attachments. You will be reimbursed for reasonable costs incurred in
notifying us.

# EXHIBIT P

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 163 | Incoming | Direction: Incoming | 9/28/2018 22:28(UTC-4) | | | | | |
| 164 | Missed | From: Direction: Incoming | 9/28/2018 22:28(UTC-4) | 00:00:00 | us | | | |
| 165 | Outgoing | To: Direction: Outgoing | 9/28/2018 20:52(UTC-4) | 00:01:30 | us | | | |
| 166 | Outgoing | To: Direction: Outgoing | 9/28/2018 18:57(UTC-4) | 00:06:35 | us | | | |
| 167 | Missed | From: Direction: Incoming | 9/28/2018 18:54(UTC-4) | 00:00:00 | us | | | |
| 168 | Missed | From: Direction: Incoming | 9/28/2018 18:13(UTC-4) | 00:00:00 | us | | | |
| 169 | Outgoing | To: Direction: Outgoing | 9/28/2018 17:41(UTC-4) | 00:00:05 | us | | | |
| 170 | Missed | From: Direction: Incoming | 9/28/2018 17:31(UTC-4) | 00:00:00 | us | | | |
| 171 | Outgoing | To: Direction: Outgoing | 9/28/2018 17:15(UTC-4) | 00:00:36 | us | | | |
| 172 | Outgoing | To: 7615 Mammie Wilson* Direction: Outgoing | 9/28/2018 16:30(UTC-4) | 00:33:08 | us | | Yes | FaceTime |
| 173 | Outgoing | To: 7615 Mammie Wilson* Direction: Outgoing | 9/28/2018 16:29(UTC-4) | 00:00:00 | us | | | |
| 174 | Incoming | From: Direction: Incoming | 9/28/2018 16:24(UTC-4) | 00:00:55 | us | | | |
| 175 | Outgoing | To: Direction: Outgoing | 9/28/2018 16:13(UTC-4) | 00:00:33 | us | | | |
| 176 | Missed | From: Direction: Incoming | 9/28/2018 15:08(UTC-4) | 00:00:00 | us | | | |
| 177 | Missed | From: Direction: Incoming | 9/28/2018 15:02(UTC-4) | 00:00:00 | us | | | |
| 178 | Incoming | From: Direction: Incoming | 9/28/2018 14:38(UTC-4) | 00:00:28 | us | | | |
| 179 | Missed | From: Direction: Incoming | 9/28/2018 14:32(UTC-4) | 00:00:00 | us | | | |
| 180 | Missed | From: Direction: Incoming | 9/28/2018 14:12(UTC-4) | 00:00:00 | us | | | |

109

# EXHIBIT Q

```
 1   Call Date:      2018-10-15

 2   Call Duration: 11:18

 3   Call Begin [] Call End []

 4   Call Participants:

 5        Rick Singer

 6        John Wilson

 7   File Name:      ████████8802 2018-10-15 17-45-46 10126-001

 8   Bates No.:

 9

10   SINGER: [00:00] John.  How are ya?

11   WILSON: Hey, Rick.  Doin' well.  And yourself?

12   SINGER: It's ki-- you're goin' in and out.  Sorry.

13   WILSON: I got a -- I got a bad, uh, (inaudible).  It's just a

14           --

15   SINGER: Where is tha--?

16   WILSON: -- (inaudible) they got a big thunderstorm goin'

17           through.  Can you hear me better here?

18   SINGER: Yeah, I can hear you better.

19   WILSON: Uh...

20   SINGER: That's much better.

21   WILSON: Uh, you're pr-- busy these days, huh?

22   SINGER: Yeah.  We got early decision comin' up.

23   WILSON: Sh--
```

```
 1   SINGER: Uh, you're gonna be goin' through the same thing,

 2           so...

 3   WILSON: Oh, I know, next year, exactly.  So, hey, uh, there

 4           were a couple topics.  One was, ya kno-- my

 5           daughter's, and, uh, making some donations now,

 6           whatever -- how that can work.  And then, second, I do

 7           want to give some time, uh, to, uh, talk a bit about

 8           your overall, uh, pricing strategy and your economic

 9           model, if you want.

10   __:     Uh...

11   WILSON: I don't want to force it on you.  But I just think --

12   SINGER: No, no.  Uh, yeah.  So le--

13   WILSON: -- could be helpful.

14   SINGER: -- well, let's -- let's start with number one.  So

15           what would be great is...  You know, w-- I have a

16           bunch of schools that we work with directly.  And, you

17           know, it's kind of a first serve-- firs-first come,

18           first [01:00] served.  Right?  So like I have

19           opportunity with Stanford in sailing.  And I can do

20           other Stanford sports potentially too.  And we have

21           Yale and we have Harvard.  And then I can go after all

22           these other schools too.  But, of course, I don't know

23           what the girls want.
```

```
 1   WILSON: Right.  Well, help me understand where you have first

 2           come, first serve and, uh...  So, uh, you have, as you

 3           said, Stanford, sailing.

 4   SINGER: Stanford, sailing.  Got Yale, soccer, um, Harvard...

 5   WILSON: They probably wouldn't want Yale.  Harvard?  What, uh

 6           -- what do you have at Harvard?

 7   SINGER: Harvard, we could do multiple sports.  I just need to

 8           go to them.  I could actually even go to Y-- uh, you

 9           don't want Yale, because you thought that they were

10           too what?  Too conservative or they were too liberal?

11   WILSON: Too liberal.

12   SINGER: OK.  I don't know which -- I don't know which side of

13           the room, uh, you know, you -- you come from.  So.

14           Uh, you know, we could do Stanford.  We can do,

15           obviousl-- USC with anything.  Right?  So that's an

16           easy one.

17   WILSON: How about UCLA?

18   SINGER: UCLA, I could do the same thing.

19   WILSON: And [02:00] what about, uh...?  Got, uh, multiple

20           there.  And what about the, um -- uh, Georgetown?

21   SINGER: Uh, for where?

22   WILSON: Georgetown?

23   SINGER: Georgetown, we could do the same thing.  Yeah.

24   WILSON: Lots of mul--ple options.
```

1   SINGER: Yeah.

2   WILSON: So Stanford only has 1 or 2.  Just sailing?  Is that

3            about it?

4   SINGER: Um, so, uh, usually I can go t-- sailing, I can go to

5            the crew coach, 'cause I'm friendly with her, um, and

6            we can, you know, d-- always do women's lacrosse.  And

7            again, ya know, they don't have to play.  They just --

8            I j-- that's the path I'm gonna get 'em in on.

9   WILSON: Gotcha.  And what about Harvard?  Crew, sailing.

10           Anything else?

11  SINGER: Um, sailing, crew, sometimes tennis.  The key to here

12           is that, if I were to get a deposit, l-- you know,

13           like, uh, uh, half a million dollars in the bank, then

14           it's --

15  WILSON: Uh...

16  SINGER: -- ya know, we can figure out where they wanna go.  So

17           what I'd like to do is...  I'm gonna be in town on

18           November 1st and 2nd.  If you can start probin' with

19           the girls as [03:00] to potentially their -- what

20           they're thinking, then we -- you and I could -- if

21           you're -- if you can be in town one of those days -- I

22           think it's a Thursday, Friday -- and we could talk

23           face-to-face, then we could figure out, OK, what are

24           we gonna go after.  So if anybody asks me for like a

1          Stanford spot and we're not sure yet, then I can call

2          you and say, "Hey, somebody wants that spot and I only

3          have 1," or "I'm gonna get a second one," or whatever.

4          But having the money already, in advance, makes it

5          much easier.  Because I gotta go with whoever's gonna

6          ante up.

7    WILSON: Yeah.  And who do we make these, uh, checks out to?

8          And, uh, what's, uh -- uh, what's your foundation?  Do

9          you have a whole wiring -- send me an email with all

10         your wiring and all, uh...?

11   SINGER: Yeah.  I can send ya a email with all the wiring

12         instructions.  And then g-- uh, uh, your check will be

13         -- to into our foundation's account.

14   WILSON: Ri-- goes to your foundation, right.

15   SINGER: Yeah.

16   WILSON: Uh, uh, do you have mul--?  So you have multiples, uh,

17         at Harvard and Stanford and, uh...

18   SINGER: Correct.

19   WILSON: You have mul--ples everywhere, it sounds like.

20   SINGER: Correct.

21   WILSON: And they don't actually have to do that sport, you're

22         saying.  They could just go in and --

23   SINGER: Correct.

24   WILSON: -- be like the, uh -- the [04:00] scorekeeper or --

 1  SINGER: Corre--

 2  WILSON: -- water boy, water girl.

 3  SINGER: Manager or whatever you want to call 'em.  Yeah.

 4  WILSON: Uh, manager, those things.  OK.  And you can do 2 at 1

 5          school, as well.  You could do 2 at, uh...?

 6  SINGER: It's more difficult to do.

 7  WILSON: Uh...

 8  SINGER: That's why it depends on where it is.  And the earlier

 9          I know, then that gives me a chance to go after it.

10          'Cause I'll have to solicit, uh...

11  WILSON: Uh, let's say it's 2 at either Stanford or Harvard.

12  SINGER: So then, uh...

13  WILSON: Are those impossible or...?

14  SINGER: No, it's not impossible, absolutely not.  It's just a

15          matter of I just need to know that I go-- I gotta

16          start doin' my work now on that.  So by you makin' the

17          deposit, it makes it easier for me, because I know I

18          g-- uh, because what they're gonna first say to me...

19          If I go to them...  And let's say we're doin' 2 girls

20          in 1 place.  Then they're gonna say to me, uh, "We're

21          gonna give up a spot for you.  Are you --"

22  WILSON: Uh...

23  SINGER: "-- are you guaranteeing me that's she's comin'?  And

24          is the family guaranteeing me that they're gonna ante

```
 1              up and they're gonna make a payment?"  Because they

 2              don't want to give up a spot.  And the earlier I do

 3              it, the better.

 4     WILSON: Gotcha.  So, uh, what about Princeton?  They have

 5              multiples [05:00] too?

 6     SINGER: 1.  Usually, I could try to get a second, but it's

 7              more difficul--

 8     WILSON: Only 1 at Princeton.  OK.

 9     SINGER: Yeah.

10     WILSON: And same kinda deal, any spor--?  You don't have to

11              really play the sport?

12     SINGER: That's correct.

13     WILSON: And you can do that -- you can also get some kinda

14              chair things too, if you don't do the sport?

15     SINGER: Uh...

16     WILSON: Or, uh, sport mostly is your...?

17     SINGER: Um, yeah, the...  It jus-- well, like it depends on

18              the school.  To go after a dean is a little more

19              difficult.  With your girls, because they're athletic

20              and they're big and all of that, I can sell to anybody

21              that they're athletic enough to be able to take 'em

22              and there'll be no question.

23     WILSON: Yeah.  Their size and, uh...  So they...  Yeah.

24     SINGER: Correct.
```

1   WILSON: Even though they wouldn't play.  OK.

2   SINGER: R--

3   WILSON: And Brown?  Is, uh, Brown also 2?  Or wh--?

4   SINGER: Brown's an option too.  Yeah, sure.

5   WILSON: A couple of 'em.  OK.

6   SINGER: Yeah.

7   WILSON: Uh, and those are all -- except for like UCLA and

8           USC...?  Those are like the 350 and the other ones are

9           gonna be like 1,000,000, whatever?

10  SINGER: Yeah.  The -- the big boys are gonna cost you over

11          1,000,000.  And, uh, probably -- if I know early

12          enough, I could probably get it done at 1.5 for both

13          girls.  Uh, I just need to -- [06:00] I need to push

14          now.

15  WILSON: OK.  So, yeah, I can get ya more now, if that helps

16          you and makes everything certain.  Uh, yeah.  So I'll

17          give you at least half.  Maybe I can get ya ¾ of a

18          million now, if that makes it like, you know, more

19          certain and you're gonna say --

20  SINGER: OK.

21  WILSON: -- (inaudible) done, that's a better way to do it, for

22          you.

23  SINGER: Uh...

```
 1   WILSON: It makes it better -- you're saying better with the
 2           schools, everything, it's much better to get it --
 3   SINGER: We-- uh, th-the --
 4   WILSON: -- as a guarantee.
 5   SINGER: -- the amount, uh, that doesn't ma-matter right now.
 6           It matters you're committed.  And you putting down
 7           some money, th-that I know...  John, I kn-- known you
 8           for years.  So I know, when, uh, we get the girls in,
 9           it's a done deal and you're gonna take care of your
10           part of it, you're gonna make the payments to the
11           schools and the -- to the coaches.  And that's what I
12           need -- that's -- tha-- so I'm not worried about that.
13   WILSON: Uh, uh, help me understand the logistics?  I thought I
14           make the payment to you and you make the payment to
15           the school.
16   SINGER: Correct.  That's correct.
17   WILSON: Oh, you said I make the payment to the schools.
18   SINGER: Well, no, no.
19   WILSON: You're (inaudible)...
20   SINGER: Uh, essentially, uh, it's gonna come to my
21           foundation...  That's correct.
22   WILSON: And you pay.  Uh, r-- OK.
23   SINGER: That's correct.
```

1   WILSON: Now, um, uh, how does that actually wor--?  What if

2           they don't actually get in?  Uh, it's not a b-- uh...

3   SINGER: Oh, no, no, no.  Y-you don't have to [07:00] worry

4           about it.  They're -- it's g-- it's a done deal.  And

5           I'll know beforehand if it's gonna be done or not.

6   WILSON: Uh...

7   SINGER: But, uh --

8   WILSON: When will you know --

9   SINGER: -- see, uh --

10  WILSON: -- in the summer of next year?

11  SINGER: -- I need a score.  See?  That's why I need their

12          grades and scores.  And that's wh--

13  WILSON: Yeah.  They get PSATs.  And they just took the PSATs.

14  SINGER: Correct.  And then I need the real scores.  That would

15          be -- that's gonna -- that's gonna be able to tell me

16          how easy it is to -- to flow it through or no-- and

17          I'm hopefu-- both girls get the same or something

18          similar to each other.

19  WILSON: They've gotten pretty similar scores all along, plus

20          and minus math and English, that kinda stuff.

21  SINGER: Right.

22  WILSON: Yeah.

23  SINGER: Right.

1  WILSON: As long as, you know, like you can -- 1300 or so, is

2         that OK --

3  SINGER: Correct.

4  WILSON: -- is it --

5  SINGER: Yes.  Yeah.

6  WILSON: -- 1300 plus?  OK.

7  SINGER: Yeah.

8  WILSON: Now, do you ha-- when you say you need to know, we

9         have to actually have picked a school by when too,

10         that it's -- OK, it's 2 to Stanford, 2 at Harvard, or

11         1 in each --

12 SINGER: Well, uh, late --

13 WILSON: -- 1 in USC, or...?

14 SINGER: -- so I need that late spring.

15 WILSON: So late spring only.  OK.

16 SINGER: Right.  And you guys are gonna visit the schools by

17         then.  You'll have so much fun, uh.

18 WILSON: Yeah, yeah.  They're g-- they haven't gone to these

19         place-- they've been to some of them.

20 SINGER: Correct.

21 WILSON: But they didn't go to them, look at 'em.  Uh, does it

22         matter if they go to them and look at the -- an-and

23         have this whole tour, with the [08:00] school knowing,

24         or just go and look at themselves?

```
 1  SINGER: No, uh.  It's a --

 2  WILSON: Want to suck up to the dean?

 3  SINGER: -- uh, a regular tour -- regular -- regular tour.

 4  WILSON: OK.  Do those have to be done durin' the week too?

 5          They can't do 'em --

 6  SINGER: Yeah.

 7  WILSON: -- on a weekend really?

 8  SINGER: Yeah.  The weekends -- you know, because they don't

 9          have the same energy.

10  WILSON: No, no.  I understand that.  But I meant for the

11          school, to meet with the whatever, faculty -- or not

12          the facu-- but the...

13  SINGER: Well, they d-- they're just gonna go on a regular

14          tour.  They're not gonna meet, uh, faculty anyways.

15  WILSON: I mean, see the class, I mean-- not meet the faculty

16          but see the classrooms.

17  SINGER: Well, if we have kids that go there.  We can set it up

18          with 'em.  If I don't kids that go, they don't go see

19          classes.  People do--

20  WILSON: Oh, they do not.  They just go on a tour --

21  SINGER: No.  People are worried --

22  WILSON: -- of campus by --

23  SINGER: -- about all that.  Yes.
```

1   WILSON: -- admissions?  OK.  So it's admissions tour, not like

2           a classroom tour.

3   SINGER: Correct.

4   WILSON: OK.  Uh...

5   SINGER: Correct.  Unless I have kids there.

6   WILSON: Uh, gotcha.  OK.  So if I do it early on, you might

7           even get, you said, 2 -- uh, 2 (inaudible) the top

8           ones (inaudible) 1 (inaudible).

9   SINGER: Correct.

10  WILSON: And does it really matter, though, if it's 2 at 1 or,

11          uh, not?

12  SINGER: It d--

13  WILSON: Ho-how much did you...?

14  SINGER: It makes it ea-- it makes it easier, if it isn't, but

15          it can be done.

16  WILSON: It could be done.  OK.  And you're pretty confident

17          right now, a-and all those top schools, you could get

18          something done, as long as they get --

19  SINGER: Yeah.

20  WILSON: -- a test score of [09:00] 1300.

21  SINGER: Because I'm -- I'm usin' up my spot now.  And then you

22          have the ne-- you're early.

23  WILSON: OK.  Great.  And then, uh...  You only have like 1 or

24          2 spots in each of these place, though, you're saying.

```
 1   SINGER: Correct.

 2   WILSON: Or, y-- uh, you have several, depending on the sport,

 3           you were s-- uh, 'cause like --

 4   SINGER: Well, it depends.

 5   WILSON: -- Harvard, you can a couple --

 6   SINGER: Uh, uh...

 7   WILSON: -- both crew and saili--

 8   SINGER: Well, John, it, uh -- it depends on boy or girl, all

 9           of that, right?  Because --

10   WILSON: But I'm saying 2 girls.

11   SINGER: -- (inaudible).  Yeah, usually 2 girls.

12   WILSON: So my t-- you can get a couple girls in each year, to

13           these places.  And they may --

14   SINGER: Correct.

15   WILSON: -- take both of those spots.

16   SINGER: Correct.

17   WILSON: OK.  Sound like you got 20 spots.  You may only have

18           2.

19   SINGER: No.  Uh, right.  You're crazy.

20   WILSON: No.  It's why you need to charge a bigger premium, my

21           friend.

22   SINGER: I got it.  Well, we'll have that discussion in --

23   WILSON: Uh...

24   SINGER: -- in, uh, November.  How's that?
```

 1   WILSON: OK.  And that sounds great.  So I w-- I will get

 2           you...  Send me an email with where you need to send

 3           these funds.  And so you don't care.  Half a million,

 4           whatever, is good, ¾ of a million, doesn't really

 5           matter, you're saying, just send something to you.

 6   SINGER: Correct.

 7   WILSON: And then, uh -- uh, then you know we're locked in for

 8           2.  We don't know where yet.

 9   SINGER: R--

10   WILSON: We'll determine that a little bit later in the year,

11           maybe November.  [10:00] So you have your dates?  Is

12           it 1 and 2, for sure?  What is your schedule?

13   SINGER: Excuse me?

14   WILSON: The dates (inaudible) --

15   SINGER: Yeah.  November --

16   WILSON: -- come back to Boston, uh.

17   SINGER: -- 1st and 2nd.  Yeah.  November 1st and 2nd -- it's a

18           Thursday, Friday -- I'll be...

19   WILSON: OK.  Yeah.  Right now we were plannin' on being out of

20           town, damn it.  We're gonna be in Europe.  Uh, when's

21           the next time you're in, uh, Boston, uh?

22   SINGER: Uh, I'll have to figure that out.  I'll let you know,

23           though.

```
 1   WILSON: OK.  My girls'll be in town.  But w-- Leslie and I

 2           will be out, yeah.

 3   SINGER: OK.  Gotcha.

 4   WILSON: All right.  Oh, by the way, you should mark your

 5           calendar for next Ju-July, if you want, in, uh, Paris.

 6           Got a big birthday, July, uh, 19.

 7   SINGER: OK.

 8   WILSON: I rented out Versailles.

 9   SINGER: Oh, my God.  You're crazy.

10   WILSON: I know.  A black-tie party there.  So you'll have to

11           come.

12   SINGER: Uh...

13   WILSON: Anyway.  Uh, I will -- I'll get you -- uh, I'll parti-

14           -

15   SINGER: I'll send you the -- I'll send you the w-- uh,

16           information about the bank and the wiring stuff, uh,

17           probably in the next day or so.

18   WILSON: OK.  That's great.  It's good to hear that earlier is

19           better.

20   SINGER: Yeah.

21   WILSON: I'm glad we had this conversation.  And then I'll have

22           the girls run a filter, over the next few weeks.  Uh,

23           they could meet with you in November without us.  Is

24           that [11:00] OK?  Or would you --
```

 1   SINGER: Sure.

 2   WILSON: -- want (inaudible) with us?

 3   SINGER: Absolutely.

 4   WILSON: OK.

 5   SINGER: Absol--

 6   WILSON: So I'll have the girls plan on meeting you sometime

 7           November 1 and 2.  Let me know the next time you're on

 8           (inaudible).

 9   SINGER: Will do.

10   WILSON: Yeah.  I'd be happy to help you with your business

11           model.  So I think you're leaving a lotta money on the

12           table.

13   SINGER: I know y-- I know that.  We'll have that discussion.

14   WILSON: OK.  So the g--

15   SINGER: All right, John.

16   WILSON: Uh...

17   SINGER: Thanks.

18   WILSON: Take, uh...

19   SINGER: OK.  Buh-bye.  [11:18]

20

21                          END OF AUDIO FILE

# EXHIBIT R

1  **Call Date:**     10/25/2018

2  **Call Duration:** 06:06

3  **Call Begin [] Call End []**

4  **Call Participants:**

5       Rick Singer

6       Gamal Abdelaziz

7  **File Name:**      ████████8802 2018-10-25 18-03-21 10712-001

8  **Bates No.:**

9

10  ABDELAZIZ:     [00:00] Rick.

11  SINGER:   Gamal, tell me something good.

12  ABDELAZIZ:     Uh, (laughter) So ██████ (sp?) is loving USC.

13       Thank you so much.  How are you doing?

14  SINGER:  I'm -- I'm living life like you, big guy.

15  ABDELAZIZ:     (laughter)  It's good to hear from you.

16  SINGER:  Going well.

17  ABDELAZIZ:     How can I be of help, my friend?

18  SINGER:  Well, I -- what I want to do is I want to just --

19       one, I wanted to find out -- I'm sure she's doing great

20       because everybody loves it.  Have you -- did you guys go

21       to parents weekend last weekend or 2 weekends ago?

22  ABDELAZIZ:     Yes, we did.  We loved it.  We absolutely loved

23       it.  Got to meet a lot of people.

24  SINGER:   And has ██████ been on campus yet to see ████████

1  ABDELAZIZ:     He has not.  He's got his own universe, uh,

2         Rick, as you know.

3  SINGER:   (laughter)  OK.  Are you still funding the universe?

4  ABDELAZIZ:     Uh, you know, I have not because ████ has been

5         in and out [01:00] of the school, um, because...  You

6         know, you're talking about Columbia?

7  SINGER:  Yeah.

8  ABDELAZIZ:     Yeah.  He's been out more than he's been in.

9         I've had, uh, uh, somewhat of a challenge with ████  He

10        came up with an idea and unfortunately I was too busy in

11        China and he didn't follow through on it and we ended up

12        -- he ended up, according to him, losing a $1,000,000,000

13        company.  So...

14  SINGER:  OK.  Wow.  We'll see.

15  ABDELAZIZ:     Uh, I know it's -- I know it's hard to digest

16        but he came up with an idea that Facebook has acquired

17        for -- about 3 or 4 years ago he came up with an idea.  I

18        had just landed in China.  We didn't have time to discuss

19        it.  And he claims, and I know he's not making up stuff,

20        that it's now worth a lot of money.  So we are --

21  SINGER:  OK.

22  ABDELAZIZ:     -- we've got a challenge with him.  I need to

23        get him to realize that life has [02:00] many, you know,

24        uh, setbacks and he needs to learn to just dust himself

```
 1        off and start all over.  But, uh, he's stuck a little

 2        bit.

 3   SINGER:   OK.  Well, I'm sorry to hear that.

 4   ABDELAZIZ:      Yeah, yeah.  He's -- he's in college.

 5   SINGER:  So --

 6   ABDELAZIZ:      I mean, he's -- he's taking his exams and he's

 7        doing his thing.

 8   SINGER:  OK, OK.  Well, cool.  Well, I'm in Boston.  It's

 9        freezing here.

10   ABDELAZIZ:      Oh, I'm sure.  Yeah.

11   SINGER:  I just -- I had to go out and buy a jacket today.

12   ABDELAZIZ:      Oh, my God.  Yeah.  My team was there and they

13        were watching the game last night and they were telling

14        me they were freezing their butt off.

15   SINGER:  Oh, absolutely.  Absolutely.  So the reason for my

16        call is I just wanted to make sure that you knew.  So my

17        foundation, which happens to all these foundations,

18        especially as we got -- we've gotten bigger.  So we're

19        getting audited right now.

20   ABDELAZIZ:      Yes.

21   SINGER:  So -- which is typical, right.  And so they're

22        looking at all my payments --

23   ABDELAZIZ:      Yes.
```

1   SINGER:   -- that have come into our foundation and so they

2        asked me, you know, about the $300,000 payment, um --

3   ABDELAZIZ:    Yes.

4   SINGER:   -- that was made.

5   ABDELAZIZ:    Yes.

6   SINGER:   And so I just want you to know from the IRS, you

7        know, I'm not going to tell the IRS anything about the

8        fact that your $300,000, um, was paid to Donna -- Donna

9        Heinel at USC to get ████████ into school even though she

10        wasn't a legitimate basketball player at that level.  So

11        I'm not going to -- I'm not going to say that to the IRS

12        obviously.  Are you --

13   ABDELAZIZ:    OK.

14   SINGER:   You're OK with that, right?

15   ABDELAZIZ:    Of course.

16   SINGER:   OK.  I just -- I just want to make sure.  I never

17        know with families, right.  But here's the funny thing.

18   ABDELAZIZ:    No, I -- I mean, I -- you know, I mean, I -- I

19        -- my intention was to, uh, donate the money to the

20        foundation and, uh, what -- you know, and then from there

21        obviously, uh...  I don't think...  Uh, do they have the

22        intention of reaching out to the people that sent those

23        [04:00] payments?  Is that what you're saying?

1  SINGER:   Uh, I don't know.  You know, we have hundreds and

2        hundreds of them.

3  ABDELAZIZ:     Yeah.

4  SINGER:  And I'm just in the point where I just -- you know,

5        the way I am, I just want to make sure everybody's aware.

