UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

                Plaintiff,

v.

JOVAN VAVIC,

                Defendant.

CRIMINAL NO.: 19-CR-10081-IT

**JOVAN VAVIC'S OPPOSITION TO THE GOVERNMENT'S
MOTION _IN LIMINE_ TO LIMIT PROPOSED EXPERT TESTIMONY**

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ...............................................................................................2

III.   LEGAL STANDARD.........................................................................................6

IV.    ARGUMENT .....................................................................................................7

      A.     Dr. Chabotar Will Offer Classic Expert Testimony to Aid the Jury........................8

      B.     Dr. Chabotar's Testimony Satisfies *Daubert* ........................................11

            1.     The Government's "Reliability" Challenge Fails ....................................11

            2.     Dr. Chabotar's Opinions Constitute Classic Expert Testimony ................15

            3.     The Government's Challenge Goes to Weight, Not Admissibility ..........17

      C.     Dr. Chabotar's Core Exculpatory Testimony Is Not "Unduly" Prejudicial..........19

V.     CONCLUSION.................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Take-Two Interactive Software, Inc.*,
  2020 WL 5750033 (S.D. Ill Sept. 26, 2020)...................................................................15, 16

*Bd. of Trustees, Sheet Metal Workers' National Pension Fund v. Palladium Equity Partners*,
  722 F.Supp.2d 845 (E.D. Mich 2010)......................................................................................7

*Best v. Lowe's Home Ctrs.*,
  563 F.3d 171 (6th Cir. 2009) ...................................................................................................6

*Cooper v. Carl A. Nelson & Co.*,
  211 F.3d 1008 (7th Cir. 2000) ...............................................................................................13

*Crane v. Kentucky*,
  476 U.S. 683 (1986).............................................................................................................2, 17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)......................................................................................................... *passim*

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation*,
  2021 WL 3286439 (S.D. Ohio Aug. 1, 2021)........................................................................15

*Fox v. Taylor Diving & Salvage Co.*,
  694 F.2d 1349 (5th Cir. 1983) ...............................................................................................14

*Kumho Tire v. Carmichael*,
  526 U.S. 137 (1999)...................................................................................................................6

*Lauzon v. Senco Prod., Inc.*,
  270 F.3d 681 (8th Cir. 2001) ....................................................................................................6

*Metavante Corp. v. Emigrant Sav. Bank*,
  619 F.3d 748 (7th Cir. 2010) .................................................................................................13

*Napue v. Illinois*,
  360 U.S. 264 (1959)................................................................................................................7, 8

*O'Bannon v. National Collegiate Athletic Association*,
  2014 WL 12795479 (N.D. Cal. May 30, 2014).....................................................................13

i

*Paddock v. Dave Christensen, Inc.*,
    745 F.2d 1254 (9th Cir. 1984) ....................................................................14

*Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*,
    F.Supp.3d, 2021 WL 5770871 (S.D.N.Y. 2021) ......................................7

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
    161 F.3d 77 (1st Cir. 1998)............................................................................7

*Sandoe v. Boston Scientific*,
    333 F.R.D. 4 (D. Mass. 2019)...............................................................7, 18

*Schall v. Suzuki Motors of America*,
    2020 WL 1162192 (W.D. Ky. Mar 10, 2020) ..........................................13

*In re Sonic Corp. Customer Data Security Breach Litigation*,
    2021 WL 5916743 (N.D. Ohio Dec 15, 2021) ........................................13

*Stambolian v. Novartis Pharm. Corp.*,
    2013 WL 6345566 (C.D. Cal. Dec. 6, 2013) ...........................................15

*United States v. Abdelaziz, et al.*,
    19-cr-10080-NMG, Dkt. 673 (Nov. 26, 2019)......................................3, 4

*United States v. Skodnek*
    896 F.Supp. 60 (D. Mass. 1995) ...............................................................14

*United States v. Colburn et al.*,
    No. 1:19-CR-10080-NMG (D. Mass. Nov 26, 2019), Dkt. 673 ...........4, 5

*United States v. Giambro*,
    544 F.3d 26 (1st Cir. 2008).........................................................................19

*United States v. Heatherly*,
    985 F.3d 254 (3rd Cir. 2021) ......................................................................20

*United States v. Organon USA Inc.*,
    2015 WL 10002943 (D. Mass. Aug. 17, 2015) .......................................18

*United States v. Romero*,
    189 F.3d 576 (7th Cir. 1999) ......................................................................13

*United States v. Ross*,
    837 F.3d 85 (1st Cir. 2016)..........................................................................20

*United States v. Tavares*,
    843 F.3d 1 (1st Cir. 2016)............................................................................19

*United States v. Varoudakis*,
   233 F.3d 113 (1st Cir. 2000) .................................................................................20

*Viterbo v. Dow Chemical Co.*,
   826 F.2d 420 (5th Cir. 1987) .................................................................................19

*Williams v. Illinois*,
   567 U.S. 50 (2012) (plurality opinion) ...................................................................14

**Other Authorities**

Federal Rule of Evidence

   Rule 702 ....................................................................................................6, 13
   Rule 703 ..................................................................................................11, 14

## I.        <u>INTRODUCTION</u>

The government charged Coach Vavic with participating in a scheme to secure the admission of students to the University of Southern California ("USC") as recruited athletes, regardless of their athletic ability, in exchange for money—including donations to USC.  Having placed USC's admissions policies and practices squarely at issue,[1] the government now seeks to exclude expert testimony which refutes the anticipated *false* testimony of a key government witness on this precise point[2] on the basis that it is (i) unreliable, and (ii) "unduly" prejudicial. That argument fails on both points.

