UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10081-IT |
| | ) | |
| JOVAN VAVIC, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S OBJECTIONS TO
CO-CONSPIRATOR STATEMENTS PURSUANT TO FED. R. EVID. 801(d)(2)(E)**

The government respectfully requests, at the close of evidence, a finding that the co-conspirator statements introduced in the government's case-in-chief are admissible pursuant to Fed. R. Evid. 801(d)(2)(E) and *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).  The defendant's objections to those statements should be overruled.

## I.   LEGAL BACKGROUND

As an initial matter, the *Petrozziello* inquiry is to be made at the close of all evidence, not at the end of the government's case-in-chief.  *See, e.g.*, *United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir. 1980) (holding that the *Petrozziello* finding is to be made "at the close of all the evidence" and noting that "requiring trial courts to delay *Petrozziello* rulings until the conclusion of all the evidence would not create any significant additional demands or difficulties"); *accord United States v. Mangual-Garcia*, 505 F.3d 1, 8 (1st Cir. 2007) ("[T]his circuit requires the court to delay its final *Petrozziello* determination until the close of all evidence.").[1]

"Under Rule 801(d)(2)(E), an out-of-court statement made by a party's co-conspirator during and in furtherance of the conspiracy does not constitute inadmissible hearsay, even when

---

[1] Unless otherwise noted, all internal quotation marks, citations, and alterations are omitted herein.

admitted for its truth." *United States v. Pena*, 24 F.4th 46, 61 (1st Cir. 2022). The *Petrozziello* standard is as follows: the government "must establish by a preponderance of the evidence that [i] a conspiracy embracing both the declarant and the defendant existed, and that [ii] the declarant uttered the statement during and in furtherance of the conspiracy." *Id.* There are several important considerations in making this determination.

First, a *Petrozziello* finding—including whether the defendant was a member of the charged conspiracy—is made under a "preponderance of the evidence" or "more likely than not" standard. *See Petrozziello*, 548 F.2d at 23 ("The judge is ruling on admissibility, not guilt or innocence . . . the ordinary civil standard is sufficient."). Accordingly, "[t]his foundational requirement is satisfied as long as the government proffers sufficient evidence to establish, by a preponderance of the evidence, the existence of a conspiracy embracing both the declarant and the defendant." *United States v. Piper*, 298 F.3d 47, 52 (1st Cir. 2002) ("We give short shrift to the claim that the government failed to adduce sufficient evidence to demonstrate the existence of a conspiracy involving . . . the appellant [by a preponderance of the evidence].."); *accord United States v. Geronimo*, 330 F.3d 67, 75 (1st Cir. 2003) (holding that the *Petrozziello* finding is made under a "more likely than not" standard).

Second, the Court must consider the totality of the evidence—not individual pieces of evidence in isolation—in making the *Petrozziello* determination, and it is well-established that the Court may consider the co-conspirator statements themselves in making its finding. *See United States v. Mitchell*, 596 F.3d 18, 23 (1st Cir. 2010) (concluding that totality of the evidence, including co-conspirator statements and independent corroborating evidence, was "more than sufficient" to meet preponderance of the evidence standard). To be sure, the Court may not make a *Petrozziello* finding based *solely* on the co-conspirator statements at issue: "The preponderance

of evidence required for the introduction of an out-of-court statement under Rule 801(d)(2)(E) must necessarily comprise more than the weight of the statement itself. A co-conspirator's statement, standing alone, is insufficient to meet the preponderance standard." *United States v. Portela*, 167 F.3d 687, 703 (1st Cir. 1999). In other words, "the determination must rest *at least in part* on corroborating evidence beyond that contained in the statements at issue." *Id.* (emphasis added).

