UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * * * | |
| v. | * * | Criminal Action No. 1:19-cr-10081-IT |
| JOVAN VAVIC, | * * | |
| Defendant. | * | |

ORDER

April 6, 2022

During trial in this matter, Defendant Jovan Vavic has objected to the government's introduction of certain out-of-court statements. The government contends that the out-of-court statements of Lawrence "Larry" Feiwell, Donna Heinel, Agustin Huneeus, Bruce Isackson, Davina Isackson, Laura Janke, Ali Khosroshahin, Steve Masera, Rudy Meredith, Jorge Salcedo, William "Rick" Singer, Lisa Vavic, John Wilson, and Leslie Wilson are admissible as coconspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E) and United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977). The court admitted the objected-to evidence subject to a limiting instruction that the out-of-court statements could not be considered for the truth of the matters asserted, pending further court order. Now, at the close of evidence, the court considers whether the government has met its burden under Petrozziello to allow admission of these out-of-court statements without the limiting instruction.

Under Federal Rule of Evidence 801(d)(2)(E), a statement offered against an opposing party that "was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. To admit statements under Petrozziello, the government "must establish by a preponderance of the evidence that (i) a conspiracy embracing both the

declarant and the defendant existed, and that (ii) the declarant uttered the statement during and in furtherance of the conspiracy." United States v. Pena, 24 F.4th 46, 61 (1st Cir. 2022).[1] "To satisfy Petrozziello and Rule 801(d)(2)(E), the proponent of a statement must introduce some 'extrinsic evidence' of the conspiracy." United States v. Ruiz, 999 F.3d 742, 748 (1st Cir. 2021). "In this context, extrinsic evidence means 'other evidence sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it.'" Id. (quoting United States v. Piper, 298 F.3d 47, 52 (1st Cir. 2002)); see also United States v. Portela, 167 F.3d 687, 703 (1st Cir. 1999) (While the court "may consider the contents of the statements at issue as evidence of the elements of a Petrozziello determination, the determination must rest at least in part on corroborating evidence beyond that contained in the statements at issue"); United States v. Sepulveda, 15 F.3d 1161, 1181-82 (1st Cir.1993) ("the preponderance of evidence required for the introduction of an out-of-court statement under Rule 801(d)(2)(E) must necessarily comprise more than the weight of the statement itself . . . [A] coconspirator's [out-of-court] statement, standing alone, is insufficient to meet the preponderance standard of Rule 801(d)(2)(E)").

---

[1] Petrozziello "explains that such a statement is admissible when the trial judge finds 'it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy.'" United States v. Ruiz, 999 F.3d 742, 748 (1st Cir. 2021) (quoting Petrozziello, 548 F.2d at 23). Other First Circuit decisions have concluded, however, that by joining a conspiracy at a later date, a defendant effectively adopted coconspirator declarations previously made. United Staes v. Saccoccia, 58 F.3d 754, 778 (1st Cir. 1995).

I. **Evidence of a Conspiracy Prior to 2013**

The <u>Second Superseding Indictment</u> [Doc. No. 505] alleged two conspiracies beginning in or about 2007. The government offered four pieces of evidence as to any conspiracy before 2013.

First, the government introduced Khosroshahin's testimony that in 2009, Singer told Khosroshahin that Vavic had worked with Singer in the past, that Khosroshahin then told Vavic of "the situation that Rick had presented and that Rick had suggested [Khosroshahin] speak to [Vavic]," and that Vavic told him "Just do it. And tell them that they're the best players you've seen."

Second, Khosroshahin testified that at some time after this conversation, he started lying to USC's athletic admissions subcommittee ("SubCo") and succeeded in having students admitted who would serve only as team managers, rather than as players, before he was terminated in 2013.

Third, Janke testified that at the time she started helping Khosroshahin present unqualified applicants to SubCo, Khosroshahin told her that Vavic was doing the same.