6        I wanted to make sure our stories are correct.

7  ABDELAZIZ:     But -- but Rick, you're -- you're a friend.

8        You've been a friend of my family for many years.  Is

9        there anything I can do to help?  Uh, I'm just --

10  SINGER:  Well, no.  No.  You -- I'm in great shape.  So what

11        --

12  ABDELAZIZ:     Good.

13  SINGER:  What I want -- but I just want to make sure -- our

14        books are great.  Everything's great.  But, you know,

15        when you deal with the IRS, you never know where they're

16        going to go.  But I'll tell you --

17  ABDELAZIZ:     Absolutely.

18  SINGER:  I'll tell you a funny story.  Is that Donna Heinel,

19        who is the senior women's administrator, she actually

20        called me and said -- sorry, I'm in a -- a hotel right

21        now and they're doing a fire alarm.

22  ABDELAZIZ:     Yeah.

23  SINGER:  Uh, they -- she called me and says, "Hey, Rick, that

24        profile that you did for ████████ I loved it.  It was

████████ 8802  2018-10-25  18-03-21  10712-001                          Page 6

1      really well done and going forward, anybody [05:00] who

2      isn't a real basketball player that's a female, I want

3      you to use that profile going forward."

4   ABDELAZIZ:     I love it.

5   SINGER:  But -- yeah, it was great.  Absolutely great.  So I

6      just want to make sure our stories are together.  I'm

7      going to essentially say that your $300,000 payment, um,

8      was made to our foundation to help underserved kids.

9   ABDELAZIZ:     OK.

10  SINGER:  And we should be in good shape.  I just want to make

11     sure you're OK with that, too.

12  ABDELAZIZ:     I am.

13  SINGER:  OK.  Terrific.  And if there's anything else I can

14     do for you, just let me know.

15  ABDELAZIZ:     Rick, I appreciate it, as always, and, uh, you

16     know, if you ever have the time for a quick call to ████

17     I would really appreciate it.  He loves you and looks up

18     to you and, uh, I think this is a moment were you to

19     reach out to 5 minutes to the kid, uh, I think he would

20     appreciate it.

21  SINGER:  I -- I'll do that.  I'll do that this weekend.

22  ABDELAZIZ:     I -- I -- I'll text you his number in case you

23     have time this weekend.

24  SINGER:  OK, I appreciate that.  I'll do that.

█████8802 2018-10-25 18-03-21 10712-001                                    Page 7

1   ABDELAZIZ:      [06:00] Thank you, Rick.  Take care.

2   SINGER:   OK.  Take care of yourself.  All right, bye-bye.

3   ABDELAZIZ:      Bye.  Bye. [06:03]

4

5                         END OF AUDIO FILE

6

# EXHIBIT S

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION** CHS REPORTING DOCUMENT |  OFFICIAL RECORD |
|---|---|---|

| **HEADER** |
|---|

| **Source ID:** | ▮▮▮▮▮▮ |
|---|---|
| **Date:** | 11/08/2018 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| **SOURCE REPORTING** |
|---|

| **Date of Contact:** | 10/31/2018 |
|---|---|

**List all present including yourself (do not include the CHS):**
SA Laura Smith
SA Elizabeth Keating
SA Kaitlyn Cedrone
AUSA Eric Rosen
AUSA Justin O'Connell
Don Heller, Attny for CHS

| **Type of Contact:** | In Person |
|---|---|
| **Country:** | UNITED STATES |
| **City:** | Boston |
| **State:** | Massachusetts |
| **Date of Report:** | 11/08/2018 |

| **Substantive Case File Number** |
|---|
| ▮▮▮▮▮▮ |

**Check here if additional reporting is in Echo**
No

**Source Reporting:**
CHS was interviewed at the United States Attorney's Office in Santa Ana, California. Present during the interview were FBI Special Agents Laura Smith and Kaitlyn Cedrone, IRS Special Agent, Elizabeth Keating, and Assistant United States Attorneys Eric Rosen and Justin O'Connell. Also present during the interview was CHS's attorney, Don Heller. After being advised of the identity of the interviewing Agents and the nature of the interview, CHS provided the following information:



| FD-1023 | Page 1 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
| --- | --- | --- |

ABDELAZIZ- CHS was unsure how s/he met GAMAL ABDELAZIZ (ABDELAZIZ) but recalled ABDELAZIZ called CHS regarding his son, ███ ABDELAZIZ ███. CHS flew to their house. ███ was a phenomenal student but ███ played basketball at ███ in Nevada. ███ also played on the ███ for one week. CHS worked with ███ legitimately got into Columbia by himself. At the same time, ███ sister, ABDELAZIZ ███, was applying to schools. ABDELAZIZ had connections at USC. ███ applied to USC but was denied. ███ ended up going to ███. ABDELAZIZ called CHS because he should have done the side door at USC with ███. ABDELAZIZ knew it would have cost $250,000 for the side-door at USC. ABDELAZIZ worked for Steve Wynn and transferred to China to open a hotel. ███ ABDELAZIZ ███ did poorly in school in China. ABDELAZIZ called CHS saying ███ was doing summers at USC. ABDELAZIZ promised ███ h/she'd get USC done for her because of the sacrifice she made in moving to China. ███ played basketball but CHS made her a better basketball player. ███ was not a Division 1 basketball player. CHS told ABDELAZIZ USC would be $300,000. CHS charged $300,000 for ███ because CHS knew s/he had to give DONNA HEINEL (HEINEL) more money because ███ would be a difficult (less strong) student for HEINEL to get through. HEINEL, or the program received approximately $200,000 of the $300,000. Someone at USC, who was from China, was a member of the sub-committee that reviewed student athletes presented by HEINEL. This Chinese person said ███ went to a tough school in China. HEINEL had to explain ███ profile to the sub-committee. ABDELAZIZ knew ███ was not strong enough to be recruited by USC. ABDELAZIZ knew there was an exchange of money to someone/USC to get ███ into USC. HEINEL diverted some of the money to a particular part of USC. ABDELAZIZ did not know about HEINEL specifically, but knew someone at USC was pulling strings. The money from ABDELAZIZ went to KWF and then went to USC program, which was directed to a specific area. The mom never talked with CHS. Both parents knew the money was going to the school, not KWF.

HEINEL- HEINEL knew the players CHS brought her were not recruitable athletes at USC. CHS had not told HEINEL they were not strong players. HEINEL knew CHS was producing profiles. There was an implicit understanding that they were not strong enough athletes to play for USC. HEINEL knew the profiles were created to look like the student athletes can play at USC. HEINEL told CHS not to send money to USC from KWF because the payments could be flagged.

███ CHS did not recall how s/he met ███ ███ played lacrosse at ███ and was not getting along with the kids at school and wanted to transfer. CHS recommended ███ transfer to Georgetown and CHS made him a tennis and lacrosse player. ███ was a good lacrosse player. CHS did not believe ███ played tennis. The ███ went to CHS' home because they bought a home nearby. ███ and GORDIE ERNST (ERNST) have since become friends. ███ did not know the money was going to ERNST; he believed it was going to the Georgetown tennis program. ███ knew ███ did not play tennis. ███ knew he was getting into Georgetown through the tennis program.

| FD-1023 | Page 2 of 6 | FEDERAL BUREAU OF INVESTIGATION |
| --- | --- | --- |

UNCLASSIFIED

SINGER-REPORTS-000034

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION | OFFICIAL RECORD |
|---------|----------------------------------|-----------------|
|         | CHS REPORTING DOCUMENT            |                 |

BIZZAK- JEFF BIZZAK (BIZZAK) was the father to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CHS met BIZZAK and ▮▮ through ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ). ▮▮▮▮▮ was on BIZZAK's Board- Surf League. CHS met ▮▮▮ and his mother in California. CHS did not meet BIZZAK. ▮▮▮▮▮ was a great athlete; he was a surfer, volleyball player (both indoor and sand), and a water polo player. ▮▮▮ was a setter in volleyball. BIZZAK's big thing was to get ▮▮▮ to work harder. ▮▮▮ did do better in school. BIZZAK and CHS had a conversation regarding USC. USC called BIZZAK a lot because of the wave technology BIZZAK had developed. BIZZAK did not want ▮▮▮ to know that he got into USC through friends at USC. CHS suggested using water polo or volleyball to get ▮▮▮ into USC. CHS had both a water polo and volleyball profile created for ▮▮▮ which CHS sent to HEINEL. Most of the information on ▮ athletic profile was real. Even though ▮▮▮ was a good volleyball player, he was not good enough to be recruited by USC. CHS got ▮▮▮ into USC early. ▮▮▮ was not told he got into USC through the side door until he received his acceptance letter. The reason they did not tell ▮▮▮ about the side door was because his parents wanted him to continue working hard in school. ▮▮▮ did his own tests; they were not taken by RIDDELL. BIZZAK knew ▮ was getting into USC through athletics. ▮▮▮▮ parents did not review ▮▮▮ athletic profile, CHS just sent it to USC. The BIZZAK's discussed Georgetown as another option for ▮▮▮ but ▮▮▮ wanted to be near water. ▮ was involved in USC; he helped build surf technology at the school.

| FD-1023 | Page 3 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|----------------------------------|

SINGER-REPORTS-000035

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---|---|---|

| FD-1023 | Page 4 of 6 | FEDERAL BUREAU OF INVESTIGATION |

SINGER-REPORTS-000036

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---|---|---|

**Synopsis:**
CHS proffer- Day 4

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

| SIGNATURE |
|---|

| Submitted By | LCSMITH (undefined undefined) | Mon, 31 Dec 2018 09:20:28 -0500 |
|---|---|---|
| First Level Approved By | JPKEELAN (John Keelan) | Wed, 2 Jan 2019 16:50:48 -0500 |

UNCLASSIFIED

SINGER-REPORTS-000038

# EXHIBIT T

1   **Call Date:**     11/29/2018

2   **Call Duration:** 04:13

3   **Call Begin [] Call End []**

4   **Call Participants:**

5       Rick Singer

6       Laurie

7   **File Name:**      ██████8802 2018-11-29 17-39-37 12374-001

8   **Bates No.:**

9

10  LAURIE  _: [00:00] Hello?

11  SINGER:   Laurie (sp?), it's Rick Singer.  How are you?

12  LAURIE  _: I'm good, Rick, how are you?

13  SINGER:   Good.  The girls good?

14  LAURIE  _: They're really good.  They love USC.  They're really

15      happy.

16  SINGER:   And are you on -- onsite, on -- whatev-- whatever --

17      um, filming now?  Are you at home?

18  LAURIE  _: I'm at home right now actually.

19  SINGER:   Awesome.  Awesome.

20  LAURIE  _: Yeah.  Yeah.

21  SINGER:   So I had -- I had talked to Moss (sp?) a couple, uh,

22      weeks ago that we were getting audited --

23  LAURIE  _: Uh-huh.

24  SINGER:   -- our foundation.

████████ 8802 2018-11-29 17-39-37 12374-001

```
 1  LAURIE _: Uh-huh.

 2  SINGER:   So I -- I just -- and I'm -- I just tried reaching

 3         out to -- so what I wanted to try to do is just make sure

 4         that you guys know they went through all my -- a bunch of

 5         folks and they're going to make calls to several families

 6         and it looks like you guys are going to be one of those.

 7         There'll probably be 8 or 9 that they're going to call.

 8  LAURIE _: [01:00] OK.

 9  SINGER:   Because they had this question about why did my

10         foundation get $200,000 2 consecutive years and then

11         nothing after that.  So I just want to make sure that you

12         know that, one, that you're probably going to get a call

13         and that I have not told them anything about the girls

14         going through the side door, through crew, even though

15         they didn't do crew to get into USC.  So I -- that is --

16         all I told them was that you guys made a donation to our

17         foundation to help underserved kids.

18  LAURIE _: Um-hmm.

19  SINGER:   And that's why you guys have done it.  And lots of

20         people don't make successive donations going forward.

21  LAURIE _: OK.  But I-- I'm confused.  But we -- so we made 2

22         donations 2 years in a row and so what are they

23         questioning?
```

 1  SINGER:   They're -- so they're questioning all -- they're

 2        looking at all of my donations to my foundation.  [02:00]

 3        OK?

 4  LAURIE _: OK, uh-huh.

 5  SINGER:   And so they went through everybody's and they

 6        started looking at everybody and saying, "OK, why these

 7        guys?  Why did these guys?  Who did these guys fund?  Why

 8        did they do -- why did they do?"  So we went through

 9        everybody --

10  LAURIE _: Um-hmm.

11  SINGER:   -- and they just picked out 10, 12 people and said,

12        "Hey, we're just going to follow-up with these folks and

13        ask them why they made a donation to your program," to

14        our foundation.

15  LAURIE _: Right.

16  SINGER:   So I said that's fine.  I said, "Can you give me

17        some idea of who those people are?"

18  LAURIE _: Right.

19  SINGER:   And your -- your guys were one of them.  And I said,

20        "Well, this is very clean.  They made a donation to our

21        foundation for underserved kids.  They're a great family.

22        They've been doing work all over LA.  Their kids are very

23        engaged in LA and I don't know why you guys think that

24        this is weird."  And they said, "It's not that we think

```
 1        it's weird.  We just want to follow-up as part of our

 2        audit."  They're driving me crazy so far.  So I --

 3   LAURIE  _: Who's -- who's auditing you?

 4   SINGER:   The IRS.

 5   LAURIE  _: [03:00]  Oh, OK.

 6   SINGER:   Right.  The IRS audits foun-- large foundations and

 7        we have so much money in our foundation and we give away

 8        so much money they're -- they want to -- you know,

 9        they're always worried about things going on in

10        foundations.

11   LAURIE  _: I see.

12   SINGER:   So what I -- what I wa-- I told Moss already and I

13        wanted to make sure that you knew, as well, if they

14        happened to call you, is that nothing has been said about

15        the girls, um, your donations helping the girls get into

16        USC to do --

17   LAURIE  _: OK.

18   SINGER:   -- crew even though they didn't do crew.  SO nothing

19        like that has been ever mentioned.

20   LAURIE  _: (inaudible).

21   SINGER:   If you ever -- ever were to say anything.

22   LAURIE  _: So we -- so we just -- so we just have to say we

23        made a donation to your foundation and that's it, end of

24        story.
```

```
 1   SINGER:   That is correct.

 2   LAURIE _: OK.

 3   SINGER:   Terrific.

 4   LAURIE _: OK.

 5   SINGER:   I just wanted to make sure I touched base because I

 6        didn't want you --

 7   LAURIE _: Yeah.

 8   SINGER:   -- to all of a sudden what -- like what's this call

 9        coming from.

10   LAURIE _: OK, yeah.  OK.  Totally.  All right.  So -- so

11        that's it.  So it's -- it's the IRS.  It's not anyone

12        from USC, it's the IRS.

13   SINGER:   [04:00] That is correct.

14   LAURIE _: OK.  Very good.

15   SINGER:   OK.

16   LAURIE _: All right.

17   SINGER:   All the best.

18   LAURIE _: All right.  Thank you, Rick.  Happy holidays.

19   SINGER:   You, too.  Take care.

20   LAURIE _: OK, thanks.

21   SINGER:   OK.  Bye-bye.

22   LAURIE _: Bye.  [04:13]

23

24                    END OF AUDIO FILE
```

# EXHIBIT U

1  **Call Date:**     2019-03-04

2  **Call Duration:** 5:24

3  **Call Begin [] Call End []**

4  **Call Participants:**

5       Rick Singer

6       Laurie (sp?)

7  **File Name:**      8802 2019-03-04 21-33-58 16410-001.wav

8  **Bates No.:**

9  SINGER:   [00:00] Laurie (sp?).

10 LAURIE:   Hi, Rick, I'm sorry to bother you.  I know Moss

11       (sp?) talked to you.  But --

12 SINGER:   No problem.

13 LAURIE:   I just had (inaudible) I just had a question because

14       Moss didn't recall this conversation.  Remember when you

15       called us and you said (inaudible) someone was going to

16       be calling us and -- but no one ever did?  What was

17       (inaudible) what was that all about?

18 SINGER:   Yeah, we were -- there was, uh, we had an audit of

19       our foundation.

20 LAURIE:   (inaudible) an audit, OK.

21 SINGER:   So we went through the audit.  The audit is done.

22       They haven't gotten back to me as what's -- if there's

23       anything.  But yeah.  The reason why I was calling you

```
 1        because in case they called you, uh, you would be

 2        prepared.  I didn't want you just to all of a sudden get

 3        a call from somebody from the IRS and be like, "Whoa,

 4        what's that all about?"

 5   LAURIE:   Oh (inaudible).

 6   SINGER:   So yeah, that was, uh, I called all our families.

 7        Uh, because we were going through this audit.

 8   LAURIE:   (inaudible) did that -- did that ever [01:00] wrap

 9        up?  Is that -- is that -- is that done?

10   SINGER:   Yeah, we're done.  We've been done, yeah.

11   LAURIE:   OK.  So why w-- in your best guess, Rick, why would

12        the government be subpoenaing the girls' records?  And I

13        know it's not just our girls.  But it's both of our

14        girls.  And there's some other girls (inaudible).

15   SINGER:   Uh, frankly, I have, uh, uh, I have no idea.  I mean

16        a lot of this could be governmental stuff.  You know,

17        there's the Harvard lawsuit.  Uh, for discrimination.

18   LAURIE:   No, what -- what is -- OK.

19   SINGER:   So that's been going on for 2 years.  The In-- the

20        Indians and the Asians are suing, uh, Harvard for

21        discrimination because they're taking minority students

22        over them who are much more qualified.  So that's been

23        going on for 2 years.  Uh.
```

 1   LAURIE:   But the Indians and the Asians are minorities.

 2        They're suing Harvard?

 3   SINGER:   They're considered in this process like white

 4        people.

 5   LAURIE:   OK.  So their -- their -- so their beef is Harvard

 6        is [02:00] taking African Americans over them?

 7   SINGER:   And Latinos that have 24s and 25s on their ACT and

 8        they have 35s and 36s.

 9   LAURIE:   Got it.  OK.

10   SINGER:   So they think they're being discriminated against.

11   LAURIE:   So OK.  I just find it so odd that both of our girls

12        got subpoenaed.  Like I don't -- their records got

13        subpoenaed.  I don't -- I really don't understand why

14        both of our girls.  Like are they looking at wealthy

15        families in California?  Like I'm -- I'm just so

16        confused.  And then I'm worried.  Like are they going to

17        try to take our girls out of USC?

18   SINGER:   Well, I think -- I think right now you're way over

19        on the whatever, right- or left-hand side.  Because th--

20        I mean nothing's -- I haven't heard a single thing.  And

21        nobody's even --

22   LAURIE:   Yeah.

1    SINGER:   There's no conjecture about any of this.  So, uh,

2          and they took the high school records which nothing was

3          fudged.  [03:00]

4    LAURIE:   I know that.  But are they going to (inaudible).

5    SINGER:   Right, so they got their test score, they got their

6          grades.  That's all, uh, so -- so I couldn't tell you.  I

7          really have no idea.  Because the records are c-- are

8          pure.  I mean nobody's touched them.

9    LAURIE:   No, I -- no, I know that.  So is it -- I wonder if

10          it's that guy at Marymount again that -- is he trying to

11          cause trouble?

12   SINGER:   Uh, I mean I have no idea.  Mean if I -- like I said

13          to Moss.  If I hear anything I'll let you know.  But this

14          is the first I've heard of anything.

15   LAURIE:   Yeah.  OK.  Well, all right, I just wanted to -- I

16          was just curious what the, uh, the -- so that was an

17          audit for you.  I just couldn't remember (inaudible).

18   SINGER:   Yeah.  We were -- our foundation was getting

19          audited.

20   LAURIE:   OK, OK, so are you -- so you're just continuing as -

21          - as with business as usual, uh, at your foundation,

22          you're just doing what you're doing.

23   SINGER:   (inaudible) yeah, that's -- we're doing what we

24          [04:00] always do, yeah.  Absolutely.

1   LAURIE:   OK, all right.  So -- so, uh.

2   SINGER:   So if you guys hear anything (inaudible).

3   LAURIE:   Yeah, no, no, I -- I had questions about SC.  I was

4        like, "Well, maybe the way they got in you're not

5        supposed to get in like that, I don't know, like can

6        you," but Moss was like, "No, you can make a donation,

7        it's OK, like I don't know."  Uh, yeah I don't know.  But

8        it's all on the up-and-up (inaudible) right?

9   SINGER:   (inaudible) yeah, I have no idea.  I mean, uh, I

10       have no idea because I don't know why they would go after

11       the kids' high school records.

12   LAURIE:   (inaudible).

13   SINGER:   Uh, and if they -- I mean because the transcript is

14       the s-- you know, transcript is right, the test scores

15       are right.

16   LAURIE:   Right.  OK.  All right, well, I -- I'm confused by

17       it.  And -- and you don't think it has anything to do

18       with -- it's [05:00] nothing at SC or how they got in or

19       anything or --

20   SINGER:   You know, uh, I would think that it would come from

21       SC if it was a problem.

22   LAURIE:   Yeah.  OK.  Yeah.  OK.

23   SINGER:   OK.

```
1   LAURIE:   All right.  Well, I have a headache because I've

2        just been so confused.  OK.

3   SINGER:   (inaudible) sorry.

4   LAURIE:   All right.  Thanks, Rick.  OK, thank you.

5   SINGER:   Take care.  OK.  Good night.

6   LAURIE:   OK, thanks (inaudible) bye.

7   SINGER:   (inaudible).  [05:24]

8                      END OF AUDIO FILE
```

# EXHIBIT V

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
| --- | --- | --- |

| **HEADER** |
| --- |

| **Source ID:** | ▮▮▮▮▮ |
| --- | --- |
| **Date:** | 10/12/2018 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| **SOURCE REPORTING** |
| --- |

| **Date of Contact:** | 09/26/2018 |
| --- | --- |

**List all present including yourself (do not include the CHS):**
SA Laura Smith
SA Katie Cedrone
SA Elizabeth Keating
AUSA Eric Rosen
AUSA Justin O'Connell
FoA Nicholas Savona
Don Heller, CHS' attorney

| **Type of Contact:** | In Person |
| --- | --- |
| **Country:** | UNITED STATES |
| **City:** | Santa Ana |
| **State:** | California |
| **Date of Report:** | 10/12/2018 |

**Substantive Case File Number**

▮▮▮▮▮▮

**Check here if additional reporting is in Echo**
No

**Source Reporting:**
CHS was interviewed at the United States Attorney's Office in Santa Ana, California. Present during the interview were FBI Special Agents Laura Smith and Kaitlyn Cedrone, IRS Special Agent, Elizabeth Keating, FBI Forensic Accountant Nicholas Savona and Assistant United States Attorneys Eric Rosen and Justin O'Connell. Also present during the interview was CHS's attorney, Don Heller. After being advised of the identity of the interviewing Agents and the nature of the interview, CHS provided the following information:

| FD-1023 | Page 1 of 10 | FEDERAL BUREAU OF INVESTIGATION |
| --- | --- | --- |

UNCLASSIFIED

SINGER-REPORTS-000007

FD-1023

**FEDERAL BUREAU OF INVESTIGATION**
CHS REPORTING DOCUMENT

OFFICIAL RECORD

SINGER-REPORTS-000008

Case 1:19-cr-10080-NMG Document 1097-22 Filed 03/25/20 Page 764 of 828

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION | OFFICIAL RECORD |
|---|---|---|
| | CHS REPORTING DOCUMENT | |

SINGER-REPORTS-000009

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---------|------------------------------------------------------------|-----------------|

UNCLASSIFIED

SINGER-REPORTS-000010

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION** | OFFICIAL RECORD |
|---------|--------------------------------------|-----------------|
|         | CHS REPORTING DOCUMENT                |                 |

did not take any money personally for getting a student into NYU. Instead, ▮▮▮▮ wanted help with fundraisers she had for athletics or help paying bills related to NYU athletics. CHS helped ▮▮ pay bills related to athletes. ▮▮▮▮ did not get a dime from CHS. CHS and ▮▮▮ did not have a monetary agreement. ▮▮▮ cannot help athletes get into NYU. ▮▮▮▮▮ went to NYU as a regular student, not as an athlete even though she was a great volleyball player. ▮▮▮ did not get money for helping the ZANGRILLO kid get into NYU.

UNCLASSIFIED

SINGER-REPORTS-000011



| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---------|---|---|



| FD-1023 | Page 6 of 10 | FEDERAL BUREAU OF INVESTIGATION |
|---------|--------------|----------------------------------|

SINGER-REPORTS-000012

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---|---|---|



| FD-1023 | | Page 7 of 10 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|---|

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION | OFFICIAL RECORD |
|---------|--------------------------------|-----------------|
|         | CHS REPORTING DOCUMENT          |                 |

UNCLASSIFIED

SINGER-REPORTS-000014

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION** OFFICIAL RECORD |
|---|---|
| | CHS REPORTING DOCUMENT |

**Synopsis:**

CHS proffer- Day 1

| FD-1023 | Page 9 of 10 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

SINGER-REPORTS-000015

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION |  |
| --- | --- | --- |
| | CHS REPORTING DOCUMENT | |

| SIGNATURE | | |
| --- | --- | --- |
| Submitted By | LCSMITH (undefined undefined) | Mon, 10 Dec 2018 15:07:08 -0500 |
| First Level Approved By | JPKEELAN (John Keelan) | Wed, 12 Dec 2018 14:55:48 -0500 |

SINGER-REPORTS-000016

# EXHIBIT W

1  **Call Date:** 2018-10-25

2  **Call Duration:** 3:09

3  **Call Begin [ ] Call End [ ]**

4  **Call Participants:**

5      Rick Singer

6      Robert Zangrillo

7  **File Name:** █████8802 2018-10-25 19-48-37 10726-001

8  **Bates No.:**

9

10  SINGER:   [00:00] Bob, how are you?

11  ZANGRILLO:     Hey, Rick, how are you?

12  SINGER:   Good, I just wanted to touch base and see how things

13      are going.

14  ZANGRILLO:     Uh.

15  SINGER:  (inaudible) good?

16  ZANGRILLO:     Uh, you know, work in progress (inaudible).

17  SINGER:   Does it ever end for you?

18  ZANGRILLO:     No, it does not ever end.  As long as you

19      aren't calling me saying there's any drama.  Just make

20      sure that all of, uh, █████ (sp?) work is getting done

21      (inaudible).

22  SINGER:   Absolutely.

23  ZANGRILLO:     OK, yeah (inaudible).

1    SINGER:   (inaudible) all of the -- all the work we're doing

2        for ███████ right now (inaudible) getting done absolutely

3        (inaudible).

4    ZANGRILLO:   OK, great, that's the only thing I was worried

5        about.   ███████ (sp?) is good, she -- she took a semester

6        off.  She's working here in Miami.  And as she's doing

7        great she's, you know, going to graduate close to ███.