To reach his opinions about USC's admissions policies and practices, Dr. Chabotar drew on his expertise and his professional interpretation of voluminous evidence he reviewed— including over 2000 pages of USC internal records and communications involving the highest levels of the USC administration, which were all produced to the government, together with substantial other materials.  *See* Exhibit A & Appendix A.  Dr. Chabotar will *not* summarize this evidence; the defense, like the government, has noticed a summary witness for that separate purpose.  Rather, Dr. Chabotar will present his expert *opinions* to the jury, and he will discuss this evidence only in explaining the *basis* for those expert opinions, as any other expert in any other case.

---

[1] The Court previously ruled that evidence relating to USC's admissions policies and practices is relevant, denying the government's motion to exclude "insofar as it seeks to preclude evidence relevant to the fiduciary duties owed by Defendants to their university employers or to whether agreements for payments to university accounts were corrupt or illegitimate."  Dkt. 956.

[2] In recognition of the Court's comments during the status conference on March 3, 2022, the defense has re-evaluated its original disclosure, *see* Exhibit A & Appendix A (attached hereto), and withdraws Dr. Chabotar's challenged opinion that "Coach Vavic faced significant pressure to fundraise for the water polo team." *See* Motion at 1.

This constitutes classic expert testimony that is squarely admissible within Rules 702, 703, and 403 of the Federal Rules of Evidence.  Dr. Chabotar's testimony will assist the lay jury in understanding the role of fundraising in higher educational institutions; the complicated relationship between admissions, recruiting, and fundraising; and the collective impact this relationship has on the duties and responsibilities of university employees in the context of the particular fundraising model used by the particular higher educational institution at issue. To be clear, the expert will not be opining on whether Jovan Vavic or any other particular individual did or did not fulfill, comply with, or violate their duties or responsibilities.  That, of course, is the exclusive province of the jury.

In short, not only will Dr. Chabotar's testimony assist the lay jury, but there is no substitute for Dr. Chabotar's testimony on this point.  As such, it is core exculpatory evidence essential to Coach Vavic's constitutional right to present a defense.  *See Crane v. Kentucky*, 476 U.S. 683 (1986).  The government's motion should be denied.

## II.     **BACKGROUND**

This Court previously inquired how the government would prove bribery and honest services fraud in the context of the "unique situation" here:  The "notion that we have a federal crime here based on an employee's failure to perform a duty to their employer[.]" Heinel Plea Hr'g, Nov. 5, 2021 at 31:11-15. In this context, the Court emphasized, "*it needs to be clear … what the duty was and what was being expected*."  *Id.* at 31:16 (emphasis added).  Further, the Court explained:

> [O]n the academic side, I think most people would agree that colleges are not simply looking for the most qualified student, but that they're letting other students in who are not the most qualified student for other reasons. And that's fine.  That's their choice to do that.  And nobody would charge an admissions officer with a violation of honest services for admitting the student whose father

is donating the building next door.  *It's all above board.  Everybody knows it's happening*. . .

And so that's my question, is how do you show -- it isn't a given to me -- from the outside -- that USC or any other school is necessarily looking for the best athlete. And so my question is, how are you showing it?

*Id.* at 36: 23-37: 23.

The answer to the Court's question is that the government will call Rebecca Chassin, a USC admissions employee, as a witness at trial.  The government called Ms. Chassin in the last trial, *U.S. v. Abdelaziz, et al.*, 19-cr-10080-NMG, and offered demonstrably *false* testimony about USC admission department policies and practices on this key point.  *See, e.g.*, *id.* Trial Tr. dated Sept. 20, 2021 at 187:25 ("[*W*]e *don't offer admission in exchange for money*.") (emphasis added); Trial Tr. dated Sept. 21, 2021 at 100:20-22, 101:2-3 ("The work of the SUBCO was to consider students *for athletic talent alone*. . . . that is the expectations that all of the members of the office of admission have around what happens at SUBCO.") (emphasis added).  In discussing USC's admissions policies and practices, Ms. Chassin purported to speak on behalf of USC's entire admission department and Subco, as well the Dean of Admissions, Timothy Brunold.[3]

---

[3] For example, Chassin testified:

    Q. Okay. You said earlier, "We don't make offers of admission in exchange for money." Do you recall saying that earlier today?
    A. Yes.
    Q. Who is the "we" you're referring to?
    A. The Office of Undergraduate Admission.
    Q. So -- and you're referring to yourself, correct?
    A. *I'm referring to the authority that the Office of Undergraduate Admission has in making admission decisions*.
    Q. Okay. *So that would include Tim Brunold*, correct?
    A. Yes.