"At the same time, however, the court may consider the hearsay statements themselves in the context of other extrinsic, corroborating evidence." *United States v. Dowdell*, 595 F.3d 50, 74 (1st Cir. 2010). Accordingly, First Circuit courts consistently consider co-conspirator statements themselves—including their corroborative effect—in making *Petrozziello* findings. *See, e.g.*, *United States v. Ruiz*, 999 F.3d 742, 748 (1st Cir. 2021) ("The trial judge considers the alleged hearsay statements alongside the proffered extrinsic evidence . . . ."); *accord Mitchell*, 596 F.3d at 23 (holding that a "trial court may consider the contents of the statement at issue as evidence of the elements of a *Petrozziello* determination, [but] the determination must rest *at least in part* on corroborating evidence beyond that contained in the statements at issue") (emphasis added); *United States v. Paredes-Rodriguez*, 160 F.3d 49, 57 (1st Cir. 1998) (holding that there is "little doubt" that the district court "may consider hearsay evidence, including the very co-conspirator statement whose introduction is being sought" in making the *Petrozziello* finding); *United States v. Carroll*, 860 F.2d 500, 506 (1st Cir. 1988) ("The statement itself may be considered when making this finding."). At bottom, "the district court must consider all of the evidence in determining whether the prosecution has shown by a preponderance of the evidence [that the *Petrozziello* standard is satisfied]." *Mangual-Garcia*, 505 F.3d at 8.

Third, "once a defendant is found to be a member of the conspiracy, statements in furtherance of the conspiracy are admissible against him even if he does not have specific knowledge of the acts spoken of." *United States v. Marino*, 277 F.3d 11, 25 (1st Cir. 2002). And in rejecting a *Petrozziello* objection, the First Circuit has explained that "each co-conspirator need not know of or have contact with all other members, nor must they know all the details of the conspiracy or participate in every act in furtherance of it." *United States v. Newton*, 326 F.3d 253, 258 (1st Cir. 2003).

## II.   DISCUSSION

There is more than sufficient evidence to establish by a preponderance of the evidence that at the time of each proffered co-conspirator statement made in furtherance of the alleged conspiracy, the defendant was a member of the conspiracy. *See Ruiz*, 999 F.3d at 748. There is ample extrinsic evidence demonstrating the defendant's involvement—including his own statements on phone calls and in e-mails, testimony from cooperating witnesses, and other documents and financial records—and this evidence is further corroborated by co-conspirator statements themselves.

As an initial matter, the defendant has repeatedly conceded the existence of the charged conspiracies and the involvement of Singer, Singer's associates, coaches and athletic department administrators, and parents—as the Court has noted. *See, e.g.*, 3/15/2022 Trial Tr. at 8 (Court: "[T]he defense is not disputing that there's a conspiracy. The defense is disputing that Mr. Vavic is part of the conspiracy . . . [a]nd you're not disputing that that conspiracy exists, so it's hard to say why wouldn't that information come into the jury."); 3/10/2022 Trial Tr. at 81 (Defense opening statement: "Unlike Donna Heinel, unlike coach Ali K., unlike the other people that were knowingly involved in this conspiracy, Coach Vavic was not."); 3/17/2022 Trial Tr. at 32 (Defense

4

question of FBI SA Brown: "And here, there was—this was such a scheme in terms of a very large and elaborate network, right?").  Accordingly, the only remaining question is whether there is sufficient evidence to make it more likely than not that the defendant joined the conspiracy.  The evidence, including both independent evidence and evidence in the form of corroborating co-conspirator statements, is more than sufficient to satisfy this standard.

First, the defendant's own statements to Singer on wiretap and consensually recorded calls are sufficient to establish by a preponderance of the evidence that he joined the conspiracy.  The First Circuit has long held that a defendant's own statements, standing alone, are sufficient to satisfy the *Petrozziello* standard.  *See, e.g.*, *Ruiz*, 999 F.3d at 748 (defendant's "own inculpatory statements" on recording satisfied *Petrozziello*); *Pena*, 24 F.4th at 62 (defendant's "own recorded interactions with [co-conspirator]" demonstrated his involvement in conspiracy under preponderance standard); *Mitchell*, 596 F.3d at 24 (*Petrozziello* satisfied where "[t]he government offered recordings of phone calls, which came into evidence as the defendant's own admissions, in which [he] discussed [objects of the conspiracy] with other conspiracy members"); *Dowdell*, 595 F.3d at 74 (co-conspirator statements "coupled with [defendant's] statements themselves, adequately supported [*Petrozziello*] finding by a preponderance of the evidence").