Fourth, the government offered Singer's recorded testimony telling Meredith in 2018 first that Singer "started with Ali," and then quickly correcting himself to say "I actually started with the water polo coach who won six straight national championships on the men's and women's side, Jovan Vavic." Singer then went on to say that Vavic was still at USC, and that Vavic "gave me a spot on the boys side and a spot on the girls side."

Based on this evidence, the court is unable to find by a preponderance of the evidence that a conspiracy between Vavic and Singer existed prior to 2013. The court finds Singer's 2018 statement as to how his scheme had evolved unreliable. By all accounts, Singer

routinely bragged about relationships with high profile and successful individuals to further his own reputation and to cause others to join his scheme, with little regard for the veracity of his statements. Singer also had a motive to claim that he started with Vavic rather than Khosroshahin, where Khosroshahin was fired by USC shortly after beginning his relationship with Singer and was an unsuccessful coach, while Vavic had national stature as the winning coach of numerous national championships over the previous two decades with continued tenure with USC.

   The court notes further that the government offered no corroborating evidence of Singer's claim that Vavic "gave me a spot on the boys side and a spot on the girls side." No evidence was introduced of any unusual payments to USC or Vavic, or any unusual SubCo packets, or any individuals who were admitted through SubCo during this period who did not play for Vavic's team. While Khosroshahin testified that he presented unqualified students to SubCo, the government offered no details of when prior to Khosroshahin's 2013 termination these students were presented to SubCo.

   As to Vavic's statement as recounted by Khosroshahin, the court notes first that while Khosroshahin was confident as to the exact words of that 2009 statement, that sharp memory was inconsistent with his generally poor recollection. Moreover, even assuming that his recollection was accurate, because he was not asked any details about his exact words to Vavic, the court is unable to assess what exactly Vavic was responding to. Moreover, as Singer was explaining his various schemes to Meredith, Meredith asked, "why didn't you tell me that before, man?" Singer responded: "Well, you know, our relationship is growing, we're dating . . . I can't give you, I can't ask you to marry me until we dated a little bit, right?" Amanda Feiwell also testified to her family's long and trusting relationship with Singer long

4

before there was any illicit action relating to her admission application. Given Singer's modus operandi of doling out *some* information about the schemes and building trust before suggesting illegal activity, there is a serious question of what "situation" Singer had presented to Vavic.

The court notes further that even if Vavic encouraged Khosroshahin—who had a losing team—to lie to SubCo, there is no evidence in the record (other than Singer's statements) that Vavic was himself lying, or indeed, had any reason to lie to SubCo at that time.

Finally, the court notes that Janke's testimony that Khosroshahin told her that Vavic was working with Singer supports Khosroshahin's claim that he believed Vavic was working with Singer, but does not make it more or less true, where the primary source for Khosroshahin's understanding was whatever Singer told him.

In sum, the government has not met its burden to establish a conspiracy prior to 2013. Thus, as to the out-of-court statements made by any of the declarants listed above prior to 2013, the statements may not be considered for the truth of the matter asserted.

## II.     Evidence of a Conspiracy Starting in 2013

The government's Opposition to Defendant's Objections to Co-Conspirator Statements Pursuant to Fed. R. Evid. 801(d)(2)(E) [Doc. No. 1215] addresses the evidence offered as to certain, but not all, of the legal elements of the charged conspiracy.

The court finds the evidence presented sufficient to establish by a preponderance of the evidence: (1) the existence of those elements of the conspiracy charged or a variance thereof, (2) Vavic's membership at some point in that conspiracy, (3) the membership of the declarants identified above (except as to Lisa Vavic) in the same conspiracy or a variance

thereof, and (4) that the proffered out-of-court statements were made in furtherance of the conspiracy or a variance thereof. Based on this finding, the court will allow the jury to consider the proffered out-of-court statements of the declarants identified above (except as to Lisa Vavic) for the truth of the matter asserted.

IT IS SO ORDERED.

April 6, 2022 /s/ Indira Talwani
United States District Judge