8        And (inaudible).

9    SINGER:   Good.

10   ZANGRILLO:   Looking for a place so that she's, uh, ready to

11       start in January.

12   SINGER:   OK, good, because I know that the classes that

13       ███████ took for her in, uh, uh, d-- at the beginning of

14       the year [01:00] when she left Santa Monica and now these

15       classes, uh, everything will be perfect.  So we'll have

16       no issues.

17   ZANGRILLO:   Awesome.  Awesome.  Is there anything else you

18       need?

19   SINGER:   Yeah.  The only other thing I just want you to know

20       is that so my foundation is being, uh, audited now.

21   ZANGRILLO:   OK.

22   SINGER:   Like every foundation.  And we got hundreds of

23       families that have been through our foundation.

24   ZANGRILLO:   Yeah.

1   SINGER:   So I just wanted to make sure that you know that I'm

2        not going to t--, uh, tell the IRS that essentially we

3        got ████ in and -- and essentially paid Donna Heinel

4        (sp?) at USC to help ████ get in.  We're not even going

5        to talk about that.  All I'm going to say to the IRS is

6        that, uh, essentially the moneys that you paid, uh, all

7        went to, uh, our foundation.

8   ZANGRILLO:   Yeah.

9   SINGER:   And because essentially they're also looking at -- I

10       think we have a total payments of over 500,000 --

11  ZANGRILLO:   Mm-hmm.

12  SINGER:   Which would have -- would have -- would have

13       included, uh, early on with, uh, ████ and NYU.

14  ZANGRILLO:   Yeah, yeah, yeah.

15  SINGER:   So I'm just going to say that, you know, [02:00] n--

16       nothing really happened, uh, from that perspective.

17       Essentially that she d-- that ████ didn't get in NYU and

18       no payment was made to my contact at NYU --

19  ZANGRILLO:   Mm-hmm.

20  SINGER:   Which we know it was.

21  ZANGRILLO:   Right.

22  SINGER:   Uh, and then we -- and then ██████, I won't say

23       that the, uh, the moneys went to go pay Donna Heinel

1      (sp?) for USC to get her in.  And the other part is when

2      (inaudible) audit --

3  ZANGRILLO:     What -- what -- what -- what -- what will be

4      the thing -- what was the ████ payment for?  Just so I

5      know so we have the story straight.

6  SINGER:   So the ████ payment is all the same thing.  All

7      your moneys including the classes that ████ took for -

8      -

9  ZANGRILLO:     Yeah, yeah.

10 SINGER:   Uh, ████, all will show they're f-- to our

11     foundation.

12 ZANGRILLO:     Yeah.

13 SINGER:   And will all show that she, uh, that they were given

14     to -- for, uh, our programs that handle underserved kids.

15 ZANGRILLO:     OK, great, perfect.

16 SINGER:   OK?

17 ZANGRILLO:     OK, I got it.

18 SINGER:   I just want to make sure that we're on the same

19     page.  Uh, they may never call but just so you know

20     (inaudible).

21 ZANGRILLO:     Yeah, OK, just in case they do.

22 SINGER:   Yeah, because I'm -- I'm in Boston now.

23 ZANGRILLO:     OK.

1  SINGER:   And I haven't been back to LA for a while so I just

2       want to make sure I [03:00] connected before it got too

3       late.

4  ZANGRILLO:    OK, perfect.  Thank you, Rick.

5  SINGER:   All right, take care.

6  ZANGRILLO:    OK, bye.

7  SINGER:   OK, bye-bye.  [03:09]

8

9                          END OF AUDIO FILE

# EXHIBIT X

1   **Call Date:**  2018-10-24

2   **Call Duration:**  11:17

3   **Call Begin [    ] Call End [    ]**

4   **Call Participants:**

5       Elizabeth Keating (sp?)

6       Bill McGlashan

7       Justin O'Connell (sp?)

8       Eric Rosen

9       Kaitlin Sedroni (sp?)

10      Rick Singer (Finn (sp?))

11      Lara Smith (sp?)

12      M1

13  **File Name:**  10_24_2018 10 28 39

14  **Bates No.:**

15

16  [00:00]

17  SEDRONI:  This is Special Agent Kaitlin Sedroni (sp?), here

18      with Special Agents Lara Smith and Elizabeth Keating, as

19      well as AUSA's Eric Rosen and Justin O'Connell (sp?)

20      and...

21  SINGER:  Finn.

22  SEDRONI:  It is appro-- it is Wednesday, October 24th, 2018, at

23      approximately 10:28 a.m.  Finn will be making a

24      consensual recording with Bill McGlashan at the United

Case 1:19-cr-10080-NMG Document 1097-24 Filed 03/25/20 Page 23 of 28

1       States Attorney's Office in Boston, Massachusetts.  I

2       will now be handing over the recording device.

3  (pause)

4  (phone ringing)  [01:00]

5  M1:  Rick, you there?

6  SINGER:   I'm here.  How are ya, Bill?

7  M1:  Oh, hey, sorry about that.  My, my bad cell coverage

8       there for a minute.

9  SINGER:   No problem.

10  M1:  I'm good.

11  SINGER:   No problem.

12  M1:  So what's goin' on?

13  SINGER:   So --

14  M1:  I've been feelin' bad for ya.

15  SINGER:   Well, I wanted to apologize yes-- for, you know,

16       screwin' up our meeting, so I apologize.  I essentially

17       flew up to Sacramento yesterday, and I'm super happy I

18       did, 'cause I got a chance to meet with my old attorney,

19       Don Heller --

20  M1:  Uh-huh.

21  SINGER:   -- a-and he talked me off the ledge, because, as you

22       know -- as you could tell by my call the other day, I was

23       on the ledge.

24  M1:  Yeah.

1    SINGER:   Um, he told me that I was overreacting a little bit
2         because, um...  So I just wanted to make sure that we
3         talked, and, uh, you kinda knew what was goin' on.  And
4         since I respect your opinion, I just wanted to get an --
5         your opinion of kinda what's happened --
6    M1:  Mm-hmm.
7    SINGER:   -- so that, um -- because you have more experience
8         just in the world than I do.  So here --
9    M1:  Mm-hmm.
10   SINGER:   -- so here's kinda what happened: [02:00] uh, Mark
11        Ridell (sp?), who is the -- my expert test-taker, who
12        took the test for █████████ --
13   M1:  Mm-hmm.
14   SINGER:   -- at Igor School, West Hollywood College Prep, um,
15        he called me to meet at Barney's Beanery, you know, in
16        West Hollywood.  Have you ever been there?
17   M1:  Never.
18   SINGER:   OK.  Well, it's a really cool place in West
19        Hollywood.  But he calls me, and he kinda comes out to LA
20        every once in a while, and he just had his, his first
21        child, so his in-laws live in LA, so he said, "Let's meet
22        at Barney's Beanery."  So anyway, so Mark starts talkin'
23        to me and tells me a story that he, he got interviewed by
24        the -- an IRS agent in Florida, because he lives in

 1        Bradenton, about the payments that he received from my
 2        foundation.  And, as you know, when families pay for
 3        either, either takin' the test or goin' through the side
 4        door, all the money goes through my foundation, and then
 5        I pay it out to whoever needs to get paid, like I did
 6        for, you know, ███████ -- ███████ [03:00] test when he
 7        took the test at West Hollywood College Prep.  So I paid
 8        half of it to Mark and half of it to West Hollywood
 9        College Prep through my foundation, so that the family
10        essentially has no connection back to what has happened.
11        So I asked Mark what he did with the agent, and what they
12        talked about, and he told me that he hasn't been
13        declaring his payments from my foundation as income for
14        his taxes.  So apparently he's been declaring all this
15        income as a gift, which was stupid.  But the agent said,
16        uh, "I'm really not so focused on Mark and your payments;
17        what I'm focused on is this foundation."  And he kept
18        askin' him questions about the foundation's mission, what
19        they do, um, how they help underserved kids, so on and so
20        forth.  So, you know, since Mark does tutoring for us
21        [04:00] he told the agent that, you know, he works with
22        kids for us, i-- underserved kids in the Bradenton area.
23   M1:  Mm-hmm.

Case 1:19-cr-10080-NMG Document 1097-24 Filed 03/25/20 Page 195 of 328

1    SINGER:   So when he gets done speakin', I kinda freak out,

2           right?  Because now I'm thinkin', oh, shit, I'm in a --

3           I'm in a lot of trouble here, and the IRS has me wired.

4           Um, they probably have me -- you know, bugged my house,

5           the whole thing, because he's talkin' all about my

6           foundation, and, you know, he really wants to dive into

7           this.  So when I met with Don, he told me, "Rick, hold

8           on.  Just relax.  Um, for them to get a wiretap on you,

9           it takes a, a bunch of months to happen, and you just

10          need to relax."  So --

11   M1:  Mm-hmm.

12   SINGER:   -- you know, overnight I'm a lot less worried than I

13          was a couple days ago (laughs) when we talked, but I just

14          -- you know, I'm gonna use this phone, which is my son's

15          phone, um, and I did it --

16   M1:  Mm-hmm.

17   SINGER:   -- for us to talk so that there are, you know, no

18          issues, just in case.

19   M1:  Yep, yep.

20   SINGER:   And [05:00] it's, it's real-- to be frank with you,

21          um, Bill, it's really embarrassing, so I hope you'll just

22          keep this between you and I.

23   M1:  Of course.  Well, I think -- I mean, the good news is --

24          I mean, from, from my personal perspective, is, is, uh,

```
 1        you know, we, we s-- sorta haven't done anything yet,

 2        which I'd prefer not to do in the context -- just t-till

 3        it's all cleared up exactly, you know, what the dynamic

 4        is of the foundation.  I'd rather just sorta lay low.

 5   SINGER:   OK.  So, so --

 6   M1:  I mean, I -- it, it, it seem-- it seems like a better

 7        idea, because, I mean, until you're confident that...

 8        Uh, m-my, my concern, obviously, is I'm trying to help my

 9        son, but I don't want to create a dynamic for him that's,

10        that's impossible --

11   SINGER:   Right.

12   M1:  -- to manage.

13   SINGER:   Right.

14   M1:  Yep.

15   SINGER:   Right, and, and, you know, we have the applications

16        ready.  I mean, I know --

17   M1:  Well, I want -- I want you to keep doing what you do

18        brilliantly, which is coaching my kids and helping them,

19        um -- helping them the way you are.  I -- I'm, [06:00]

20        I'm grateful for what you do, and you're, you're, you're

21        unique at it.  The fact is that side door is a lovely

22        additional de-stresser, but if it doesn't -- if it isn't

23        possible, it isn't possible.

24   SINGER:   OK, gotcha.  Well --
```

1   M1:  You know?

2   SINGER:   -- so I, I will keep you in play, um, and I know --

3   M1:  Yeah.

4   SINGER:   -- you got -- you got Jimmy Iovine (sp?), you got

5        all those guys helpin' you, and that's cool --

6   M1:  Yeah.

7   SINGER:   -- and that's cool.  We just, as you --

8   M1:  Well, (inaudible), the, the iro-- the irony -- (laughs)

9        the irony of the whole way the system works, as I've

10       become sort of conscious of it -- I had this call with,

11       with, uh, the -- our -- Marc, uh, Benioff knows ████ is

12       interested in SC, and so he, he just gave 20 million

13       bucks to the school and is on the board, and he called

14       down to this, this guy, who's one of the development

15       folks, that, and just said, "Look, I want you to know who

16       Bill is," and da-da-da.  The irony of the whole thing is

17       that i-it is...  (laughs) The way these schools work,

18       particularly commercial schools like SC, you -- uh, my

19       [07:00] impression -- uh, this may be wrong; you would

20       know -- is it, it is so, um, commercial.  I mean, you

21       know, it, it, it's very clear to me that if they sense

22       that I'm gonna write a check, they're gonna do what they

23       can do to get me in --

24  SINGER:   And --

 1   M1:  -- at that school.

 2   SINGER:   And you're -- and --

 3   M1:  My son in.

 4   SINGER:   And you're right, and that's where -- that's, that's

 5        --

 6   M1:  It's just -- it's just --

 7   SINGER:   -- why USC's become the power.

 8   M1:  -- it's...  It's just (inaudible)...  Well, and by the

 9        way, you flip it around, you say if you've got 5,000

10        kids, effectively, in an undergraduate class, you could

11        have 4,000 of them be 4.0, perfect, you know, test

12        scores, and still let a thousand in that are -- that are,

13        you know, people that are well-connected, that are gonna

14        help you grow your school, and you've got an amazing

15        program --

16   SINGER:   And --

17   M1:  -- you know?

18   SINGER:   And, and that's essentially what USC's done, right?

19   M1:  Yeah, it's brilliant.

20   SINGER:   Right?  You got -- you know, Benioff's given his

21        money, and, uh, you know, everybody else is, is gi-- is

22        doin' their thing.  They're tryin' to hire the president.

23        Everybody who's --

24   M1:  Yeah.

1  SINGER:   -- on the board is anteing up to get the right

2         president in.  It's, you know, it's crazy.

3  M1:  [08:00] Mm-hmm.

4  SINGER:  It's crazy.  So l-- so just so you know, I don't

5         know if you saw ███████ ████████████ --

6  M1:  Yeah.

7  SINGER:   -- and --

8  M1:  Uh, well, he was totally excited that there was a green

9         checkbox next to his Chapman electronic submission.

10        (laughs)

11 SINGER:  Uh, uh, absolutely.  So he's done a fabulous --

12 M1:  But (inaudible), I, I have to say, between you doing what

13        you're doin' for him and ████████h, with her, you know,

14        c-- tutoring that he's been getting, you know, and just

15        his writing, all that, i-it's, it's been -- it's, it's

16        not been a...  I mean, my memories as a kid is this was

17        totally torturous.  It's felt OK with ██████.  I mean, he

18        needs some help on, um -- and he's gonna need your help

19        on getting his pitch in to the Iovine and Young Academy -

20        -

21 SINGER:  Yeah.

22 M1:  -- just 'cause he doesn't man-- as you know, he's -- has

23        a hard time sort of managing his time, but he's growin'

24        up.  I mean, he's, he's doin' a lot better than he was.

1   SINGER:   No, he's, he's been amazing, and he's been on top of

2          stuff.  Like, he hounds me, which is so different,

3          because I was [09:00] hounding him.

4   M1:  Don't you love that?  That's great.

5   SINGER:   Yeah.

6   M1:  Very good sign.

7   SINGER:   No, that's good, and, and --

8   M1:  Yeah.

9   SINGER:   -- and I'll jump on ████ here soon.

10  M1:  Perfect.

11  SINGER:   Um, I just want to get all the applications done,

12         but I --

13  M1:  By the way, I got -- I got, uh, ████, um...  We-- w-

14         weirdly, he did his first, uh -- you know, his PSAT, and

15         then he, at time and a half, ran out of time, and was

16         quite frustrated that he couldn't finish.  And I called

17         the, the assessment -- you know, the neuros--

18         neurospecialist --

19  SINGER:   Yeah.

20  M1:  -- who had done the assessment for both ████ and ████,

21         and she said, "Why doesn't he have double time?  I called

22         for double time."  And his, his friggin' school -- his --

23         like, she -- the woman who runs that, Rebecca, who's a

24         lovely woman, but she sort of feels it's her job to

1    prevent kids from getting, you know, uh, concessions, um,

2    as opposed to being their advocate.  So it -- it's right

3    there in his report, so we've gone back to her this week

4    and said, "You've gotta give him the double time, and you

5    gotta go back to ACT and SAT and pitch him for the double

6    time."

7  SINGER:   Absolutely.

8  M1:  Um, [10:00] so we're on that with ▮▮▮, as well --

9  SINGER:   OK.

10 M1:  -- to help him as he gets into his test cycle.

11 SINGER:   OK.  Well, that's great.  So, thanks --

12 M1:  Yeah.

13 SINGER:   -- thanks for takin' the call, and --

14 M1:  By the way, uh, so you know, the, the, uh, the, the...

15    You know, in my experience with a guy like that who isn't

16    paying his taxes, the issue the IRS always has is taxes.

17    They, they -- the IRS doesn't care about anything other

18    than you're paying your taxes.  And, you know, they tend

19    to be aggressive about making sure that organizations are

20    doin' what they're supposed to do from a tax perspective,

21    but they're -- that's all they care about at the end of

22    the day.

23 SINGER:   Gotcha.  Gotcha.  Well, I appre--

1  M1:  And they really -- they really -- that-that's, that's the

2       whole kit and kaboodle is tax.

3  SINGER:   Well, I appreciate that, and thanks for keepin' this

4       between us.  It's just a little --

5  M1:  Of course.

6  SINGER:   -- embarrassing, so thanks.

7  M1:  No, it shouldn't be embarrassing.  It is what it is.

8  SINGER:   OK.  Thanks, Bill.

9  M1:  All right, buddy.  (overlapping dialogue; inaudible).

10  SINGER:   Take care.  OK, bye-bye.

11  M1:  Yeah.

12  SINGER:   Uh...

13  (phone beeps)

14  SEDRONI:  This is Special Agent Kaitlin Sedroni, here with

15       Special Agents Lara Smith and Elizabeth Keating, as well

16       as AUSA's [11:00] Eric Rosen and Justin O'Connell, and...

17  SINGER:   Finn.

18  SEDRONI:  It is Wednesday, October 24th, 2018, at approximately

19       10:39 a.m.  Uh, this will now end the recording.  Good.

20  [11:17]

21

22                        END OF AUDIO FILE

# EXHIBIT Y

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

| **HEADER** |
|---|

| **Source ID:** | ▮▮▮▮▮ |
|---|---|
| **Date:** | 12/07/2018 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| **SOURCE REPORTING** |
|---|

**Date of Contact:**     11/09/2018

**List all present including yourself (do not include the CHS):**
SA Keating
SA Smith
SA Cedrone
FoA Savona
Attorney Don Heller
AUSA Eris Rosen
AUSA Justin O'Connell

**Type of Contact:**     Telephonic

**Date of Report:**     11/16/2018

| **Substantive Case File Number** |
|---|
| ▮▮▮▮▮▮ |

**Check here if additional reporting is in Echo**
No

**Source Reporting:**

On November 9, 2018, IRS Special Agent Elizabeth Keating, FBI Special Agents Laura Smith and Kaitlyn Cedrone, FoA Nicholas Savona, and AUSA's Eric Rosen and Justin O'Connell had a conference with CHS and his attorney Don Heller. CHS provided the following information:



| FD-1023 | Page 1 of 5 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---------|---|---|

**McGlashan:** CHS met Bill McGlashan ("McGlashan") through ▮▮▮▮▮▮▮▮▮▮ at TPG. CHS had ▮▮▮▮▮ children and he told McGlashan about CHS' foundation and program. The conversation with McGlashan was first about the Ride Foundation and donations to the foundation. The conversation changed to discussing working with ▮▮▮▮ McGlashan ▮. ▮▮▮▮ CHS met with McGlashan once or twice at his home. ▮▮▮▮ mother, ▮▮▮ was not involved. ▮▮▮▮ has a brother named ▮▮▮▮. ▮▮▮▮ scores were not good enough for the schools that ▮▮▮▮ wanted to attend. He would have received approximately ▮▮▮ if he took the test on his own.

CHS had a discussion with McGlashan about taking the test for ▮▮▮▮ and getting a good score from CHS' people. Mark Riddell ("Riddell") took the test for ▮▮▮▮. ▮▮▮ did not know that Mark was taking the test for him. McGlashan and ▮▮ flew on a private plane to Los Angeles for the testing. CHS did not go into detail about the testing. CHS told McGlashan that he/she would get ▮▮▮▮ a good score in one try and that ▮▮▮▮ would not know which would increase his confidence. McGlashan knew that someone else was taking the test and getting a good score. McGlashan would shut down the conversation when CHS tried to be more specific about the testing. McGlashan controlled the conversations with CHS and they tended to be short and sweet.

▮▮▮▮▮▮▮▮ could have introduced McGlashan to CHS. ▮▮▮ operates a private medical practice in San Francisco. ▮▮▮▮ introduced other families to CHS. CHS paid ▮▮▮ once for medical services. ▮▮▮▮n has a niece and nephew that CHS talked to on the phone. CHS did not do side doors or SAT testing for them. ▮▮▮ could have introduced CHS to Agustin Huneeus.

| FD-1023 | Page 2 of 5 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|--------------------------------|

UNCLASSIFIED

SINGER-REPORTS-000046

Case 1:19-cr-00840-NMG Document 109-22 Filed 03/03/25 Page 206 of 328

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION | OFFICIAL RECORD |
|---------|-------------------------------|-----------------|
|         | CHS REPORTING DOCUMENT        |                 |

| FD-1023 | Page 3 of 5 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|--------------------------------|

SINGER-REPORTS-000047

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION | OFFICIAL RECORD |
|---------|--------------------------------|-----------------|
|         | CHS REPORTING DOCUMENT          |                 |

UNCLASSIFIED

SINGER-REPORTS-000048

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Synopsis:**
CHS Day 6 Proffer Call 11/09/2018

| SIGNATURE | | |
|---|---|---|
| Submitted By | EAKEATING (undefined undefined) | Fri, 14 Dec 2018 14:51:14 -0500 |
| First Level Approved By | JPKEELAN (John Keelan) | Mon, 17 Dec 2018 09:50:41 -0500 |

UNCLASSIFIED

SINGER-REPORTS-000049

# EXHIBIT Z

## 07/30/2018 15:04:47 Incoming Call, Rick Singer and TPG Capital (Bill MCGLASHAN)

## [Session 4146]

| SINGER | Bill. |
|---|---|
| MCGLASHAN | Hey Rick, how are you? |
| SINGER | Great, how about yourself? |
| MCGLASHAN | I'm good. How go the wars? |
| SINGER | Uh, things are good. We are all we got rid of a couple of the ideas and companies. |
| MCGLASHAN | [Laughter] |
| SINGER | And, we are, we made some amazing traction in some areas we never thought, um, of doing, and it impacts more people than anybody on the planet. |
| MCGLASHAN | Wow. |
| SINGER | Um, we're involved in this now. We signed a deal with LabCorp and uh, we created a platform called the recovery platform. |
| MCGLASHAN | Mmmm. |
| SINGER | And now we're doing a whole, we create, I took, I hired six addicts, and we created seven month mobile app for addiction after they leave rehab. |
| MCGLASHAN | Wow. |
| SINGER | And then the state of North Carolina hired us, so they were the first state to do the opioid program. Every state has it, which is to take on all of the um, opioid abusers through the courts. |
| MCGLASHAN | That's awesome. As a, as an attempt to keep them off opioids [OV] and, |
| SINGER | Yes, they're going to force them into doing... you know, they got to go get their testing, and then here's their seven month program. It's online. That we created a counseling program for them. For a group of individuals [UI] on a daily basis and, then we're all the silver living homes all over. We've already started in Sacramento and Orange County to test it. It's pretty amazing because this issue is huge in not only opioids, but alcohol, drugs, everything. |
| MCGLASHAN | No, it's uh, it's uh, it's uh, a devastating problem for society. I mean it's incredible. |

| SINGER | But yeah, and we got the, you know, we got the Lab Corp partnership, and we've got the first state partnerships [IA] ability.  Um, now we just got to get everybody enrolled and then get started. |
| MCGLASHAN | That is so cool, Rick.  That's a, that's a, that's a fairly dramatic pivot from what you've been doing. |
| SINGER | Well that's one of them, yeah.  And then the map4life, so that's map4life.  And then the job business is actually changed too, because that became a talent aggregation.  I bought a company called Versatile PhD.  Which they have all the PhDs coming out of the 80 top colleges in America, and none of those People can get academic jobs, so right away they've got to get a real job. |
| MCGLASHAN | Mmm. |
| SINGER | And they don't even know what the hell to do.  They have no idea.  So, we got a subscription with all these universities, and then we go after individually helping these people, and they pair, so now I just created a virtual grad school, because the masters population is three times as big as the PhD population. |
| MCGLASHAN | Mmm. |
| SINGER | So when I met with the Google people, I said, how about if I can give you a list of all the masters candidates from these schools and here's their stats.  Here's the behavior.  Here's your skill.  Here's the PhD candidates.  I got 'em all.  What do you say?  They're like, well shit, then we don't have to go find them? |
| MCGLASHAN | Gotta love that. |
| SINGER | Right, and I got all the... |
| MCGLASHAN | They'll pay them very big origination fee on that. |
| SINGER | Right, so I figured, that's the best way to get them.  Just own the talent. |
| MCGLASHAN | Mmhmm. |
| SINGER | So that business is going well.  And then Donna's business to getting into colleges, just about ready to launch the beta test, so we're ready to start there.  So you know, I learn a lot.  I get my ass kicked a lot. But that's okay. |
| MCGLASHAN | You keep entrepreneuring.  I love it. |
| SINGER | [Laughs] |
| MCGLASHAN | It's awesome.  Did you, have you followed all the education |

| | stuff we've done at this point. |
|---|---|
| SINGER | No I haven't, no. |
| MCGLASHAN | So we're now the largest education investor in the world at Rise. |
| SINGER | Okay. |
| MCGLASHAN | From a zero start, as you know. |
| SINGER | Right. |
| MCGLASHAN | A year and a half ago.  Um, so it, it ranges from, you know K through 12 tools.  We just bought...  It'll be public as of, I think, I think the press is tomorrow, but um, Drain Box which is the company that, um math, math company run by this woman, Jesse that does um, uh, completely customized, uses algorithms to completely customize the math learning journey for students. |
| SINGER | Okay, that's cool. |
| MCGLASHAN | Amazing outcomes, you know data behind it.  Reed Hastings was the original investor in it. |
| SINGER | Okay. |
| MCGLASHAN | And it's become a big company, um, and by far the most, um, interesting on the spectrum of , of um, you know tools that allow you to deliver.  You know, it's a little like a Kahn [PH] Academy, except that... |
| SINGER | Right. |
| MCGLASHAN | Kahn doesn't actually give you a customized path, it just responds.  It just allows you to sort of create your own path. |
| SINGER | Right. |
| MCGLASHAN | Um, there, it's used in the schools instead of as an adjunct um, program.  We bought Renaissance. |
| SINGER | Okay. |
| MCGLASHAN | Um, um, with Francisco.  We and they partnered to buy the company.  We just closed that deal. |
| SINGER | Okay. |
| MCGLASHAN | Um, obviously you already knew about Alobar [PH], and what we're... |
| SINGER | Yup. |
| MCGLASHAN | Our sorry, if we ever find what we're doing there.  Um, we bought, funded Digital House, which is a, um, a company that's leading technical coding platform in Latin America. |
| SINGER | That's great. |
| MCGLASHAN | Um, which is really cool, because, it's, it, uh, it's sort of |