Trial Tr. dated Sept. 21, 2021 at 52:17-53:1-7; *see also* Trial Tr. dated Sept. 21, 2021 at 54:2-55:5:

    A. The Athletics Subcommittee is for athletic talent only, so that's the only thing that would be considered in that process. . . .
    Q. What? Did Coach Vavic tell you that?
    A. That was the expectation of SUBCO. It was very clear.
    Q. Well, you say that expectation of SUBCO was very clear. Did they give a written statement to Coach Vavic about that?

Magistrate Judge Kelley previously made an adverse credibility determination when Mr. Brunold, Ms. Chassin's supervisor, took a similar position in a sworn affidavit during subpoena litigation over the body of USC internal records and communications that Dr. Chabotar reviewed to reach his expert opinions.  In that affidavit, Mr. Brunold wrote:

> The Admission Department has no involvement with respect to donations or potential donations. The Admission Department does not track donations by an applicant's family. Information concerning donations by an applicant's family is not included in an applicant's file.[4]

Judge Kelley found that position to be "not credible."  *U.S. v. Abdelaziz, et al.*, 19-cr-10080-NMG, Dkt. 673 (Nov. 26, 2019) at 21:15-22:2 ("I don't for a second believe Mr. Brunold's affidavit that he submitted here[.]").  Specifically, upon reviewing the USC internal records and communications, Judge Kelly found:  "*I think it's belied by many of the documents that we've received . . . I just think that's not credible.*"  *Id.* (emphasis added).[5]  At a subsequent hearing, Judge Kelley again emphasized this point:

---

A. I don't know.
Q. Okay. You're not aware of any written guidance given by SUBCO in 2014 to Coach Vavic saying you cannot consider a donation when looking at a walk-on candidate, correct?
A. If we believe that was the basis for a coach recruiting a student, it would not have been appropriate for it to be in SUBCO.
Q. Okay. You said, "we." Are you including Tim Brunold in the "we" that you're talking about?
A. *The Office of Admissions, yes, including Tim Brunold.*

[4] Declaration of Timothy Brunold in Support of Non-Party University of Southern California's Motion to Quash at 2, United States v. Colburn et al, No. 1:19-CR-10080-NMG (D. Mass. Aug. 29, 2019), Dkt. 532-3.

[5] Tr. of Motion Hearing at 27-28, *United States v. Colburn et al.*, No. 1:19-CR-10080-NMG (D. Mass. Nov 26, 2019), Dkt. 673.  In whole, Judge Kelley reasoned:

> I mean, I don't for a second believe Mr. Brunold's affidavit that he submitted here, and I think it's belied by many of the documents that we've received. *I mean, part of the problem we're facing here is that I think you have a very basic fact that you need to get across to a jury to support your defense that I think jurors would have no problem accepting as true, and U.S.C. has gone on the record saying that's not true.* So you're digging assiduously for documents showing that donations affected a person's chance of getting in, and U.S.C. is denying that's true. And I think it's caused U.S.C. a lot of trouble here unnecessarily. Even if the parting line

I've also reviewed the 302s with USC, and I know that the higher-ups are saying, 'We     never did that,' and the lower-downs are saying, 'We might have.' . . .*I'll just tell you     from other material I've seen ex parte in the case, it is a viable assertion that USC had a     practice of its admissions, of its athletics department admitting kids in exchange for a donation … as athletic walk-ons*.

Dkt. 906 (Feb. 28, 2020) at 14:7-16:4 (emphasis added).

The government has given notice that it intends to call Ms. Chassin again, presumably to repeat the false claim that USC did not grant preferential admission based on the family's anticipated ability or commitment to donate, rather than particular levels of academic or athletic talent—the same position Judge Kelley found to be "not credible" and "belied" by the USC internal records produced in the case.

Coach Vavic must be permitted to defend himself against these false claims.  He will do this through, among other things, the presentation of classic expert testimony that rebuts Ms. Chassin's assertions about USC's admissions policies and practices by substantiating, based on his expertise and review of voluminous USC records, the very proposition advanced in the Court's statement above, namely, "that colleges are not simply looking for the most qualified student, but that they're letting other students in who are not the most qualified student for other reasons."  This is the truth that the government's witness is denying, and the defense should be permitted to rebut that denial by providing a qualified expert witness who can explain to the jury why it is false based on their professional expertise.

---

there, which I know may be we don't admit people because they make donations, *I just think that's not credible*.

*Id.* (emphasis added).