For example,[2] during the August 3, 2018 wiretap call, which neither the defendant nor his co-conspirator Singer knew was being recorded:

- The defendant and Singer discussed the cover story that Singer's sham charity The Key Worldwide Foundation ("KWF") was paying the high-school tuition for the

---

[2] The below summary, collected in the middle of trial, is not intended to be an exhaustive collection of all the evidence introduced during trial regarding the existence of the charged conspiracies and the defendant's involvement.

defendant's sons as fake "scholarships."  Ex. 532 at 5–7 (Defendant: "Okay, and this— the, uh, the, uh, funding then is uh, uh, how did you call it, 'an amazing young man and' and uh . . .").  The defendant agreed to that cover story despite the fact that his spouse had previously acknowledged in an e-mail to him: "[They] would not be receiving any kind of scholarship.  [Singer] would be paying their tuition directly."  Ex. 119.

- The defendant told Singer that he was "$100,000 in the freaking hole" for his USC water polo account, recounting "a few years back" that "was a good good time, when you actually were—were helping me out, and I had like $400,000 in my endowment." Ex. 532 at 8.  He told Singer, "so I have to actually fundraise, and uh, and do whatever I can to—to get where I was in the past.  And uh, um, that's a good news for you, so if you have anybody out there, that, uh, that's a water polo player . . . ."  *Id.* at 9.

- Following the defendant's invitation, Singer told the defendant that he had a "water polo player" from Marin Academy, that he was going to put "through Donna," but that "I can just say, I'm gonna go through you . . . and then that way, um, I can have money funded to you."  *Id.* at 10.  As the liaison to the Subco, Donna Heinel did not recruit any athletes, and by definition, going "through Donna" with a water polo player meant that the applicant was not a legitimate athletic recruit being recruited by the coach.[3] The defendant expressed no confusion at Singer putting a water polo player "through Donna" without his knowledge, and then without knowing her name or knowing

---

[3] *See, e.g.*, 3/11/2022 Trial Tr. at 8 (Ali Khosroshahin testifying that Donna Heinel had no role in recruiting); 3/22/2022 Trial Tr. at 106 (Laura Janke testifying similarly); 3/30/2022 Trial Tr. at 34, 65 (Casey Moon testifying that Jovan Vavic, not Donna Heinel, was responsible for recruiting water polo players).

anything about Agustina Huneeus, he agreed to recruit her in exchange for money to his water polo account. *See id.* at 12 (Singer: "I'm waiting for her action photo. 'Cause I now know what exactly Donna wants, right? . . . So then, that way you can get funded. . . . How's that?"   Defendant: "That would be something that would help because, um, that's a win-win situation.").

- But the defendant warned Singer that they needed to be more careful than they had in the past because—as corroborated by communications between Donna Heinel and Singer[4] and the testimony of USC admissions officer Rebecca Chassin[5]—the USC admissions department was carefully checking the credentials of athletic recruits: "You know, I just want to let you know that they are being very, very careful now, about checking all the resumes and crap like that, so it's becoming more difficult . . . so maybe she can kind of get lost in the shuffle."   Ex. 532 at 11–12.   The defendant's statements followed e-mail communications to the defendant notifying him that admissions was carefully reviewing water polo Subco profiles, and that "we need to make sure that all information submitted to admissions is 100% correct."   Ex. 94.

- During the August 2018 wiretap call, when the defendant told Singer that admissions was "checking all the resumes" and that it was "becoming more difficult," but hoped that Huneeus would "get lost in the shuffle," Singer told the defendant: "If there's an

---

[4] *See* Ex. 589 at 2 (Heinel: "Are you gonna tell the family?  Or, uh, I just wanna make sure . . . that, um, you know, that doesn't get out . . . uh, you know, I'm always worried about those [high-school] counselor[s]."  Singer: "Totally [laughter] we already—we already dealt with that, absolutely.").

[5] *See* 3/22/2022 Trial Tr. at 151–52 (Chassin testimony that in the spring of 2018, she began to hear concerns from high-school counselors that "they were surprised that students were being admitted on the basis of their athletic talent, that they didn't think those students played on those teams or were particularly talented to be recruited at a Division I level.")

issue, Jovan, actually Donna and I have created a great relationship.  I don't think Donna will push back on you."  The defendant expressed no confusion, telling Singer, "Okay, . . . you know, resume is really the key I need."  Ex. 532 at 12.