| | partnered with all the big, uh, employers, uh to get these folks trained up, 'cause they need 'em, in that, in that environment. Um, we did lead school with India, which is a, school in a box solution, focused on creating affordable private schools in India.   We're actually doing a platform in, in uh, Africa. Which buying eight schools to start with in Nigeria, but doing it with a blended finance model with philanthropy. |
|---|---|
| SINGER | That's great. |
| MCGLASHAN | [OV] to make economics work. |
| SINGER | That's great. |
| MCGLASHAN | And then, we're, we, finally got agreement from ASU.  I don't know if you know Crow [PH] over at ASU? |
| SINGER | Yeah, we, uh, uh, he's actually after me really hard, because we're opening 24 universities in China. |
| MCGLASHAN | Oh, interesting. |
| SINGER | And, so, uh, Paul LeBlanc called me from Southern New Hampshire.  He wants to be our partner there.  Because you can't put university [IA], a family that has the, um, that has the license. |
| MCGLASHAN | Mmm. |
| SINGER | So I need, I have to have an American partner that can give me... I don't need a degree, I need to create a certificate program. |
| MCGLASHAN | Mmmhmm. |
| SINGER | So that the Chinese can actually do it in hospitality, digital media, um, and then service oriented stuff, like nursing.  And there's between five and twenty million people in each part of the second and third tier cities in China, right? |
| MCGLASHAN | Mmhmm. |
| SINGER | And our partner in China is Iwan [PH].  And Iwan [PH] is one of the biggest companies in China, so they're going to be all the real estate stuff, and it's all online.  So, we may end up... |
| MCGLASHAN | I love it. |
| SINGER | Going, to, we may end up going to Krog [PH] with Mitch Daniels [UI] from Perdue.  Because you know, they won a public battle with the Global. |
| MCGLASHAN | Mmhmm. |
| SINGER | But, Michael's, Michael's quite a guy. He's got a [OV] |
| MCGLASHAN | Yeah, he is. |

| SINGER | He's got a, he's done an amazing job. |
| MCGLASHAN | Well, so what, so what he's done with us, is you know the program, the four year degree program, that he, that you know is the Starbucks program. |
| SINGER | Yup. |
| MCGLASHAN | That's, again this is just between you and me, for now, but that's, we're privatizing that, and we're the shareholder, alongside ASU.  Um, we've gotten his commitment that we bring four, three other universities in, so they're four to start with, um, King's College... |
| SINGER | Okay. |
| MCGLASHAN | ...is one.  Um, there's one in Australia.  Leading program in Australia, I forget the name of it.  But anyway, it's a platform of universities.  Um, we're way down the track with Disney and a few others now as well, to launch the same program, you know as an employee benefit offer [OV] as a four year degree. 15 |
| 13 | 07 to 15 |
| 13 | 11 [IA] |
| MCGLASHAN | Rick |
| 15: 13: 11 to 15:13:15 [IA] | |
| SINGER | Michael's program that you guys are doing.  There's 70,000 kids behind. |
| MCGLASHAN | Mmhmm. |
| SINGER | So he asked me if we could do this across the country for them, so that we could get to the number they want to get to.  So, I know they're not getting to the numbers, um... |
| MCGLASHAN | No, they're not. |
| SINGER | [UI] made of steel. And so they asked. |
| MCGLASHAN | That's right. |
| SINGER | They asked me to go, I help them with that.  So... |
| MCGLASHAN | All this, all this sort of says, we've got to get, you, me and Rogers together in a room.  And probably, you know, Dunlap, um, and just have a conversation together.  We should just air out, here's exactly where we are, and what we're doing. |
| SINGER | Yup. |
| MCGLASHAN | You should do the same, and just figure out how we get aligned here. |
| SINGER | I would love to do that.  That would be great, because all |

| | these things, we, like, maybe some of your colleges could be the ones we use in China. |
|---|---|
| MCGLASHAN | Yup, totally. |
| SINGER | Right, right, because. |
| MCGLASHAN | Totally. |
| SINGER | I got, I got to have this cheap way of approaching this certificate program which does not affect their cert... their accreditation, that's what makes it so great. |
| MCGLASHAN | Mmhmm. |
| SINGER | They can pretty much do whatever they want because I'm partnering with, the hospitality, I got is the certificates going to be called the intercontinental certificate. So that in China, now you feel like you got...because the American university doesn't mean diddly to them. |
| MCGLASHAN | Yeah. |
| SINGER | And those right, and those places. |
| MCGLASHAN | That's right. |
| SINGER | Yeah, we should do that, absolutely. |
| MCGLASHAN | I love it. I love it. Um, jumping, so I'll have Jess coordinate for us to do the meeting. |
| SINGER | Okay, okay. What's going with ▮▮▮? |
| MCGLASHAN | It's very timely, because the momentum couldn't be better. |
| SINGER | Absolutely. |
| MCGLASHAN | So just quick on ▮▮▮. He feels really good. |
| SINGER | Good. |
| MCGLASHAN | I mean he's, he's, you've probably saw his grades have been sort of dramatically improving. |
| SINGER | Yeah, yes. |
| MCGLASHAN | I mean, he's actually working, which is sort of amazing how boys. It just takes them a while I think to... |
| SINGER | Yup. |
| MCGLASHAN | Clue in. |
| SINGER | And he's got the confidence, he's got a score, he's got confidence. |
| MCGLASHAN | Yup, totally. I mean it's sort of miraculous. He's engaging. His internships have been brilliant. You know, he was at Stella McCartney's you know for the first two weeks. |
| SINGER | Right. |
| MCGLASHAN | And then attention went really well. That was his second round at attention. They love him. Um, and then um, and |

| | then he's now down at STX [PH], you know, working. Um I, I've set up through the, you know friends of mine who are involved there this lunch on Friday with... |
|---|---|
| **SINGER** | Yup. |
| **MCGLASHAN** | Um, the dean of the, of the Iovine and Young [PH] Academy. |
| **SINGER** | Right. |
| **MCGLASHAN** | Um, he's already met the, the number two dean, the vice dean, Lynn [PH]. |
| **SINGER** | Okay. |
| **MCGLASHAN** | This dean asked if, if, we could have lunch, uh, or a meeting. And I sort of thought, shit, I don't have the time, but I figured, you know, lunch is a better... |
| **SINGER** | Absolutely. |
| **MCGLASHAN** | ...engagement model, right. Uh [OV] you had said to me before, do a meal, get to know these people. |
| **SINGER** | Always. |
| **MCGLASHAN** | So, yeah, so we're, well we'll have lunch on Friday, and then she'll give us a tour, a couple hours with her. Um, what they ask, I went through a buddy of mine on the board there. I've got a number of friends, quite a few friends that are of the board. Um, and I, basically said the following, I wanted to run this by you and get your instinct on it. But I said, look, the issue is with early admission, with these schools like a Brown, the only way I can really lean on my friends there, et cetera, is if he applies early. |
| **SINGER** | Correct, and applies... |
| **MCGLASHAN** | Um, yeah, so it's bind... The problem is it's binding. And all else being equal, if he were to get into Iovine and Young, he would go to SC over Brown. |
| **SINGER** | Right. |
| **MCGLASHAN** | The clear sense I'm getting. You should have your own discussion with him. |
| **SINGER** | He, that's the way it felt last time I was with him. |
| **MCGLASHAN** | Yeah, so, what I said to Paul, and he's the guy that helped me. Paul Walker's on the board there. Is I said, and he's not had this explicit conversation with her, but he said, um, I would need, you know, he's basically the manage of we need to know that ████████ is going to get in. In other words, other wise he's better off applying to Brown. It's not that you need to contractually agree or anything, but basically, he's getting |

7

| | in. So, that's that's what I'm trying to angle for, is that after, she has his, his uh, [OV], self cores and, uh, and his grades. |
|---|---|
| SINGER | Right. |
| MCGLASHAN | Already. Paul get, sent them over to her. And so she wanted those, because she said I need to know if he's going to get into SC. I, I said to Paul, look, I really have a hard time imagining he can't get into SC, generically. |
| SINGER | Now his grades are not good enough to get into SC. |
| MCGLASHAN | Is that right? |
| SINGER | Oh yeah, oh yeah. |
| MCGLASHAN | That's amazing. Wow, okay. |
| SINGER | [OV] Because the issue is not [UI] that his grades aren't good enough. The number of kids applying from schools that are stronger than him. |
| MCGLASHAN | Yup. |
| SINGER | [IA] That [UI] the issue. So, she's, that's why she's, she's so, she's probably going to tell you, is, think about this. Here's some strategies. |
| MCGLASHAN | Yup. |
| SINGER | The department, each department has a VIP list. |
| MCGLASHAN | Mmhmm. |
| SINGER | And, essentially what they do, is they can walk a kid through admissions with Tim, and say we want this family. The problem occurs... |
| 15:18: 16 to 15:18:20 [IA] | |
| MCGLASHAN | Rick, you're breaking up. |
| SINGER | Oh, sorry. |
| MCGLASHAN | Yup... |
| SINGER | [IA] |
| MCGLASHAN | You said the problem occurs and I lost you. |
| SINGER | Yup, so let me... I'm going to go to a different place, one second. So what happens is they have a VIP list. Each department, each dean, has their own VIP list. And essentially at some point they get the opportunity to go to Tim, and say, here's my list. This is what I want. That's how they... that may not happen until January, February. |
| MCGLASHAN | Mmhmm. |
| SINGER | They may give us a nod, saying, hey, it looks good. It looks good. But, you haven't really, you haven't really sat in front of Tim and said, it's done. |

| MCGLASHAN | Yup. |
| --- | --- |
| SINGER | Okay. So, I was thinking about this for you. I don't know how you want to handle it. I would just give you some. Here's some approaches maybe. Okay. |
| MCGLASHAN | Yup. |
| SINGER | I don't know if this makes sense. So, one is to go just down that path, and my guess is you'll get accepted, and it'll happen, but you won't know, until you know, mid-spring, and/or right before they get the admissions letter right before March 25th. Which is not a good... |
| MCGLASHAN | Yup. Yup. |
| SINGER | Not a good, not a good feeling for you guys, not knowing. |
| MCGLASHAN | Yup. |
| SINGER | Right, 'cause they're going to say, it's looking good, it's looking good, well, how about like let's get it done. |
| MCGLASHAN | Yeah. |
| SINGER | Okay, so, another way some people have done it, is, I told you I have a side door there. There is a financial thing in there, but what happens is we get them accepted in the fall, earlier. Latest is first week of February, or January because they want to see first semester grades. But let's just say it happens in the fall, then what would have to happen, would make it much easier, is your department says, we'll take that kid, because, what will happen is, when we apply like that, they're going to say, yeah, we'll admit him, but we can't say he's getting into that program. But if the program already said we'll take him. |
| MCGLASHAN | That's great. |
| SINGER | Right. So you would go... |
| MCGLASHAN | That's great. |
| SINGER | You would go through athletics. |
| MCGLASHAN | The, the, the, the interesting thing is the side door at, that Paul is working at the Iovine and Young academy is, which doesn't apply to overall admissions to your point. But even here, I'm going to have to play games. They're saying, Paul said, look, you've got to be willing to join the board of Iveen and Young, you personally. [OV] And, you know, I told her you'll write, a one to three million dollar check. And, and uh, that's, you know, I said, wow, okay. The only awkward thing for me is I don't want... I said if I, even if I agree to do that, I |

|  | would want to join the board a year after ▓▓▓ gets in or something, so I don't create a weird dynamic for him, you know. |
| SINGER | Sure, so, so, in this path, you'd pay 250, you'd get accepted. Uh, let me get his stuff and I'll take it to them. If they can accept him in the fall. |
| MCGLASHAN | Yup. |
| SINGER | He may be... It may be before he even applies. |
| MCGLASHAN | See that would be great. |
| SINGER | Right. |
| MCGLASHAN | I would do that in a heartbeat. |
| SINGER | Right, and then you get this unofficial, official letter. |
| MCGLASHAN | Now does he, here's the only question, does he know? Is there a way to do it in a way that he doesn't know that happened. |
| SINGER | Oh yeah. Oh he... |
| MCGLASHAN | Great. |
| SINGER | What he would know is, that I'm going to take his stuff, and I'm going to get him some help, okay. |
| MCGLASHAN | So that, that he would have no issue with. You lobbying for him. You helping use your network. No issue. |
| SINGER | That letter, that letter comes to you. |
| MCGLASHAN | Yup. |
| SINGER | So, my families want to know this is done. |
| MCGLASHAN | Yup. |
| SINGER | Right, so they want this letter to come to them, so I have them, I have admissions, and that's why I extend the letter to you, you hold it. |
| MCGLASHAN | Right. |
| SINGER | You don't have to tell him a thing. |
| MCGLASHAN | Yup. |
| SINGER | At that, at that point, that, as soon as you get that letter, then they expect just a $50,000 check, and it goes to Women's Athletics. |
| MCGLASHAN | Great. |
| SINGER | And then the other 200 comes in March after you get your official, official letter, but the letter you're actually getting is the same letter you're getting in March. |
| MCGLASHAN | I love it. |
| SINGER | Right, and they just do it that way. |

| MCGLASHAN | But again, he wouldn't, he wouldn't, have to see any of these letters. |
| SINGER | He wouldn't see any of them. |
| MCGLASHAN | Correct, what he would know... |
| SINGER | None of them. |
| MCGLASHAN | ...is Rick would say, hey, I had a great conversation, ███████, things are looking great. You know. |
| SINGER | Correct. |
| MCGLASHAN | Keep your grades up, work hard, but things are looking great. That kind of thing. |
| SINGER | Correct. I have to keep, I have to do a profile for him in a sport, which is fine, I'll create it. You know, I just need him... I'll pick a sport and we'll do a picture of him, or he can, we'll put his face on the picture whatever. Just so that he plays whatever. I've already done that a million times. So... |
| MCGLASHAN | Well we have images of him in Lacrosse. I don't know if that matters. |
| SINGER | They don't have a lacrosse team. [OV] But as long as I can see him doing something, that would be fine. |
| MCGLASHAN | Yeah. |
| SINGER | And then what happens is then what you have to do, because this would be a specialty program, is that you have to then talk to the department and say, hey listen, can you take him in the department, we've gotten him accepted into the university. |
| MCGLASHAN | Yup. Well I can handle, I think I, I mean I'll know after this lunch. I think I can handle them at Iovine and Young. |
| SINGER | Right. |
| MCGLASHAN | Yeah. Which is where he really wants to go. |
| SINGER | Right. So you're saying, hey listen, I think I can get him into this school. |
| MCGLASHAN | Yup. |
| SINGER | Now, now, can you, 'cause they're going to come to you and say, this is selective program, would you want this kid? And he's quote an athlete who's coming to you. In fact, would you take him? And the department says yes. |
| MCGLASHAN | Now would she see that, 'cause, that, he's going to be fairly well seen at the school, because half the board knows me, and I'm going to be sort of calling in and asking people to help, you know Benioff [PH] and Dominic, and [UI] all those guys. |
| SINGER | But, so, so, what I would suggest is have you called them? |

11

| | Any of them yet? |
|---|---|
| MCGLASHAN | No |
| SINGER | Good, don't. |
| MCGLASHAN | Okay. |
| SINGER | Because you don't need, because when this, the way this, the quieter it, the quieter this is, the better it's so, people don't say well, okay, this guy, why are all these people calling us. The kid's already been accepted. He's coming here as an athlete. He's already in. What you just want, is the person you're meeting with on Friday to say, you know what we want this kid. |
| MCGLASHAN | So she doesn't have to know how he got in. Is that the case? |
| SINGER | What I would say to her, if you want to have that discussion now with ████ there, that we have friends in Athletics they are going to help us, because ████ is an athlete, and they're going to help us. From the... |
| MCGLASHAN | But I can't say that in front of ████, 'cause he knows he's not. |
| SINGER | No, no, right. |
| MCGLASHAN | Yeah. |
| SINGER | And just say, you know what, we're going to get, we're going to get some, we're going to get people to help us. |
| MCGLASHAN | Why wouldn't, why wouldn't I say look, leave it to me to worry about getting him in, 'cause I have a lot of friends involved in the school. |
| SINGER | Perfect, perfect. |
| MCGLASHAN | And, I feel confident, I can figure out a way to get the school to help us. Rick Caruso, the chairman of the board's a friend. |
| SINGER | Correct. |
| MCGLASHAN | And, uh. |
| SINGER | Correct. |
| MCGLASHAN | You know what I mean. |
| SINGER | Correct, right, so you could you, what is going to happen when they see his application, he'll be flagged as an athlete. |
| MCGLASHAN | Okay. |
| SINGER | But once he gets, once he gets here, he just goes, he doesn't go to the athletic orientation. He goes to the regular orientation like all my other kids just did. They all got home, and everything's fine. The issue is the specialty program. And he could do... |

12

| MCGLASHAN | So how does he... just as a, just as a, just as this plays out, my worry on this is, ███ starts getting letters at home from the athletics program and... |
| --- | --- |
| SINGER | He won't. |
| MCGLASHAN | Okay. |
| SINGER | He won't. What he will get in the summer, is a letter saying come to the athletic orientation. Okay, but here's what I would... |
| MCGLASHAN | What, yeah, what do we do about that. |
| SINGER | Here's what I would do. I would just tell him. I would tell him, listen I got lots of friends in athletics. You're an athlete kind of guy, and my friends in athletics are going to help you. So I'm letting you know. They're going to help you get in. Because they have the easiest way in. And, [OV] all the coaches, I'm friends with all the coaches. So, they're going to help you get in. And, um, but maybe here's a better idea. Maybe this is a better idea. We go this path. You work with the dean, but, but, how, how would you feel about, if you already know that he's going to get into the program, but we apply to letters and sciences as a regular student. |
| MCGLASHAN | Yup. |
| SINGER | Once he's there, when he goes to orientation, you, they, you switch him. Because the department's already said it's okay, you can switch him. Then... |
| MCGLASHAN | So what am I... I'm switching him from what to what? |
| SINGER | From letters and sciences, undeclared, to the program. |
| MCGLASHAN | To the Iveen and Young? |
| SINGER | Yes. |
| MCGLASHAN | But what if he's able to get into the Iveen and Young program out of the gates? |
| SINGER | Well if he gets into the program out of the gate, [OV] |
| MCGLASHAN | I think you have to... Don't you have to get in anyway to one of the other... |
| SINGER | You do, but you are all have a relationship with these people, and they're already know that he's one of the spots. All I'm trying to do is cut away any other people looking in. |
| MCGLASHAN | Yeah, yeah. So I guess, what I'm wondering, I think normally the way it works is you have to apply to the school period. |
| SINGER | Correct, correct. |
| MCGLASHAN | And then you separately apply to Iovine and Young. So they |

13

| | expect you to get admitted to both places right. |
|---|---|
| SINGER | No, what happens is, when they see you, he's applying to Iveen and Young now, but you have to first be admitted to USC before Iovine and Young can take you. |
| MCGLASHAN | Right. |
| SINGER | But his application will actually say, and he'll write his essays to fit Iovine and Young. |
| MCGLASHAN | Okay. |
| SINGER | Does that make sense? |
| MCGLASHAN | Yeah, but they have a separate, what they have is a... |
| SINGER | A supplement. |
| MCGLASHAN | A, well it's a, it's his pitch he has to do. To come down and present to Grey [PH] and [UI] and everybody for this idea that he has. |
| SINGER | Correct, it's a sup... it's their supplement. It's that department's supplement. |
| MCGLASHAN | Yup. |
| SINGER | Yup, so let me do, my own, I'll do... Let me take some of this week and do my own research. |
| MCGLASHAN | Yup. |
| SINGER | As to what is the best way that it keeps him, nobody knows, he doesn't know anything, and it can flow much easier. |
| MCGLASHAN | Perfect. |
| SINGER | Let me do that, and then that way, hopefully by Friday I'll have some answers so that you can at least be poised to um, have a discussion after that, with them. |
| MCGLASHAN | Exactly, exactly, that's perfect. That Friday, the focus of Friday'll be you know... |
| SINGER | Intro. |
| MCGLASHAN | You know, intro, tell us about the school, vision, |
| SINGER | Yes. |
| MCGLASHAN | You know, where you going with this. Um... |
| SINGER | Yes. |
| MCGLASHAN | Yeah, perfect. Um, that's great. And then I guess the part that was new news to me is that in order to use the, the uh, athletic sort of, you know, department side door if you will, he has to actually apply to letters and arts, he can't be applying to Iovine and Young? |
| SINGER | No, that's not true. I just was trying to figure out the easiest way. |

14

| MCGLASHAN | Got it. |
| SINGER | That, because it's a guarantees in letters and sciences.  To get into Iovine and Young you need them to take him. |
| MCGLASHAN | What's, what's interesting, with the, friends of ours that went into the, that applied to film school, uh, that's friends with their [UI] daughter applied.  She did not get in, but then she was pushed over to a generic, you know get into SC.  So she got into SC, but she didn't get into the film school. |
| SINGER | [UI] |
| MCGLASHAN | What, where would she have gotten in? Was it, would it have been like letters and sciences or something?  Where would they put her? |
| SINGER | Yeah, yeah, in letters and sciences.  Absolutely. |
| MCGLASHAN | Got it.  Got it. |
| SINGER | Because that's the big school.  That's anthropology, the zoology, biology, economics, everything. The whole planet is in there.  And that's where normally people start. |
| MCGLASHAN | Yup. |
| SINGER | Because they're not sure what they want to do. |
| MCGLASHAN | And then you go onto a new more, yup. |
| SINGER | Yes. |
| MCGLASHAN | Got it, yeah, because they have people transfer into Iovine and Young their sophomore year, but they make them start over and take the full... |
| SINGER | Sure. |
| MCGLASHAN | ...program, even including the freshman courses. |
| SINGER | Sure. |
| MCGLASHAN | That are required at Iveen and Young.  They want them to have the full four year... |
| SINGER | Sure. |
| MCGLASHAN | ...program.  Which is, which is, whatever it is, you know 60% of your course work, 'cause it covers so many different departments. |
| SINGER | Correct. |
| MCGLASHAN | In that, in that program.  Okay, well, so you'll, you'll, you'll give me a heads up [OV] and then one other, just family question, with ▮▮▮ now entering his sophomore year, and sort of, the process is beginning, we have him on time and a half.  I told ▮▮▮ yesterday, and ▮▮▮ by the way, who is the, who I think is the one who needs the most time, has no |

| | extra time currently. And, ███ talking to the doctor that assessed them, to get her to ask, to request time for ███. I told her she should be requesting double time for all of them. |
|---|---|
| SINGER | 100% multiple days. No matter what, multiple days. So, even if it's 50% time and a half, multiple days. |
| MCGLASHAN | So is that a different ask to get multiple days versus... |
| SINGER | Well the 100%. |
| MCGLASHAN | [OV] And if they get time and a half, can they use your facility to take the test? |
| SINGER | No, not unless it's multiple days. |
| MCGLASHAN | So as long as it's multiple days, we're in. |
| SINGER | Correct, correct. Like it could be [OV] |
| MCGLASHAN | And they, that's a separate filing? |
| SINGER | Overall it's the same. Well, so, you're saying ███ got a, time and a half. |
| MCGLASHAN | Yeah. |
| SINGER | So, what has to happen, is there has to be an appeal to get the multiple days. The doc's got to come up with stuff discrepancies to show why he needs multiple days. That he can't sit six and a half hours taking one test. |
| MCGLASHAN | Perfect. |
| SINGER | And so if he gets multiple days, than I can control the center. |
| MCGLASHAN | Thank you. |
| SINGER | Yes. |
| MCGLASHAN | And then what about... If you get a, if you get double time, you automatically get multiple days? |
| SINGER | Automatically, yes. |
| MCGLASHAN | Oh, so it's either multiple days with 1.5 or um, double, 2X time. |
| SINGER | Correct. |
| MCGLASHAN | Got it, okay, I'll make sure ███ goes to work. |
| SINGER | And we don't care if it's SAT or ACT. |
| MCGLASHAN | Yup, yup. |
| SINGER | Because, we're just going to take it one time and be done anyway. |
| MCGLASHAN | Yup, exactly. The ███ is going through the stress of her SSATs, which is totally cute and sad to watch. But it's like Jesus Christ. This whole testing thing is such a nightmare for kids. |
| SINGER | It is. |

| MCGLASHAN | It's awful.  It really is. |
| SINGER | Agreed. |
| MCGLASHAN | Awful.  Yeah.  Alright, my brother. |
| SINGER | [OV] Okay, I'll talk to you [UI] |
| MCGLASHAN | My follow ups are to get us together with the group.  And then you're going to let me know what the right plan of action would be.  And I'm totally open to that if that's the right, uh, what the right approach is. |
| SINGER | Exactly, yeah, let me find out. |
| MCGLASHAN | Awesome. |
| SINGER | You got it. |
| MCGLASHAN | Okay. |
| SINGER | Take care. |
| MCGLASHAN | Thanks a lot. |
| SINGER | Yup, take care, buh bye. |

# EXHIBIT AA

**Rosen, Eric (USAMA)**

McGlashan script –

- Intro and courtesies -
  - Bill, how's it going?
  - I'm up in Sacramento, which is why I couldn't meet you yesterday. Essentially, I called my old lawyer, Don, and he told me to fly up immediately, so I did. I'm glad I did, because he talked off the ledge a bit, I think I'm ok. I probably over-reacted a little bit, but I still want to talk this out.
- Plot -
  - Let me tell you a little bit of what happened, and I want to get your thoughts and advice on what to do.
  - So you know Mark Riddell - Mark is the guy who took the test for▮ down in LA at Igor's school, **remember? Right?** So he comes out to LA every once in a while, he has family here, which is how we actually met back in the day. Anyway, so a week or so ago, Mark I guess is in town, and he calls me. Which is weird because he never calls me. The guy is about 20 years younger than me, we're not friends. He wants to meet for a coffee.
  - I go to meet Mark in LA (where in LA?, make it real), and Mark tells me that the week before he had been interviewed by an IRS Agent in Florida about payments from my Foundation. As you know, when families pay me for either the testing like you did or the side-door, it goes into my Foundation, and then I pay out to whoever needs to be paid **like I did with you, right? - I wrote checks to Mark and Igor** after the exam, that way there is no connection between you and them, RIGHT????
  - Ok, I asked Mark, well, what did they talk to you about? And he tells me that he hadnt been declaring the payments from my Foundation as income on his tax returns ... and that the agent had been asking him about the payments. Apparently he had been declaring them as gifts, which was incredibly stupid. He didn't want to pay taxes on them.
  - But the agent, he said, was really focused on the Foundation ... kept asking, "what do they do? How do you know them? What services he provides for them?" Now Mark does tutoring as well, so he just told them he was tutoring for my "underserved" kids, which is what I write on the checks, so its all good.
    - [Joke about IRS agent being a "gal" in her 20s, dumb as a rock. They didn't send their A-Team]
  - So I freaked out ... I assumed that the IRS had wired up my phone, bugged my house, tracking my car. I was looking for the GPS tracker under my bumper. I was on the ledge. Don, best criminal guy in Sacramento, told me to relax. He explained to me how hard it was to get a wiretap, said it would take months. So I'm a little more chill now than when I called you a few days ago. But I still wanted to use this phone to call, which is my kid's old phone.
  - So tell me what you think? [anything else]