### III.   <u>LEGAL STANDARD</u>

Under Federal Rule of Evidence 702, expert evidence is admissible so long as it will assist the trier of fact, the expert is qualified "by knowledge, skill, experience, training, or education" to testify on the subject, and the expert applies "reliable principles and methods" to the facts of the case.  Fed. R. Evid. 702.  The Supreme Court has explained that the Federal Rules were drafted with a "liberal thrust" and that their general approach is to "relax[ ] the traditional barriers to opinion testimony." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993) (quotations omitted).  Importantly, Rule 702 "is one of admissibility rather than exclusion." *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (quoting *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991)); *see also* Fed. R. Evid. 702 Committee Notes on Rules—2000 Amendment ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule").

In assessing the admissibility of expert testimony, the trial court has wide latitude to determine the reliability and relevancy of the expert testimony.  *Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999).  "*Daubert* attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs.*, 563 F.3d 171, 176-77 (6th Cir. 2009).  However, the *Daubert* factors are not a definitive checklist or test.  Rather, the "inquiry must be tied to the facts of a particular case," depending on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150 (quotations omitted).

With respect to reliability, trial courts must assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  This inquiry must

focus "solely on the principles and methodology [of the expert], not on the conclusions that they generate." *Id.* at 595.  There is no precise formula by which a trial court might deem an expert's methodology acceptable or unacceptable.  *Bd. of Trustees, Sheet Metal Workers' National Pension Fund v. Palladium Equity Partners*, 722 F.Supp.2d 845, 853 (E.D. Mich 2010).

Contentions that the expert's assumptions are "unfounded" go to the weight, not the admissibility of the testimony.  *Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*, --- F.Supp.3d ---, 2021 WL 5770871, *1 (S.D.N.Y. 2021).  As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) ("As long as an expert's . . . testimony rests upon good grounds, based on what is known, it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from juror's scrutiny for fear that they will not . . . weigh its inadequacies.") (internal quotations and citation omitted)).  Thus, "[e]xpert testimony should be excluded only if it is so fundamentally unsupported that it can offer no assistance to the jury." *Sandoe v. Boston Scientific*, 333 F.R.D. 4, 10 (D. Mass. 2019) (quotations and citations omitted).

## IV.   <u>ARGUMENT</u>

In a criminal case, the government violates due process when it uses false testimony at trial.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  Similarly, due process is violated when the government, although not soliciting false evidence, fails to correct it when it appears.  *Id.* [6]

---

[6] At the pre-trial hearing on March 3, this Court pressed the government on this very point: "[A]s an officer of the Court … [i] you knew that the statements are false and you get them in … If those statements are false, isn't there a problem?"  The government responded, contrary to

Here, Coach Vavic seeks to correct the government's false narrative by, among other things, offering expert testimony that will aid the jury in understanding the complicated relationship between admissions, recruiting, and fundraising at universities, including at USC. Contrary to Ms. Chassin's demonstrably false claims about USC's admissions policies and practices, not only did the anticipated ability or commitment to donate affect a person's chances at being admitted to USC, but in many cases it was the decisive reason why a student was suggested for preferential consideration or admitted to USC pursuant to preferential consideration—including in the context of athletic recruitment.

Dr. Chabotar's testimony will assist the lay jury because a lay jury is not well-equipped to evaluate what constitutes a policy and practice in the realm of higher education admissions.  In particular, a lay jury lacks the comparative context that Dr. Chabotar brings to the table, i.e. *why* universities face pressure to fundraise, *why* universities consider money in admissions and athletic recruitment, and *how* USC compares to the average university in this respect.  This is something most lay jurors do not understand.  The testimony will expose Ms. Chassin's claims about USC as not only false—but resoundingly so, when USC is viewed in this broader context.

A.      <u>**Dr. Chabotar Will Offer Classic Expert Testimony to Aid the Jury**</u>

Dr. Chabotar will offer the following opinions, which are based upon his training and expertise and his extensive review of well over 2000 pages internal USC communications, admissions information, budget information, scholarly and news articles, and other documents related to USC's finances, admission practices, and athletic program.  Dr. Chabotar's opinions

---

*Napue v. Illinois*,  "*I don't think there's necessarily a problem*," and went on to explain that the "very falsehood of certain statements was very effectively used in the last trial..."  (emphasis added).  The expert's testimony here is essential to Coach Vavic's ability to expose the falsehood of Ms. Chassin's anticipated testimony.

will assist the jury by explaining how each of these components—finances, admissions, and

athletics—interact and impact university customs, policies, and practices.

Dr. Chabotar will testify that:

- Higher education institutions must maintain adequate revenue streams to cover their expenses.  Tuition and fees alone are not a sufficient revenue source to pay for expenses.

- Nearly every college and university, including USC, relies upon endowment spending and annual giving, among other additional revenue streams.

- Fundraising efforts—that is, obtaining gifts or donations for the endowment, and obtaining annual contributions from donors—are therefore essential to most private universities in the United States, including USC.

- Capital giving is a category of revenue consisting of substantial donations to a university usually intended for new construction and major renovations.  Annual giving is a category of revenue consisting of donations or gifts made to the university for current use.  These donations are made by alumni, friends of the university, parents, foundations, and other supporters of the university.