- The defendant then distinguished between his legitimate recruits and the students that Singer brought him in the past, and he worried that admissions would ask questions about why he was recruiting "nobodies": "If somebody's a legit water polo player, and I want them, you know, then—then I can argue that this is somebody I want.  But the issue becomes when somebody really never played water polo, is really kind of a mediocre player, the—and the resume's weak.  That's when they can, you know, say, well why are you recruiting this girl?  Why—what is she going to bring, she's nobody, you know."  *Id.* at 15.

- Like Rudy Meredith and Ali Khosroshahin, the defendant agreed—in exchange for payments to his water polo program—to help Singer get coaches at other schools to "use a spot" in exchange for payments to those coaches.  *Id.* at 15–18.

- The defendant admitted that, in exchange for purporting to recruit Singer's clients, he received money in the form of payments to his water polo program and tuition payments for his sons, and he noted that "I don't need to benefit [] all the time": "You know, you help me with my, you know, program, with my kids.  And so, I don't always need to get the money from you for, for things, that you know, it's something that I don't need to benefit from all the time . . . [b]ecause you're already helping me.  You're already helping enough."  *Id.* at 20.

Further, during the January 2019 consensually recorded call, the defendant's own words confirmed his agreement with Singer to recruit purported water polo players to USC in exchange

for the tuition payments for his sons.  *See, e.g.*, *United States v. DiMasi*, 810 F. Supp. 2d 347, 364 (D. Mass. 2011), *aff'd sub nom. United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013) ("For *Petrozziello*, as well as other purposes, a defendant's later conduct can provide evidence of his criminal intent.").  Singer asked the defendant, "it's still OK for me to holler at you" to recruit a water polo player "because essentially what we've done in the past with the scholarships for your boys.  Correct?"  The defendant confirmed the agreement, again demonstrating his knowledge of the quality of the water polo players Singer had brought him in the past: "Absolutely, we just have to find the right person. . . . I used to be able to get 'em in much easier . . . [h]e can't just be a to-total nobody . . . so he has to be a water polo player, he has to have uh, uh somewhat decent uh resume . . . you know something that, that I can show that this guy is a legit or girl is a legit player." Ex. 625 at 2–3.

<u>Second</u>, testimony of cooperating witnesses and corroborating co-conspirator statements further support a finding, by a preponderance of the evidence, that the defendant was a member of the Singer-led conspiracies.  As the First Circuit has explained:

> A defendant's conviction for participation in a [] conspiracy may be upheld under a reasonable doubt standard on the basis of the uncorroborated testimony of a cooperating witness alone.  **Plainly, then, the testimony of a cooperating witness may be used to satisfy the lower evidentiary burden required by *Petrozziello*.**

*Mitchell*, 596 F.3d at 23 (emphasis added) (rejecting defendant's contrary argument as a "nonstarter" and holding that "the testimony of [] a cooperating witness was extrinsic evidence that was probative of the existence of the conspiracy . . . and [the defendant's] membership in that conspiracy").  This principle is well-established in the First Circuit.  *See, e.g.*, *Geronimo*, 330 F.3d at 76 (testimony of cooperating witness "certainly permitted the judge to conclude by a preponderance of the evidence that [the defendant] had joined the conspiracy" even where "the jury did not determine beyond a reasonable doubt that [the defendant] was guilty of the conspiracy

charge"); *Newton*, 326 F.3d at 259 (cooperating witness's testimony "led the district court to conclude that [the defendant] participated in the [] conspiracy"); *Portela*, 167 F.3d at 703 (cooperating witness's testimony about, and in-court identification of, the defendant supported *Petrozziello* finding).

The testimony of Ali Khosroshahin, along with the corroborating testimony of other cooperating witnesses like Laura Janke and Rudy Meredith, satisfies the *Petrozziello* standard.