Eric S. Rosen
Assistant United States Attorney
District of Massachusetts
Tel: +1 617 748 3412
E-Mail: eric.rosen@usdoj.gov

*Please keep this between me & you.*

1

# EXHIBIT BB

UNCLASSIFIED



| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | |
|---|---|---|

| HEADER | |
|---|---|
| **Source ID:** | |
| **Date:** | 10/10/2018 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| SOURCE REPORTING | |
|---|---|
| **Date of Contact:** | 09/21/2018 |

**List all present including yourself (do not include the CHS):**
Kaitlyn Cedrone, Laura Smith, Elizabeth Keating, and John Keelan.

| **Type of Contact:** | In Person |
|---|---|
| **Country:** | UNITED STATES |
| **City:** | Boston |
| **State:** | Massachusetts |
| **Date of Report:** | 10/10/2018 |

**Substantive Case File Number**

**Check here if additional reporting is in Echo**
No

**Source Reporting:**
CHS was interviewed at the Longwarf Marriott Hotel, 296 State Street, Boston, MA. After being advised of the identity of the interviewing Agents and the nature of the interview, CHS provided the following information:

| FD-1023 | Page 1 of 4 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---------|---------------------------------------------------------------|-----------------|

**SIDE DOORS/FAKE PROFILES:**

UNCLASSIFIED

SINGER-REPORTS-000002

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|



*USC:*

Initially all the payments to USC went to the programs. The side doors started with JOVAN VAVIC (VAVIC), USC's water polo head coach. Originally all students admitted through the side door were players; however, they were not top recruits. VAVIC was compensated approximately $60,000 - 80,000 that CHS funded through THE KEY WORLDWIDE FOUNDATION (KWF) to sponsor scholarship students at ▓▓▓▓▓▓▓▓▓. The scholarships were used to maintain a relationship with VAVIC for potential spots to get students into USC down the road.



| FD-1023 | Page 3 of 4 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION | OFFICIAL RECORD |
|---------|--------------------------------|-----------------|
|         | CHS REPORTING DOCUMENT          |                 |

**Synopsis:**
CHS approach - 09/21/2018

| SIGNATURE | | | |
|-----------|---|---|---|
| Submitted By | KCEDRONE (undefined undefined) | | Mon, 10 Dec 2018 13:05:13 -0500 |
| First Level Approved By | JPKEELAN (John Keelan) | | Wed, 12 Dec 2018 14:58:36 -0500 |

| FD-1023 | Page 4 of 4 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|--------------------------------|

UNCLASSIFIED

SINGER-REPORTS-000004

# EXHIBIT CC

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

| **HEADER** |
|---|

| **Source ID:** | ▮▮▮▮ |
|---|---|
| **Date:** | 11/09/2018 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| **SOURCE REPORTING** |
|---|

**Date of Contact:** 09/27/2018

**List all present including yourself (do not include the CHS):**
SA Laura Smith
SA Katie Cedrone
SA Elizabeth Keating
AUSA Eric Rosen
AUSA Justin O'Connell
FoA Nicholas Savona
Don Heller, CHS' attorney

| **Type of Contact:** | In Person |
|---|---|
| **Country:** | UNITED STATES |
| **City:** | Sacramento |
| **State:** | California |
| **Date of Report:** | 10/10/2018 |

**Substantive Case File Number**

▮▮▮▮▮▮

**Check here if additional reporting is in Echo**
No

**Source Reporting:**

CHS was interviewed at the United States Attorney's Office in Sacramento,California. Present during the interview were FBI Special Agents Laura Smith and Kaitlyn Cedrone, IRS Special Agent Elizabeth Keating, FBI Forensic Accountant Nicholas Savona and Assistant United States Attorneys Eric Rosen and Justin O'Connell. Also present during the interview was CHS's attorney, DON HELLER. After being advised of the identity of the interviewing Agents and the nature of the interview, CHS provided the following information:

| FD-1023 | Page 1 of 5 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION |
| | CHS REPORTING DOCUMENT |

OFFICIAL RECORD

SINGER-REPORTS-000018

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION** | OFFICIAL RECORD |
|---|---|---|
| | CHS REPORTING DOCUMENT | |

was not getting money for helping _____ ) get into _____ . All the money will be going to CHS. The parents think they are going through CHS's relationships but they do not know exactly where the money is going. CHS told _____ parents that _____ could study data analysis with basketball.

SINGER-REPORTS-000019



| FD-1023 | FEDERAL BUREAU OF INVESTIGATION | OFFICIAL RECORD |
|---|---|---|
| | CHS REPORTING DOCUMENT | |

**Synopsis:**
Proffer Day 2 - 09/22/2018

| SIGNATURE | | |
|---|---|---|
| Submitted By | EAKEATING (undefined undefined) | Thu, 6 Dec 2018 09:24:41 -0500 |
| First Level Approved By | JPKEELAN (John Keelan) | Thu, 6 Dec 2018 11:50:07 -0500 |

SINGER-REPORTS-000021

# EXHIBIT DD

UNCLASSIFIED



| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---|---|---|

| HEADER | |
|---|---|
| **Source ID:** | ▮▮▮▮▮ |
| **Date:** | 01/09/2019 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| SOURCE REPORTING | |
|---|---|
| **Date of Contact:** | 11/01/2018 |

**List all present including yourself (do not include the CHS):**
SA Keating
SA Cedrone
SA Smith
FoA Savona
AUSA Rosen
AUSA O'Connell
Intern Adele Zhang
Intern Sophia Harris-Dyer
Don Heller

| **Type of Contact:** | In Person |
|---|---|
| **Country:** | UNITED STATES |
| **City:** | Boston |
| **State:** | Massachusetts |
| **Date of Report:** | 01/09/2019 |

**Substantive Case File Number**

▮▮▮▮▮▮▮

**Check here if additional reporting is in Echo**
No

**Source Reporting:**
CHS was interviewed at the United States Attorney's Office in Boston, Massachusetts. Present during the interview were FBI Special Agents Laura Smith and Kaitlyn Cedrone, IRS Special Agent Elizabeth Keating, FBI Forensic Accountant Nicholas Savona, Assistant United States Attorneys Eric Rosen and Justin O'Connell, and Interns Adele Zhang and Sophia Harris-Dyer. Also present during the interview was CHS's attorney, Don Heller. CHS provided the following information:



| FD-1023 | Page 1 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION** | OFFICIAL RECORD |
|---------|---------------------------------------|-----------------|
|         | CHS REPORTING DOCUMENT                 |                 |

UNCLASSIFIED

SINGER-REPORTS-000040

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---------|---------------------------------------------------------------|-----------------|

| FD-1023 | Page 3 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|----------------------------------|

SINGER-REPORTS-000041

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---------|------------------------------------------------------------|-----------------|

**Janavs:**

Michelle Janavs ("Janavs") worked with CHS on the side door. Her husband Paul did not know about the side door. Janavs' son ███ visited Ernst at Georgetown ███ is a good tennis player. The family thought they were making a donation to the Georgetown tennis program through the KWF.

Janavs' daughter ███ plays volleyball and is the manager of the team because she is injured. ███ was admitted to USC through volleyball and Janavas knew that ███ was not a recruitable athlete. The first payment that the family made was for $50,000 to USC Women's Athletics. CHS did the SAT scheme for ███ ███ knew about the testing. CHS told Janavs that his/her proctor will be at his school getting ███ a good score.

Janavs, ███, and a Fidelity employee had a conference call to discuss how they could to make payments through their foundation. They determined that it would be an issue for their foundation.

| FD-1023 | Page 4 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|---------------------------------|

UNCLASSIFIED

SINGER-REPORTS-000042

UNCLASSIFIED

| FD-1023 | FEDERAL BUREAU OF INVESTIGATION |  |
|---------|---------------------------------|---|
| | CHS REPORTING DOCUMENT | |

They suggested going an installment plan for all their children.



CHS met ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ through ▮▮▮▮▮▮▮▮. ▮▮ son ▮▮▮ was a good student and baseball player. He was good enough to be a recruited walk-on. ▮▮▮ wanted to make sure that ▮▮ was admitted to USC. CHS called Dan Hubbs to get ▮▮▮ on the USC baseball team. The payment for admissions went to the KWF. CHS told ▮▮▮▮ that the money was going to USC. ▮▮▮ paid $200,000 to the KWF and $50,000 to Heinel. There were no inaccuracies with the

| FD-1023 | Page 5 of 6 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|--------------------------------|

UNCLASSIFIED

SINGER-REPORTS-000043

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---------|---------------------------------------------------------------|-----------------|

application. ▮▮▮ mother did not know about the side door.

▮▮▮▮ -

▮▮▮▮ -

**Synopsis:**
CHS Day 5 Proffer 11/01/2018

| SIGNATURE | | |
|-----------|---|---|
| Submitted By | EAKEATING (undefined undefined) | Wed, 9 Jan 2019 15:29:19 -0500 |
| First Level Approved By | JPKEELAN (John Keelan) | Thu, 10 Jan 2019 09:39:29 -0500 |

SINGER-REPORTS-000044

# EXHIBIT EE

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  OFFICIAL RECORD |
| --- | --- | --- |

| HEADER | |
| --- | --- |
| **Source ID:** | |
| **Date:** | 12/09/2019 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| SOURCE REPORTING | |
| --- | --- |
| **Date of Contact:** | 12/06/2019 |

**List all present including yourself (do not include the CHS):**
SAs Kaitlyn Cedrone and Laura Smith
FoA Elizabeth Dupont
AUSAs Eric Rosen, Justin O'Connell, Kristen Kearney and Leslie Wright
Attorney Don Heller

| **Type of Contact:** | In Person |
| --- | --- |
| **Country:** | UNITED STATES |
| **City:** | Boston |
| **State:** | Massachusetts |
| **Date of Report:** | 12/06/2019 |

**Substantive Case File Number**

**Check here if additional reporting is in Echo**
No

**Source Reporting:**
On December 6, 2019, CHS provided the following information. During the interview, CHS was shown several emails for review:

GIANNULLI
The Giannulli girls, ▮ GIANNULLI (▮ and ▮ GIANNULLI (▮ knew they were getting into USC through crew. ▮ knew less than ▮ Neither ▮ nor ▮ knew about the payments. The parents, MOSSIMO GIANNULLI (MOSSIMO) and LORI GIANNULLI (LORI) knew that profiles were being created for crew for both ▮ and ▮

[Exhibit 5 Bates PM1020 email dated Aug 19, ▮ re ▮
MOSSIMO and LORI knew this profile would represent the girls in their application to the University of Southern California (USC).

[Exhibit 6 Bates PM966 email dated Sept 21, ▮ re ▮
MOSSIMO and LORI knew CHS was going to submit the information to USC representing that ▮ was a coxswain.

[Exhibit 7 Bates PM441 email dated July 16, 2017]
CHS was building a profile for ▮ S/he was filling the in the information. MOSSIMO and LORI knew ▮ was going in to USC the same way, representing that she was a coxswain for USC.

| FD-1023 | Page 1 of 4 | FEDERAL BUREAU OF INVESTIGATION |
| --- | --- | --- |

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  OFFICIAL RECORD |
|---|---|---|

[Exhibit 8 PM458 email dated July 20, 2017]
MOSSIMO was running the show but LORI got on it because MOSSIMO was not responding.

[Exhibit 9 Singer671638 email dated July 28, 2017]
LAURA JANKE was reminding CHS she needed information to finish the resume. MOSSIMO and LORI were helping to create the profile by sending photos of ███ and ███ because CHS had asked for photos.

MOSSIMO and LORI knew ███ and ███ were being accepted to USC through fake athletic profiles depicting them as crew coxswains. MOSSIMO and LORI knew ███ and ███ admission to USC needed to be concealed because of the school counselor who questioned ███ getting in. They had to conceal admissions from friends too. ███ and ███ were not real recruits and MOSSIMO and LORI knew this. They had to keep quiet about the admissions.

[Exhibit 12 PM293 email dated November 29, 2017]
MOSSIMO and LORI thought their payment of $50,000 went directly to USC's program. They thought their $200,000 payment went to the Foundation. CHS told MOSSIMO and LORI in sum and substance that the $250,000 they paid for each of their daughters was paid to get them into USC. CHS does not recall exactly what s/he said to MOSSIMO and LORI regarding the money. CHS did recall telling MOSSIMO and LORI that the first $50,000 for each girl went to USC. It was CHS' belief that MOSSIMO and LORI knew part of the $200,000 sent to the Foundation was going to USC. They did not specifically discuss the money going to USC out of the $200,000. MOSSIMO and LORI understood the money was part of the deal and it had to be paid in order to get the girls into USC.

[Exhibit 14 Bates Singer387830 re: ███ getting in]
PAT HAYDEN (HAYDEN) was not aware of the deal CHS, MOSSIMO, and DONNA HEINEL (HEINEL) had agreed to in order to get the girls in to USC.

CHUCK KENTWORTHY (KENTWORTHY) may have told HAYDEN that HAYDEN should meet CHS.

When CHS met HAYDEN, s/he did not tell HAYDEN about the fraud or the money being paid to get his clients into USC.

| FD-1023 | Page 2 of 4 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

SINGER-REPORTS-000132

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
| --- | --- | --- |



| FD-1023 | Page 3 of 4 | FEDERAL BUREAU OF INVESTIGATION |
| --- | --- | --- |

SINGER-REPORTS-000133

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---------|---------------------------------------------------------------|-----------------|

**Synopsis:**
CHS proffer 12/6/2019

| SIGNATURE | | |
|-----------|--|--|
| Submitted By | LCSMITH (SMITH, LAURA) | Wed, 18 Dec 2019 07:55:40 -05:00 |
| First Level Approved By | jpkeelan (Keelan, John) | Mon, 6 Jan 2020 17:55:49 -05:00 |

| FD-1023 | Page 4 of 4 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|--------------------------------|

SINGER-REPORTS-000134

# EXHIBIT FF



Status: Unread

10/13/2018 13:22(UTC-4)

| 356 | Start Time: 10/11/2018 13:52(UTC-4)<br>Last Activity: 10/11/2018 13:52(UTC-4)<br>Number of attachments: 0<br>Source: iMessage: ████ 8802<br>Body file: chat-787.txt<br><br>Participants:<br><br>████ 8802<br>Rick Singer* (owner)<br><br>Felicity Huffman* | Yes |



Status: Unread

10/11/2018 13:52(UTC-4)

| 357 | Start Time: 10/11/2018 13:52(UTC-4)<br>Last Activity: 10/11/2018 13:52(UTC-4)<br>Number of attachments: 0<br>Source: iMessage: ████ 8802<br>Body file: chat-788.txt<br><br>Participants:<br><br>████ 8802<br>Rick Singer* (owner)<br><br>Felicity Huffman* | Yes |



Status: Unread

10/11/2018 13:52(UTC-4)

| 358 | Start Time: 10/7/2018 20:06(UTC-4)<br>Last Activity: 10/7/2018 20:06(UTC-4)<br>Number of attachments: 0<br>Source: iMessage: ████ 8802<br>Body file: chat-789.txt<br><br>Participants:<br><br>████ 8802<br>Rick Singer* (owner) | Yes |

# EXHIBIT GG



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 13, 2020

**SENT VIA E-MAIL AND FEDERAL EXPRESS**
Counsel of Record

    Re:    *United States v. David Sidoo, et al.*
           Case No. 19-cr-10080-NMG[1]

Dear Counsel:

    Enclosed please find the following discovery materials, produced pursuant to the agreed-upon protective order:

1. A DVD containing a SecureZIP file titled VB-DISCOVERY016.zip. The password to access the zip file is ▮▮▮▮▮▮▮▮ Instructions regarding how to extract the contents of the zip file are contained on the DVD and are also set forth in our prior production letters. Also enclosed with this letter is an index listing the records contained in the zip file, which are Bates-stamped VB-RECORDS-00501313 – VB-RECORDS-00706147. These records are primarily e-mails obtained recently from Defendant Mikaela Sanford.

2. One thumb drive containing the following records:[2]

   - Pen register data for Singer's phones with phone numbers ending in 0584, 8802, and 5816. Additional information regarding these phones is set forth below;

   - Proffer agreements with Singer and others;

---

    [1] The government will provide the defendants in *United States v. Ernst, et al.*, No. 19-cr-10081- IT, with the same discovery as that being provided here.

    [2] Some of the records contained on this thumb drive have not yet been Bates-stamped. The government will soon Bates-stamp these documents, create indexes, and send replacement discovery.

- Title III and consensual recordings not previously produced, including a recorded call between Singer and government agents;

- Text messages from Mikaela Sanford's phone;

- Consent to search forms signed by Singer;

- Reports regarding agents' contacts with Singer during the investigation;

- The contents of Singer's Google Drive accounts;

- Handwritten notes created by Singer during the investigation, including written "scripts" that Singer used during calls with defendants and others;[3]

- Records related to expense reimbursement requests made by Singer during the investigation;

- Text message screenshots sent from Singer to agents during the investigation;

- A video and related documentation concerning Morrie Tobin and Rudy Meredith;

- FBI and IRS interview reports and associated agent notes;[4]

- Ping data for Singer's phone with phone number ending in 8802;

- QuickBooks files for The Key Worldwide Foundation and The Key. Please note that these files are being produced in native format and require QuickBooks 2019;[5] and,

- An image of Singer's flip phone with phone number ending in 5816.

3. A second thumb drive containing a native image of Singer's laptop, which was seized on or about November 23, 2018. The government is currently copying this laptop, and

---

[3] Investigators are working with Singer to determine whether he has any other handwritten notes.

[4] Any missing agent notes will be supplemented in later productions as the notes are obtained from the agents.

[5] The government was only recently able to access the QuickBooks files provided with this discovery.

will produce the image as soon as the copying is complete.[6] Please note that we intend to produce a processed, Bates-stamped version of the laptop data at a later date.

In addition, as referenced in our March 3, 2020 discovery letter, below please find information regarding phones used by Singer during the investigation:

**iPhone 7+**

**Serial**
**IMEI**
**Phone Number** 8802

This telephone was intercepted pursuant to a court-ordered wiretap between June 5, 2018 and September 29, 2018. Between September 27, 2018 and March 11, 2019, calls made to and from this telephone were consensually recorded. Additionally, there was a pen register on this phone for the period April 18, 2018 to October 7, 2018. Local extractions of this telephone were made on or about the following dates: October 5, 2018, October 29, 2018, November 1, 2018, November 29, 2018, November 30, 2018, January 16, 2019, February 15, 2019, February 28, 2019 and March 11, 2019. All of these extraction reports have already been produced.

This telephone remained in Singer's possession until May 2019. In May 2019, Singer exchanged the telephone for a new iPhone XR, Serial                    IMEI                    When the phone was replaced, data from the original phone was transferred to the new phone.

The new 8802 phone remained in Singer's possession until Friday, March 6, 2020. At this time, Singer sent the phone, via FedEx, to agents at the FBI's office in Chelsea, MA. Agents took possession of the phone on Monday, March 9, 2020. On or about March 9, 2020, the FBI requested the phone be extracted using "GreyKey," in an attempt to recover deleted text messages. In the event the text messages are recovered, the government will review and produce them as appropriate.

**Motorola ZTE Z233V Cymbal**
**Phone Number** 5816

Agents provided Singer with this flip phone on September 21, 2018. The purpose of the phone was for Singer to use it to call agents and his counsel. This phone was not recorded. Singer ceased using this phone in October 2018 and returned it to agents on or about October 23, 2018. Agents conducted an extraction of this phone on March 4, 2020, and this extraction report is being provided herewith.

---

[6] Certain potentially privileged documents have been excluded from the image subject to a privilege review.

**LG-M150**
**Android ID** 
**IMEI**
**Phone Number** 5704

At the inception of Singer's cooperation, Singer's attorney instructed Singer to purchase this telephone for communications with his attorney and Singer's family. Singer purchased this phone on or about September 24, 2018, and used it until on or about October 18, 2018. Singer never used this phone to communicate with agents. This phone was not recorded.

Agents in California seized this telephone from Singer between October 31, 2018 and November 1, 2018, and it has been in the government's possession since that time. Agents conducted a logical extraction of this telephone on or about November 7, 2018, and the government has previously produced the extraction.

**iPhone 8+**
**Serial #** 
**IMEI**
**Phone Number** 0584

After Singer turned in the 5816 and 5704 phones, he purchased this telephone in October 2018 for communications with agents and with his counsel. This phone was not recorded. There was a pen register on this phone for the period October 12, 2018 through April 11, 2019, and that pen register data is being provided herewith. This phone is currently in Singer's possession and he uses this as his personal phone.

**Landline**
**Phone number** 8802

There was a pen register for this phone for the period May 4, 2018 through July 3, 2018. The pen register data is being provided herewith.

\*　　\*　　\*

4

The government recognizes its ongoing discovery obligations and will continue to produce additional discovery as required. If you have any questions regarding the materials enclosed, or those that are forthcoming, please contact us at your earliest convenience. **Finally, if you intend to attach agent reports to filings, please redact all personal identifiers on the reports.**

Sincerely,
ANDREW E. LELLING
United States Attorney

By:    */s/ Eric S. Rosen*
Eric S. Rosen
Justin D. O'Connell
Kristen A. Kearney
Leslie A. Wright
Karin M. Bell
Stephen E. Frank
Assistant U.S. Attorneys

# EXHIBIT HH

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

| **HEADER** |
|---|

| **Source ID:** | |
|---|---|
| **Date:** | 10/30/2018 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| **SOURCE REPORTING** |
|---|

| **Date of Contact:** | 10/23/2018 |
|---|---|

**List all present including yourself (do not include the CHS):**
Kaitlyn Cedrone
Laura Smith
Elizabeth Keating
Eric Rosen
Justin O'Connell
Donald Heller

| **Type of Contact:** | Other |
|---|---|
| **Other Contact Type:** | In person/Telephonic |

| **Date of Report:** | 10/30/2018 |
|---|---|

| **Substantive Case File Number** |
|---|
| |

**Check here if additional reporting is in Echo**
No

**Source Reporting:**
CHS was interviewed on October 23 and 24, 2018 at the USAO, Boston, MA. After being advised of the identity of the interviewing Agents and the nature of the interview, CHS provided the following information:

October 23, 2018:
CHS purchased an unauthorized phone, ████-5704, at the end of September, following the advice of his attorney, DON HELLER. CHS used this unauthorized phone to call DON HELLER, CLIFF SINGER, and BILL MCGLASHAN. CHS had no other phones. CHS used a taxi driver's phone on CHS' way home on September 24, 2018 to call CLIFF SINGER. CHS also noted that CHS' American Express card and Zoosk account were potentially compromised.

The six families CHS told about an FBI investigation CHS was involved in were as follows:

1. ████ - CHS met with ████ to go over her applications. CHS went outside to talk to ████ parents. ████ did most of the talking, while ████ was quieter. CHS told ████ parents that CHS had a problem and that they potentially had a problem as well, in regards to families that had made a donation. ████ did not feel like he did anything wrong because he was a donor and has given donations all the time. CHS informed the parents that this was a bribe. The parents asked if CHS was wired, to which CHS responded no. CHS warned the parents that eventually CHS would call them and ask questions about the situation. The parents did not know the money went to MICHAEL CENTER. CHS advised the parents not to tell anybody. CHS believed ████ was the one who initially called CHS to start the process. ████ and ████ were connected to ████ and ████. CHS had both ████ kids as clients, but no one did the side door. One student went to ████

2. ████ wife, was late coming home on October 4, 2018. Prior to ████ return and

| FD-1023 | Page 1 of 3 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

turning the recording device on, CHS told ▮▮▮ that CHS was wired, and that everyone who donated would be pulled into the FBI investigation. ▮▮ was not alarmed. CHS told ▮▮ not to tell anyone. CHS believed ▮▮ did not tell ▮▮ The ▮▮ were connected to the ▮▮ and ▮▮ families. CHS was sure that ▮▮ did not tell either of these families.

3. ▮▮▮▮▮ - On October 19, 2018 CHS texted ▮▮▮▮ from phone number ▮▮▮-8802 to meet up in person in Santa Monica. The two met at ▮▮▮ rental house on the beach. CHS and ▮▮ turned their phones off. CHS told ▮▮▮ that CHS was picked up in Boston by the USAO and FBI for the SAT scam and "donations." CHS told ▮▮▮ about the SAT portion because CHS almost did the scam for ▮▮ CHS will still go to CHAPMAN to use CHS' connections to help ▮▮ at no cost. CHS told ▮▮ to not talk about YALE, and that CHS was wired for the past eight months. ▮▮▮▮ response was that he was use to this sort of thing because he was a drug dealer. CHS told ▮▮ not to talk to anyone, and to stay away from this. CHS told ▮▮ A to contact ▮▮ and ▮▮ to inform them about CHS' involvement in this investigation. CHS wanted ▮▮ to explain to the ▮▮ that they would get a call from CHS regarding the schemes. ▮▮ and ▮▮ were divorced. CHS got ▮▮ into UC SANTA BARBARA for a $250,000 donation. Nothing went to UC. ▮▮ also helped get ▮▮ in to UC. CHS and ▮▮ agreed that their code word when they needed to talk was to bring up their business ventures.

4. BILL MCGLASHAN - CHS called MCGLASHAN on the unauthorized phone, ▮▮▮-5704. CHS told MCGLASHAN that CHS' regular phone was wired, but did not give any details. MCGLASHAN asked if it was bad, to which CHS responded yes. CHS was supposed to meet MCGLASHAN at the Santa Monica airport on October 23, 2018 at approximately 1300 PST. ▮▮▮ MCGLASHAN's son, was "friends" with ▮▮▮ HUNEEUS. ▮▮ received a score of ▮ on his ACT. CHS told MCGLASHAN they did not need to talk about the athletic side of ▮▮ deal to be a kicker at USC for $250,000. ▮▮▮ real first name is ▮▮ but he but goes by ▮▮▮▮▮ did not know about this.

5. ▮▮▮▮ - The day both ▮▮ and CHS were supposed to meet the President of Lainey College, CHS told ▮▮ that CHS was pulled in by the FBI, and CHS' phone and email were wired. The two pulled the car over and had a conversation about it on the side of the road. CHS told ▮▮ the FBI was going after the SAT scam and the Foundation. CHS told ▮▮▮ that the Foundation could be shut down. ▮▮▮ was involved in the investigation too because of the Harvard deal with $400,000 to the Soldier's team. ▮▮ used this money to scholarship his daughter. CHS let ▮▮ know CHS could not move money now. ▮▮ was very scared and worried, and wondered what was his biggest problem. CHS said ▮▮ biggest problem was the $60,000, and that ▮▮ should say that it was a part of income for Soldier Town. Soldier Town could also be shut down.