- Although often given without restriction, most universities allow donors to restrict part or all their annual gift to an academic program, an athletics program, or another specific purpose.

- Universities, including USC, need both capital gifts and annual gifts to operate. Annual gifts are particularly important to keeping the doors open, as they are typically spent in the year they are received.

- Many private institutions, particularly those focused on fundraising, consider a family's potential for giving in making admissions decisions.

- "Responsibility center management" (RCM) is a model of budgeting under which each school or department is responsible for doing its own fundraising and meeting its own budgets.  Under this model, the departments and programs have major fundraising responsibilities on their own or in partnership with other units. Under RCM, significant management authority is shifted to deans and department heads, and as a result, there is minimal centralized management.

- Collegiate athletics are expensive programs to run, but they provide opportunities and benefits to institutions.  Almost all athletic programs incur budget deficits, standing alone, for universities, with few exceptions.  But at many elite private institutions, including at USC, athletic programs can be a net-positive for the school because of the fundraising opportunities they present, despite being a net-negative operationally.

9

- USC has employed an RCM model, dating back to USC President C.L. Max Nikias and his predecessor President Steven Sample, under which each department is responsible for doing its own fundraising and meeting its own budgets. USC's form of RCM involves significant decentralization and expectations for fundraising on each unit, including for the USC Athletic Department, as well as little central oversight.

- USC placed an acute emphasis on fundraising, and relatedly, increasing USC's revenue, profile, and ranking—particularly under USC President C.L. Max Nikias, who spearheaded the second largest capital campaign in the history of higher education and dramatic changes to the physical plant of USC, including the Uytengsu Aquatics Center. This emphasis on fundraising shaped the institutional culture and priorities of USC, and in particular, the Athletic Department under Pat Haden, USC Athletic Director from 2010-2016.

- Under USC's RCM model, and in the context of this institutional emphasis, fundraising was essential to the survival of the USC athletic teams—the vast majority of which lost money, including water polo. Coach Vavic's mandate as head coach included fundraising. While the water polo team received funds for operating expenses from the Athletic Department, excess operating expenses were expected to be covered through the water polo gift account and/or operating endowment funds derived from fundraising.

- In the context of this emphasis on fundraising, USC was not unlike many universities that had a culture and practice of suggesting children of prospective donors for preferential admissions consideration, and granting these children preferential admission—including through, in the case of USC, the Athletic Subcommittee for Admissions ("Subco") process, regardless of particular levels of athletic talent or potential, and even in instances where the child was anticipated to fill a non-player role (i.e. team manager, social media manager). Pursuant to this practice, the family's anticipated ability or commitment to donate—not the child's academic or athletic ability—was often the decisive reason why a student was suggested for preferential consideration or admitted to USC pursuant to preferential consideration, including through the Subco process.

Notably, the government *concedes* that all but the last point are proper subjects for testimony—and thus, that it meets the standards under Federal Rules of Evidence 702, 703, and 403.

B.      **Dr. Chabotar's Testimony Satisfies *Daubert***

1.      **The Government's "Reliability" Challenge Fails**

The government does not dispute, nor could it, that Dr. Chabotar is an expert in the
economics and management of universities.  Dr. Chabotar is a founding partner of a higher
education consulting firm.  He is President Emeritus and Professor of Political Science of
Guilford College in Greensboro, North Carolina.  Dr. Chabotar has been on the faculty of the
Harvard Institutes for Higher Education since 1983, and previously has been on the faculties of
the Harvard Graduate School of Education, the University of Massachusetts, and Michigan State
University.  Prior to becoming President of Guilford, Dr. Chabotar was vice president for finance
and administration and treasurer at Bowdoin College, and a member of the faculty.  Dr. Chabotar
has published extensively on a variety of topics relating to higher education strategy and finance
and his Ph.D. degree in public administration from the Maxwell School at Syracuse University
concentrated on higher education.

The government nevertheless seeks to exclude Dr. Chabotar because he "has never
worked for the University of Southern California ("USC");" his opinions are based on nothing
more than "cherry-picked emails among employees of the USC athletics department;" and these
emails constitute "hearsay." Motion at 1, 3, 10.   This is demonstrably incorrect on all three
points.

*First*, it is beyond dispute that Dr. Chabotar, like any expert witness in federal court, is
permitted to offer opinions that are based on his review of data presented to him, rather than his
percipient knowledge.  Rule 703 specifically permits this: "An expert may base an opinion on
facts or data in the case that the expert *has been made aware of* or personally observed."  Fed. R.
Evid. 703 (emphasis added).  Thus, Dr. Chabotar does not need to have percipient knowledge of

USC's practices in order to opine on them: "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993).