- Khosroshahin testified that Singer approached him about doing side-door deals for unqualified soccer players at USC in exchange for money to his USC soccer program. 3/11/2022 Trial Tr. at 12–13.  Khosroshahin testified that he refused Singer's offer "because [it involved] lies and it wasn't right."  3/14/2022 Trial Tr. at 119.  Singer called Khosroshahin a boy scout, told him that he "needed to stop being so black and white and look for the gray," and directed him to go speak with the defendant, who "he'd been working with [] in the past."  3/11/2022 Trial Tr. at 14.  Khosroshahin went to speak with the defendant, prior to 2010, and Khosroshahin testified that the defendant told him to do side-door deals with Singer, "F*** 'em.  Just do it.  And tell them that they're the best players you've seen":

> A.   Yes, sir.  I went and visited him in his office.
>
> Q.   What happened?
>
> A.   I sat down and I told him of the situation that Rick had presented and that Rick had suggested I go and speak with him.
>
> Q.   And how did he react?
>
> A.   He was very straightforward.  His reaction was -- this is exactly what he said.  He said, "Fuck 'em.  Just do it.  And tell them that they're the best players you've seen."
>
> Q.   When Mr. Vavic told you to fuck 'em, just do it, what was your understanding of who he was referring to?
>
> A.   The admissions subcommittee.  The sub -- admissions.
>
> Q.   When Mr. Vavic told you to tell them that they're the best, what was your understanding of who he wanted you to tell that these student athletes were the best?
>
> A.   The subco.
>
> Q.   Were these students athletes that Mr. Singer was bringing you the best?
>
> A.   No, sir.
>
> Q.   What had Mr. Singer told you about them?
>
> A.   That they weren't good enough to play for my team.
>
> Q.   When the defendant told you to fuck 'em, just do it, tell them they're the best, what did you understand him to mean?
>
> A.   To lie about their abilities in order to help them gain

- During cross-examination spanning 193 pages of trial transcript, defense counsel did not ask Khosroshahin a single question about this exchange with the defendant. 3/14/2022 Trial Tr. at 117 (Q. "In five hours of cross-examination, were you asked a single question about what Jovan Vavic said to you in his office that day?" A. "No, sir."). During opening statements, the defense conceded that the defendant referred Khosroshahin to Singer. 3/10/2022 Trial Tr. at 83.

- Khosroshahin testified that he told FBI agents about the defendant's statements during his first interview with the government in April 2019, before he entered into a

cooperation agreement, and the defendant's statements are reflected in multiple interview reports of Khosroshahin. 3/14/2022 Trial Tr. at 122–23.[6]

- Khosroshahin testified that Singer kept him apprised of his side-door relationship with the defendant as part of the ongoing conspiracy, including that he was paying the high-school tuition of the defendant's sons "because of the same arrangement that had been in place . . . with getting students in." 3/14/2022 Trial Tr. at 42.

- Laura Janke corroborated Khosroshahin's testimony.  Among other things, Janke testified that Khosroshahin told her—at the time they entered into the conspiracy with Singer—that the defendant was also doing side-door deals with Singer. 3/21/2022 Trial Tr. at 179.

- Rudy Meredith corroborated Khosroshahin's testimony as well.  Meredith testified that *both* Khosroshahin and Singer encouraged him to join the conspiracy and told him that the USC water polo coach was doing side-door deals with Singer. 3/15/2022 Trial Tr. at 93, 95.  Meredith also testified about a May 2018 recorded phone call (Ex. 506[7]) with Singer, when Singer did not know he was being recorded, which directly corroborated Khosroshahin's testimony:

---

[6] Both of the FBI 302s of Khosroshahin's first two interviews with the government in 2019 support his testimony that the defendant told him to "F***" the USC admissions department and, in reference to doing side-door deals with Singer, to "just do it."  In response to the Court's inquiry, the government has not found any First Circuit case explicitly addressing whether a court may consider interview reports in making a *Petrozziello* determination.  The First Circuit has held that "trial courts may consider any non-privileged evidence, regardless of its admissibility, in making Rule 801(d)(2)(E) determinations" under *Petrozziello*. *See, e.g.*, *Paredes-Rodriguez*, 160 F.3d at 57.