6. ▮▮▮▮ - On October 17, 2018, CHS met the ▮▮▮ at their home. On October 21, 2018, CHS met ▮▮ at McDonald's, where CHS told ▮▮ that CHS was picked up in Boston by the FBI for an investigation regarding the ACT/SAT and donations made to CHS' Foundation. ▮▮ took the test. ▮▮▮ responded by saying they did nothing wrong. ▮▮▮ stated his $25,000 donation to the Foundation was for all the hassle that occurred in getting extra time for ▮▮ CHS stated that eventually CHS will call ▮▮ to discuss everything. ▮▮ wanted to clean ▮▮ application, so CHS told ▮▮ not to use the score of 31 then. CHS never told the ▮▮ that the $25,000 was for getting the score of 31 at West Hollywood College Prep School. MARK RIDDELL took multiple tests at West Hollywood on the same day, potentially when ▮▮ was there. The ▮▮ were not connected to the ▮▮ but ▮▮ did date ▮▮▮▮ went to USC, and CHS was able to get ▮▮ denied from LMU.

CHS told the aforementioned six families about the investigation because CHS had loyalty to all of them and wanted to help them. CHS did not tell the HUNEEUS family because they were already "nailed," and CHS had no loyalty to them. CHS did not tell ▮▮ because she was new and CHS therefore had no loyalty to her. CHS did not tell the ▮▮ family because ▮▮ was already a sure thing at SMU. USC will not happen because ▮▮ did not want to work hard.

October 24, 2018
The following responses were provided by CHS:

CHS' email, ▮▮ @gettingintocollege.com, was not being used by CHS. The email address was for ▮▮ ▮▮▮ business, but was not sure if anyone sent any emails to it. CHS did not use any other email accounts, except CHS might have one for Map4Life, and CHS' yahoo email to communicate with DON HELLER.

| FD-1023 | Page 2 of 3 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION** <br> CHS REPORTING DOCUMENT |  |
|---------|---------------------------------------------------------------|--------------------|

CLIFF SINGER knew about the FBI investigation as soon as CHS was home on September 24, 2018. CHS asked CLIFF what it was like to be in "camp," referring to prison. CLIFF explained his experience to CHS while CHS used the taxi driver's phone on CHS' way home that day. CHS talked to CLIFF at length on an unauthorized phone, ██████-5704.

The following responses were provided by DON HELLER:

DON confirmed that he told CHS to purchase the unauthorized phone, ██████-5704, to be used for DON and CHS' family. DON stated his reasoning for allowing CHS to purchase a new phone were as follows: he had trouble reaching CHS on the authorized phone, ██████-5816, there was bad reception, and he thought the authorized phone was monitored/maybe having to or from information received. DON was very leery about computer protections. DON did not trust the Agents, and has had prior experience of abuse of attorney/client privilege information. DON felt he developed a level of trust with the Agents over time.

[Agent Note: On numerous occasions throughout the investigation both CHS and DON were told that the authorized phone, ██████-5816, was not monitored and was to only be used by CHS for contact with DON, the Agents, and the AUSA's. Despite DON later developing trust with the Agents, the unauthorized phone was only discovered through specifically asking the CHS if CHS owned or used any other phones.]

**Synopsis:**
Interview 10/23/2018 - 10/24/2018

| SIGNATURE | | |
|-----------|---|---|
| Submitted By | KCEDRONE (undefined undefined) | Mon, 10 Dec 2018 13:06:58 -0500 |
| First Level Approved By | JPKEELAN (John Keelan) | Wed, 12 Dec 2018 14:57:41 -0500 |

| FD-1023 | Page 3 of 3 | FEDERAL BUREAU OF INVESTIGATION |
|---------|-------------|--------------------------------|

UNCLASSIFIED

SINGER-REPORTS-000032

# EXHIBIT II

## TRANSCRIPT

1    AUTOMATED VOICE:  Welcome to the conference calling center.  At any time
2    during this message, please enter your passcode followed by the pound sign.  [9 long beats]
3    Your passcode has been confirmed.  If you need technical assistance during your call, press *0
4    [star zero].  After the tone, please state your name followed by the # [pound] sign.

5    RICK SINGER:  Rick Singer.

6    AUTOMATED VOICE:  There are four parties in the conference, including you.  Rick
7    Singer is now joining.

8    RICK SINGER:  Helloo.

9    MULTIPLE SPEAKERS:  Hey Rick.

10   FEMALE SPEAKER:  Hello. Hi.

11   AUTOMATED VOICE:  Is now joining.

12   UNKNOWN SPEAKER:  Who's that?

13   AUTOMATED VOICE:  Don Heller is now joining.

14   DON HELLER:  Don Heller.

15   ERIC ROSEN:  Hey Don.

16   DON HELLER:  Hey, how are you, Eric?

17   ERIC ROSEN:  Good.  I think everybody's on.  Justin are you there?  No.., but we can
18   start, so-- start.  I got to speak a little quietly.  So Rick, we went through a couple, bunch of
19   calls to- today.  The one with Donna, John Wilson, Michelle, and ██████████.

20   RICK SINGER:  Yes.

21   ERIC ROSEN:  Umm.  It was good.  Some of them are good.  Some I just want to give
22   you a little bit more sort of pointers on and um that we can talk about it going forward.  The
23   best one was the um session with Donna that you had uhm in the --

24   AUTOMATED VOICE:  Is now joining.

25   ERIC ROSEN:  So, the one with Donna is great.  The one thing that I think we'll do
26   another call at some point fairly soon is uhm… you know, you and Donna talk about a couple

1

1    things.  You talk about sports.  You're saying like "she's good at sports" or "he's good at
2    sports."  I think if we can you know, obviously like, tone that down a little bit uhm and uh tone
3    that down a little bit.  And, you know, you don't have to hype up their sporting abilities.  I
4    think generally, I mean all of these people aren't getting recruited by USC.  You know, I think
5    that's the message that we sort of want to get across.  In the call with Donna you talk about
6    extended time referring to the SAT, talking about ▇▇▇▇ Janavs.  Does she know about the
7    extended time, for like the stuff with Mark Riddell and all that?

8    RICK SINGER:  No, she doesn't know anything about it.  But she asked a question of
9    why her GPA is so low and her test scores are high.  She said ▇▇▇▇▇▇▇▇▇▇▇▇▇
10    ▇▇▇▇▇ and I said "Yes, she has a ▇▇▇▇▇▇▇▇ and she gets extended time."  So that
11    she can put that in her notes, because Admissions is going to ask her that question, why is there
12    such a difference?

13    ERIC ROSEN:  And Rick, you're calling in on your uh, the burn-, uhh, on the flip
14    phone, right?

15    RICK SINGER:  No, I'm calling them on the phone you told me call on, I thought.

16    ERIC ROSEN AND ANOTHER SPEAKER:  No, right now-- currently.

17    RICK SINGER:  So like today when I made the phone calls, I called them on my normal
18    phone, my normal cell phone.

19    ERIC ROSEN:  No, no, we're talking about right now.  Are you call-

20    RICK SINGER:  Oh, no, I can't use that phone.  It doesn't dial.  It takes me ten minutes
21    to even get to dial Don.  The most impractical, impossible phone.  Seriously, I tried to get Don
22    - ten minutes it took me this morning to call him because I couldn't get to the numbers and, I
23    tried to, it's a nightmare.  I'm calling you right now from my regular phone because I would
24    never be able to get on.

25    DON HELLER:  Ohh, I think that's going to end this call right now.  Rick.

26    RICK SINGER:  Wh-

27    ERIC ROSEN:  Rick, you need to umm…

28    RICK SINGER:  You guys need to give me another phone.  This is ridiculous.

1        ERIC ROSEN:  We will give you another phone on Friday, but for right now I, I, you

2   need to… Don, can you call him and conference him in?

3        DON HELLER:  I can.  Let me try.  I'll call- I'll try calling your...

4        RICK SINGER:  Yeah, I can answer the cell phone but I can't…

5        DON HELLER:  Let me um- let me hang up.  Oh actually, I don't have to hang up.

6        ERIC ROSEN:  Rick, you hang up right now your phone.

7        RICK SINGER:  My phone?  This phone?  Okay got it.

# EXHIBIT JJ

## Notes (185)

| # | Time | Note | Deleted |
|---|------|------|---------|
| 1 | Created:<br>10/4/2018<br>23:56(UTC-4)<br>Modified:<br>10/4/2018<br>23:56(UTC-4) | Title: New Note<br>Source: Notes<br>Body: | Yes |
| 2 | Created:<br>10/1/2018<br>12:27(UTC-4)<br>Modified:<br>10/4/2018<br>22:29(UTC-4) | Oct 2<br><br>Loud and abrasive call with agents. They continue to ask me to tell a fib and not restate what I told my clients as to where here money was going -to the program not the coach and that it was a donation and they want it to be a payment.<br>I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking the questions. Essentially they are asking me to bend the truth which is what they asked me not to do when working with the agents and Eric Rosen.<br><br>Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools. This time about asking each person to agree to a lie I was telling hem.<br><br>Spoke to ████████ which is a referral from Gordon Caplon. They want to nail Gordon at all costs. ████ told me his daughter is a good runner 19 minute 3 mile good enough for recruited walk on or walk on to Wash U and Cornell. Explained the side door but very late and I probably could not do it at this stage.<br><br>The agents told me to get him to take another school I had a relationship just to entrap him despite him never asking for any other school.<br><br>When I told them Gordon texted me that ████ did not get extended time and the reasons why they still wanted me to ask him for a payment to take the SAT through WHCP even when he was not approved just to nail him. I said that is ludicrous as he will not entertain because she was not approved. | |

SINGER-PHONE-000495

# EXHIBIT PP

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA,

v.

DAVID SIDOO, et al.,

Defendants.

Case No. 19-cr-10080-NMG

## DECLARATION OF JOHN GARDNER

I, John Gardner, declare and state as follows:

1. I am a Litigation Manager in BDO's Forensic Investigations and Litigation Services practice located in Houston, Texas. I have more than 21 years of experience working for the Garland Police Department and the FBI's NTRCFL in Dallas, Texas as a certified Computer Analysis Response Team member. I work extensively with organizations, attorneys, law enforcement and federal, state, and local governments, specializing in complex digital forensics and e-discovery – from collection through production – for matters that involve a range of issues, including intellectual property theft, business technology, copyrights, patents, trademarks, as well as employment, environmental, and numerous other disputes involving digital media and mobile devices.

2. There are several versions of forensic hardware and software that allow a forensic analyst to extract and decode iMessages, Facebook Messenger messages, and other data from unlocked iPhones. The most commonly used forensic tool for extracting data from mobile devices is Cellebrite. Cellebrite software allows for the extraction of data from mobile devices, and a program for reviewing the data contained in the extractions. Specifically, Cellebrite's UFED 4PC can recover active iMessages and Facebook Messenger messages contained on an iPhone 7 Plus, and Cellebrite's Physical Analyzer can decode the extracted data.

3. The government used the Cellebrite UFED 4PC to extract data from Singer's iPhone 7 Plus on at least nine occasions. The government generated reports from each of these extractions. A review of the data provided by the government reveals that all iMessages that existed on the device before September 27, 2018 were deleted, with the exception of 18 active messages.

4. In late 2018 and early 2019, for non-law-enforcement users, Cellebrite supported two types of extractions on an iPhone 7 Plus: a logical extraction and an advanced logical

1

extraction. Logical extractions are not as successful in recovering data as a physical extraction.

5. During this same time period, the government had access to law enforcement only tools that could obtain more data from iPhones, including the iPhone 7 Plus, than those available commercially. Specifically, the government had access to GrayKey devices and to Cellebrite Advanced Services. Each of these tools allowed the government to perform physical system extractions of an iPhone 7 Plus. Physical system extractions have the capability to extract more data than contained in the types of extractions the government performed (logical and advanced logical). This includes the acquisition of additional data; data which may demonstrate that additional iMessages were deleted.

6. These enhanced extraction techniques may recover evidence of additional deleted data, including data deliberately deleted by the phone's user. However, the timing of the extraction is important. Generally, it becomes increasingly difficult to retrieve data from a device as time goes by. With continuous usage of the device, deleted data has a greater likelihood of becoming overwritten or destroyed, and its space reallocated to another database entry or process. When this happens, forensic tools cannot recover the deleted content.

7. That the original iPhone 7 Plus is no longer available for inspection is significant. Using current commercially available extraction techniques, it is possible that additional data could be retrieved from Singer's iPhone 7 Plus, which may include additional data regarding the deleted iMessages. Without the original device, these extraction methods are not available.

8. The Cellebrite extractions and reports provided by the government show the following activity on the iPhone 7 Plus:

   a. Approximately 2,244 iMessages that were present on the device prior to September 27, 2018 were deleted.

   b. Between September 27, 2018 and March 10, 2019, 559 additional iMessages were deleted from the iPhone 7 Plus.

9. The above analysis is based on the Cellebrite extractions and reports provided by the government (*i.e.,* the logical images and/or UFDR reports), which were processed using Cellebrite's Physical Analyzer software.

10. To further examine the information produced by the government, a de-duplicated data set of deleted messages were exported into an Excel spreadsheet, and filtered to determine the timing of the deletions. It should be noted that an additional 1,658 encrypted chat messages were shown as deleted in a February 15, 2019 report provided by the government. However, based on the format in which this data was provided (*i.e.,* a PDF file), it could not be included in the above analysis. As such, the 1,658 deleted messages identified in that report were not included in the total sum of deleted messages.

11. The data contained within the Cellebrite extractions and reports does not contain all data extant on the iPhone 7 Plus at the date of the extraction. As is relevant here, the extractions and reports provided by the government do not necessarily include all iMessages that were present or deleted on the iPhone 7 Plus. It is possible that other deleted messages were deleted on the iPhone 7 Plus but could not be recovered during the extraction process.

12. I have reviewed the list of defendants in this case and certain related cases, as well as the government's letter of May 30, 2019 listing co-conspirators. Based on my review of the list of defendants, the government's May 30, 2019 letter, and the extractions, I recovered evidence that Singer deleted iMessages with defendants and co-conspirators.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on 25st day of March, 2020.

John Gardner

John Gardner

# EXHIBIT QQ

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 19-cr-10080-NMG |
| DAVID SIDOO, et al., | |
| Defendants. | |

**AFFIDAVIT OF JOHN B. WILSON IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS INDICTMENT WITH PREJUDICE**
**OR, IN THE ALTERNATIVE, FOR SUPPRESSION OF EVIDENCE**
**BASED ON GOVERNMENTAL MISCONDUCT**

I, John B. Wilson, declare the following:

1. I am a defendant in this action. I make this affidavit pursuant to *Simmons v. United States*, 390 U.S. 377 (1968), and in support of Defendants' Motion to Dismiss Indictment with Prejudice or, in the Alternative, for Suppression of Evidence Based on Governmental Misconduct.

2. Almost a decade ago, I hired William "Rick" Singer to provide college counseling for my son. Mr. Singer provided typical college-counseling services, such as tutoring for standardized tests, and advice on essay-writing and selecting appropriate colleges.

3. As part of this process, Mr. Singer told me that the University of Southern California was one of several schools that had a sports program that welcomed donations from parents of student-athlete applicants, and that the donations could be considered in admissions. Mr. Singer used the term "side door" to describe this program, and said that it was a legitimate and common practice. He said that doing this was similar to donating a building or endowing a chair, but involved smaller donations. He also said that many of the school's athletic teams—including water polo, which Mr. Singer knew my son played—depended on such side-door donations.

4.      Mr. Singer told me that my donation would go to the school and to support the USC water polo team. He never said that any part of my donation would be a bribe or illegal payment to any individual or school.

5.      In September 2018, I had several conversations with Mr. Singer about him providing college-advising services to my two daughters. In one of the conversations, consistent with his prior descriptions of side-door donations as proper (and common), he told me that, because he had recently facilitated several side-door donations to Harvard University, he would be negotiating side-door donations directly with the President of Harvard. To start his counseling of my daughters, Mr. Singer agreed to conduct a Skype video/audio meeting with my family on September 28, 2018.

6.      On the afternoon of September 28, 2018, Mr. Singer was texting about our meeting and sent a text asking to move the conversation from Skype to FaceTime. I understand that FaceTime is an audio/video application offered on iPhones.

7.      My family conducted this FaceTime meeting with Mr. Singer on September 28, 2018. I participated in some but not all of the FaceTime conversation with Mr. Singer. To the best of my memory, during this call and in other conversations, among the things Mr. Singer said were:

> a.      The side-door program was more popular and widespread than it had been in 2013-2014, and was occurring at many more schools and with more students.
>
> b.      Schools knew and accepted that applicants utilizing the side-door program did not have to be athletes capable of competing on the school's varsity sports team, and did not need to be accomplished athletes. They could be team

2

> assistant managers or have similar nonplaying roles. Thus, the side-door would be appropriate for my daughters.

> c. Mr. Singer did not say this program involved bribery of coaches, administrators, or schools. He described it as a legitimate and common fundraising method.

9. I have reviewed the transcripts produced by the government of recorded conversations I had with Mr. Singer from September 29, 2018 through 2019. In some of these conversations, Mr. Singer used words that are ambiguous, misleading, or inconsistent with how he described the side-door program in the September 28, 2018 conversation and in prior conversations.

10. I have not seen a transcript of this September 28, 2018 FaceTime conversation in the materials produced by the government.

11. Mr. Singer sent numerous texts to me and my family from 2010 to 2019. I have reviewed text messages from Mr. Singer that the government has produced in this case. Text messages my family and I exchanged with Mr. Singer are missing from the government productions that I have reviewed, including texts between iPhones during September 20-30, 2018. For example, I did not see in the government productions a September 28, 2018 text message asking to switch the call from Skype to FaceTime, or other texts about this meeting.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 25, 2020.

John B. Wilson

3

# EXHIBIT RR

**From:** Rosen, Eric (USAMA) <Eric.Rosen@usdoj.gov>
**Sent:** Tuesday, March 24, 2020 8:55 PM
**To:** Kendall, Michael <michael.kendall@whitecase.com>
**Cc:** Bell, Karin (USAMA)3 <Karin.Bell@usdoj.gov>; O'Connell, Justin (USAMA) <Justin.O'Connell@usdoj.gov>; Wright, Leslie (USAMA) <Leslie.Wright@usdoj.gov>; Kearney, Kristen (USAMA) <Kristen.Kearney@usdoj.gov>; Tomback, Andrew <andrew.tomback@whitecase.com>; Malkiel, Yakov <yakov.malkiel@whitecase.com>; Frank, Stephen (USAMA) 1 <Stephen.Frank@usdoj.gov>
**Subject:** RE: US v. Siddoo, Follow up on discovery

Mike –

In response to your further inquiry, Singer did inform the government that he had scheduled a FaceTime call prior to the call, and the government directed Singer to maintain his regular college counseling contacts with students during the period in which he was cooperating with investigators.

We believe we have now provided you with all the factual information we have about the call.

Eric


**From:** Kendall, Michael <michael.kendall@whitecase.com>
**Sent:** Tuesday, March 24, 2020 12:38 PM
**To:** Rosen, Eric (USAMA) <erosen2@usa.doj.gov>
**Cc:** Bell, Karin (USAMA)3 <KBell3@usa.doj.gov>; O'Connell, Justin (USAMA) <JOconnell@usa.doj.gov>; Wright, Leslie (USAMA) <LWright4@usa.doj.gov>; Kearney, Kristen (USAMA) <KKearney@usa.doj.gov>; Tomback, Andrew <andrew.tomback@whitecase.com>; Malkiel, Yakov <yakov.malkiel@whitecase.com>
**Subject:** US v. Siddoo, Follow up on discovery

Eric,

Thanks for your prompt reply. It was very helpful. We need to clarify a few details:

What is the reason that the Government did not monitor the call?
Did Singer fail to tell the Government about the call before it occurred?
When and how did the Government first learn about the call—from our inquiries?

Mike


**Michael Kendall** | Partner
**T** +1 617 979 9310 **M** +1 617 905 8206 **E** michael.kendall@whitecase.com
White & Case LLP | 75 State Street | Boston, MA 02109-1814
**From:** Rosen, Eric (USAMA) <Eric.Rosen@usdoj.gov>
**Sent:** Tuesday, March 24, 2020 11:23 AM
**To:** Malkiel, Yakov <yakov.malkiel@whitecase.com>; Bell, Karin (USAMA)3 <Karin.Bell@usdoj.gov>
**Cc:** O'Connell, Justin (USAMA) <Justin.O'Connell@usdoj.gov>; Wright, Leslie (USAMA)

<Leslie.Wright@usdoj.gov>; Kearney, Kristen (USAMA) <Kristen.Kearney@usdoj.gov>; Kendall, Michael <michael.kendall@whitecase.com>; Tomback, Andrew <andrew.tomback@whitecase.com>
**Subject:** RE: US v. Siddoo, Follow up on discovery

Yakov –

      We are responding to your emails of March 21, 23 and 24, 2020.

      *First*, as we indicated in our reply on March 19, 2020, we do not believe we have any additional information responsive to your request about the note. As we have previously indicated, we are reviewing our productions to ensure that that is the case. To the extent Singer drafted the note "in response" to anything, we do not believe it was a request from the government. It may have been a request from his own counsel. To the extent we find any information responsive to your request, we will produce it promptly.

      *Second*, we do not believe we have additional agent reports or notes of the September 28, 2018 meeting in California. As you note, the call occurred during a break in the meeting and the government did not play a "role" in the call or monitor it. To the extent we find any information responsive to your request, we will produce it promptly.

          Eric

**From:** Malkiel, Yakov <yakov.malkiel@whitecase.com>
**Sent:** Tuesday, March 24, 2020 11:15 AM
**To:** Bell, Karin (USAMA)3 <KBell3@usa.doj.gov>
**Cc:** Rosen, Eric (USAMA) <erosen2@usa.doj.gov>; O'Connell, Justin (USAMA) <JOconnell@usa.doj.gov>; Wright, Leslie (USAMA) <LWright4@usa.doj.gov>; Kearney, Kristen (USAMA) <KKearney@usa.doj.gov>; Kendall, Michael <michael.kendall@whitecase.com>; Tomback, Andrew <andrew.tomback@whitecase.com>
**Subject:** RE: US v. Siddoo, Follow up on discovery

Dear Karin,

We are writing to ask that you resolve a discovery problem that is impeding our efforts to meet Judge Gorton's Order that we file by tomorrow all motion practice relevant to sanctions over the delayed production of Singer's iPhone notes. We have made repeated requests to the USAO for discovery related to two issues directly relevant to this motion practice:

1.  All information and documents in the government's possession relating to a FaceTime call Singer had with the Wilson family on September 28, 2018, apparently while he was in the Sacramento FBI office with two prosecutors and four agents from the prosecution team. It appears that the team took a break from its debriefing to allow Mr. Singer to conduct this call. The Government did not record this call, nor did it reference it in the FBI-1023 of the September 28 interview.
2.  All information and documents that describe the circumstances that lead to the creation of Singer's note on January 30, 2019 referencing John Wilson and USC.

We request that the government produce the requested information today, and respond forthwith and tell us what it intends to do. If the government is going to refuse to provide complete disclosure, we will need to move for expedited discovery before Magistrate Judge Kelley.

We look forward to your response. We are also available to discuss this today by telephone.

Mike, Andy, and Yakov

**Yakov Malkiel** | Associate
**T** +1 617 979 9322   **M** +1 617 407 0117   **E** yakov.malkiel@whitecase.com
White & Case LLP | 75 State Street | Boston, MA 02109-1814
**From:** Kendall, Michael <michael.kendall@whitecase.com>
**Sent:** Monday, March 23, 2020 12:45 PM
**To:** Wright, Leslie (USAMA) <Leslie.Wright@usdoj.gov>; O'Connell, Justin (USAMA)
<Justin.O'Connell@usdoj.gov>; Kearney, Kristen (USAMA) <Kristen.Kearney@usdoj.gov>; Frank, Stephen
(USAMA) 1 <Stephen.Frank@usdoj.gov>; Bell, Karin (USAMA)3 <Karin.Bell@usdoj.gov>; Rosen, Eric
(USAMA) <Eric.Rosen@usdoj.gov>
**Subject:** US v. Siddoo, Follow up on discovery

Leslie,

Thank you for your March 18, 2020 response to our questions.  We are writing to follow-up on item
4.  According to a recently produced FD-1023 report with a Date of Contact September 28, 2018, Mr.
Singer was at the FBI's Sacramento office on September 28, 2018.  Six agents and prosecutors had flown
out from Boston to conduct the interview.  Mr. Singer apparently made the 33-minute FaceTime call you
mention during a break that took place "at approximately 13:15 pst" (according to the FD-1023, at page
3 of 4).  There is no mention of the FaceTime conversation in the FD-1023 or the agents' handwritten
notes.  Does the USAO – including all agents and AUSAs present -- have any documents or information
describing this FaceTime call,  including participants, contents, etc. and the agents' and AUSAs' role in
it?  If so, could you please provide the relevant documents and reduce the participants' memories to a
narrative summary and produce that to us today?

Mike

**Michael Kendall** | Partner
**T** +1 617 979 9310   **M** +1 617 905 8206   **E** michael.kendall@whitecase.com
White & Case LLP | 75 State Street | Boston, MA 02109-1814
**From:** Wright, Leslie (USAMA) <Leslie.Wright@usdoj.gov>
**Sent:** Wednesday, March 18, 2020 10:30 AM
**To:** Kendall, Michael <michael.kendall@whitecase.com>; O'Connell, Justin (USAMA)
<Justin.O'Connell@usdoj.gov>; Kearney, Kristen (USAMA) <Kristen.Kearney@usdoj.gov>; Frank, Stephen
(USAMA) 1 <Stephen.Frank@usdoj.gov>; Bell, Karin (USAMA)3 <Karin.Bell@usdoj.gov>; Rosen, Eric
(USAMA) <Eric.Rosen@usdoj.gov>
**Cc:** William Trach <william.trach@lw.com>; Jack Dicanio <jack.dicanio@skadden.com>; CS Flashner
<csflashner@mintz.com>; Vicki Chou <vchou@hueston.com>; allison.blanco@lw.com;
jkeller@kelleranderle.com; Joshua N. Ruby <jnr@dcglaw.com>; P Hooper <phooper@health-law.com>; J
Sharp <jsharp@nixonpeabody.com>; Brittani A. Jackson <bjackson@hueston.com>; J Kearney
<jkearney@health-law.com>; nct@foleyhoag.com; S Hsutro <shsutro@duanemorris.com>; M Siddall
<msiddall@mosllp.com>; Malkiel, Yakov <yakov.malkiel@whitecase.com>; Martin G. Weinberg
<owlmgw@att.net>; D Meier <dmeier@toddweld.com>; R Cahn <rcahn@kelleranderle.com>; Maynard,
Lauren <lmaynard@nixonpeabody.com>; emily.reitmeier@skadden.com; ML Schwartz

<mlschwartz@bsfllp.com>; michael.clemente@lw.com; R Rpopeo <rrpopeo@mintz.com>; EP Beirne
<epbeirne@mintz.com>; ME Robinson <merobinson@mintz.com>; Tomback, Andrew
<andrew.tomback@whitecase.com>; Jack Pirozzolo <JPIROZZOLO@SIDLEY.COM>; D Zchesnoff
<dzchesnoff@cslawoffice.net>; Sean Berkowitz <sean.berkowitz@lw.com>; D Meier
<dmeier@toddweld.com>; Allen Ruby <allen.ruby@skadden.com>; Michael Loucks
<michael.loucks@skadden.com>; B Kelly <bkelly@nixonpeabody.com>; G WV <gwv@dcglaw.com>; T
Miner <tminer@mosllp.com>; D Schumacher <dschumacher@health-law.com>; Marshall A. Camp
<mcamp@hueston.com>
**Subject:** RE: US v. Siddoo, Follow up on discovery

Counsel,

Please see attached in response to your email below.