*Second*, the government openly mischaracterizes the basis for Dr. Chabotar's opinions with its reference to "cherry-picked emails."  As the expert disclosure makes clear, *see* Exhibit A & Appendix A, Dr. Chabotar's opinions are based on his extensive background and experience in the field of the economics and management of universities and his review of voluminous materials (all of which were produced to the government with the disclosure) as follows:

- more than 2000 pages of record-based evidence in this case, including analysis of USC admissions, documents related to athletics budgets, internal USC correspondence, correspondence between USC officials and students/parents of students, profiles of prospective students, and other internal USC documents;

- a summary chart entitled, "Applicants with Special Interest Connections Supported by the USC Athletics Department, 2009-2019," summarizing admissions data, and underlying USC internal documents, for over 200 different applicants to USC—as well as the underlying records used to create the chart; and

- more than two dozen publicly available scholarly and news articles, including articles specific to USC.

Most of these extensive materials were in fact produced *by USC*, and the government cannot reasonably claim that they do not provide a reliable basis for expert opinion.

In particular, the government asserts that the testimony should be excluded because it does not satisfy the "*Daubert* factors."  However, the factors listed in the government's motion (peer review, error rates, testing, and acceptance) are not necessarily applicable to non-scientific

expert testimony.  *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) ("[T]he test for reliability for nonscientific experts is 'flexible' and . . . '*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.'") (quoting *Kumho Tire*, 526 U.S. at 150).  Contrary to the government's claim, the expert's background and experience may alone provide an adequate foundation of reliability.  *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760-62 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, experience, training, or education.'").

Further, "experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000).  And the types of data Dr. Chabotar relied upon are routinely utilized by experts.  *See, e.g.*, *Schall v. Suzuki Motors of America*, 2020 WL 1162192, at *4 (W.D. Ky. Mar 10, 2020) (expert relied upon internal correspondence—including emails and memos—of businesses involved in the litigation); *O'Bannon v. National Collegiate Athletic Association*, 2014 WL 12795479, *4 (N.D. Cal. May 30, 2014) (experts relied upon facts and data contained in media reports); *In re Sonic Corp. Customer Data Security Breach Litigation*, 2021 WL 5916743, *10 (N.D. Ohio Dec 15, 2021) (finding bank executive could reasonably rely upon non-academic sources such as media articles to inform opinions).

*Third*, with respect to the suggestion that Dr. Chabotar's opinion is based on "a group of hearsay emails selected by counsel about certain athletic recruits," *see* Motion at 10, the hundreds of internal USC communications reviewed are independently admissible non-hearsay records, or records that meet a hearsay exception.  *See* Opposition to the Motion in Limine to

13

Preclude Irrelevant Evidence, Dkt. 924 at 11-13 (discussing the admissibility of these records).

Even if this were not the case, however, the government's "hearsay" argument has no bearing on

the reliability—and therefore the admissibility—of Dr. Chabotar's opinions.

Contrary to the government's claim that there is "no authority" providing that an expert

would reasonably rely on "a group of hearsay emails selected by counsel," it is well-established

that "Rule 703 … permits experts to rely on otherwise inadmissible evidence[.]" *United States v.*

*Skodnek*, 896 F.Supp. 60, 65 (D. Mass. 1995).  Further:

> "[B]asis evidence" that is not admissible for its truth may be disclosed even in a
> jury trial under appropriate circumstances.  The purpose for allowing this
> disclosure is that it may "assist the jury to evaluate the expert's
> opinion."  Advisory Committee's 2000 Notes on Fed. Rule Evid. 703, 28
> U.S.C.App., p 361.  The Rule 703 approach . . . is based on the idea that the
> disclosure of basis evidence can held the factfinder understand the expert's
> thought process and determine what weight to give to the expert's opinion.

*Williams v. Illinois*, 567 U.S. 50, 78 (2012) (plurality opinion); *see also Fox v. Taylor Diving &*

*Salvage Co.*, 694 F.2d 1349, 1356 (5th Cir. 1983) ("an expert is permitted to disclose hearsay for

the limited purpose of explaining the basis for his expert opinion, Fed. R. Evid. 703, but not as

general proof of the truth of the underlying matter, Fed. R. Evid. 802); *Paddock v. Dave*

*Christensen, Inc.*, 745 F.2d 1254, 1261-62 (9th Cir. 1984) ("Rule 703 . . . permits such hearsay,

or other inadmissible evidence, upon which an expert properly relief, to be admitted to explain

the basis of the expert's opinion.").   As noted at the outset, here, Dr. Chabotar will *not*

summarize this evidence; the defense has noticed a summary witness for that separate purpose.

Rather, consistent with this caselaw, Dr. Chabotar will present his expert *opinions* to the jury,

and he will discuss this evidence only in explaining the *basis* for those expert opinions.

In short, Dr. Chabotar does not have to work at USC to offer reliable opinions about USC

admissions practices.  To the extent the government argues that Dr. Chabotar did not review the

"right" 2000-plus pages of evidence, or that his opinions are wrong, that goes to the *weight* of his

testimony, *not its admissibility*—and cannot be addressed by excluding the testimony, as discussed below.