[7] Corroborating Khosroshahin's testimony even further, Khosroshahin testified that he had never heard this phone call between Meredith and Singer and that he had no idea of what other evidence the government had of his conversation with Vavic. 3/14/2022 Trial Tr. at 122–23.

```
SINGER:   So, like I said, I, so I started with Ali, I
          actually started with the water polo coach who
          won six straight national championships on the
          men's and women's side, Jovan Vavic.
MEREDITH: Is he still there?
SINGER:   Oh yeah, absolutely he's been to the national
          finals every fricking year, in men's and women's.
```

```
MEREDITH: Right.
SINGER:   I started, I started with him, he gave me a spot
          on the boys side and a spot on the girls side,
          then I went to Ali once, and Ali's like, "oh I'm
          scared, I don't know, I don't know." I said,
          "listen, just walk over to Jovan and say hey
          listen, I met this guy Rick Singer, what do you
          think of him," right, boom then he got a little
          unscared and then he did it every year, and then
          I did it with Coach Hobbs, the baseball coach and
          then I did it with Coach Helton, the football
          coach, and then finally Donna said, "I can tell
          when the coaches present their kids, that they're
          yours." I said, "well that's good,
          congratulations."  "You can stop, then you don't
          need to go to them, just come to me," and that's
          what I've been doing, but I can't do that at all
```

<u>Third</u>, the testimony, documents and e-mails, financial records, and other evidence regarding Vanessa Feiwell and Johnny Wilson, including the defendant's own statements, satisfy the government's "more likely than not" burden under *Petrozziello*.[8]

The defendant's purported recruitment of Vanessa Feiwell, who had not played water polo in two years, in exchange for money demonstrates his involvement in the charged conspiracies by a preponderance of the evidence:

- In July 2015, the defendant e-mailed an athletic compliance employee at USC about "hypothetical[]" scholarships for high-school water polo players. Ex. 119. The e-mail did not say anything about Singer or the defendant's sons. *Id.* After the defendant forwarded the e-mail to his spouse, she responded by acknowledging that Singer would be paying their sons' high-school tuition, and that they "would not be receiving any kind of scholarship." *Id.*

- One month later, the defendant's spouse sent the defendant the tuition amounts for their sons, and the defendant forwarded the e-mail to Singer, saying "here are the amounts" and directing him where to mail the tuition check. Ex. 122. Singer paid their $37,970 in tuition the following day. Ex. 123.

- Less than one month later, Singer asked Laura Janke to create a falsified water polo profile for Vanessa Feiwell, telling her: "Charge me whatever you want. Jovan and I

---

[8] As noted above in discussing the August 2018 wiretap call, the defendant's agreement to "recruit" Agustina Huneeus in exchange for money—without knowing anything about her save that she was a water polo player from Marin Academy—corroborates the defendant's membership in the charged conspiracy. *See* Exs. 532 (wiretap call between Singer and Vavic), 781 (voicemail from Vavic to Singer), 549 (e-mail from Singer to Agustin Huneeus), 550 (wiretap call between Singer and Agustin Huneeus).

have already spoken." Ex. 126. Janke responded, "I will make a regular profile and also the type I used to make at USC so Jovan can have his pick." *Id.*

- Janke created a falsified athletic resume for Vanessa Feiwell, who testified that she had not played water polo in two years, and even when she did, was predominantly a junior varsity high-school player. 3/21/2022 Trial Tr. at 20–28 (Janke); 4/1/2022 Trial Tr. at 100 (Vanessa Feiwell).

- One month later, Vanessa Feiwell—purporting to be an elite high-school water polo player living less than an hour from USC—sent the falsified athletic resumes to the defendant. Ex. 132. The e-mail falsely stated that "per [their] discussion" she "would like to reiterate" that she wanted to play goalie for USC. *Id.* Vanessa Feiwell testified that there had been no discussion with the defendant. 4/1/2022 Trial Tr. at 108.