Thanks,
Leslie

**Leslie Wright**
Assistant United States Attorney
U.S. Attorney's Office, District of Massachusetts
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3367
leslie.wright@usdoj.gov

**From:** Kendall, Michael <michael.kendall@whitecase.com>
**Sent:** Sunday, March 15, 2020 11:55 AM
**To:** O'Connell, Justin (USAMA) <JOconnell@usa.doj.gov>; Wright, Leslie (USAMA)
<LWright4@usa.doj.gov>; Kearney, Kristen (USAMA) <KKearney@usa.doj.gov>; Frank, Stephen (USAMA)
1 <SFrank1@usa.doj.gov>; Bell, Karin (USAMA)3 <KBell3@usa.doj.gov>; Rosen, Eric (USAMA)
<erosen2@usa.doj.gov>
**Cc:** William Trach <william.trach@lw.com>; Jack Dicanio <jack.dicanio@skadden.com>; CS Flashner
<csflashner@mintz.com>; Vicki Chou <vchou@hueston.com>; allison.blanco@lw.com;
jkeller@kelleranderle.com; Joshua N. Ruby <jnr@dcglaw.com>; P Hooper <phooper@health-law.com>; J
Sharp <jsharp@nixonpeabody.com>; Brittani A. Jackson <bjackson@hueston.com>; J Kearney
<jkearney@health-law.com>; nct@foleyhoag.com; S Hsutro <shsutro@duanemorris.com>; M Siddall
<msiddall@mosllp.com>; Malkiel, Yakov <yakov.malkiel@whitecase.com>; Martin G. Weinberg
<owlmgw@att.net>; D Meier <dmeier@toddweld.com>; R Cahn <rcahn@kelleranderle.com>; Maynard,
Lauren <lmaynard@nixonpeabody.com>; emily.reitmeier@skadden.com; ML Schwartz
<mlschwartz@bsfllp.com>; michael.clemente@lw.com; R Rpopeo <rrpopeo@mintz.com>; EP Beirne
<epbeirne@mintz.com>; ME Robinson <merobinson@mintz.com>; Tomback, Andrew
<andrew.tomback@whitecase.com>; Jack Pirozzolo <JPIROZZOLO@SIDLEY.COM>; D Zchesnoff
<dzchesnoff@cslawoffice.net>; Sean Berkowitz <sean.berkowitz@lw.com>; D Meier
<dmeier@toddweld.com>; Allen Ruby <allen.ruby@skadden.com>; Michael Loucks
<michael.loucks@skadden.com>; B Kelly <bkelly@nixonpeabody.com>; G WV <gwv@dcglaw.com>; T
Miner <tminer@mosllp.com>; D Schumacher <dschumacher@health-law.com>; Marshall A. Camp
<mcamp@hueston.com>
**Subject:** US v. Siddoo, Follow up on discovery

Dear Counsel,

In your email of March 12, you invited us to follow up on outstanding discovery requests after reviewing your next production. We write now to raise a limited, preliminary set of issues given that (a) your production will not be delivered to us until March 16, (b) processing and reviewing the production will take time, (c) we are required to meet a March 20 filing deadline, and (d) your March 13 discovery cover letter already discloses basic information about the contents of the production.

1. We have asked you to produce the attachments/exhibits referenced in the Singer and USC FBI memoranda. The discovery cover letter does not indicate that we will be receiving those documents.
2. We have asked whether the government has obtained information from USC's attorneys regarding USC persons and USC conduct. We requested that you disclose any such information, if so. It does not appear from the discovery cover letter that you are addressing this request.
3. We have requested information about whether the Government has made any promises, rewards or inducements to Mr. Singer or his relatives about possible criminal conduct by Singer and his relatives that is uncharged and unrelated to the parents charged in this case. Further, we asked whether Mr. Singer has made any statements under oath or otherwise about his assets, whether the government has permitted Singer to keep any assets, and if so which ones. It does not appear that your production will be addressing this request.
4. We are unable to tell from the discovery cover letter, but need to know urgently, whether your production provides detailed information about the following:
   a. An unrecorded conversation between Rick Singer and the Wilson family reflected by or immediately following interception session 9193.
   b. The list in Singer's iPhone note of January 30, 2019, 22:26 (at SINGER-PHONE-000664), which states, "John Wilson 20k nothing to do with USC plus donation to USC program for real polo player."
5. Finally, we have made various specific Brady requests to you, including in our letters of September 27, 2019 and January 28, 2020. To date, you have declined to inform us whether you are withholding evidence responsive to those requests.

Given the pressing discovery and motion timelines, we request a teleconference to discuss these requests. On Monday-Tuesday we are available beginning at 4:30 pm (earlier those days we are unavailable because of a trial at Middlesex Superior Court).

Thank you,

Mike

==================================================================================

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 617 979 9300. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available on https://www.whitecase.com/privacy-policy.

# EXHIBIT SS

1   **Call Date:** 2018-09-29

2   **Call Duration:** 13:40

3   **Call Begin [   ] Call End [   ]**

4   **Call Participants:**

5        Rick Singer

6        John Wilson

7   **File Name:** ████8802 2018-09-29 15-24-23 09249-001

8   **Bates No.:**

9

10  [00:00:00]

11  WILSON:   Hey, Rick.  How ya doin'?

12  SINGER:   Hey, John.  How are ya?

13  WILSON:   Good.  You feelin' better?

14  SINGER:   Lot better.

15  WILSON:   Oh, (overlapping dialogue; inaudible).

16  SINGER:   You good?  You been out of town?

17  WILSON:   Yeah, I've been out of town.  Been traveling.  I'm

18       goin' to Europe next week, so it'll be easier to connect

19       this week, so...

20  SINGER:   OK, cool.  So the girls --

21  WILSON:   So, yeah --

22  SINGER:   -- were great.

23  WILSON:   Cool.  I, I still didn't get a c-- a f-- a full

24       debrief from 'em, but talked to Leslie (sp?).  They, um,

```
 1        they have any clarity on, on where they want to go, what
 2        majors, or still (overlapping dialogue; inaudible)?
 3   SINGER:   Yeah.  Yeah, well, I mean, you have done a great job
 4        of, uh -- (laughs) it's so funny -- influencing 'em on
 5        what is the appropriate path to go down.  What do you
 6        think they both said?  (overlapping dialogue; inaudible)
 7        --
 8   WILSON:   What, all the Ivy League schools?
 9   SINGER:   No, no, I mean --
10   WILSON:   (overlapping dialogue; inaudible).
11   SINGER:   -- uh, uh, uh, they want to be business and
12        engineering.  (laughter) I said, "So do..."  I said,
13        "Does that come from your dad?"  And, of course, "Well,
14        my dad -- they pr-- my dad's programmed us," right?
15        (laughter) [00:01:00] So I said, "That's cool.  So we can
16        make all that happen."  I said, "You think you might like
17        that?"  They said, "Well, my dad (inaudible), so..."
18   WILSON:   (laughter) Come on!  I thought they actually liked
19        science and engineering.  They (overlapping dialogue;
20        inaudible) --
21   SINGER:   No, I'm sure they --
22   WILSON:   -- science.
23   SINGER:   -- I -- but you're -- you've influenced them, right?
24        (overlapping dialogue; inaudible) --
```

Case 1:19-cr-10080-NMG Document 1097-45 Filed 03/25/20 Page 287 of 328

1  WILSON:   Yeah, I've influenced 'em, but I want 'em to pick

2        what they like.

3  SINGER:   No, definitely they get it, they get it, right?   And

4        it's just --

5  WILSON:   OK.

6  SINGER:   -- it's just funny, 'cause then when Leslie kinda

7        interjected they're like, "Mom, stay out of it.   Mom,

8        stay out of it."   Right?   It was funny.   Um, but they're

9        both obviously great girls.   They want -- in a lot of

10        ways, they want to have kind of the same kinds of things

11        from the school.   We, um -- I have a huge list of schools

12        for them.   Um, you know, and, and I said, "You guys gotta

13        send me dates, because you both go to 2 separate schools,

14        and Lynnfield and then -- and Andover, different dates of

15        days off.   So Leslie's gonna be runnin' all over the

16        place tryin' to figure out [00:02:00] how to get 1 over

17        here for a day, and over here."

18  WILSON:   Yeah.

19  SINGER:   But, uh, that's why I need to know your dates, so I

20        can figure out where to go visit that would be best

21        suited.

22  WILSON:   Right.   Now, would they go on weekends, or gotta go

23        during school days (overlapping dialogue; inaudible)?

1  SINGER:  You gotta go on a school day, or, or a day when it's

2      a school day but they're off of school.

3  WILSON:  Yeah, OK.

4  SINGER:  That's the ideal situation, 'cause --

5  WILSON:  That's gonna be tougher, yeah.  But the ideal isn't

6      just seeing the campus on a weekend?

7  SINGER:  Yeah, 'cause I gotta get to a point where we know if

8      we're applyin' ED or where we're goin', what we want,

9      'cause you're gonna want to know first choice, second

10      choice, all that stuff.

11  WILSON:  Yeah, no, exactly.  And just so I'm, I'm clear on

12      the, the kinda pecking order schools, and UCLAs and all

13      that stuff versus -- uh, I think you said UCLAs mostly

14      are in the, the bracket of, um, like, uh, Stanford -- or

15      not Stanford, but like, uh, USC and so forth.  And what

16      were the schools in that, if you did the side door?  And

17      I'm interested about the side door and that stuff, um --

18  SINGER:  So the side door is gonna be -- gonna happen where

19      you want 'em to happen.  (overlapping dialogue;

20      inaudible) --

21  WILSON:  It can happen anywhere?  Does it have to be

22      [00:03:00] a sports side door?  I wasn't clear on that.

23  SINGER:  Well, so that's the -- that's the easiest way to

24      approach it, right --

1  WILSON:   Yeah.

2  SINGER:   -- because all of the coaches have...  You know,

3      they have guaranteed spots, and you've done a good job,

4      you got athletic girls who got great size, they're in the

5      right sports, so, you know, potentially there's a sailing

6      option, and potentially there's a crew option.  I mean, I

7      don't know how good of athletes they are.  They may be

8      good enough to be able to compete at some of these

9      schools, and then who knows what we have to do, depending

10     on where, where the spots (inaudible).

11 WILSON:   Mm-hmm.  Yeah, so they --

12 SINGER:   So you have --

13 WILSON:   -- have to get that sports.  Uh, what if they're not

14     really that good?  I mean, they can do some crew, but I

15     don't know they're gonna be good.  ███████ (sp?) not

16     even that good competitively at sailing.  She just taught

17     sailing and did sailing in, you know, (overlapping

18     dialogue; inaudible) --

19 SINGER:   Right, so --

20 WILSON:   -- Yacht Club.

21 SINGER:   But at the end of the day, by the side door, I may

22     be able to go to the sailing coach and say, "Hey, this

23     family's willing to make the contributions.  She could be

24     on your team.  She is a sailor.  She may not be up to the

```
1        level you are, but she can con-- you know, you're gonna

2        get a benefit, [00:04:00] and the family's gonna get

3        benefit.  So are you will-- are you interested in doing

4        that?"

5   WILSON:   Yeah.  OK.  And just -- but -- and what's the other

6        side?  If it's not a sport, what is it?  Is there any

7        other side doors in --

8   SINGER:   Then I have to go to -- then I have to go to

9        department chairs, and, and, and get...  Some schools

10        have a VIP list at the department chair level, so we

11        could go that route, and then you can help their

12        (inaudible) -- their, their program.  It just depends on

13        which school you want to go to.

14   WILSON:   OK, you know, I have this friend -- you know, one of

15        the things I wanted to talk to you about, too, is I -- I

16        don't know how -- I remember last time I did this, you

17        didn't really make any money on this, on the side, this

18        stuff.  You just charge, and then you make a donation to

19        the school, and that's it?

20   SINGER:   Well, uh, so it depends in different ways.  So

21        what's happened in the grown-up world of my world now,

22        compared to when, you know, we did _____ was that

23        essentially now the money goes into my foundation, as a

24        donation, (overlapping dialogue; inaudible) --
```

1  WILSON:   Oh, to your foundation, not to the schools.

2  SINGER:   Yeah, then that way the kids don't know it happens,

3      right?

4  WILSON:   Yeah.

5  SINGER:   So -- and then the other part [00:05:00] of that is

6      they don't chase you all the time for money.  'Cause once

7      you -- you know, once you're -- they know you gave money,

8      that's a different story.  And then what I can -- what

9      I'll do is I'll split the money potentially to the coach

10      or other pl-- parties that are out that school that need

11      the money, right?

12  WILSON:   Mm-hmm.

13  SINGER:   So...  Or it may go right to the coach, um, that's

14      helping us.  It ju-- it just depends on the school.

15  WILSON:   Right.  OK, so you don't actually get credit for a

16      donation to the school, or get hounded for that.  You

17      get, uh --

18  SINGER:   (overlapping dialogue; inaudible)

19  WILSON:   -- your donation to you, or your foundation, the Key

20      or whatever --

21  SINGER:   Right, and you get --

22  WILSON:   -- that, uh -- and --

23  SINGER:   -- your write-off, and then you do your thing.

24  WILSON:   OK.

1   SINGER:   And then the kids get in the school.

2   WILSON:   So my colleagues -- so, so you c-- you, you

3         (inaudible) I assume take a share of that or something.

4         If it's all going to your foundation, you can't take a

5         share if it goes to your foundation.  You don't get a fee

6         on that, then?

7   SINGER:   Um, I just do my fee for what I take when I do your

8         normal applications.

9   WILSON:   Yeah, that's, like, terrible.  I, I think, from a

10        business model point of view, again, I advised you last

11        time, (laughter) I still advise you, this is worth a lot

12        to people, and so, you know, to the extent you [00:06:00]

13        want to make more money, I would think you would have

14        some kind of fee for that.  (inaudible) it's 350 to the

15        foundation, plus another 20% for me for using my leverage

16        and my relationships --

17  SINGER:   Yeah.

18  WILSON:   -- or something, no?

19  SINGER:   Well, I'm, I'm gonna use your business model going

20        forward.

21  WILSON:   I think you should.  I, I really would advise you...

22        But anyway, I -- so then I have this, uh, close friend of

23        mine here who works at, uh, McKinsey with me, and he's

24        very well off.  He's the head of, uh, one of these big

```
 1        areas in McKinsey for a lot of years.  And his daughter's

 2        -- wants to go to Brown next year.  His concern -- I

 3        said, "Well, have you thought about...?"  It may be too

 4        late, 1.  I don't know.  Um, she's going through her

 5        senior year right now.

 6   SINGER:  Well, what's the relationship that that person would

 7        have...?  I mean, is that g-- is that person big enough

 8        in McKinsey that people would know who that person is?

 9   WILSON:  Uh, yeah, probably.

10   SINGER:  OK, so then here would be my suggestion, to be frank

11        with you --

12   WILSON:  OK.

13   SINGER:  -- and I'd love to help -- you know, it is late and

14        all of that.  The president takes meetings all the time

15        from influential people.  She's a good gal.  And she--

16   WILSON:  Of Brown?  Yeah, I don't know.

17   SINGER:  Yeah, at Brown.  So what I would suggest is that,

18        [00:07:00] um, he calls up her office -- they have a

19        scheduling person for the president -- and he sets up a

20        meeting for he and his daughter to go meet, and she kinda

21        meets with them, and then she'll give an indication, and

22        he'll get an idea of what it's gonna need -- what's gonna

23        need to be done to, to have her to go to Brown.  That's -

24        -
```

1  WILSON:    (overlapping dialogue; inaudible) the front door --

2  SINGER:    -- that's the path I would go.

3  WILSON:    -- like, like, $10,000,000 kind of thing?  Or that'd

4      be the (overlapping dialogue; inaudible) --

5  SINGER:  No, no, no, I think it's a lot less than that.  I

6      think it's a lot less than that.  But, um, but it's first

7      getting the meeting with the president, and just talkin'

8      about -- and then also what he could do for the

9      university, not only financially but, you know, just in -

10     - he could be a, a guest lecturer.  He could do, you

11     know, lots of different things.

12  WILSON:    Uh-huh.

13  SINGER:    That would be my suggestion.  (overlapping dialogue;

14     inaudible) --

15  WILSON:  He wanted to do it -- so the, the other thing he had

16     a concern was he wanted to do it in a way his daughter

17     wouldn't know.  His daughter's already said, "Dad, don't

18     help me with this, don't help me with that."  She's very

19     kind of, uh --

20  SINGER:  Well, then that's a different path, and then -- then

21     I may have to get involved in that.  Um --

22  WILSON:  Right, so that's --

23  SINGER:    -- but, but it's really --

24  WILSON:    -- the only thing he's sensitive to.

```
 1  SINGER:   -- it's --

 2  WILSON:   [00:08:00] His daughter's, like, really independent

 3       that way.

 4  SINGER:   Right.

 5  WILSON:   And she's very smart.  She got a 35 or 31 below

 6       perfect --

 7  SINGER:   But, but --

 8  WILSON:   -- on the ACTs --

 9  SINGER:   -- I --

10  WILSON:   -- and all that, but...

11  SINGER:   No, I get it, but it -- what I would do is I would

12       still -- because him goin' to meet the president isn't --

13       doesn't mean that she's gonna help him, but that's a good

14       starting point.

15  WILSON:   Mm-hmm.  Well, maybe I'll just connect you 2 by an

16       email, and (inaudible) somethin' like that?

17  SINGER:   So --

18  WILSON:   Does that make sense?

19  SINGER:   So I can make the -- I can call the office, and then

20       what they normally...  So I just had a family do that,

21       and essentially what they told me to do was just, um,

22       have, have my family call the scheduling coordinator for

23       a time --

24  WILSON:   Mm-hmm.
```

1   SINGER:   -- and, and -- with the background of the

2        candidates, and then they'll, they'll usually set up the

3        meeting.  Sounds like this person's well -- high enough

4        up that it makes sense for (overlapping dialogue;

5        inaudible) --

6   WILSON:   Yeah, he's one of the top, let's say, 12 people.

7        He's on the Executive Board and all that stuff like that,

8        so...

9   SINGER:   Yeah, yeah, so then that makes sense.

10  WILSON:   Now, he's, um... [00:09:00] Let's see, what else?

11       Uh, that's her f-- uh, what do you call it, early

12       decision school, I think, and all that stuff?

13  SINGER:   Yeah.

14  WILSON:   So she's got all that --

15  SINGER:   Yeah.

16  WILSON:   -- stuff goin' for her.  She really loves it, wants

17       to get there and all that stuff, and he's willin' to pay

18       a million, 2 million.  He didn't care.  Um, so it's that

19       -- it's his last daughter, and he's, you know, pretty

20       well off that way.  I don't know what -- um, is Brown one

21       of those 350 or million...?

22  SINGER:   Oh, it's in the millions.  Yeah, yeah, yeah.  No,

23       there's no --

24  WILSON:   2 million (overlapping dialogue; inaudible)?

```
1   SINGER:   -- 350 (inaudible)...  Yeah, there's no -- there's

2       no (laughs) 350...  I'll -- I would have a (overlapping

3       dialogue; inaudible) --

4   WILSON:   I thought that Stanford -- not Stanford -- I thought

5       that UCLA and USC and stuff like that was (overlapping

6       dialogue; inaudible) --

7   SINGER:   Yeah, that's a different story.  They're not Brown.

8   WILSON:   No, no, that's what I meant.  The, the -- there's

9       the 350 schools, or...  (laughter)

10  SINGER:   Yeah.  Yeah, exactly.

11  WILSON:   And everybody else jumps up to the million

12      (inaudible), yeah?

13  SINGER:   Yeah, you gotta ante way up.  Yeah, absolutely.

14  WILSON:   There's not much, uh -- not much in between.  Uh,

15      because (inaudible), too, like, (inaudible) is just -- a,

16      a bunch of them are 350s, the second tier or whatever you

17      want to call 'em, and then everything else just jumped

18      immediately to --

19  SINGER:   That's correct.

20  WILSON:   -- (inaudible) 1, 2.

21  SINGER:   W-- yeah.

22  WILSON:   There's no, like, 500 or 700 (overlapping dialogue;

23      inaudible) --

24  SINGER:   No, no.
```

1   WILSON:   -- or...?

2   SINGER:   No.  No, because it makes no sense for them to get

3              involved at those schools unless they're gonna really get

4              after.  But in [00:10:00] your case, with the girls, I

5              may be able to negotiate, knock it down so that, you

6              know, (inaudible) for 2 and figure it out.

7   WILSON:   L-let's say, let's say they both wanted to go to a

8              Harvard or a Stanford, right?  Obviously -- is it much

9              more difficult in Stanford versus Harvard, or Princeton?

10  SINGER:   No, same -- no, but it's the same --

11  WILSON:   Are they all the same?

12  SINGER:   They're all the same.

13  WILSON:   Yeah.  If you wanted to do 2 at Harvard or 2 at

14             Stanford...?  Now, I'm an alumni at Harvard.  I've given

15             some money, but not a lot.  I've given, you know, a few

16             hundred grand or (overlapping dialogue; inaudible).

17  SINGER:   Uh, well, uh, so we just need to strategize on how

18             we're gonna -- where we're gonna go, where we wanna go,

19             right?  'Cause I don't think the girls have any, any idea

20             right now.

21  WILSON:   Yeah, no, I don't think...  They would love to go to

22             Stanford or Harvard.  (inaudible) --

23  SINGER:   Sure.

 1  WILSON:   -- she loves the school there, and loves the thought

 2       of it.  Uh, ██████████ loves Harvard, just from the thought

 3       of it.  I know she's said to her friends...  Uh, I just

 4       listen to 'em talkin' to their friends, you know?

 5  SINGER:   Right.

 6  WILSON:   "Where would you like to go?"  You hear that stuff.

 7       It doesn't have my influence...  It has my influence

 8       indirectly, and, of course, they have these big, you know

 9       -- oh, that's a great school, just the, the brand name in

10       their minds, you know.

11  SINGER:   Well, and, again, most people don't think they can

12       get into Stanford so they don't even [00:11:00] bring up

13       that name.

14  WILSON:   Yeah, but they lived out there and they went --

15  SINGER:   I know.

16  WILSON:   -- swimming in the waterfalls.

17  SINGER:   Right.

18  WILSON:   They know that --

19  SINGER:   No, no, I totally get it.  (laughs) I totally get

20       it.  No, I get it.

21  WILSON:   (inaudible) lived there.

22  SINGER:   Yeah.

1  WILSON:   So those are the 2 that are on the top.  I-it's,

2         it's the strategy to try to get into those 2.  Um, is

3         Harvard easier 'cause I'm --

4  SINGER:   No, it's not that.

5  WILSON:   -- legacy?

6  SINGER:   But --

7  WILSON:   That doesn't mean shit?

8  SINGER:   Your legacy means 0, because... (laughter)

9  WILSON:   (inaudible) my life, you know.

10  SINGER:   John, (overlapping dialogue; inaudible) --

11  WILSON:   Unless you're donating a building, huh?

12  SINGER:   You've done quite well for yourself, so for a guy

13         that has no legacy, you're OK.  (laughter)

14  WILSON:   Oh, shit.  So legacy doesn't help at all, huh?

15  SINGER:   Unless you're a big legacy, but you --

16  WILSON:   Especially a big donor legacy, huh?  OK.

17  SINGER:   -- you haven't -- you haven't done that yet.

18  WILSON:   OK, I see.  That's interesting.  So that doesn't

19         matter.  Um --

20  SINGER:   Like, what's your -- like, how much do you give to

21         Harvard?

22  WILSON:   Nothing.  Like, a couple hundred grand over the

23         years, so...

24  SINGER:   OK.  (laughter)

```
 1   WILSON:   So they have too much money.  It pisses me off every

 2       time they ask for money.  I say, sure, I'll give you 10

 3       grand, you know.  Stop botherin' me.

 4   SINGER:   No, I get it.  I get it.

 5   WILSON:   [00:12:00] The fuckin' endowment's $30,000,000,000.

 6       Like, are you shitting me?  (laughter)

 7   SINGER:   I know.  I know, I know, I know.  I know, I get it.

 8       I get it.

 9   WILSON:   (inaudible) give to, you know, other charities.  But

10       anyway, that's a -- that's a whole different story.  But

11       i-is it --

12   SINGER:   So --

13   WILSON:   -- a better strategy to try and split 'em across the

14       2 --

15   SINGER:   Oh, yeah, I got (inaudible) strategies --

16   WILSON:   -- try to get 'em to go to 1.

17   SINGER:   -- I'm gonna...  No, I'm gonna use athletics to help

18       you, because that's the easiest way.

19   WILSON:   'Cause they're pretty tall and strong, and I think

20       they could actually...  I mean, when I saw ████

21       rowing --

22   SINGER:   No, they're good athletes.

23   WILSON:   When I saw ████ (sp?) --

24   SINGER:   Yeah.
```

1   WILSON:   -- row on fuckin' that crew machine, I thought she

2       was gonna break the machine, she was goin' so hard.

3   SINGER:   No, she -- no, th-they en-- they, they may end up

4       gettin' in without even a donation, but, but you --

5       you'll know at least this route, we got an --

6   WILSON:   They gotta get (overlapping dialogue; inaudible) --

7   SINGER:   -- we got the side door route, too.

8   WILSON:   -- though, right?

9   SINGER:   Yeah, yeah.

10  WILSON:   But they're not really playing crew much.  They're

11      not doing crew, running crew.

12  SINGER:   Right.

13  WILSON:   So you gotta (overlapping dialogue; inaudible).

14  SINGER:   So we'll, we'll, we'll figure it out.  So --

15  WILSON:   But what would it be, if they wanted to go to one...

16      Uh, is that -- it's gonna be 2 and a half (overlapping

17      dialogue; inaudible) --

18  SINGER:   It's gonna be 1 -- it -- normally it's 1, 2 each,

19      right?  So I would have to make a deal if you wanted 'em

20      both at the same school, and if they could even take 'em

21      at the same school, and it would cost you -- it'd cost

22      you a couple million dollars.  Big guy like you,

23      [00:13:00] (laughs) that's easy.