### 2.   Dr. Chabotar's Opinions Constitute Classic Expert Testimony

In fact, Dr. Chabotar's opinions about USC's admissions policies and practices are not only reliable—but they constitute classic expert testimony.  Dr. Chabotar reviewed the materials described above and applied his specialized knowledge of university management and finance to the facts of this case to form opinions that will aid the trier of fact.  This is entirely proper for an expert witness.  *See In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation*, 2021 WL 3286439 (S.D. Ohio Aug. 1, 2021) (permitting expert to rely on his knowledge, skill, experience, training, or education "to conceptualize, analyze and interpret historical facts" to reach his opinions and to explain what facts and communications support his conclusion); *see also Stambolian v. Novartis Pharm. Corp.*, 2013 WL 6345566, at *10 (C.D. Cal. Dec. 6, 2013) (allowing expert commentary on documents and exhibits in evidence "to explain[] the regulatory context in which they were created, defin[e] any complex or specialized terminology, or draw[] inferences that would not be apparent without the benefit of experience or specialized knowledge").

The court's recent decision in *Alexander v. Take-Two Interactive Software, Inc.*, 2020 WL 5750033, *2-3 (S.D. Ill Sept. 26, 2020), is instructive.  That case involved a dispute related to the defendant's alleged use of a professional wrestler's likeness and copyrighted tattoos in one of its video games.  *See id*.  The trial court permitted the plaintiff to offer Dr. Jose Zagal as an expert witness in video game development and design.  *Id*. at *1.  In reaching his opinions, "Dr. Zagal reviewed case-specific materials, including the written discovery responses and document production."  *Id*. at *2.  "He also reviewed various articles and online industry material."  *Id*.

15

"Based on his expertise in game culture, Dr. Zagal opined that a realistic portrayal . . . is important to the success and sales of . . . videogames." *Id*.  He described how "videogame developers attempt to achieve what he describes as verisimilitude with [the] videogame character[] in part by copying and reproducing [the wrestler's] copyrighted tattoos." *Id*.  "*Dr. Zagal conclude*[*d*] *that the defendant chose to include certain properties of wrestlers in the videogame because it believe*[*d*] *that the inclusion of such properties would increase the game's profits*.  *Id*. (emphasis added).

Of course, whether the video game wrestler's tattoos and likeness were copies of the wrestler's true likeness could be evaluated by the jury without the aid of expert testimony.  But the expert was nevertheless permitted to testify because the court found that his testimony, which applied his expertise to an analysis of case-specific materials, would help the jury understand the process involved in videogame design and production.  *Id*. at *3.  The testimony included opinions about the conduct of the defendant in that case and the reasons for that conduct.  In other words, the expert was not restricted to testifying about the video game industry in general but was allowed to offer specific opinions about the defendant company.  In denying the motion to exclude Dr. Zagal, the court concluded, "*Dr. Zagal reviewed the materials produced during discovery and applied his specialized knowledge of videogame design and culture to the facts of this case.  The specifics of his methodology and overall strength of his opinions may be adequately challenged by Defendants at trial*."  *Id*. (emphasis added).

So, too, here.  Dr. Chabotar will explain, based on application of his "specialized knowledge" to case-specific records in this case, how private universities like USC rely on donations to maintain certain sports and other programs.  He will explain that private universities like USC typically consider a student's potential for contributions in its admissions

16

determinations.  He will further explain that, based on his review of voluminous material produced in this case as well as publicly available articles and documents, USC placed an acute emphasis on fundraising.  In the context of this emphasis on fundraising, USC had a culture and practice of suggesting children of prospective donors for preferential admissions consideration, and granting these children preferential admission—including through the Athletic Subcommittee for Admissions ("Subco") process, regardless of particular levels of athletic talent or potential, and even in instances where the child was anticipated to fill a non-player role (i.e., team manager, social media manager).  Pursuant to this practice, the family's anticipated ability or commitment to donate was often the decisive reason why a student was suggested for preferential consideration or admitted to USC pursuant to preferential consideration, including through the Subco process.

Dr. Chabotar's testimony will assist the lay jury in understanding the role of fundraising in higher educational institutions; the complicated relationship between admissions, recruiting, and fundraising; and the collective impact this relationship has on the duties and responsibilities of university employees in the context of the particular fundraising model used by the particular higher educational institution at issue. Indeed, as discussed above, a lay jury is not well-equipped to evaluate what constitutes a policy and practice in the realm of higher education admissions. As such, it is core exculpatory evidence essential to Coach Vavic's constitutional right to rebut Rebecca Chassin's false testimony on the same point, and there is no substitute for Dr. Chabotar's testimony.  *See Crane*, 476 U.S. 683.