- Nevertheless, the defendant forwarded the profile to his assistant coach Casey Moon, directing him to add Vanessa Feiwell to their recruits for the Subco and to allocate a small scholarship for her. Ex. 132. Moon testified that he had never before heard of Vanessa Feiwell; that his understanding was that the defendant was recruiting Vanessa Feiwell; and, that the USC water polo coaching staff would never recruit (i) a player from California without seeing them play, or (ii) based on a resume alone. 3/30/2022 Trial Tr. at 38, 71, 74.

- Vanessa Feiwell did not know she was receiving a scholarship as a recruited water polo player, and Moon did not know Rick Singer. 4/1/2022 Trial Tr. at 93, 111. But one month after the defendant's e-mail to Moon directing him to add her to the Subco list and give her a scholarship, Singer texted Laura Janke: "[Vanessa Feiwell] is getting a 1% [scholarship] from Jovan." Ex. 706.

- At the defendant's direction, Vanessa Feiwell was presented to the Subco as a "top 10 goalie" in the country.  Ex. 139; 3/30/2022 Trial Tr. at 73 (Moon) (Q.  "Where did you get the information for that assessment of [USC Applicant's] abilities?"  A.  "Again, it's conversations with our head coach.").

- After the admission of Vanessa Feiwell, the defendant e-mailed her, asking her whether she would like to live in the same dorm "with water polo players."  Ex. 157.  Moon testified that freshman female water polo recruits at this time lived in the same dorm together as a matter of course, and that he—not Vavic—was generally the person who communicated with recruits about housing.  3/30/2022 Trial Tr. at 90.  Vanessa Feiwell told the defendant that she did not want to live with water polo players, but that she— a purported water polo recruit whom the defendant gave a scholarship—would "come to the pool at any time when help is requested."  Ex. 157.  Vanessa Feiwell also e-mailed the defendant if "your team needs help this year please let me know!" and that she would "help[] out the team or even work[] in the athletic office!"  Ex. 179.

- The defendant was also notified that Vanessa Feiwell told Moon that "Coach Jovan said I could not attend" an official visit that all recruits attended.  Ex. 133.  Moon testified that this was highly unusual.  3/30/2022 Trial Tr. at 87.

- In August 2016, Singer paid another year of tuition for the defendant's sons, $39,900.  Ex. 775.  Shortly thereafter, Vanessa Feiwell went to the defendant's office and re-confirmed to him that, "I haven't played water polo in a few years, and it would be scary going against these college water polo players."  4/1/2022 Trial Tr. at 115.  She left the defendant's office, never spoke with him again, and had no involvement with the USC water polo team.  *Id.* at 116–17.

- Less than two years later, the defendant was captured on a wiretap agreeing with Singer to recruit a purported water polo player that he knew nothing about (even her name) in exchange for money, hoping that she would "get lost in the shuffle"; warning Singer that admissions was "being very, very careful now, about checking out all the resumes and crap like that, so it's becoming more difficult"; and discussing the phony scholarships with Singer, telling him that Singer's "help" with "[his] kids" meant that "it's something that I don't need to benefit from all the time" because "you're already helping me enough." Ex. 532. And a few months later, the defendant confirmed on another call that he would pretend to recruit other purported water polo players from Singer, as long as they were not a "total nobody," telling Singer that he needed "something that, that I can show that [they are] a legit player." Ex. 625.

Further, the defendant's purported recruitment of Johnny Wilson further corroborates his involvement in the charged conspiracies:

- The e-mails between Singer and John Wilson provide evidence that the defendant agreed with Singer to recruit a water polo player in exchange for money, without regard for his ability or whether he would actually play. For example, on February 12, 2013, Singer advised Wilson that Vavic was "giving me 1 boys slot," Ex. 23, and later added that his son would not have to play or even "get in the pool." *See* Ex. 46; *see also* Ex. 24 ("the commitment is to be on the roster not attend all practices . . . frankly after the 1st semester he can move on"). The e-mails are explicit that the recruitment was contingent on a "payment to USC." *See* Ex. 32 ("When do we make our first payment to USC."); Ex. 33 ("let me know when u have verified u have it all completed and into Jovan. Also when and where to wire money.").