1  WILSON:   Yeah.  Not so easy on liquidity, but yeah,

2          (laughter) (inaudible).  You got the installment plan?

3          (inaudible).

4  SINGER:   (inaudible).  Listen, I gotta go to an a-- another

5          appointment.  I just wanted to make sure I got back to

6          you.  I'm gonna be spending some time in Boston, because

7          I'm gonna be reading in Harvard this year, so I'll be

8          able to get together with you.

9  WILSON:   Oh, I'd love that.  That'd be great.  And I'm gonna

10         connect you -- I'll just (inaudible) -- I'll send an

11         email to you, and the guy's name is ██████████, and --

12 SINGER:   OK.

13 WILSON:   -- he could become a client and do whatever, and

14         I'll let the 2 of you kinda email back and forth and

15         stuff.  He'd love to do something not known to his

16         daughter at Brown.

17 SINGER:   Got it.

18 WILSON:   (laughs) And he's got money.

19 SINGER:   I gotcha.  I gotcha.

20 WILSON:   OK.

21 SINGER:   All right.  Take care.

22 WILSON:   All right, take care.  Bye.

23 SINGER:   OK, bye-bye.

24 [00:13:40]

1

2                          END OF AUDIO FILE

# EXHIBIT TT

1   **Call Date:**      11/05/2018

2   **Call Duration:** 09:12

3   **Call Begin [] Call End []**

4   **Call Participants:**

5       Rick Singer

6       John

7   **File Name:**      █████ 8802 2018-11-05 21-33-16 11187-001

8   **Bates No.:**

9

10  JOHN:      [00:00] Hey, Rick, how are you?

11  SINGER:   John, where are you at?

12  JOHN:     I'm in Texas.  I'm in Dallas heading back to Houston

13          tonight.  Had a big dinner meeting here with another

14          client.

15  SINGER:   OK.

16  JOHN:     Flying back.  I'm back in the US.  I came in from,

17          uh, Saudi Arabia was last week.

18  SINGER:   And how was it?

19  JOHN:     Uh, interesting.  It's -- a lots different.  You

20          know, things are, you know...  Have you been to Saudi

21          Arabia before?  It's -- it's pretty dry and stiff.  You

22          know, both no liquor and not a lot of fun.  But it's even

23          a bit more somber these days with the whole Khashoggi

```
 1        thing.  No one makes any jokes, who's listening where,

 2        you know.

 3   SINGER:   Right.  Did you -- did you guys enjoy yourself at

 4        least on the whole trip?

 5   JOHN:     Oh, it was all business.  That was business.  I met

 6        Leslie in Paris after.  That was all business stuff.

 7   SINGER:  Oh, OK.  I got you.

 8   JOHN:     Yeah, so I was in Saudi and Dubai and Abu Dhabi and

 9        Kuwait and then back over here.  Oil client.  Yeah.

10   SINGER:  OK.

11   JOHN:     Yeah.

12   SINGER:  So here's -- so here's where we are.

13   JOHN:     How you doing?

14   SINGER:  I'm good.  So (inaudible).

15   JOHN:     When was your call -- when does your application

16        thing get done?  What's the deadline on all that stuff?

17   SINGER:  [01:00] Well, we just finished November 1st, which is

18        the huge deadline.  Uh, because, remember, that's early

19        action, early decision.

20   JOHN:     OK.

21   SINGER:  Now we have a November 15th and a November 30th and

22        then pretty much life is, uh, much easier.

23   JOHN:     Oh, after November 30th.  OK.
```

1   SINGER:   Yeah, because the UCs are due November 30th.  USC is

2        due November 30th, all that.  So -- but let me give you an

3        update.

4   JOHN:     OK.

5   SINGER:   So, um, we got the Stanford spot.  They want to know

6        if you want it because I have to pay the coach, um, right

7        away.  Harvard I'm working through to try to get us 1 or

8        2 spots.  It will not happen for several months before I

9        even know anything because --

10  JOHN:     Mm-hmm.

11  SINGER:   -- they are still working... You know, the kids

12       from this year haven't even been admitted.  And then I'm

13       working on a second spot at Stanford.  So the sailing

14       spot that we have, [02:00] that we'll pay the coach, um,

15       he doesn't care if it's a sailor or not.

16  JOHN:     OK.

17  SINGER:   He doesn't care one bit.  One bit.  So it could be

18       whatever we want.  Um, but again, I got to let him know

19       if we want that.

20  JOHN:     OK.  How soon is that?  What's his -- his deadline

21       because I thought we'd wait until -- not wait but we'd

22       have until like the fall or something.  Or until like the

23       spring (inaudible).

24  SINGER:   Well, not until the fall because --

```
1   JOHN:      The spring I thought.  This coming spring.

2   SINGER:  Yeah.  So it'll be -- it prob-- let me -- I'll have

3         to go and talk to him, try to talk to him tomorrow.  But

4         it --

5   JOHN:      OK.

6   SINGER:  He just wants to make sure that he -- before he goes

7         out and recruits a ton of kids, he wants to make sure

8         that he's know he's got somebody for next year.

9   JOHN:      Right.  And what does he need short-term?  Does --

10        he needs the 175 grand right away?

11  SINGER:  No, no.  He's (inaudible) in good shape.  I mean we

12        already gave him some money for his coaches.

13  JOHN:      Yeah.

14  SINGER:  He just wants to solidify the spot as a guarantee

15        for sure because he need-- he needs to recruit.  See,

16        this year was his girl year [03:00] and next year he's

17        going to split it between boys and girls because the team

18        is co-ed, of what he's going to get.  So he doesn't want

19        to overload too much on girls but not enough in all that.

20        So that's why he needs to know right away.  But I will

21        have that conversation with him in the next day or two to

22        find out when our --

23  JOHN:      OK.

24  SINGER:  -- drop dead date is.
```

```
 1   JOHN:    All right.  So you're telling me he's going to want

 2            something this -- before like Christmas kind of thing.

 3            Is that true or is that...?

 4   SINGER:  It sounds like it, yes.

 5   JOHN:    Ugh.  OK.

 6   SINGER:  Sounds like it.

 7   JOHN:    Because (inaudible) seen the school.  They seen the

 8            school when they were doing like water polo camp there.

 9   SINGER:  No, no.  I know that.  I know that.  So let me --

10   JOHN:    I mean, what am I committing myself? I don't want to

11            be a jerk here but, you know, what am I committing myself

12            to?  Because that's the other thing I need to understand

13            because, you know, budget wise and everything and I'm not

14            --

15   SINGER:  Yeah, I don't think --

16   JOHN:    I'm not like a super-gazillionaire here where I can

17            just throw away millions.  Yeah.

18   SINGER:  No, I know that.  Um...

19   JOHN:    Liquidity wise.  What -- when I do -- if I pull the

20            trigger, say I pull the trigger, what does that really

21            mean?  This (inaudible)?

22   SINGER:  I think that you're not -- I think that you're not -

23            -

24   JOHN:    (inaudible).
```

```
 1   SINGER:   -- pull -- you're not -- it'll be no more than

 2        (inaudible) million and my hope is it's 1,500,000 total

 3        [04:00] for both.

 4   JOHN:    OK.  So it's between 1 -- 1,500,000 and 2,000,000?

 5   SINGER:  Correct.

 6   JOHN:    If they go -- if they go to these schools?  If they

 7        go to a lesser school it's 300 grand --

 8   SINGER:  Then it's a lot less.

 9   JOHN:    -- (inaudible).

10   SINGER:  Yes, absolutely.

11   JOHN:    Yeah.  And if I pull the trigger, that means I have

12        to commit to him and pay (inaudible) Stanford?  What's he

13        saying he wants?  If I said yes, what does that mean?

14        I'm also (inaudible) to him?

15   SINGER:  Well -- well, right now...  Essentially what I've

16        told him...  He wants a $1,000,000.  But I said to him we

17        can get him 500 now --

18   JOHN:    Mm-hmm.

19   SINGER:  -- and I -- if we get another spot at Stanford I'm

20        going to push you -- I'm going to try to push you down to

21        750.  OK.  Just so he --

22   JOHN:    OK.

23   SINGER:  Because if -- here's my point to him.  Help me get

24        another spot at Stanford and then I can give the second
```

1      coach less and give you the million.  Because I'd like to

2      stay around 1,500,000 to 1,700,000 overall at Stanford.

3    JOHN:     For 2 slots you're saying?

4    SINGER:   Correct, [05:00] correct.

5    JOHN:     Is it some other coach?  How does that work for him?

6      Does he -- is he screwing his colleague?  Or (laughter) I

7      don't know how that works.  He gets the lion's share and

8      someone else gets less?

9    SINGER:   No, so what happens is -- it's like...  I'll give

10      you an example.  Like women's lacrosse is always looking

11      for help.  Women's fencing, looking for help.  This --

12      immediately they give us a spot, guaranteed spot, you --

13      we pay the coach, we get it done, and the other spot so I

14      can get 2.  That's my goal.

15   JOHN:     OK.

16   SINGER:   But I'm going to -- but he wants to know where he

17      stands.  That's why I'm going to have that conversation

18      with him in the next day or so.

19   JOHN:     Right.

20   SINGER:   At the same time --

21   JOHN:     (inaudible) helping (inaudible) --

22   SINGER:   -- I'm working on how --

23   JOHN:     -- three-quarters of a million this year,

24      (inaudible) this year.  Period.  And that's it.  And

```
 1       then, you know, the rest you have to just, you know --

 2       that's it for --

 3  SINGER:   Well --

 4  JOHN:     -- 2 years (inaudible).

 5  SINGER:   Well, that could be.  I -- I will try to get him to

 6       do that.

 7  JOHN:     Does he -- does he have time sensitivity on this

 8       stuff or no, he doesn't really care?

 9  SINGER:   He does because he wants to figure out his

10       recruiting plan.  So --

11  JOHN:     Well, they (inaudible) money.  I know (inaudible)

12       because he got slots.  [06:00] So there's 2 dimensions.

13       You've got the slot dimension, which he wants to make

14       sure he fills out and gets real competitive people for

15       the other slots.

16  SINGER:   Correct.

17  JOHN:     So then there's the -- the -- the value of money.

18       Does he care about budget this year versus next year?

19  SINGER:   No.

20  JOHN:     You mentioned --

21  SINGER:   No.  Because we've already taken care of him for

22       this year.

23  JOHN:     He had the little small immediate need of 125, not a

24       big deal.
```

```
 1    SINGER:   Right.

 2    JOHN:     And now he's looking for the other, whatever,

 3        million or million and a quarter?

 4    SINGER:   Right.

 5    JOHN:     Or 750 or whatever, 500.

 6    SINGER:   Correct.

 7    JOHN:     What'd we give him?  500?  No, I only gave -- I gave

 8        you (inaudible).

 9    SINGER:   You gave -- gave me -- yeah.  You gave us 500.

10    JOHN:     150-- 175 or -- OK.

11    SINGER:   Yeah.  Yeah.

12    JOHN:     So we could give him 5, we could give him 750 and

13        call it a day.  Not what happens if we go down that path?

14        Let's start (inaudible) understand.  We say, "Yeah, I'll

15        give 750," but then they choose not to.  Someone else

16        could backfill or we could redeploy or how does that work

17        (inaudible)?

18    SINGER:   Well, that would be -- that -- I --

19    JOHN:     How -- how pregnant am I once I make this

20        (inaudible)?

21    SINGER:   Well, we're -- we're -- we're pretty pregnant but

22        there's always people who want the spot.

23    JOHN:     Mm-hmm.
```

```
1   SINGER:   So I just -- I -- I can't guarantee you that I can

2             find another party.  It depends on when that hits.

3             [07:00]  So if it hits early then, yes, I can -- I can

4             probably find somebody.  If it doesn't hit early then it

5             becomes more difficult.

6   JOHN:     Right.  But isn't that kind of unreasonable of him

7             to -- I don't know how this works (inaudible) because

8             when -- when we talked about it last year, (inaudible) go

9             to the schools, see them, and (inaudible) to make this

10            call.

11  SINGER:   Sure.  But -- but here's the difference, John.

12  JOHN:     It's really hard.

13  SINGER:   If you want a guarantee and you want the first spot,

14            you got to -- you got to decide early.

15  JOHN:     Right.  I didn't have that impression when we talked

16            originally but that was -- I thought the timing would be

17            like spring.  I had no problem.  But now they haven't

18            even seen any schools yet.  Like ugh, I can't make the

19            call.

20  SINGER:   Well, I --

21  JOHN:     But --

22  SINGER:   No, I -- so -- so give me a day or two and I'll get

23            back to you.  At the same time, I'm working on the
```

```
 1        Harvard stuff and trying to get a second spot at

 2        Stanford.

 3  JOHN:     All right, cool.  And what is the Harvard timing?

 4        When you going to have a (inaudible)?

 5  SINGER:   I'm -- I'm hoping to have something around the first

 6        of the year or before -- before.

 7  JOHN:     OK.  So we won't have anything there before we have

 8        this call to make.

 9  SINGER:   Correct.  Depends -- correct.  Correct.

10  JOHN:     [08:00] All right.  (inaudible) right.

11  SINGER:   And I'll get back to you -- I'll get back to you in

12        a day or two.  Let me just, um, get some more definition

13        around this.

14  JOHN:     All right.  And that'd be great.  So just a little

15        (inaudible) saying we got to make a blind choice.  You

16        know, it's hard to go wrong with something like that,

17        right?  (laughter)

18  SINGER:   That's true.  And you already know what it's like to

19        live out there.  I get it.  Yeah.

20  JOHN:     I know.  But if they say, "Oh, I really want to go

21        to Harvard," then oh, shit.  You know, I paid all this

22        money to Stanford.  (laughter)

23  SINGER:   I get you.  I got you.

24  JOHN:     That would be my luck, right.
```

1  SINGER:   I got you.

2  JOHN:     All right.  But still a high class problem, right.

3      (inaudible).

4  SINGER:   Absolutely.

5  JOHN:     -- get into Harvard, right.  They wouldn't get in

6      and so then (inaudible).

7  SINGER:   And did I tell (inaudible).

8  JOHN:     (inaudible) they don't get into Harvard so it was

9      (inaudible) but you didn't get in but you're going to

10      Stanford so, you know, count your blessings.

11 SINGER:   I mean, you weren't going to get into either one,

12      let's just say, based on the numbers that it takes to get

13      in.

14 JOHN:     Yeah, (inaudible).

15 SINGER:   (inaudible) and they don't even play the sports,

16      right.

17 JOHN:     Yeah.  (inaudible) they had a 2% shot or whatever

18      taking the test or whatever it comes out at.

19 SINGER:   Right, right.  So -- so I'll get back to you in a

20      day or two, all right.

21 JOHN:     OK.  Well, I [09:00] appreciate the update.

22 SINGER:   OK.  I'll let you know soon.

```
 1   JOHN:      (inaudible).  All right.  And then in December

 2        (inaudible) how you manage your overall operation because

 3        I do think I could help you there.

 4   SINGER:   I got you.  I know that.

 5   JOHN:      All right.

 6   SINGER:   All right, thank --

 7   JOHN:      (inaudible).

 8   SINGER:   OK, John.  OK, bye-bye. [09:12]

 9

10                         END OF AUDIO FILE
```

# EXHIBIT UU

FD-340c (4-11-03)

File Number  S-0009102 3

**Field Office Acquiring Evidence**  BS

Serial # of Originating Document  S-00091023-A-31

Date Received  10\31\2018

From _____
(Name of Contributor/Interviewee)

_____
(Address)

_____
(City and State)

By  SA Laura Smith

To Be Returned  ☐ Yes        ☑ No
Receipt Given  ☐ Yes        ☑ No
Grand Jury Material - Disseminate Only Pursuant to Rule 6 (e)
Federal Rules of Criminal Procedure
            ☐ Yes        ☑ No
Federal Taxpayer Information (FTI)
            ☐ Yes        ☑ No

Title:
CHS proffer - Day 4

Reference:  CHS proffer - Day 4
                    (Communication Enclosing Material)

**Description:**  ☐ Original notes re interview of

318A - BS - 2885343

_____

_____

_____

_____

IA-19



Rick does not have anyone on the inside of SAT or ACT.

Abdulaziz – RS uncue how they met. Called RS for [redacted] RS frew to house, [redacted] phenominal student but didn't get [redacted] Played Bask. B. at [redacted] in Nevada. RS noted w/ [redacted] clients got into Columbia. At same time sister, [redacted], was applying to schools. Dad had connections at USC. [redacted] denied from USC, went to GW. Dad called b/c should have done side deal w/ [redacted] Dad knew it would have been $250k for SD to USC. [redacted] got into Columbia playing [redacted] played on 5 ridus for 1 week. Dad works for Steve Wynn + then ter to China to open hotel. [redacted] did poorly at school [redacted] in China. Dad Called saying [redacted] was doing summer at USC. Dad promised [redacted] he'd get USC done for her b/c Sacrifice to go to China. RS made her a better bask ball player, was not a y/

Donna knows players aren't necessarily competitive to USC. ~~but are~~ RS has not told Donna they are not Donna knows to strong players. Donna knows RS is profile created. Producing profiles. Implicit understanding. ~~look into different profile~~ These aren't strong enough to play for RS told dad $300K → RS knew he had USC to give Donna more b/c this wouldn't be difficult (less strong student). Donna/prog. received ± $200K. US Person Ann Chine. was in subco meeting. Donna had to explain ▓▓▓▓▓ profile. USC china contact Said ▓▓▓▓▓ went to tougher school in China. Gamal knew Kid ~~nothing~~ was not strong enough to be recruited. Gamal knew there was an ~~exchange~~ exchange of money to someone/USC to get ▓▓▓▓▓ in. Donna directed some of the money. Gamal didn't know about Donna; he knew someone at USC pulling strings. $ → foundation → USC program which was directed by someone to a specific area. ~~coach~~ Man never talked to RS. Parents knew $ going to school, not the foundation.

9

# EXHIBIT VV

UNCLASSIFIED



| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION** CHS REPORTING DOCUMENT | OFFICIAL RECORD |
|---|---|---|

| **HEADER** | |
|---|---|
| **Source ID:** | █████████ |
| **Date:** | 12/06/2018 |
| **Case Agent Name:** | CEDRONE, KAITLYN |
| **Field Office/Division:** | Boston |
| **Squad:** | C 10 |

| **SOURCE REPORTING** | |
|---|---|
| **Date of Contact:** | 11/29/2018 |

**List all present including yourself (do not include the CHS):**
SA Keating
SA Cedrone
SA Smith
AUSA Rosen
AUSA O'Connell
AUSA Leslie Wright
AUSA Kristen Kearney

| **Type of Contact:** | In Person |
|---|---|
| **Country:** | UNITED STATES |
| **City:** | Chelsea |
| **State:** | Massachusetts |
| **Date of Report:** | 12/06/2018 |

**Substantive Case File Number**

████████████

**Check here if additional reporting is in Echo**
No

**Source Reporting:**

On November 29, 2018, CHS met with FBI Special Agents Kaitlyn Cedrone and Laura Smith, IRS Special Agent Elizabeth Keating, and AUSA's Eric Rosen, Justin O'Connell, Leslie Wright, and Kristen Kearney at the Marriott Residence Inn located in Chelsea, Massachusetts. CHS provided the following information:

CHS clarified that Sophia Santorio took the test with Natalie Henriquez.

**Gordie Ernst's ("Ernst"):**
Ernst's wife, ████ is in charge of the family finances. CHS believes that Lisa knows that Ernst received money for something but CHS never told ████ about the deal CHS had with Ernst.

████ was responsible for the bookkeeping of CHS' nonprofit and for profit businesses. ████ used Quickbooks to manage the accounting. Masera was responsible for submitted documents to CPA ████████████
CHS directed ████ by telling him when to make payments to coaches and facilitators and when to bill parents.
████ gave the Quickbooks documents to ████ once a year so taxes would be filed. CHS meets with ████
once a year to review CHS's tax returns before the ████ are filed. CHS reviews the returns with ████ and makes sure they are accurate. CHS does not physically sign the returns but he/she reviews and approves the returns for filing.

| FD-1023 | Page 1 of 5 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

SINGER-REPORTS-000052

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

████ took over the booking for CHS' nonprofit and for profit entities in approximately January 2018. CHS hired Creating Answers late in the spring of 2018.

**The Edge:**
The Edge was originally created for CHS to work with international students, and then CHS began working with students from the United States. CHS believes the Edge files a Form 1120.

**RWS:**
RWS was created by Williams to create a tax benefit for CHS. CHS received money from RWS. CHS does not know the exact purpose of RWS.

**The Key Worldwide Foundation ("KWF"):**
CHS talked to a friend, who was an attorney, about nonprofits. She created and prepared the documents for CHS to create the KWF. The purpose of the nonprofit was to serve under served kids but then CHS thought that a family could contribute a bribe payment to KWF for help to get their child into college. The parent could then write off the payment as a donation on their taxes and CHS could use the money to help people.

CHS used personal credit cards to pay KWF expenses. The KWF did not have a credit card in its name. The money going to or from the Edge account was probably for credit card reimbursements. The only personal funds that CHS took from the KWF was $500,000 for a salary payment. CHS treated it as compensation on his/her personal tax return and paid taxes of approximately $250,000 on it.

CHS bought a Sprinter van from Midwest Auto Group. CHS thinks that it was paid for out of The Edge account because recently the KWF was going to purchase the Sprinter van from The Edge. CHS used the Sprinter van for work in both the for profit and nonprofit businesses.

CHS does not keep track of the banking activity of the KWF.

Parents paid CHS for working with their children for legitimate purposes. CHS would tell parents that the KWF could issue them an invoice in their names or their businesses name. CHS told them that if the invoice was in the business name they could write it off as a business expense for consulting fees on their tax returns. Masera sent invoices to the families.

The ████ family paid the KWF $250,000 total. CHS did not know why only $100,000 and not the entire $250,000 was reported on the KWF 2016 Form 990. The amount was determine by ████ ████ prepared to books to give to the CPA.

CHS thought that all the the payments from parents are included on the KWF tax returns and that taxes were paid on it. CHS told parents that they can write off the payments made to the KWF on their taxes as a charitable deduction.

CHS did not know why the amount paid by ████ reports a donation of $250,000 instead of the check amount of $300,000. CHS thought it was possible the $50,000 paid to Ernst was deducted.

*(Agent Note: CHS reviewed the Contribution list on the spreadsheet prepared by SA Elizabeth Keating)*

████ :
The payment from ████ was to thank CHS for helping him get his children into school.

████
CHS did not have an explicit conversation with ████ about how the financial arrangement would work.

████
The $250,000 payment to the KWF from ████ was for CHS helping his kids get into college.

| FD-1023 | Page 2 of 5 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

SINGER-REPORTS-000053

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

All the other people listed as contributing to the KWF were for CHS getting their kids into college. No legitimate donations were made to the KWF.

*(Agent Note: CHS reviewed the Other Expenses on the spreadsheet prepared by SA Elizabeth Keating)*

All the businesses listed in the Other Expenses section are legitimate expenses of the KWF and not related to business dealings.

Better LA:
Better LA was a project with Pete Carroll to help inner city kids in LA.

Key Math Development:
Key Math Development was created to teach math to minority students.

Financial Literacy Project:
Financial Literacy Project was created to teach reading to minority students.

Key Intern Development:
Key Intern Development is similar to Better LA.

Generation WOW:
Generation WOW is a nonprofit that helps inner city girls.

Scholarship Awards
CHS did not know what was included in Scholarship Awards expense.

*(Agent Note: CHS reviewed the Grants list on the spreadsheet prepared by SA Elizabeth Keating)*

CSUF:
The F in CSUF may stand for ▮▮▮▮▮ It was possibly a payment to Ali K.

McDonough Gym:
Ernst told CHS to give some money to the gym during the period CHS was still paying Ernst.

Community Donations:
The community donations are actual donations paid.

DePaul Religious Studies:
The payments to DePaul were legitimate donations for religious studies.

Generation W
Payments made to Generation W were for helping inner city women. It is a nonprofit similar to Generation WOW.

NYU
The payments to NYU were not a quid pro quo for getting students into NYU. ▮▮▮▮▮▮▮▮ helped CHS by providing guidance. She did not have any influence to get kids into NYU. The money goes to her program and fundraising.

USC Baseball
The money given to USC baseball was probably for ▮▮▮▮▮▮▮▮ is a good player and plays baseball at USC. CHS handed a check to the baseball coach.

USC Water Polo:
This payment was for helping kids get into USC. The students actually played on the water polo team.

USC Womens Soccer:
CHS did not know why the payment was for $25,000. The money would have gone to Ali K.

| FD-1023 | Page 3 of 5 | FEDERAL BUREAU OF INVESTIGATION |
|---|---|---|

UNCLASSIFIED

SINGER-REPORTS-000054

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |

**Baruch College:**
_____ helped students get into college. ____ told CHS to make the payments to the college. ____ did research for CHS.

**Chapman University:**
CHS paid money to "grease the wheel." Not all students that CHS submits to Chapman get in.

**City of Houston:**
CHS did not know what this payment was for.

**Friends of Cambodia:**
This was a legitimate donation made for dentists to travel to Cambodia and perform dental work.

**Loyola High School:**
The payments made to the high school were for Jovan Vavic's children's tuition.

**University of Miami:**
CHS did not remember why a payment was made to the University of Miami. It may be because he did work with the university. No kids that he worked with attended this school.

**University of Texas:**
The payment was to Michael Center. CHS wrote checks to the program but does not remember it being that much.

**USC Soccer:**
CHS did not remember what that payment were for.

**USC Womans Athletics and USC Womens Volleyball:**
The payments were made for Donna Heinel. _____ plays volleyball at USC.

**Yale Summer Time Sports:**
This was a payment to Rudy Meredith.

**Ladylike Foundation:**
Ladylike foundation is a real charity.

**Princeville Enterprises:**
CHS did not remember who the payment went to.

**USC Soccer:**
CHS did not remember what this payment was for.

**Bluesky:**
This money was for the investment into the Swansea City Soccer Group in Whales.

**Food with Purpose:**
CHS owns 20% of a Sharkey's franchise and Food with Purpose was for the investment in Sharkey's.

| FD-1023 | Page 4 of 5 | FEDERAL BUREAU OF INVESTIGATION |

UNCLASSIFIED

SINGER-REPORTS-000055

UNCLASSIFIED

| FD-1023 | **FEDERAL BUREAU OF INVESTIGATION**<br>CHS REPORTING DOCUMENT |  |
|---|---|---|

**Synopsis:**
CHS meeting on 11/29/2018

| SIGNATURE | | |
|---|---|---|
| Submitted By | EAKEATING (undefined undefined) | Fri, 14 Dec 2018 14:52:41 -0500 |
| First Level Approved By | JPKEELAN (John Keelan) | Mon, 17 Dec 2018 09:47:41 -0500 |

UNCLASSIFIED

SINGER-REPORTS-000056