### 3. The Government's Challenge Goes to Weight, Not Admissibility

To the extent the government disputes whether the materials reviewed by Dr. Chabotar support his conclusions, the proper course is for it challenge those conclusions through cross

examination or the presentation of its own witnesses—not by excluding the testimony. *See Daubert*, 509 U.S. at 596. The questions posed by the government in its motion (how many applicants the witness evaluated; for what years; etc.) all go to the weight of the testimony, not its admissibility. *See Sandoe*, 333 F.R.D. at 10 ("Expert testimony should be excluded only if it is so fundamentally unsupported that it can offer no assistance to the jury.").

The cases cited by the government are also inapposite. For instance, the government repeatedly cites *United States v. Organon USA Inc.*, 2015 WL 10002943 (D. Mass. Aug. 17, 2015). In that case, the trial court excluded a portion of the proposed expert testimony that the court determined was both irrelevant and of "suspect" reliability. *Id*. at *4. The excluded testimony related to what the witness believed *other* experienced health care attorneys and regulators "would have reasonably believed" about the discounts and rebates offered by the defendant in that case. *Id*. The trial court found that testimony was not sufficiently reliable and that the expert was merely speculating. *Id*. The court noted, for instance, that the expert had not consulted with any other attorneys or regulators to find out what they believed about the facts. *Id.*

Here, by contrast, Dr. Chabotar is not speculating about what other persons would believe. He is offering his own opinions about USC admissions policies and practices based on his background and experience and his review of communications and other documents related to USC's admissions of student athletes. In connection with those opinions, he will explain what he reviewed and how those materials shaped his opinions.

The common thread in the cases cited by the government is that, unlike here, there was no method for challenging or testing the expert opinions through cross examination or other testimony. The witnesses in those cases were offering merely unsupported speculation. *E.g.,*

18

*United States v. Giambro*, 544 F.3d 26, 33 (1st Cir. 2008) ("suppositions . . . and conjecture abound[ed]" in the testimony and the underlying data relied upon by the witness was "purely anecdotal").  Thus, the trial courts excluded the testimony.

By contrast here, however, the government can test the opinions, which are supported by the voluminous discovery in this case.  The government can explore what documents Dr. Chabotar reviewed and how they shaped his opinion.  The government can challenge the expert's opinions through cross-examination or presentation of other evidence.  Under these circumstances, the testimony should not be excluded.  *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.");  *see also United States v. Tavares*, 843 F.3d 1, 7 (1st Cir. 2016) ("[A]ny question about the factual underpinnings of [the expert's] opinion goes to its weight, not to its admissibility.");  *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (questions relating to the bases and sources of an expert's opinion generally affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration).

### C.   Dr. Chabotar's Core Exculpatory Testimony Is Not "Unduly" Prejudicial

In a final effort, the government seeks to exclude Dr. Chabotar's opinions about USC admissions practices and polices under Rule 403.  Of course, Dr. Chabotar's testimony is "prejudicial" to the government for the same reason that it constitutes core exculpatory evidence central to Coach Vavic's constitutional right to present a defense:  Dr. Chabotar's testimony undermines the government's central allegations of a bribe and a breach of fiduciary duty and exposes the false testimony of Rebecca Chassin.  That does not mean, however, that the testimony is "unfairly" prejudicial—which is what Rule 403 protects against.  "In balancing the

scales of Rule 403, it is important to note that only 'unfair' prejudice is to be avoided, as 'by design, all evidence is meant to be prejudicial.'" *United States v. Ross*, 837 F.3d 85, 90 (1st Cir. 2016) (quoting *United States v. Morales-Aldahondo*, 524 F.3d 115, 119-20 (1st Cir. 2008) (additional citation omitted); *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000) (same); *see also United States v. Heatherly*, 985 F.3d 254, 266 (3rd Cir. 2021) ("Rule 403 bars not all prejudice, but only unfair prejudice. *It does not protect* [*parties*] *from devastating evidence in general.*" (emphasis added) (citation omitted)).   If, as the government asserts, Dr. Chabotar's testimony is "unfairly prejudicial" because he lacks percipient knowledge of USC's admissions practices, then by that standard, almost all expert testimony would be inadmissible.

## V.   <u>CONCLUSION</u>

Coach Vavic respectfully requests that the government's motion be denied and that Dr. Chabotar be permitted to testify consistent with the summary provided in this opposition.

Dated: March 5, 2022                    Respectfully submitted,

<div style="margin-left:45%">

*/s/ Stephen G. Larson*
_____

Stephen G. Larson, (Admitted *pro hac vice*)
slarson@larsonllp.com
Koren L. Bell, (Admitted *pro hac vice*)
kbell@larsonllp.com
Paul A. Rigali, (Admitted *pro hac vice*)
prigali@larsonllp.com
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
(213) 436-4888

Irwin B. Schwartz (BBO# 548763)
ischwartz@blaschwartz.com
BLA Schwartz, PC

Attorneys for *JOVAN VAVIC*

</div>

**CERTIFICATE OF SERVICE**

I, Stephen G. Larson, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF, and paper copies will be sent to those indicated as non-registered participants on March 5, 2022.

*/s/ Stephen G. Larson*
Stephen G. Larson