17

- Vavic's own statements corroborate this arrangement. For example, on October 4, 2013, after Singer sent the defendant Johnny Wilson's name, Vavic told Singer: "I need his resume, needs to be a good resume." Ex. 38. Thereafter, in response to Singer's e-mail noting that the "family is ready to help," Vavic promised to "present [him] with my top walkons." Singer replied: "The family is fully on board. All your help is always very much appreciated." The e-mails make no reference to Johnny Wilson's athletic ability—only to the need for a "good resume," and an exchange of "help" from the family for "help" from Vavic.

- Minutes after Vavic promised Singer to present Johnny Wilson with his "top walkons," his spouse, Lisa Vavic, forwarded his materials to assistant coach Casey Moon with the instruction: "This is a top walk on. Please save this and we will present him later." *See* Exs. 1491, 1495.

- The athletic resume for Johnny Wilson was falsified by Singer and, his Subco profile contained additional falsehoods supplied by Vavic. Indeed, on October 13, Singer advised Wilson that he would "embellish [Johnny Wilson's] profile more" at Vavic's request. *See* Ex. 39. The next day, Singer sent an associate purported accolades to include on the profile. Ex. 40. Less than an hour later, Singer instructed the associate to improve Johnny's swim times by several seconds. Ex. 41. Casey Moon testified that he later learned that several of the accolades on the profile were false. 3/30/2022 Trial Tr. at 51. Moon testified that he prepared a version of Johnny Wilson's profile to present to the Subco, and acknowledged that the Subco profile contained additional accolades that do not appear in the original resume. For example, the Subco profile describes Johnny Wilson as a four-year varsity starter, even though his resume did not

describe him as a starter. *Id.* at 55–56. A comparison of the resumes shows additional changes. *Compare* Ex. 1504 at 2, *with* Ex. 62 at 2. Johnny Wilson's description of his own achievements in the USC Water Polo media guide includes very few of these accolades, and notably, no reference to him ever serving as captain of his high-school team. Ex. 1669 at 17. Moon testified that his practice in preparing the Subco profile was to obtain the information from the resume Vavic sent him as well as from Vavic directly. 3/30/2022 Trial Tr. at 56.

- The Subco profile contained a false assessment of Johnny Wilson's talent. For example, it described him as a "Top 10 Attacker in Grad Class," which Moon testified meant that he was one of the top high-school players in the country that year. Ex. 1504 at 2. It further described him as an "[i]mmediate impact player." 3/30/2022 Trial Tr. at 57. Moon testified that this assessment represented Vavic's view. *Id.* This testimony is corroborated by Vavic's own e-mail to Alex Garfio, in which he described Johnny Wilson as a "legid walk on who could end up playing for us very soon." Ex. 61. Moon copied Vavic on his e-mail sending the falsified Subco profile to Garfio. Ex. 1503. Moon testified that after later seeing Johnny Wilson in the water on the first day of practice, it was clear to him that Johnny Wilson was neither a top 10 attacker nor an immediate impact player. 3/30/2022 Trial Tr. at 64.

- Following Johnny Wilson's admission, Wilson paid Singer $220,000, and Singer sent $100,000 to Vavic's water polo account. 4/1/2022 Trial Tr. at 159–61.

- Vavic ignored Johnny Wilson after his admission, and he quit the water polo team after his first semester, as Singer had advised his father he could. *See* Ex. 80 ("[He] sent an e-mail to Jovan but didn't hear back."); Ex. 771 ("[He] keeps sending emails to Jovan

but no luck.").  Moon testified that Johnny Wilson did not attend any practices after the first day.  In his e-mail quitting the team, Johnny Wilson thanked Vavic "for the incredible opportunity you have given me here at USC as an individual member on the team as well as a student at this school."  Ex. 91.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, based on the totality of the evidence—including the defendant's own statements, testimony from several cooperating witnesses, other documents and financial records, and corroborating co-conspirator statements—the government has proven (i) that it is more likely than not that the charged conspiracies existed (which the defendant concedes), and (ii) that the defendant was a member of them.  The government has therefore satisfied its burden under *Petrozziello*, and the Court should overrule the defendant's objections to the co-conspirator statements.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Ian J. Stearns*
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

_/s/ Ian J. Stearns_____
IAN J. STEARNS
Assistant United States Attorney