UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal Action No. 1:19-cr-10081-IT |
| | * | |
| JOVAN VAVIC, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

September 15, 2022

TALWANI, D.J.

After the court reserved ruling on Defendant Jovan Vavic's oral motion for a judgment of

acquittal at the close of the government's case, and the jury convicted him of all counts tried,

Vavic filed the pending Renewed Motion for Judgment of Acquittal or, in the Alternative,

Motion for New Trial [Doc. No. 1277]. For the following reasons, the motion for judgment of

acquittal is DENIED, but the alternative motion for a new trial is GRANTED.

## I.    Background

### A.    *Indictment*

The Second Superseding Indictment [Doc. No. 505] ("Indictment") charged Vavic with

conspiracy to commit honest services mail and wire fraud in violation of 18 U.S.C. § 1349

(Count 2); conspiracy to commit federal programs bribery in violation of 18 U.S.C. § 371 (Count

3); and honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 (Count 16).[1]

---

[1] Counts 2 and 16 also charged, respectively, conspiracy to commit mail and wire fraud and wire fraud. Indictment [Doc. No. 505]. The court concluded that the government could not proceed on a property fraud theory. Mem. & Order 9-18 [Doc. No. 564].

The Indictment also charged a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count 1), Indictment [Doc. No. 505], which the court dismissed on the government's motion, Mot. to Dismiss Count 1 [Doc. No. 784]; Elec. Order [Doc. No. 829].

The Indictment described a scheme masterminded by William "Rick" Singer. The government alleged that, in 2007, Singer founded the Edge College & Career Network, LLC (also known as "the Key"), which operated as a for-profit college counseling and preparation business. Indictment ¶ 10 [Doc. No. 505]. In or about 2012, Singer founded the Key Worldwide Foundation ("KWF"), a purported charity, as a non-profit corporation. Id. at ¶ 11. According to the Indictment, between 2012 and 2019, Singer paid university coaches and administrators at schools including the University of Southern California ("USC"), Georgetown University ("Georgetown"), and Wake Forest University ("Wake Forest"), to designate applicants as athletic recruits, thereby facilitating those applicants' admission to those universities. Id. at ¶¶ 13-15, 22-23. The payments were made both to university accounts and to the coaches and administrators personally. See e.g., id. at ¶¶ 25-29, 34-36, 43-44. Both types of payments were alleged to be unlawful bribes—a matter which is parsed in detail below.

At USC, the scheme was alleged to involve Vavic, the head water polo coach; Donna Heinel, the senior associate athletic director; Ali Khosroshahin, the head (and later former head) women's soccer coach; and Laura Janke, the assistant (and later former assistant) women's soccer coach. Id. at ¶¶ 2, 4-6. As to Vavic, the government alleged that Singer and other unnamed co-conspirators made payments to a bank account at USC that funded Vavic's water polo team and that these payments benefitted him professionally. Id. at ¶ 26. In addition, Singer allegedly made private school tuition payments totaling nearly $120,000 for Vavic's children, under the guise of a purported scholarship from KWF. Id. at ¶ 27. The Indictment alleged that in exchange for these payments, Vavic designated multiple students as recruits to the USC water polo teams, facilitating their admission to USC, and agreed to designate other students as water polo recruits in the future. Id. at ¶ 28. The Indictment alleged further that Vavic assisted Singer

in recruiting other participants to the scheme, including Khosroshahin, who then went on to recruit Janke and others. Id. at ¶¶ 48-50.

As to Heinel, the government alleged that between 2014 and 2018, Singer's clients made payments of more than $1.3 million (between $50,000 and $100,000 per student) to USC accounts designated by Heinel, typically one dedicated to the USC Women's Athletic Board. Id. at ¶ 51. Singer also allegedly directed payments of $20,000 per month from KWF to Heinel personally as part of a sham consulting agreement. Id. at ¶ 52. In exchange for the payments, Heinel allegedly designated more than two dozen students as athletic recruits, even though many of the students had fabricated athletic credentials, and some did not play the sport for which they were purportedly being recruited. Id. at ¶ 55.

William Ferguson was employed as the women's volleyball coach at Wake Forest. Id. at ¶ 3. The government alleged that in 2017, Singer sent, from one of KWF's charitable accounts, $50,000 to university accounts that Ferguson designated and another $50,000 to a private camp that Ferguson controlled in exchange for Ferguson designating an applicant as a recruit to the women's volleyball team, thereby facilitating her admission to Wake Forest. Id. at ¶¶ 93-102.

Gordon Ernst was employed as the head coach of men's and women's tennis at Georgetown. Id. at ¶ 1. The government alleged that between 2007 and 2018, Singer paid Ernst bribes, falsely labelled as "consulting" fees, totaling more than $2 million. Id. at ¶¶ 76, 116. In exchange, Ernst allegedly designated numerous applicants as recruits for the Georgetown tennis teams, including students who did not play tennis competitively. Id. at ¶ 77.

B.    *Trial Evidence*

Because Vavic challenges the sufficiency of the government's evidence, the court recounts the facts "in the light most favorable to the verdict." United States v. Paz-Alvarez, 799 F.3d 12, 18 (1st Cir. 2015).

1.    Singer's Side-Door and Test-Taking Schemes

Singer operated a business called the Key, which he advertised as "the nation's largest private life coaching and college counseling company." Ex. 1797 at 32. In 2012, he formed KWF as a tax-exempt 501(c)(3) entity "dedicated to providing low-cost resources to adolescents and young adults to inspire personal achievement and cultivate self-confidence through educational and athletic resources and events." Exs. 1284, 1293 at 1.

When dealing with parents and families, Singer held himself out as a traditional college counselor who could help their children find the right school and assist with the application process. Day 6 Trial Tr. 147:11-17; Day 16 Trial Tr. 103:3-12. Despite his "strong personality" and tendency to exaggerate, Day 6 Trial Tr. 146:12-25, Singer was able to build trust with families to the point that Vanessa Feiwell, one of his advisees, considered him "like another father figure," Day 16 Trial Tr. 117:22-118:7. Then, once a family was "in deep with him," Day 6 Trial Tr. 147:5-10, he would explain to the parents that he could get their children admitted to competitive universities as fake athletic recruits in exchange for a purported donation to the university's athletic department or sports team, id. at 148:3-151:12. Bruce Isackson, who paid Singer to have his daughters recruited and admitted to the University of California, Los Angeles ("UCLA") and to USC as soccer and crew athletes, respectively, testified that he understood the scheme to be illegitimate from the outset and that he believed that the majority of the money

would go to Singer and others involved in the scheme, not to the universities. Id. at 142:18-143:23, 153:8-154:9.

Singer called his recruitment scheme the "side door." Day 7 Trial Tr. 93:22-24. To make it work, he developed relationships with university coaches and athletic administrators who could facilitate the admission of his clients' children as athletic recruits, enabling them to bypass the general admissions process. Id. at 92:8-93:21. Singer's clients would pay KWF, and Singer, through KWF, would send a purported donation to the university athletic program or a payment to a coach's personal business, such as summer sports camp. Day 5 Trial Tr. 23:3-28:14. In some instances, Singer's clients would send purported donations directly to the university athletic program. Id.

Singer also facilitated a test-taking scheme, whereby his clients could pay to have their children's test scores altered. Day 7 Trial Tr. 31:14-32:5. Bruce Isackson and his wife, Davina, also participated in this part of Singer's scheme and paid to have an ACT proctor change one daughter's score. Id.

        2.     Overview of USC Admissions, Fundraising, and Athletic Recruitment

          a.     General Admissions

Approximately 22,000 undergraduate students attend USC. Day 12 Trial Tr. 108:13-14. In recent years, about 69,000 students have applied as prospective freshmen, and another 9,000 through the transfer process. Id. at 108:15-19. Between 8,000 and 9,000 students are admitted as freshmen for a twelve to sixteen percent admission rate, and of those, between 3,000 and 3,400 ultimately attend USC. Id. at 108:20-109:11.

Over the last twenty years, admission to USC has become increasingly competitive. Day 13 Trial Tr. 21:1-12. In the normal course, applicants to USC submit their high school

transcripts, standardized test scores, and several essays. Day 12 Trial Tr. 109:14-25. In 2019, the

average grade point average ("GPA") for incoming students was between 3.8 and 4.0. Id. at

111:10-14. Prior to 2019, USC required applicants to submit either an  SAT or an ACT score. Id.

at 111:22-25. For the SAT, the average score of incoming students was 1460 out of a possible

1600, and for the ACT, their average score was about 33 out of a possible 36. Id. at 112:1-5. In

earlier years, when the SAT was scored out of 2400 points, the average score for incoming

freshman was 2100. Id. at 139:8-12.

For prospective freshmen, the regular application deadlines are December 1 for

consideration for merit-based scholarships and January 15 for all applications. Id. at 110:1-5.

Applicants receive decisions on their admission by the end of March. Id. at 110:6-7.

> b.    Fundraising

In 2011, USC president C.L. Max Nikias announced the "Campaign for USC," a $6

billion capital campaign and the largest in the history of higher education. Exs. 1175, 1176. As a

result, the entire university was very focused on fundraising. Day 5 Trial Tr. 125:20-126:21. As

part of the campaign, Pat Haden, the director of the USC athletic department, launched a $300

million fundraising drive, which was the most ambitious in the athletic department's history. Ex.

1176.

USC has nineteen sports teams. Day 5 Trial Tr. at 95:22-23. The vast majority operate at

a deficit. Id. at 96:5-18. The athletic department provides a certain amount of funding to these

nonrevenue-generating sports, but the coaches are expected to bring in the remainder of their

operating budgets through fundraising. Day 6 Trial Tr. 76:5-23. The money raised by a coach

through fundraising goes to the team's gift account, which is university-controlled, but the funds

are used for the benefit of the team at the coach's discretion. Id. at 76:24-77:20. In addition to

being evaluated based on the success of their teams, coaches are evaluated on their ability to fundraise. Day 5 Trial Tr. 26:17-19; Ex. 1 at 42.

The USC athletic department also has its own fundraising, or "advancement," office. Day 13 Trial Tr. 92:23-93:4. Occasionally, administrators within the athletic department would ask coaches to "look" at prospective students to see if the students could be part of their teams. Day 5 Trial Tr. 128:24-133:6. These were generally students who came from wealthy families that might be able to make donations to the athletic department. Id.

Coaches did not receive any specific training in how to engage in fundraising. Id. at 21:1-3. The coaches did, however, frequently use Zillow—a real-estate website that provides value estimates of homes—to assess the wealth of the parents of prospective recruits. Day 6 Trial Tr. 58:23-59:5. The coaches may have been instructed on how to do this by Steven Lopes, the associate athletic director. Id.

Some applicants are of "special interest" to the school, generally based on their parents' wealth or social connections. Day 12 Trial Tr. 112:10-25, 114:18-25, 116:1-7. These students are placed on a "VIP list." Id. Although the students on the VIP list go through the general admissions process, at the end of that process, the dean of admissions gives them a "second look" and makes the final decision on their admission. Id. at 113:25-114:17. A student's placement on the VIP list improves that student's chance of admission to USC. Id. at 115:15-116:7.

        c.    Athletic Recruitment

The athletic admissions process differs from the general and VIP admissions process in several respects. Id. at 116:8-14. USC is a National Collegiate Athletic Association ("NCAA") Division I ("D-I") school. Day 4 Trial Tr. 129:10-22. D-I is the highest level of intercollegiate

athletics, and D-I schools have the largest athletic budgets. Id. As such, they can recruit the "best of the best" student athletes, including Olympians and national team players. Id.

Given the competition between schools to recruit these athletes, the timeline for athletic admissions is much earlier than for general admissions. Day 12 Trial Tr. 116:12-24. Under NCAA rules, D-1 coaches can begin reaching out to prospective recruits and evaluating them during their junior year of high school and can make verbal scholarship offers before the start of senior year. Id.; Day 15 Trial Tr. 38:14-22.

At USC, a special admissions subcommittee, known as "Subco," reviews the applications of prospective athletic recruits. Day 13 Trial Tr. 43:20-24. Subco is composed of six members of the admissions department. Day 12 Trial Tr. 116:25-117:17. In an average year, Subco considers between 200 and 250 applicants, including both first year and transfer students. Id. at 117:25-118:7.

At the time of the events at issue, the athletic recruitment and Subco process generally proceeded as follows. The coaches of each team decided who they wanted to recruit. Id. at 122:3-16. In making those decisions, the coaches had substantial discretion; there were no guidelines or rules regarding how coaches could or should select recruits or limiting the number of recruits a coach could designate. Day 5 Trial Tr. 99:6-15; Day 13 Trial Tr. 97:3-100:8. For each prospective recruit selected by a coach, the coach or his or her assistant would prepare an athletic "profile" or "resume" that listed the recruit's credentials and contained a short paragraph about the recruit's potential contributions to the team. Day 14 Trial Tr. 43:18-45:9. Coaches categorized the prospective recruits as "scholarship athletes," "one percent scholarship athletes," or "recruited walk-ons." Day 12 Trial Tr. 126:24-127:18; Day 13 Trial Tr. 53:8-10, 53:24-54:8. Scholarship athletes were those to whom the coach intended to offer full or partial financial

assistance. Day 12 Trial Tr. 127:10-18; Day 13 Trial Tr. 53:11-23. Coaches could also offer recruits a "one percent scholarship"—also known as a "book scholarship"—a nominal amount of financial assistance that roughly covered textbook costs. Day 13 Trial Tr. 53:24-55:15. Recruited walk-ons were athletes a coach was interested in but did not designate for scholarship funding. Day 12 Trial Tr. 127:10-18. Although recruits who received a one-percent scholarship were technically scholarship athletes, Subco viewed them in the same way as recruited walk-ons. Day 13 Trial Tr. 95:8-21. The coaches did not present the prospective recruits to Subco directly. Day 5 Trial Tr. 10:4-5; Day 12 Trial Tr. 123:4-6.

At the time of the events at issue, Heinel was the senior women's athletic director at USC as well as the athletic department's liaison with Subco. Day 5 Trial Tr. 9:24-10:12. Heinel did not coach any sport and had no responsibilities to recruit athletes. Id. at 10:19-11:4, 40:14-17. The coaches provided the athletic profiles and any other information about the prospective recruits to Heinel, or to one of her subordinates, Alex Garfio and Katie Fuller, who also acted as Subco liaisons. Day 5 Trial Tr. 10:4-12, 111:9-16; Day 12 Trial Tr. 123:7-124:4. It was the Subco liaisons' responsibility to present the information provided by the coaches about each prospective recruit to Subco. Day 5 Trial. Tr. at 10:13-18; Day 12 Trial Tr. 123:4-17.

In 2019, Subco met every two weeks throughout the year to review prospective recruits presented by Heinel or her subordinates. Day 12 Trial Tr. 123:9-10. Subco would review (1) a cover sheet with basic information about the recruit created by the athletic liaison; (2) the recruit's athletic profile, which had ostensibly been prepared by the coach; (3) any additional information from the coach about the recruit's athletic potential; (4) and the recruit's high school transcript and test scores. Id. at 124:7-21. Subco did not verify the accuracy of any of these materials. Id. at 124:22-25.

Subco's role is to balance a prospective recruit's athletic potential with his or her academic preparation. Day 12 Trial Tr. 117:18-24. In considering a recruit's athletic potential, Subco relies entirely on the athletic profile and any other information submitted by the liaison; Subco does not have the expertise to second-guess a coach's assessment of the recruit's athletic abilities. Id. at 141:15-142:1. In effect, Subco's role is to ensure that a prospective recruit is not "too academically risky" to attend USC. Day 13 Trial Tr. 57:6-58:22.

Subco would not have approved the recruitment of an athlete designated by the coach as a "practice player." Day 12 Trial Tr. 129:8-25. However, many sports teams have much larger rosters than players on the field, and not all recruited athletes compete during their first year or even years on the team. Id. at 130:1-18. In fact, some recruits never ultimately compete. Day 13 Trial Tr. 91:15-17. In addition, some recruits may be required to "redshirt," meaning that they participate in all team activities, such as practice and training, but do not compete during their first year in order to gain extra time to develop their athletic skills and abilities. Id. at 91:6-14; Day 15 Trial Tr. at 47:11-48:21.[2]

Although an athletic recruit may also be on the VIP list, Subco does not consider an applicant's "philanthropic potential," Day 12 Trial Tr. 119:24-120:25, and coaches are directed not to include information about an applicant's philanthropic potential in the material provided to Subco, Day 13 Trial Tr. 100:9-105:23; see also Ex. 855.1 (assistant USC sand volleyball coach apologizing for noting student's philanthropic potential in materials presented to Subco).

After reviewing a prospective recruit's information, Subco makes an admissions decision by majority vote. Day 12 Trial Tr. 136:23-137:3. Unlike in the general admissions process, the

---

[2] Under NCAA rules, an athlete has five years to complete four years of competition. Day 15 Trial Tr. 47:11-16.

vast majority of applicants considered by Subco are admitted to USC—as high as ninety percent. Id. at 118:8-18. Due to the importance of athletics to USC, recruits may be admitted despite having significantly lower grades and test scores than general admissions applicants. Id. at 121:1-21.

Once a recruit is admitted through Subco, the admissions department sends an admission approval letter. Id. at 130:19-131:13. The letter lets the recruit know that he or she has been approved for admission to USC. Id. When general admission opens, the recruit must typically submit an application, but one hundred percent of recruits who receive an approval letter are admitted. Day 13 Trial Tr. 55:12-24, 61:6-11.

3.      Vavic and USC Water Polo

a.      Vavic's Employment

Vavic began working at USC as a water polo coach in 1993, Ex. 1 at 112, and continued there until the time of his arrest in 2019, Day 14 Trial Tr. 28:5-8. Under his head coach contract and employment agreement, Vavic's general duties as head coach included "recruiting, team administration, public relations, media relations, fundraising activities, coaching and team discipline, and supervision over the hiring of all assistant coaches, part-time coaches, graduate assistants, volunteer coaches and any other University Athletic Department personnel who work in conjunction with the Team." Ex. 1 at 7.

On July 2, 2013, Vavic signed an amendment to the head coach contract for the twelve-year term beginning July 1, 2009, and ending June 30, 2021. Id. at 3. The amendment contained a section entitled "Termination by University for Cause." Id. at 5. It then defined "cause" to include, among other things:

> c.    any improper conduct that, in the University's sole judgment, reflects adversely on the University or its athletics programs;

. . .

h. as determined in the sole judgement of the University, Employee's provision of false, misleading or incomplete information relevant to the conduct of important University business, including but not limited to information provided by Employee during the interview and hiring process.

Id. at 5-6.

Throughout Vavic's tenure, his teams were extremely successful: every year, both the men's and women's teams ranked first or second nationally, and he was regarded as the best water polo coach in the country. Day 14 Trial Tr. 30:12-20, 120:18-19.

b. Water Polo Recruiting

Vavic's staff consisted of several assistant coaches, including Casey Moon. Day 14 Trial Tr. 27:5-28:8, 33:21-35:3. Although Vavic was ultimately responsible for recruiting decisions, the assistant coaches would travel to see potential recruits play and would give Vavic recommendations. Id. at 33:21-35:3. If they could not see a potential recruit play in person, the coaches might request video and talk with the recruit's high school and club team coaches. Id. at 35:21-38:11. As a result, the coaches were generally familiar with the "upcoming talent" in southern California. Id. Moon could not recall ever recruiting a water polo player without having seen him or her play, either in person or on video. Id. at 38:12-19.

The number of water polo players recruited varied by year and depended largely on team composition. Id. at 35:4-16. Due to the limited number of scholarships available to water polo recruits under NCAA rules, many of the athletes were recruited as walk-ons. Id. at 38:20-39:12. Moon testified that the water polo program did not recruit practice players. Id. at 40:16-19. He explained, however, that not every member of the team competed and that it "depend[ed] on personnel"; certain players might not compete because there were more "experienced players . . .

12

ahead of them." Id. at 101:16-103:20. In fact, of the thirty or more players on the men's team, only sixteen could travel to games. Id. at 102:16-23.

Garfio, one of Heinel's subordinates, was initially the water polo teams' liaison to Subco and was later replaced by Fuller. Day 15 Trial Tr. 42:13-19, 63:11-19. The water polo coaches would present their top recruits—those who had made verbal commitments to USC as well as any scholarship athletes—to Subco during the first meetings, in September or October. Id. at 38:14-41:17. This was important because Subco would consider only three water polo recruits per meeting, and the coaches wanted to be able to make commitments to their top talent as early as possible. Id. In an August 24, 2016 email to a number of coaches, Garfio suggested that "the early September meetings are usually a good time to squeeze in a few early commitments," given the limited number of Subco slots available to each team. Ex. 1400; Day 15 Trial Tr. 44:17-46:9. Walk-ons were presented later, sometimes as late as March. Day 15 Trial Tr. 41:5-17.

As assistant coach, Moon was responsible for compiling all the documents necessary for presenting prospective recruits to Subco. Day 14 Trial Tr. 43:18-24. Part of that entailed taking the athletic profiles sent to him by Vavic and putting them into the template preferred by Subco. Id. at 43:25-44:13. Moon would also add, at the bottom of each profile, a section entitled "assets to the team," which reflected the prospective recruit's potential contributions to the team. Id. at 44:14-45:9. Moon testified that he drafted this section based on the information sent to him and conversations with Vavic. Id. However, on multiple occasions, Moon and the other assistant coaches created the profiles, including the "assets to the team" sections, without Vavic's apparent involvement and sometimes with feedback from the Subco liaison. Exs. 1653, 1657-59, 1682.

The assistant coaches "copied" templates for the profiles and reviewed each other's work. See, e.g., Exs. 1657-59. On one occasion, Milos Skaljac, one of the assistant coaches, sent a draft profile to other assistant coaches—Marko Pintaric, James Shin, and Moon—asking them to "review the attached bio's" and noting, "[f]or the short paragraph please feel free to add more if needed." Ex. 1657. The assistant coaches also proofread the profiles, Ex. 1658, and suggested edits to each other, Ex. 1659.

At one point, Fuller asked Skaljac to change a profile, explaining, "[w]e can't say 'he is arguably one of the top goalies in the class' if he is a developing player . . . please rephrase his bio paragraph and resend!" Ex. 1682. Vavic was not copied on any of these communications but had previously sent Fuller an email telling her that the student with the objectionable profile "needs work" and would "not play immediately, needs at least 2 years" but that he was tall, a goalie, and came from a wealthy family whose parents "would be great supporters of our program." Ex. 1246.

Sometimes, Moon would send the prospective recruits' information to Garfio to get a "preread" on the recruit's potential for admission before preparing the athletic profile. Day 14 Trial Tr. 50:5-11; see, e.g., Ex. 1394. In December 2014, Garfio suggested to Moon, copying Vavic, that Moon "beef up [a prospective recruit's] talent as much as possible" before Garfio re-presented the recruit to Subco. Ex. 1396. In January 2015, Heinel emailed Vavic about "inconsistencies" in the accolades in the athletic profiles of several water polo recruits. Ex. 94. Heinel stated that she had given the resumes back to Moon to be corrected. Id. Moon said that he was "re-editing" the profiles and that, in the future, he would be sure that when "rewriting the resume" to Subco's format, he would make sure that all the information was correct. Id. Lopes

then responded that "We need to be sure that all information submitted to admissions is 100% correct." Id.

   c. Water Polo Fundraising

Despite the water polo teams' consistent success, water polo was a non-revenue-generating sport. Day 14 Trial Tr. 144:21-23. As a result, the water polo teams had to fundraise to make up any budget shortfalls and to supplement their operating budgets. Id. at 133:19-134:15; Ex. 1406 ("You are receiving this email because your overall 17-18 budget was overdrawn by $105,550 . . . [P]lease be sure to focus on building up your gift account in the coming months so that you are able to cover any future overages that you[] may have").

Fundraising was primarily the head coach's responsibility. Day 14 Trial Tr. 142:3-6. It was part of Vavic's annual evaluation and the one area in which he did not excel. Ex. 1 at 40-43. In Vavic's May 2013 evaluation, Lopes noted that "[s]ome of our development staff has concerns that you and your staff aren't fully committed to fundraising for the capital project." Id. at 42.

The water polo team fundraised in several ways, including an annual golf fundraiser, which raised approximately $100,000 per year. Day 14 Trial Tr. 31:2-32:20. The team also solicited donations from parents of athletes, alumni, and other supporters of the team. Id. at 141:11-17.

In addition, staff within the athletic advancement office would sometimes email Vavic and his assistant water polo coaches asking them to "follow up" or meet with students who had philanthropic potential or asking whether those students might "make sense" as "student managers." Exs. 1149, 1154, 1159, 1167. On at least one occasion, Vavic exchanged emails with Ron Orr, a USC associate athletic director, about a potential walk-on with wealthy parents. Ex.

1154. Orr asked Vavic whether he was "following this walk on for admission," to which Vavic responded that the candidate was "not a top recruit" but that the team needed goalies and that the candidate was "a good student" such that they should "not have a problem getting him in school." Id. On another occasion, Scott Wandzilak, a development officer in the athletic advancement office, emailed Vavic and Moon regarding a "[d]onor and potential recruit," asking them to meet with a female student whose parent was a "very high end donor prospect." Ex. 1149.

The government stipulated that during the entire period of the charged conspiracy, there was no reason to believe that any of the funds in the men's or women's water polo gift accounts were ever misused. Ex. 1815.

> 4.     Khosroshahin, Janke, and USC Women's Soccer

Beginning in 2007, Khosroshahin was employed as the head women's soccer coach at USC. Day 4 Trial Tr. 126:11-14. Janke was the assistant women's soccer coach. Id. at 130:19-22.

An important part of Khosroshahin's and Janke's jobs was recruiting student athletes to their team. Id. at 131:12-24. In considering whether to recruit an athlete, Khosroshahin and Janke considered athletic ability, technical ability, speed, and decision-making on the field. Id. at 131:25-132:3. To make these evaluations, the coaches would often observe the athletes playing on their high school or club teams or, if they were unable to evaluate the athletes in person, would invite them to a summer soccer camp. Id. at 132:4-14. They would also get references from the athletes' coaches and watch film of the athletes, obtained from the athletes themselves or their coaches. Id. at 132:15-24.

Khosroshahin and Janke never recruited for "nonplaying" positions, such as team managers. Day 5 Trial Tr. 7:24-25; Day 12 Trial Tr. 11:14-16. They did, however, recruit players who had potential but needed time to develop their skills before competing. Day 5 Trial Tr. 101:25-102:18; Day 12 Trial Tr. 84:5-85:25. These students were generally recruited as walk-ons, not scholarship athletes, and some might never ultimately compete. Day 5 Trial Tr. 102:19-103:3; Day 12 Trial Tr. 84:5-85:25. Khosroshahin and Janke did not refer to such recruits as "practice players," but other teams did. Day 12 Trial Tr. 84:9-17.

In 2013, Khosroshahin and Janke were both fired from USC. Day 5. Trial Tr. 93:11-14; Day 12 Trial Tr. 14:8-16.

> 5.    Singer's Involvement with USC Coaches Prior to 2013

> > a.    2009 or Earlier: Jovan Vavic

Singer reports that his side-door scheme "started with the water polo coach who won six straight national championships on the men's and women's side, Jovan Vavic, [who gave him] a spot on the boys' side and a spot on the girls' side." Ex. 506. There is no allegation or evidence that any payments from Singer went to Vavic personally during this period.[3]

> > b.    2009 to 2013: Ali Khosroshahin and Laura Janke

In 2009, Singer made a proposal to Khosroshahin: would Khosroshahin recruit a student to the soccer program in exchange for a donation from the family to the soccer team's gift account. Day 5 Trial Tr. 12:18-13:9; 14:25-15:1. After talking to Singer, Khosroshahin went to speak with Lopes, who was his direct supervisor, about "quid pro quos." Id. at 13:20-14:4;

---

[3] In a phone call between Vavic and Singer on August 3, 2018, Vavic told Singer that he was "in the freaking hole with [his] fundraising" because USC had cut his endowment. Ex. 532. Vavic then stated that a few years back was "a good time" when Singer was helping him out and that he now had to "actually fundraise." Id. The call provides no information regarding whether the "good time" that Vavic referenced could have been prior to 2013.

154:3-158:1. Khosroshahin went back to Singer and said that he was not interested in recruiting any of Singer's clients. Id. at 14:5-11. Singer called Khosroshahin a "Boy Scout" and told him to "stop being so black and white and look for the gray." Id. at 14:12-15. Singer also told Khosroshahin that Singer had worked with Vavic in the past and suggested that Khosroshahin speak with Vavic. Id. at 14:16-15:1.[4]

Khosroshahin went to Vavic's office, sat down, and "told him of the situation that [Singer] had presented." Id. at 15:24-16:6.[5] Vavic responded, "Fuck 'em. Just do it. And tell them they're the best players you've seen." Id. at 16:7-10. Khosroshahin understood "them" to be a reference to Subco. Id. at 16:14-17.

Following that conversation, Khosroshahin concluded that Vavic had taken Singer up on his proposal and that there was no reason for him not to do so as well. Id. at 17:12-14. In Singer's words, after Khosroshahin spoke with Vavic, Khosroshahin got "unscared and then he did it every year." Ex. 506. Khosroshahin figured that the extra money would allow him to spend additional time with the team and provide more resources for the team's success. Day 5 Trial Tr. at 17:18-22. He told Janke about Singer's proposal and said that Singer had told him that Vavic

---

[4] Singer did not testify at trial. The government did not introduce extrinsic evidence of the conspiracy sufficient to allow the court to find by a preponderance of the evidence that a conspiracy existed between Vavic and Singer prior to 2013 such that this evidence could be admitted under Fed. R. Evid. 801(d)(2)(E). See Order [Doc. No. 1227]. Accordingly, the jury was instructed that Singer's 2009 statement to Khosroshahin (and Khosroshahin's repetition of that statement to Janke) could be considered only to show its effect on Khosroshahin (and Janke) and not for the truth of the matter asserted by Singer. Day 20 Trial Tr. 249:9-250:5 (jury instruction regarding out-of-court statements).

[5] Khosroshahin did not testify to exactly what he said to Vavic, how he explained Singer's proposal, or if there was any suggestion that money would be paid to Khosroshahin personally rather than to a USC account. Day 5 Trial Tr. 15:25-16:6.

was involved in a similar arrangement. Day 11 Trial Tr. 178:6-179:9. In pitching the proposal to Janke, Khosroshahin presented it as legitimate development activity. Day 12 Trial Tr. 50:10-15.

At first, the students that Singer sent Khosroshahin were real soccer players, though not of the caliber that Khosroshahin and Janke would ordinarily have recruited. Day 6 Trial Tr. 66:21-67:2. And unlike with actual recruits, Khosroshahin and Janke did not observe Singer's students play soccer, review video of the students playing, or speak to their high school or club team coaches. Day 5 Trial Tr. 23:13-24. In exchange for Khosroshahin's recruitment of these students, Singer's entities made payments to the USC women's soccer gift account. Id. at 25:15-26:3; Day 12 Trial Tr. 11:22-25. Khosroshahin and Janke used the money for team-related activities: they took the team to Europe, purchased heart-rate monitors, and brought outside groups to work with the team. Day 5 Trial Tr. 26:4-16; Day 12 Trial Tr. 12:3-11.

In 2010, after Khosroshahin and Janke had begun to work with Singer, Lopes met with a group of the head coaches, including Khosroshahin. Day 6 Trial Tr. 44:11-45:14. Lopes told the coaches that if any of them had done work with Singer in the past, they should stay away from him. Id. A month later, Mike Garrett, then the athletic director at USC, was fired and replaced by Haden. Id. at 47:10-17. After that, Khosroshahin saw Singer all over the USC campus. Id. at 47:18-50:14.

Over time, Khosroshahin and Janke's arrangement with Singer changed in several ways. First, Singer began to send them students who were not soccer players at all, never mind low-caliber ones. Day 6 Trial Tr. 81:21-84:18. Second, instead of going to the team's gift account, Singer sent the money to Khosroshahin and Janke's summer soccer camp. Id. Although the camp was hosted on USC's campus, Khosroshahin and Janke owned the business, and the money went to them personally. Day 5 Trial Tr. 27:4-19; Day 12 Trial Tr. 12:12-25.

Between 2009 and 2013, Khosroshahin recruited seven of Singer's clients to the soccer team. Day 5 Trial Tr. 22:23-23:2. After Singer sent over information about the recruits, Janke would prepare the packets for Subco, including the athletic profiles. Id. at 24:21-25:1; Day 11 Trial Tr. 180:5-181:2. Because Singer's clients were unqualified for the women's soccer team, Janke would fabricate their accolades and their potential contributions to the team. Day 11 Trial Tr. 180:5-181:2. None of these students played on the team, but some participated as managers. Day 5 Trial Tr. 24:5-10.

6.      Singer's Involvement with USC Coaches and Administrators from 2013 to 2019

a.      2013: Recruitment of Amanda Feiwell

Before 2013, as described above, Singer had Khosroshahin and other coaches submit prospective recruits to Subco. After Janke and Khosroshahin were fired mid-year, though, Janke reached out to Heinel to ensure that the children of two of Singer's clients would still be admitted as soccer recruits. Day 12 Trial Tr. 14:17-18:21.

One of these clients was the Feiwell family. Day 16 Trial Tr. 102:8-13. When she was terminated, Janke was in the middle of a side-door deal to recruit Amanda Feiwell as a soccer player. Day 12 Trial Tr. 14:17-18:8. Janke talked to Heinel, who agreed to facilitate Feiwell's admission by presenting her to Subco. Id. The Feiwells ultimately made a $50,000 "donation" to the USC Women's Athletic Board, a fund controlled by Heinel, in exchange for Amanda Feiwell's recruitment to USC. Id.; Exs. 690, 773.

b.      2013: Recruitment of Johnny Wilson

Among Singer's clients were John and Leslie Wilson. Ex. 23. On February 12, 2013, Singer emailed the Wilsons, saying "Jovan is giving me 1 boys slot and as of yet no one has stepped up to commit." Id. A couple of weeks later, on February 28, 2013, Leslie Wilson

responded, asking Singer whether the spot at USC was still available and whether any other candidates were considering it. Id.

On March 26, 2013, Sanford, one of Singer's employees at KWF, sent an email to Singer with a tour itinerary at USC and Loyola Marymount University ("LMU") for the Wilson's son, Johnny Wilson. Ex. 24. Singer forwarded the email to John Wilson, who asked whether these were "generic tours" and whether the family would be meeting with any assistant water polo coaches. Id. Singer responded that LMU was "not very interested in Johnny" but that he had asked Vavic to meet the Wilsons on USC's campus, and that "Jovan just texted me, he will meet you all at 3:30 p.m. on Tuesday on the pool deck." Id.

Later that day, John Wilson emailed Singer again to ask "[i]f water polo and swimming are n[o]t realistic for [J]ohnny, then [w]hat are the schools he has a realistic shot at (without help)." Id. He then asked:

> Johnny also was wondering if he did the side door at USC is it a year round commitment? for two years min? Or one? Will he be traveling w team or stay home for road meets etc.
>
> What would a bench warmer position mean? Would the other kids know he was a bench warmer side door person?

Id. Singer responded that Johnny Wilson would not need to travel if he was not playing and that the commitment was simply to be on the roster for one year and to attend mandatory functions. Id. John Wilson wrote back that he would love for his son "to actually be committed and give it his best" so as not to "taint his meeting with USC coach." Id. Singer then reassured him that the USC men's water polo team had forty-two players, of whom more than twenty did not travel but only practiced, and that "[b]ench warming on the 4 time in a row national champion[ship] [team] is not bad as a freshman." Id.

On May 13, 2013, John Wilson asked Singer to meet that weekend to discuss Johnny Wilson's "USC package" for the coach. Ex. 26. On June 11, 2013, Leslie Wilson sent Singer some photographs of their son playing water polo. Ex. 29. On August 11, 2013, John Wilson emailed Singer to ask about the application timeline, to which Singer responded, "Jovan and I meet in 2 weeks and at that time he will give me his timeline for Johnny's stuff." Ex. 32. John Wilson sent another email asking about the timeline on August 23, 2013, to which Singer responded "Jovan is in Greece. He texted me yesterday that he wants Johnny's material not app around September 20th." Ex. 33.

In an October 3, 2013 email with the subject line "Johnny Wilson – Water Polo Menlo School – Stanford Club Polo," Singer wrote to Vavic "per our conversation" and attached Johnny Wilson's transcript and SAT scores but no athletic profile. Day 9 Trial Tr. 66:21-67:4; Exs. 38, 55. The next day, Vavic responded, "I need his resume, needs to be a good resume." Ex. 38.

On October 13, 2013, Singer emailed John Wilson that "Jovan has Johnny's stuff and asked me to embellish his profile more, which I am doing." Ex. 39. John Wilson thanked Singer and asked "[w]hen is Jovan going to be able to give us decision on USC?" Id. Singer responded that "Jovan will provide Johnny's info to admission when he does his other guys over the next month." Id.

The next day, Singer sent an email entitled "Johnny Wilson Profile – need ASAP" that contained a list of water polo and swimming accolades to an individual named John Margulies. Ex. 40. About forty-five minutes later, Singer sent another email asking Margulies to change the fifty-yard freestyle swim time from 22.49 seconds to 20.12 seconds and the one-hundred-yard freestyle swim time from 49.45 seconds to 43.98 seconds. Exs. 40, 41. On October 17, 2013,

Margulies sent Singer an athletic profile for Johnny Wilson, which reflected the accolades from Singer's first email as well as the faster swim times from the second email. Ex. 43. Singer forwarded the profile to John Wilson. Id.[6]

On October 23, 2013, John Wilson again emailed Singer asking about the expectations for Johnny Wilson if he got into USC through this "[water polo] approach." Ex. 46. Singer responded that he should "[j]ust be ready for practice in the fall as a player on the roster or just a member of the squad but not get in the pool." Id. John Wilson answered that he was "encouraging Johnny to focus on water polo this spring" and that he would "strongly prefer" Johnny to "play[] as hard as he can and at least suit[] up and scrimmage[] w[ith] the team." Id.

On January 21, 2014, Vavic emailed Singer to ask whether Johnny Wilson was still interested in USC and telling Singer that, if so, Vavic needed his fall grades. Ex. 55. Later that day, Singer responded that the family was "ready to help" and that he would send Vavic the grades. Id. Vavic answered that he could not "guarantee anything" but that he would present Johnny Wilson to Subco "after my top recruits" but "with my top walkons." Id.

That same day, Vavic's wife, Lisa Vavic, using Vavic's personal email account, emailed Johnny Wilson's transcript and SAT scores to Moon with the message, "This is a top walk on. Please save this and we will present him later." Exs. 1491, 1492, 1493, 1494. Shortly thereafter, she emailed Moon again, attaching Johnny Wilson's athletic profile. Ex. 1495. Prior to receiving these emails, Moon had never heard of Johnny Wilson, and it was unusual for him to receive emails about recruitment either from Lisa Vavic or from a personal, rather than a USC, email address. Day 14 Trial Tr. 48:2-49:4.

---

[6] There is no evidence that Vavic was aware of these exchanges or the changes to the swim times. Day 9 Trial Tr. 101:2-103:24. Nor did the government present any evidence regarding Johnny Wilson's actual swim times.

On February 26, 2014, Vavic emailed Johnny Wilson's athletic profile to Heinel's subordinate, Garfio, and forwarded the same email to Moon. Ex. 62. Ten minutes later, Vavic emailed Garfio again, attaching Johnny Wilson's current semester grades along with the message:

> Alex, This kid would be the fastest player on our team, he swims 50 y in 20", my fastest players are around 22", this kid can fly, he was the captain of his hs team as a sophomore, great work ethic, was ALL CCS, he is a legi[t] walk on who could end up playing for us very soon.

Ex. 61. Vavic then forwarded that email to Moon. Id.

After receiving the emails from Vavic, Moon used that information to prepare an athletic profile. Day 14 Trial Tr. 55:1-15. About an hour later, Moon emailed the new profile to Garfio, copying Vavic. Ex. 1503, 1504. Moon asked Garfio to print the profile and add it to Johnny Wilson's Subco packet. Ex 1503.[7]

Johnny Wilson was presented to Subco as a water polo recruit on February 28, 2014. Ex. 1508. The Subco packet included both the profile prepared by Marguiles and the one prepared by Moon. Ex. 64. Based on his grades and test scores, Wilson would not have been competitive at USC in the general admissions process. Day 12 Trial Tr. 138:23-139:21. Based on his athletic profiles, however, Subco believed that he had considerable athletic talent. Id. at 139:22-143:1. The members of Subco who reviewed Wilson's materials do not appear to have noticed that there were two different profiles containing different information; Subco did not ask for any follow-up information regarding the discrepancies, and the contradictions did not impact Subco's

---

[7] The profile Moon sent to Garfio differed in several respects from the one that Vavic had forwarded Moon an hour prior. Compare Ex. 62 with Ex. 1504. Moon testified that he did not remember where he got the different information but that his "practice" was to get it from the original profile and his conversations with the head coach. Day 14 Trial Tr. 55:20-56:17. Moon testified that he did not have any specific memory of any conversation with Vavic about Johnny Wilson. Id. at 56:22-57:22.

decision. Day 13 Trial Tr. 128:7-133:4. Subco voted to admit Wilson as a recruited walk-on. Exs. 64, 1508.

On March 1, 2014, John Wilson emailed Singer to thank him for "making this happen" and to ask about options for making the payment. Ex. 769. On March 30, 2014, John Wilson exchanged emails with someone who appears to be his assistant regarding the payments for Singer's services: $100,000 was to go to the Key, another $100,000 to KWF, and $20,000 to Singer personally "for his expenses." Ex. 70. On April 15, 2014, Steven Masera, who did the accounting for the Key, emailed Singer asking when to pay USC water polo for Johnny Wilson and USC baseball for another student. Ex. 76. Singer responded, "ASAP if we can afford it." Id. The next day, Singer remitted a $100,000 cashier's check to USC men's water polo, which noted "Wilson family" as the "purpose/remitter." Ex. 77. USC associate athletic director Orr sent a letter to John and Leslie Wilson on July 28, 2014, thanking them for their generous gift to the men's water polo team. Ex. 81.

On July 22, 2014, John Wilson emailed Singer asking about the start date for water polo and explaining that Johnny Wilson had emailed Vavic but had not heard back. Ex. 80. Singer responded the next day that the first practice was August 19, and that Johnny Wilson would need to "create a relationship" with Vavic "if he wants to be on the team." Id. The next day, John Wilson emailed Singer again saying that his son was not having any luck reaching Vavic and asking for Vavic's cell phone number. Ex. 771.

Moon remembered seeing Johnny Wilson at water polo practice on the first day but not after that. Day 14 Trial Tr. 62:5-63:13. Nor could Moon recall Johnny Wilson ever playing for the team. Id. At some point, Moon heard "chatter" from the other players on the team that

Johnny Wilson had suffered a concussion. Id. at 63:14-17. On January 12, 2015, Johnny Wilson

emailed Vavic the following note:

> I hope that you had a great break and wonderful holiday season. I wanted to thank you
> and illustrate how profoundly appreciative I am for the incredible opportunity you have
> given me here at USC as an individual member on the team, as well as a student at the
> school. Unfortunately, this was a much bigger commitment than I had planned on making
> and despite by best efforts, my grades reflected my inability to balance my academic and
> athletic life. Along with my academic struggles, I am also still very conscientious about
> my situation regarding my head. While water polo has gotten me very far in life and
> always played a major role, I must start considering being more careful with my head. I
> already have 3 diagnosed concussions and with a very likely fourth concussion looming
> in the near future I must start considering my future. Because my body is already starting
> to burn out from water polo, I need to make sure the same doesn't happen with my head.
> I will need to use my brain for the next 70 years and for this reason I need to be focusing
> more on my academic life and my future over water polo. For these reasons, I will not be
> playing water polo this semester and will be focusing on my academic life and my future
> career in the business world.

Ex. 91.

       c.     2015-2016: Recruitment of Vanessa Feiwell

Singer began working with Vanessa Feiwell during her sophomore year in high school as

a traditional college counselor. Day 16 Trial Tr. 101:5-6, 103:3-12. At some point, Singer told

Vanessa Feiwell that if she was interested in being a manager for the water polo team, Singer had

connections at USC who could help her do that. Id. at 103:13-20. Feiwell was interested; she had

played water polo during her freshman and sophomore years of high school but was not

nationally ranked and thought it would be "cool" to be involved with the team. Id. at 101:7-

102:7, 103:16-20, 114:14-18.

On September 22, 2015, Laurence Feiwell, Vanessa Feiwell's father, emailed Singer

three different photographs of his daughter playing water polo. Exs. 126, 779, 780. Singer

forwarded the photographs to Janke with the note, "Laura can you do a profile for Vanessa

Feiwell for Water Polo. I will send info today. Charge me whatever you want. Jovan and I have

already spoken." Exs. 126, 779, 780. Janke responded that she would make "a regular profile and also the type I used to make at USC so Jovan can have his pick" and noted that she could "add in any awards" if Feiwell did not have any. Ex. 126. A few days later, Janke sent Singer two profiles for Feiwell in two different formats so that "Jovan can choose which one he prefers." Ex. 129. Janke added that Singer should let her know if Vavic needed something different. Id. Singer forwarded the profiles to Vanessa Feiwell, Ex. 130, but she did not review the content of the profiles at that time and was unaware that they contained fabrications of her athletic credentials, Day 16 Trial Tr. 105:9-11, 110:6-19.

On October 1, 2015, Singer sent Vanessa Feiwell an email, attaching an unofficial high school transcript, SAT scores, and one of the profiles created by Janke. Ex. 131. Singer instructed Feiwell to "[s]tart over with a new email" and to send the attachments to Vavic with the following message: "Coach Vavic per our discussion I am sending you copies of my Transcript, Unofficial Test Scores, and Water Polo Profile. I would like to reiterate that I would love an opportunity to play goalie for you and attend USC." Id. The email also instructed her that Singer "should not be near any of the emails" and that she should let Singer know once she had sent the email to Vavic. Id.

Vanessa Feiwell did as instructed. Ex. 132. Despite the content of the email to Vavic, though, Vanessa Feiwell had never met with or had a conversation with Vavic. Day 16 Trial Tr. 108:8-25. On October 2, 2015, Vavic forwarded her email to Moon, saying "[i]f it is not to[o] late please add Vanessa for the [S]ubco, we need another goalie, scholarship is books as the others." Ex. 132. Despite his familiarity with water polo players in the area, Moon had never heard of Feiwell prior to receiving this email from Vavic. Day 14 Trial Tr. 69:21-70:1. Vavic also responded to Vanessa Feiwell, thanking her for her email and letting her know that Moon

would contact her if he needed any additional information. Ex. 778. Moon prepared a profile for Feiwell's Subco packet based on the athletic profile attached to Vavic's email. Day 14 Trial Tr. 71:20-72:2; Ex. 139.[8]

On October 19, 2015, Moon emailed Vanessa Feiwell, asking her to confirm her attendance at an upcoming official visit. Ex. 794. The next day, Moon emailed Vavic to inform him that three women, including Feiwell, had cancelled their official visits. Ex. 133. As to Feiwell, Moon noted that she had said "Coach Jovan said I could not attend the visit this weekend." Id. Feiwell did not remember discussing the visit with Vavic and believed that Singer must have coordinated any such communication. Day 16 Trial Tr. 126:9-21. The email also asked Vavic a question about flight travel lists. Ex. 133. Vavic responded to the portion of the email concerning travel but did not respond to the information about the official visit cancellations. Id.

On November 18, 2015, Janke texted Singer, "Did I need to do anything for Feiwell? I know the girl is going through Jovan but i[s] the boy going to go t[h]rough golf?" Ex. 706. Singer responded, "Boy is going through Cynthia Cooper. Donna figured it out and called me. She asked me to go to her with Feiwell and she will figure it out. She wants first semester grades but they will not be out till Feb. Vanessa Feiwell is getting a 1% from Jovan." Id.

On November 30, 2015, at Vavic's direction, Moon emailed Garfio, with a copy to Pintaric, asking Garfio to add Feiwell to the Subco list. Day 14 Trial Tr. 82:8-83:23; Ex. 1734.

---

[8] As with Johnny Wilson's profiles, there were discrepancies between the one that Vavic forwarded to Moon and the one that Moon prepared for Subco. Day 14 Trial Tr. 72:6-16; compare Ex. 132 with Ex. 139. Moon did not recall where he got this different information but again testified that it was his practice to get it, in part, from the head coach. Day 14 Trial Tr. 72:17-25.

On January 15, 2016, Heinel emailed Singer "Are we still Ok to present Vanessa Feiwell" at the next Subco, which was to be on January 28. Day 8 Trial Tr. 142:18-19; Ex. 1726. Singer responded, "Absolutely. She will come to USC for sure." Day 8 Trial Tr. 142:20-21; Ex. 1726. Feiwell was presented to Subco on January 28, 2016, and Subco voted to admit her. Ex. 139.

On February 1, 2016, Heinel emailed Singer confirmation that Feiwell had been admitted as a recruited walk-on through Subco with her admission approval letter attached. Ex. 142. On February 10, 2016, Laurence Feiwell sent a $50,000 check to USC Athletics for "WOT Donation." Ex. 774. "WOT" stands for "Women of Troy" and pertained to a gift account controlled by Heinel. Day 12 Trial Tr. 64:8-65:5.

On April 29, 2016, Vavic emailed Vanessa Feiwell asking whether she would like him to request housing for her and whether she would like to be in the same dorm as the water polo players. Ex. 157. Vanessa answered that she would "love to live in one of the new north buildings" and would "prefer to be roomed with a random roommate." Id. Vavic responded that the water polo players were housed in Fluor Tower, near the pool, and asked whether Vanessa would like him to coordinate that. Id. Vanessa again asked for help with different accommodations, and Vavic explained that he could only help with Fluor Tower. Id. Vanessa ultimately did not live in Fluor Tower, and Moon initially stated that he could not recall any other recruit who did not live in Fluor Tower. Day 14 Trial Tr. 90:14-19. Moon later testified, though, that other water polo recruits, including two of Vavic's sons, did not live in Fluor Tower. Day 16 Trial Tr. 58:13-15.

On July 20, 2016, Vanessa Feiwell emailed Vavic about meeting to discuss her schedule for "helping out the team." Ex. 179. Vavic answered that he was in Europe, and Feiwell

responded that they could talk when he returned. Id. Shortly after Feiwell began her freshman year, she visited the pool to speak with Moon and Vavic. Day 16 Trial Tr. 114:21-115:12. This was the first time that she had spoken with Vavic. Id. at 115:13-16. Feiwell introduced herself and said that she was excited to help out the team, at which point Vavic asked if she wanted to jump in the pool and block some shots. Id. at 115:17-116:12. Feiwell said that she would not feel comfortable doing so. Id. at 116:8-116:23. The entire conversation lasted about two minutes, and at the end, Moon told her that he would be in touch if the team ever needed help. Id. Neither Vavic nor Moon ever contacted her after that point, and she never played nor had any other involvement with the team. Id. at 116:13-117:8; Day 14 Trial Tr. 90:20-23.

        d.      2015-2018: Tuition Payments for Vavic's Children

Vavic and Lisa Vavic' four children played water polo at the highest levels, including the Olympics. Day 14 Trial Tr. 92:10-95:23. Their two youngest sons are Marko and Stefan. Id.

On July 22, 2015, Vavic emailed Scott Simon, the director of athletic compliance at USC, to ask a question about "[h]igh [s]chool players who are receiving financial aid/athletic scholarship from their high schools." Ex. 1355.1. Specifically, Vavic wanted to know whether the NCAA cared if, hypothetically, a high school student received financial aid or an athletic scholarship from a donor who was a graduate of the university that the high school student ultimately attended. Id. Vavic forwarded this email to Lisa Vavic, who changed the subject line to "Loyola High School Payment" and responded,

> Marko and Stefan would not be receiving any kind of scholarship. Someone would be paying their tuition directly. I do not know if Rick Singer is a booster in anyway with USC. I have feeling that he is not so that he remains unbiased with all schools as he sits on different admissions boards for the colleges and always rotates those boards.

Ex. 119.1.

Under NCAA rules, a booster is anyone who has participated in a specific university's athletics program, made financial contributions to the athletic program, or otherwise promoted the university's athletics program. Day 7 Trial Tr. 155:12-16. The NCAA has a number of rules concerning what boosters can and cannot do when it comes to athletic recruits. <u>Id.</u> at 155:17-23. And recruits can be disqualified from competing for violations of these booster rules. <u>Id.</u>

A couple of days later, Simon answered Vavic's email and explained:

> The basic rule is that before an individual gets to college, except for the people/groups listed below, anyone can pay for their educational expenses (e.g., tuition, fees, room and board, books, tutoring, standardized test preparatory classes) as long as the payments goes directly to the school/tutor/service provider (as opposed as to the [prospective student-athlete]). However, the following people/groups cannot:
>
> - agent
> - professional sports team/organization
> - booster
>
> . . . .

Ex. 1355.1; Day 8 Trial Tr. 121:7-122:8.

On August 27, 2015, Lisa Vavic emailed Vavic the Loyola High School identification numbers for their younger two sons, the amount of tuition due for freshmen and juniors, and the address to which tuition checks should be sent. Ex. 121. Vavic forwarded this information to Singer with the message "Here are the amounts for Marko and Stefan and their ID numbers." <u>Id.</u> Singer, in turn, forwarded the email to Masera and asked Masera to "[p]lease pay these from our foundation as scholarships. In a [separate] note please make sure to put names and ID numbers." <u>Id.</u> Singer then responded to Vavic that his staff would "take care of" the tuition payments the next day. Ex. 122. On August 28, 2015, KWF sent a check in the amount of $37,970 to Loyola High School for Marko and Stefan's 2015-2016 tuition. Ex. 123.

About a year later, on August 3, 2016, Vavic forwarded a similar email with tuition amounts from his wife to Singer. Ex. 181. Singer said that he would ask his office to send the

payments by the end of the week, id., and then emailed Masera asking him to do so, Ex. 772. On August 4, 2016, KWF sent a check in the amount of $39,900 to Loyola High School for Marko and Stefan's 2016-2017 tuition. Ex. 775. KWF made two additional payments to Loyola High School, one on August 4, 2017, in the amount of $20,400, for Stefan's 2017-2018 tuition, and the second on July 3, 2018, in the amount of $21,175, for his 2018-2019 tuition. Exs. 776, 520.

        e.      2017: Heinel's Further Involvement

In July 2017, Janke and Khosroshahin had the following text message exchange regarding Heinel's involvement in the scheme.

| | |
|---|---|
| JANKE: | Rick has Donna in his back pocket. |
| KHOSROSHAHIN: | What happened[?] |
| JANKE: | He sent me an email tonight asking me to do about 8 or 9 profiles of kids Donna is presenting. |
| KHOSROSHAHIN: | Damn |
| JANKE: | Yeah. He said he met with her already this summer about them. He doesn't even need the coaches anymore |
| KHOSROSHAHIN: | Good for him. |
| JANKE: | He may still be using coaches but that is just my guess |
| KHOSROSHAHIN: | He's probably doing both |
| JANKE: | Yeah |

Ex. 707.

        f.      2018: Recruitment of Augustina Huneeus and other Water Polo Players

On August 3, 2018, Singer and Vavic had a phone call, which was intercepted by an FBI wiretap. Day 8 Trial Tr. 158:16-23; Ex. 532. Vavic noted that he and Singer had not spoken in a couple of years prior to this call. Ex. 532.

The call began with a long discussion of the search for a new USC president. Day 8 Trial Tr. 162:5-7.

The conversation then turned to the donations that Singer had made to pay Vavic's sons' tuition. Ex. 532. Singer said that someone from Loyola High School had asked why KWF was funding Stefan Vavic's tuition and that Singer had responded "we've got an amazing young man in our foundation, we fund amazing kids. And he was selected to be funded just like, um, the rest, his brother." Id. Vavic said that he appreciated that but then asked Singer to confirm that he was not a USC booster because Stefan Vavic was being recruited to USC. Id. Singer said that he was not a booster and assured Vavic that his foundation had "scholarshipped 1,000 kids" that year. Id.

At that point, Vavic told Singer that he was "in the freaking hole" with fundraising because USC had cut his endowment. Id. Vavic said that a few years back was "a good time" when Singer was helping him out but that he now had to "actually fundraise." Id. He told Singer that this was "good news for you" if Singer had "anybody out there . . . that's a water polo player." Id. Singer responded,

> So there is a girl, that is going, that I was gonna go through Donna because she's now, you know she was on my ass about doing that. There is a girl, that . . . she is a water polo player, and she plays at . . . Marin Academy. And she is a water polo player, and we were, and we're gonna go through Donna, but if you'd prefer, I can just say, I'm gonna go through you. And then you can present her to Donna . . . and then Donna can present her. And then that way . . . I can have the money funded to you.

Id.

Vavic asked whether Heinel already knew about the girl, and Singer answered that she did not. Id. Vavic said that maybe the girl was in his summer camp, but Singer said that she had been in Europe all summer. Id. After Vavic explained that it was getting harder to recruit athletes with low grades, Singer reassured Vavic that the girl he was discussing had "like a 3.6, 3.7, uh, 3.8 GPA" and "a 1380, 1350" test score. Id. Vavic responded "[o]kay, so that's not so bad" and that USC was now "being very, very careful . . . about checking out all the resumes and crap like

33

that." Id. As a result, Vavic explained, it was "becoming more difficult, but it would be easier . . .

to squeeze her in possibly in November, when I squeeze in all of my top 7-8 kids, so maybe she

can kind of get lost in the shuffle rather than later." Id. Singer told Vavic that he had created a

"great relationship" with Heinel and that Heinel was unlikely to "push back" on him. Id. Vavic

then asked Singer to get the student's name and information and explained that the "resume is

really the key." Id. Singer said that he was just waiting on an action shot and that he would not

tell Heinel about the girl so that Vavic could "get funded." Id.

Singer then said that he might also have a boy and asked whether Vavic would be able to

take two girls from the same school. Id. Vavic answered,

> Well, it all depends on . . . their resume. No, it wouldn't be difficult, it really all depends
> . . . what kind of a water polo program they have, how they are, and what really—how
> can I present them and squeeze them in. You know if . . . somebody's a legit water polo
> player, and I want them, . . . then I can argue that this is somebody I want. But the issue
> becomes when somebody never really played water polo, is really kind of a mediocre
> player, . . . and the resume's weak. That's when they can, you know, say, well why are
> you recruiting this girl? What is she going to bring, she's nobody, you know.

Id. Singer explained that he always told USC that the recruits would be "really good practice

players," but Vavic countered that, these days, walk-ons had to have grades that were almost as

good as regular admittees and that "somebody who's 3.3 and 1000 will not get in as a walk-on."

Id. Singer assured Vavic that "these kids'll be like 3.7, 3.8, 3.9 with good test scores," and Vavic

responded, "that makes it easier for me." Id.

Singer then told Vavic, "remember this, I can always get you a lot more money if you can

help me get somebody into, like, use a spot, at a Harvard, at a Princeton . . . places like that,

where I can get the family to help you and help that program. That make sense?" Id. Vavic said

that he could help because he was very good friends with the water polo coaches at Harvard and

Brown but that those programs had limited recruitment spots. Id. Vavic said that he would talk to

them, though, and find out about their "situation with fundraising." Id. Vavic also told Singer

that he was friendly with the coaches at San Jose State and UC Davis, and that although the

water polo programs were "not at the same level" as USC, "everybody needs money." Id.

Vavic then turned the conversation back to the issue of whether Singer was a booster,

explaining that he was "so freaking concerned about making sure that . . . we do everything by

the book" because the tuition funding was "too small of an amount of money" to get in trouble

over. Id. Vavic then added,

> to be honest with you, I don't mind sometimes if . . . this is all the way it is to help you
> out in many other ways with other schools . . . . You know, you help me with my . . .
> program, with my kids. And so, I don't always need to get money from you, for things
> that you know . . . I don't need to benefit from all the time. I'm okay with that. Because
> you're already helping me. You're helping enough.

Id.

On August 24, 2018, Singer emailed one of his clients, Agustin Huneeus, with the subject

line "Re: USC," asking for his daughter Agustina's unofficial transcript, her test scores, and a

picture of her playing water polo. Ex. 549. Agustin Huneeus responded that he finally had a

photo. Id.

In an August 30, 2018 phone call, Agustin Huneeus asked Singer to explain the "water

polo thing again," including "the economics, the timing, how it all works." Ex. 550. Singer

answered that he was putting together Agustina Huneeus's profile and that it would be for water

polo. Id. Singer would then give all of her information to the senior women's athletic director,

who would present Agustina Huneeus to Subco. Id. Singer explained, however, that this case

would be "a little different because Jovan is totally supporting our applications." Id. Agustin

Huneeus asked Singer why that was the case, given that his daughter was "not worthy to be on

that team." Id. Singer responded that Vavic was "my guy," and was "giving up one of his spots," so instead of women's athletics giving up a spot, he's giving up his spot." Id.

Agustin Huneeus then asked if Vavic was giving up his "water polo spot," and Singer answered "yes, and he know's she's not coming to USC to play." Id. Singer elaborated, "I've been working with him for twelve years, and I have actually helped all of his kids get into college all over the country. So I've helped all four kids, at no cost to him." Id.[9]

After further explaining the Subco process, Singer stated that once Agustina Huneeus received her admission approval letter, Agustin Huneeus would write a $50,000 check to Heinel, made out to USC Women's Athletics. Id. Once the final offer of admission arrived, he would send another $200,000 to KWF, and Singer would talk to Vavic about how to split up the money. Id. Singer told Agustin Huneeus that "what Jovan usually does is I subsidize his staffs' salaries," claiming to pay two of Vavic's staff as contractors. Id.[10]

On September 19, 2018, Janke emailed Singer an athletic profile for Agustina Huneeus, along with a corrected version the next day. Ex. 572. Singer immediately sent the profile, her transcript, and her test scores to Heinel. Ex. 568. The transcript reports Agustina Huneeus's GPA as 3.21. Id.

On October 2, 2018, Singer called Heinel. Id. at 81:20-23; Ex. 584.[11] During the call, Heinel told Singer that she would have a decision on Huneeus by the second week of November.

---

[9] The Indictment does not allege that Singer helped Vavic's children get into college, and no evidence was offered to support Singer's claim. Vavic's children did not attend college "all over the country"; instead, all four attended USC. Day 9 Trial Tr. 10:18-11:4.

[10] The Indictment does not allege that Singer paid Vavic's staff or subsidized their salaries, and no evidence was offered to support Singer's statement. Day 9 Trial Tr. 13:24-14:16.

[11] This call was made after Singer was approached by law enforcement and agreed to cooperate in an investigation into the side-door scheme. Day 10 Trial Tr. 33:9-24. Among other things, he

Ex. 584. Heinel, who had started invoicing Singer $20,000 a month to be paid to her personal consulting business, also agreed to Singer's request that she add details to her invoices going forward. Id.

On October 5, 2018, Singer called Heinel from Boston to ask about a recent Subco meeting. Day 10 Trial Tr. 36:23-37:7; Ex. 589. Heinel told Singer that two of his clients' children had been admitted through Subco. Id. Singer then asked Heinel when she wanted the $50,000 payments to the Women's Athletics Board, and Heinel suggested that they "hold on that" because she didn't like "to do it so close" to the admission. Id.; Day 10 Trial Tr. 83:21-85:6.

On October 11, 2018, Vavic called Singer and left a voicemail. Ex. 781. Vavic explained that Fuller, Heinel's subordinate, would take some of his players for Subco in November, as well as fifty other kids. Id. He suggested:

> let's try to squeeze this kid in . . . he needs to have a decent resume. But . . . I'm
> . . . thinking, if we take him, when there are all these other people, maybe we can
> squeeze him in.

Id.

The record includes no information regarding a male water polo candidate before Subco during this period. Agustina Huneeus, however, was presented to Subco on November 1, 2018, and Subco voted to admit her. Ex. 602. On November 7, 2018, Heinel forwarded a copy of Huneeus's admission letter to Singer. Ex 613. On November 17, 2018, Agustin Huneeus sent a $50,000 check to the USC Women's Athletic Board. Ex. 795. In January 2019, the admissions

---

made calls at the FBI's direction and agreed to a "consensual wiretap" of his phone. Id. at 34:12-36:22.

department learned that Agustina Huneeus was not a legitimate athletic recruit and withdrew her offer of admission. Day 12 Trial Tr. 152:14-153:3.

g.    January 2019 Phone Call with Vavic

On January 2, 2019, the FBI directed Singer to call Vavic from Boston. Day 10 Trial Tr. 57:24-58:4; 88:23-89:3, 93:17-22; Day 11 Trial Tr. 76:17-77:15; Exs. 792, 793. Singer told Vavic that he was being audited, that he had "lost track" of the scholarships that KWF had given to Vavic's boys, and that he was not sure whether there was another year of tuition left. Ex. 625. Vavic responded, "we are done." Id. Singer then said that he had "been able to go through Donna . . . to help us with getting some kids in," but asked whether he could still "holler" at Vavic if he came across a water polo player "because essentially what we have done in the past with the scholarships for your boys." Id. Vavic responded, "[a]bsolutely, absolutely . . . we just have to find the right person," explaining that Subco now required walk-ons to have "decent grades" and "some kind of a resume." Id. Vavic also said that if Singer had a good athlete in another sport, he might be able to put Singer in touch with the coach. Id.

7.    Recruitment of Coaches and Activities at Other Universities

After Khosroshahin was terminated in 2013 from USC, he continued to work with Singer. Day 5. Trial Tr. 29:7-17; Day 12 Trial Tr. 14:17-19. Khosroshahin's new arrangement entailed introducing Singer to soccer coaches at other schools. Day 5 Trial Tr. 29:7-30:4. For every one of Singer's clients who gained admission through one of Khosroshahin's connections, Singer agreed to pay Khosroshahin $25,000. Id.

In 2014, Khosroshahin told Rudy Meredith, the Yale women's soccer coach, that Meredith could make a lot of money by working with Singer to get Singer's clients' children admitted to Yale as athletic recruits. Day 7 Trial Tr. 92:8-93:24. Khosroshahin also told

Meredith that Singer was engaged in this scheme at USC through football, soccer, and water polo. Id. at 93:1-5.

As a result of this conversation, Meredith spoke with Singer. Id. at 93:6-11. Singer told Meredith that he was getting his client's children admitted through the football, soccer, and water polo programs at USC, as well as at Harvard and Duke, among others. Id. at 95:7-22. Meredith went on to do three deals with Singer. Id. at 96:17-19. All the money Singer paid Meredith went from KWF to Meredith's summer soccer camp and benefitted him personally; none of it went to Yale. Id. at 142:20-143:4. Singer paid Khosroshahin for students who completed side-door deals at Yale. Day 5 Trial Tr. 30:5-30:21.

Khosroshahin also introduced Singer to Jorge Salcedo, the UCLA men's soccer coach. Id. at 30:22-31:4. Salcedo went on to recruit Singer's clients to UCLA, and Khosroshahin was paid for this as well. Id. at 31:5-9.

At some point, Singer told Meredith that Meredith could make more money by getting other coaches and administrators involved. Day 7 Trial Tr. 100:12-19. Singer offered to pay Meredith $15,000 for each student recruited by one of Meredith's contacts. Id. at 100:24-25.

In addition to helping Singer at USC, Janke also worked with Singer to create athletic profiles for Singer's clients whose children were seeking admission to Stanford, Yale, and UCLA. Day 12 Trial Tr. 19:16-19:20.

## II.     Motion for a Judgment of Acquittal

Vavic contends that the evidence presented at trial was insufficient as to the conspiracy counts and resulted in prejudicial spillover as to the honest services count, warranting acquittal as to all three counts.

A.    *Legal Standard*

To prevail on a motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, a defendant must "show that the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offenses beyond a reasonable doubt." United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018) (citing United States v. Gabriele, 63 F.3d 61, 67 (1st Cir. 1995)). In making that determination, the court does not "weigh the evidence or make any credibility judgments, as those are left to the jury." United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (citing United States v. Ayala-Garcia, 574 F.3d 5, 11 (1st Cir. 2009)). Instead, the court "resolve[s] all credibility disputes in the verdict's favor," id. (quoting United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)), and "examine[s] the evidence—direct and circumstantial—as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict," United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018) (internal quotations omitted). Accordingly, the jury's verdict must be upheld, unless, viewing the evidence in this manner, no rational jury "could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

B.    *Conspiracy Charges*

"A criminal conspiracy is an agreement between two or more people to accomplish an unlawful purpose." United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011). In other words, "[t]he essence of the conspiracy is an agreement to commit a crime . . . ." United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) (internal citations and quotations omitted). For the jury to convict a defendant of conspiracy, the government must prove beyond a reasonable doubt that "(1) a conspiracy existed, (2) the defendant had knowledge of the conspiracy, and (3) the

defendant knowingly and voluntarily participated in the conspiracy." Dellosantos, 649 F.3d at

116. "Under the third element, the evidence must establish that the defendant both intended to

join the conspiracy and intended to effectuate the objects of the conspiracy." Id.

      1.    Count 2: Constructive Amendment and Prejudicial Variance

Count 2 of the Indictment alleged that the purposes of the conspiracy to commit honest

services mail and wire fraud were (1) to facilitate the admission of applicants to colleges and

universities, (2) to enrich the defendants and Singer personally, and (3) to secure additional

funding for designated university accounts that the defendants controlled or that otherwise

benefitted them professionally. Indictment ¶ 104 [Doc. No. 505]. The manner and means alleged

were (1) creating fake athletic profiles, (2) designating applicants as purported recruits in

exchange for bribe payments, (3) concealing the fraud and bribery from the universities, (4)

recruiting additional athletic coaches to designate applicants as purported recruits for competitive

athletic teams in exchange for bribes, and (5) concealing the nature and source of the quid pro

quo payments by funneling money through the Key's accounts. Id. at ¶ 105.

The Indictment made the specific allegations previously detailed regarding Vavic and

Heinel at USC, Ernst at Georgetown, and Ferguson at Wake Forest. Id. at ¶¶ 25-102. At trial,

however, the government did not present any evidence related to Ernst and Georgetown or

Ferguson and Wake Forest. Rather, the government's evidence of a multi-university conspiracy

related to Meredith at Yale and Salcedo and the Isacksons at UCLA. Moreover, the government

presented evidence relating to the test-taking scheme in which the Isacksons were involved.

Vavic argues that this "mismatch" between the Indictment and proof at trial constitutes a

constructive amendment of the Indictment and a prejudicial variance by creating a substantial

likelihood that Vavic may have been convicted of an offense other than that charged by the grand

jury—namely, a conspiracy involving Meredith (Yale), Salcedo and the Isacksons (UCLA), and both recruitment and test-taking, and excluding Ernst (Georgetown) and Ferguson (Wake Forest).

> The law in this circuit is that
>
> [a] constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them. A variance occurs when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment. A constructive amendment is considered prejudicial *per se* and grounds for reversal of a conviction. Variance is grounds for reversal only if it affected the defendant's "substantial rights"—i.e., the rights to have sufficient knowledge of the charge against him in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense. Variance also protects against "prejudicial spillover" so that when a defendant has multiple codefendants, proof that one defendant was involved in one conspiracy does not lead the jury to believe that another defendant was involved in a separate conspiracy.

United States v. Fisher, 3 F.3d 456, 462-63 (1st Cir. 1993) (internal quotations and citations omitted).

The difference between a constructive amendment and a variance is largely one of degree. See, e.g., United States v. Beasley, 583 F.3d 384, 389 (6th Cir. 2009) ("the line separating an amendment from a variance is blurry"); United States v. Adamson, 291 F.3d 606, 615 (9th Cir. 2002) ("The line between a constructive amendment and a variance is at times difficult to draw."). In both cases, though, such claims are grounded in a defendant's Fifth Amendment right to indictment by grand jury and his Sixth Amendment to be informed of the charges against him. See United States v. Brandao, 539 F.3d 44, 57 (1st Cir. 2008). Neither right is implicated here.

Where the evidence presented pertains directly to the charges in the indictment, the fact that the government may prove "aspects of the conspiracy beyond those recited in the indictment

. . . simply does not constitute a variance" or a constructive amendment. Fisher, 3 F.3d at 463. And even to the extent that there is a variance between the evidence adduced at trial and the facts alleged in the indictment, that alone does not necessitate disturbing a conviction; rather, "'[a] variance is grounds for reversal only if it is prejudicial. . . .'" Dellosantos, 649 F.3d at 116 (quoting Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009)) (internal citations omitted).

Here, the Indictment broadly alleges that "the defendants conspired with others known and unknown to the Grand Jury to use bribery and other forms of fraud to facilitate the admission of Singer's clients to selective colleges and universities in the District of Massachusetts and elsewhere." Indictment ¶ 103 [Doc. No. 505]. That evidence was presented as to Meredith at Yale and Salcedo at UCLA, rather than as to Ernst at Georgetown and Ferguson at Wake Forest, does not vary these essential terms of the charged offense. Even if these factual differences did amount to a variance, however, it would not be prejudicial, where the additional evidence pertained directly to the charged conspiracy, including its means of recruiting additional coaches to the scheme. In addition, the omitted evidence caused Vavic no prejudice: the concerns implicated by constructive amendment and prejudicial variance arise when the change has the effect of "broadening the possible bases for conviction from that which appeared in the indictment," not narrowing it. United States v. Miller, 471 U.S. 130, 138 (1985).[12]

Bruce Isackson's testimony regarding his involvement in Singer's test-taking scheme is on a different footing, where the Indictment did not charge Vavic with any involvement in the test-taking scheme. The government argues that the testimony was appropriate because it

---

[12] On the issue of notice, the allegations related to UCLA were included in both the original Indictment [Doc. No. 1] and the Superseding Indictment [Doc. No. 272]. The allegations related to Yale were included in the Information [#1] to which Singer pleaded guilty. U.S. v. Singer, 19-cr-10078.

constituted Bruce Isackson's "own Giglio." This argument makes no sense. In <u>Giglio v. United States</u>, 405 U.S. 150, 153 (U.S. 1972), the Supreme Court extended the prosecution's obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), to disclose to the defense any and all information that could be used to impeach the credibility of a prosecution witness. While a prosecutor may wish to dull the impact of cross examination by presenting potential impeachment evidence during direct examination, the court is unaware of any case law suggesting that this offsets the risk of prejudice to the defendant from the introduction of such testimony by the prosecutor. Nevertheless, the court concludes that where the government's questioning related to the test-taking scheme was brief, related only to Bruce Isackson's guilty plea, and made no suggestion that Vavic was in any way involved, the evidence did not constitute a constructive amendment or a prejudicial variance.

      2.     Counts 2 and 3: Sufficiency of the Evidence

          a.     Intent to Join the Overarching Conspiracy Charged in Count 2 and the USC Conspiracy Charged in Count 3

Vavic next argues that the government failed to introduce sufficient evidence that he intended to join the multi-university conspiracy charged in Count 2 or the USC conspiracy charged in Count 3, as opposed to some other conspiracy or conspiracies. Given the secrecy of conspiracies, the government need not prove an express agreement between co-conspirators. <u>United States v. Morillo</u>, 158 F.3d 18, 23 (1st Cir. 1998) ("The agreement itself need not be express, but may consist of no more than a tacit understanding") (internal quotations omitted). Indeed, a conspiracy may be proven without establishing that "(1) each conspirator knew of or had contact with all other members; (2) each conspirator knew of all the details of the conspiracy or participated in every act in furtherance of it; or (3) the conspiratorial 'cast of characters' remained intact throughout the duration of the entire enterprise." <u>United States v. Cruz-</u>

Rodríguez, 541 F.3d 19, 28 (1st Cir. 2008). The government may even prove a conspiracy without identifying any specific co-conspirators, so long as the evidence is sufficient to permit an inference that the defendant conspired with others. See United States v. Rios-Ortiz, 708 F.3d 310, 318 (1st Cir. 2013).

The seminal case regarding single versus multiple conspiracies is Kotteakos v. United States, 328 U.S. 750 (1946), in which thirty-two defendants were indicted as co-conspirators in a scheme to defraud the Federal Housing Administration by obtaining false documents from various financial institutions. As the Supreme Court later summarized the case,

> [e]xcept for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan.

Blumenthal v. United States, 332 U.S. 539, 558 (1947). "To determine if the evidence supports finding a single conspiracy (that is to say, a single general agreement), courts have looked for (1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants." Portela, 167 F.3d at 695.

Beginning with the common goal, it is not enough for co-conspirators to have *similar* goals; rather, they must share the "common purpose of a *single* enterprise." Kotteakos, 328 U.S. at 769 (emphasis added). The notion of a common goal is "broadly drawn," Portela, 167 F.3d at 695 n. 3, and can include such general illegal purposes as the distribution of controlled substances for profit, see, e.g., United States v. Mangual-Santiago, 562 F.3d 411, 421-22 (1st Cir. 2009), or extorting someone's clients, see e.g., United States v. Ciresi, 697 F.3d 19, 26-27 (1st Cir. 2012).

Vavic argues that there is no evidence of a common purpose where the government presented no evidence that Vavic ever so much as communicated with Khosroshahin, Janke, Meredith, Salcedo, Heinel, Masera, the Wilsons, Laurence Feiwell, Agustin Huneeus, or the Isacksons between 2013 and 2019. The jury could have found, however, that Vavic encouraged Khosroshahin to work with Singer and to lie to Subco prior to 2013; agreed with Singer to facilitate students' admissions to USC as water polo recruits in exchange for tuition for his sons' private high school; was aware of and apparently unconcerned by the fact that Heinel, who did not have any legitimate role in the recruitment of athletes, was presenting students to Subco on her own and would not "push back" on Vavic's recruits; and offered to help put Singer in touch with coaches at other universities who might engage in the scheme in exchange for money. The government also produced evidence that the members of the conspiracy all obtained personal financial gains. While the government did not offer evidence that the individual participants knew of the specific arrangements that different coaches and administrators made for their personal benefit, or even the nature of the different transactions, the jury could infer that participants who were receiving personal compensation would assume that others were receiving similar compensation for their roles. Taking the evidence in the light most favorable to the verdict, a reasonable jury could find common goals among these participants to enrich the Defendants and Singer personally by facilitating the admission of applicants to colleges and universities through the athletic recruitment process and recruiting coaches at other universities.[13]

---

[13] As discussed below, because the purpose must be illegal, a common object of securing additional funding for designated university accounts in return for admission slots may violate university policies but would not be a sufficient basis for the existence of the conspiracy.

Interdependence concerns whether "'the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme.'" Mangual-Santiago, 562 F.3d at 422 (quoting Portela, 167 F.3d at 695). Specifically, "'[e]ach individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key.'" Id. (quoting Portela, 167 F.3d at 695). However, "[t]here is no requirement that co-conspirators work together harmoniously when pursuing their illicit aims." Cruz-Rodríguez, 541 F.3d at 29. The First Circuit has thus found sufficient evidence of a single conspiracy where a jury could reasonably find that a drug supplier (1) was aware of the existence of other suppliers and (2) understood that his success depended on the health of the distribution network centered around a "hub character." Portela, 167 F.3d at 697.

Vavic argues that there is no evidence of interdependence where Singer tightly controlled all communications with his clients, prevented direct contact between Vavic and the Wilsons, lied to the Wilsons about what he had told Singer, and concealed his involvement in Vanessa Feiwell's recruitment. Likewise, Vavic argues that the evidence shows competition, not interdependence, between himself and Heinel at USC. But despite this competition, a reasonable jury could have found that Vavic was aware of other participants in the side-door scheme and that he understood that his interactions with Singer would not have been feasible without the participation and secrecy of other coaches, administrators, and parents who were seeking their children's admission to USC and other universities.

Finally, overlap among the participants may be satisfied "by the pervasive involvement of a single core conspirator, or hub character." Dellosantos, 649 F.3d at 118 (1st Cir. 2011) (quoting Mangual-Santiago, 562 F.3d at 422). However, the conspirator must have knowledge of

the conspiracy's general scope. <u>Blumenthal</u>, 332 U.S. at 557. Again, where the government presented evidence that Vavic was willing to forge connections between Singer and coaches at other schools and was aware that other coaches and administrators, including Heinel, were working with Singer to facilitate students' admission as athletic recruits, a reasonable jury could find the required overlap.

      b.    Intent to Commit Honest Services Fraud and Federal Programs Bribery

Vavic next argues that the government failed to prove that he intended to effectuate the objects of the charged conspiracies. Vavic contends that the government did not prove beyond a reasonable doubt (1) his intent to defraud universities of the intangible right to the honest services of their athletic coaches and administrators; (2) a bribe or kickback; or (3) an intentional misrepresentation or concealment of a material fact or matter.

Pursuant to 18 U.S.C. § 1346, a scheme or artifice to defraud includes "a scheme or artifice to deprive another of the intangible right of honest services." The statute itself contains no instruction regarding what conduct should fall within the meaning of "honest services." Nor does it identify the "another" to whom such "honest services" are owed. In <u>Skilling v. United States</u>, the Supreme Court rejected a challenge to the statute as impermissibly vague by narrowing its scope, holding that honest services mail or wire fraud must involve "offenders who, *in violation of a fiduciary duty, participate[] in bribery or kickback schemes*." 561 U.S. 358, 407 (2010) (emphasis added). In concurrence, Justice Scalia asserted that the Court's construction did not "solve the most fundamental indeterminacy: the character of the 'fiduciary capacity' to which the bribery and kickback restriction applies." <u>Id.</u> at 421 (Scalia, J., concurring in part and concurring in judgment). The majority responded that while "Justice Scalia emphasizes divisions in the Courts of Appeals regarding the source and scope of fiduciary duties

. . . [such] debates were rare in bribe and kickback cases" where "the existence of a fiduciary relationship, under any definition of that term, was usually beyond dispute . . . ." Id. at 407 n.41.

The government has defined Vavic's duty of honest services by reference to his employment contract with USC and the 2013 amendment thereto, which provides that an employee may be terminated for cause for "improper conduct" that "reflects adversely" on USC or for providing "false, misleading, or incomplete information relevant to the conduct of important [u]niversity business." The government also points to testimony from Khosroshahin, Janke, and Moon—who explained that, based on their "common sense," they understood that recruiting should not be used as a fundraising tool—and evidence that Vavic had a similar understanding based on his conversations and conduct. As to the alleged bribes, the government points to evidence of Singer's payment to both USC accounts and to a private school to cover tuition for Vavic's sons. But where the alleged bribe or kickback is based on payments made to his employer, and not to Vavic's personal financial benefit, and the government asked the jury to define the fiduciary duty owed by Vavic to his private employer based on "common sense," Justice Scalia's concern regarding the "most fundamental indeterminancy" is unanswered by the majority's holding. Accordingly, the court considers first whether the government established the conspiracies at issue based on the alleged payments to the private school, and finding that it has met its burden, addresses the alleged bribery by payments to a USC account only in connection with the motion for a new trial.

    i.    Evidence as to the Duty of Honest Services

Where the alleged bribe or kickback consists of payments to a private school for Vavic's son's tuition, the existence of a fiduciary relationship rests easily on the employment relationship. In short, where the coaches' and administrators' employment relationships with

their universities were of the sort that imposed discretion, those relationships consequently imposed an obligation of loyalty to the employer, that is, a duty to serve the employer's interests in exercising that discretion. And that duty would be violated though the misuse of that discretion in conducting university business for private financial gain. Indeed, Vavic does not argue otherwise.

<blockquote>ii.        Evidence as to a Bribe or Kickback</blockquote>

Here, a reasonable jury could have found that the tuition payments that Singer made for Vavic's children's tuition constituted a bribe. Vavic does not dispute that payments to third parties could constitute a bribe but argues that the evidence was insufficient for the jury to find a quid pro quo. Considering the evidence in the light most favorable to the verdict, however, a reasonable jury could have found that the payments were made in exchange for Vavic's assistance in recruiting Singer's clients' children. The evidence at trial included some payments that occurred contemporaneously with the recruitment of Vanessa Feiwell. In addition, the jury heard the following call after Singer was instructed by law enforcement to tell Vavic that KWF was being audited and that he had "lost track" of whether there was a year of scholarship tuition left for Vavic's sons.

> SINGER:     So, the reason why I called is . . . I lost track on our . . . .do I have
>                  another year with . . . your last child or is this the end of it. 'Cause
>                  I'm being audited so I wanna make sure that the scholarships that
>                  we've given to your boys, I don't know if I still have one through
>                  our foundation for next year or are we done.
>
> VAVIC:      Done
>
>                  . . . .
>
> VAVIC:      We are done
>
> SINGER:     We are done. Okay that's, okay that's good to know. And then I
>                  just wanna make sure that, you know, obviously I've been able to
>                  go through Donna, um, to get, to help us with getting some kids in,

but if I come across somebody that's a water polo player—'cause I know that what you—they have to be a water polo player for you. Um, then um, it's still ok for me to holler at you because essentially what we've done in the past with the scholarships for you boys. Correct?

VAVIC:        Absolutely, absolutely.

              . . . .

VAVIC:        Absolutely, we just—we have to find the right person. And he has to be . . . because the way [USC]'s now doing everything Rick is, um, when you get a walk on, uh, I used to be able to get 'em in much easier, now the walk-on, uh, is required to have decent grades and some kind of a resume. He can't just be a total nobody.

              . . . .

VAVIC:        So he has to be a water polo player, he has to have, uh, somewhat decent resume, and maybe, you know, 3rd team all CIF. Uh ya know 4th or 5th team All-American. You know something that, that I can show that this guy is a legit or girl is a legit player. And I have an easier time with the girls because I have less girls than boys, just so you know.

              . . . .

SINGER:       Okay, well I just wanted to make sure that, um, that all the—that all the scholarshipping for your boys is done, and I'm glad they're—you're happy, they're happy, and if I come across a polo kid, I'll let you know.

Ex. 625.

Taking the evidence in the light most favorable to the verdict, a reasonable jury could have found that Vavic had recruited Singer's clients' children in exchange for the tuition payments and remained willing to engage in future water polo recruitment or encourage other coaches to get involved based on those tuition payments.

> iii.        Material Misrepresentations or Omissions

Vavic also argues that the government failed to prove that he agreed or intended to make false statements where it did not adduce evidence that Vavic knew that any of the information

51

contained in Johnny Wilson's or Vanessa Feiwell's Subco packets was false or, as to Vanessa Feiwell, that she was associated with Singer where the evidence demonstrates that Heinel, not Vavic, facilitated Vanessa Feiwell's and Agustina Huneeus's admissions. But as to the conspiracy charge, the government was not required to prove that Vavic *himself* made the intentional misrepresentation at issue; rather, it needed only prove that the *scheme* either "involved the intentional misrepresentation or concealment of a material fact or matter or the scheme involved an intentionally false statement, assertion, half-truth, or knowing concealment concerning a material fact or matter." Day 20 Trial Tr. 262:11-15. Given this, the government presented evidence that would permit a reasonable jury to conclude that the scheme entailed such misrepresentations, where multiple co-conspirators testified to wholesale fabrications of athletic credentials and where the jury could have found that Vavic was aware that Heinel, who was not supposed to be recruiting *anyone*, was presenting students to Subco.

C.    *Venue*

Finally, Vavic argues that where the January 2, 2019 call and any other uses of the wires or mail were not in furtherance of any bribery scheme involving Vavic, a rational jury could not have determined that it established venue in Massachusetts by a preponderance of the evidence. The court disagrees.

A reasonable jury could find that this call was in furtherance of the overarching conspiracies previously analyzed. During the call, after Vavic stated that any potential recruit for him would have to play water polo, he offered that if Singer had a student who was an athlete in another sport, Vavic could talk to the coaches (depending on what sport) and put Singer in touch with them.

52

In addition, the government presented evidence that Singer was in Boston for two calls made to Heinel, and a reasonable jury could have found by a preponderance of the evidence that Heinel's participation in those calls was in furtherance of conspiracies that Vavic had joined.

### III.   Motion for a New Trial

In addition to his motion for a judgment of acquittal, Vavic moves for a new trial pursuant to Federal Rule of Criminal Procedure 33, arguing that (1) the government's misstatements through the trial and during the rebuttal argument in closing and (2) the court's order admitting for substantive purposes the incriminating statements of his alleged co-conspirators were unfairly prejudicial.

A.   *Legal Standard*

In considering a motion for a new trial under Federal Rule of Criminal Procedure 33, the trial court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Unlike with an insufficiency of the evidence claim, when the trial court evaluates a Rule 33 motion, it need not view the evidence favorably to the conviction but instead exercises its own judgment in assessing the government's case. See Merlino, 592 F.3d at 33 ("a district court has greater latitude in considering a motion for a new trial than it does in considering a motion for acquittal"). "The trial court may set aside a verdict and order a new trial if, in its opinion, the verdict is against the clear weight of the evidence, is based upon evidence that is false, or resulted from some trial error and amounts to a clear miscarriage of justice." Payton v. Abbott Labs, 780 F.2d 147, 152 (1st Cir. 1985). "[T]he remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict." Merlino, 592 F.3d at 32 (quoting United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001)).

When considering a motion for a new trial based on an objected-to statement made by the government, the court must determine whether the statements were improper and, if so, whether they "so poisoned the well" as to necessitate a new trial. United States v. Carpenter, 494 F.3d 13, 23 (1st Cir. 2007). For statements to which the defense did not object, the plain error standard applies. United States v. Vazquez-Larrauri, 778 F.3d 276, 282-83 (1st Cir. 2015). That standard, similarly requires a new trial "only if, in light of the entire record, the remarks in the prosecutor's closing argument have 'so poisoned the well that the trial's outcome was likely affected.'" United States v. Kasenge, 660 F.3d 537, 542 (1st Cir. 2011) (quoting United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003)).

B.    *Government's Alleged Misstatement of Law in Closing*

The court begins with the government's alleged misstatement of law in closing, and the issues touched upon above, where the alleged bribe or kickback involved payment to the university, rather than to Vavic personally.

The government argued in rebuttal:

> If you conclude that Jovan Vavic lied to subco about why he was recruiting Johnny Wilson and misled USC to benefit his own program financially, I submit to you you can convict him for that alone.

Day 20 Trial Tr. 214:15-18. A few minutes later, government counsel stated:

> And that brings us to Agustina Huneeus . . . . Ladies and gentlemen, that call by itself, even without everything else, I submit to you, is enough to convict him. There's no recruitment. He doesn't even know her name. He doesn't even know anything about her, except that she's not really going to play water polo and that her parents are going to give him $100,000 for his team.

Id. at 227:6, 227:22-228:3. Government counsel then elaborated:

> If a math teacher sells an A to a student who deserves a D and lies to the registrar about it and puts the money in the math department fund, that's honest services fraud.

Id. at 233:14-233:16.

The court instructed the jury in relevant part as follows:

> The first element of honest services mail fraud and honest services wire fraud also requires a bribery or kickback scheme. For bribery, there must be a specific intent to give or receive something of value with the corrupt intent of inducing the employee purporting to act for and in the interest of his or her employer **to act in his or her or the defendant's own interests instead of the employer's interests**. Without a bribe or kickback, undisclosed self-dealing, such as the failure to disclose a conflict of interest, does not satisfy this element.
>
> . . . .
>
> Payment made to a third party may constitute a thing of value to an employee based on the subjective value placed on it by the employee. **Payment made to a university to which the employee owes a duty of honest services may constitute a thing of value to the employee based on the value placed on it by the employee** only, (1), if the employee uses those funds for his or her personal use rather than the entity's use; or, (2) **the payments are made for the employee's own interests and receipt of the payments is contrary to the university's interest**.

Day 20 Trial Tr. 264:4-14, 265:15-24 (bold emphasis added). Under these instructions, the

government was required to show that the payments served the defendants' interests and harmed

the university's. The government responds that it did not urge the jury to convict Vavic based

solely on a misrepresentation and gain to Vavic—and nothing more—but instead that it

"parroted the Court's instruction when discussing that portion of the charge." Gov't Opp. 49

[Doc. No. 1320].

Specifically, though, the government told the jury:

> And you know that when he was taking money to the water polo team in exchange for recruiting Johnny Wilson and when he agreed to take money to the water polo team to recruit Agustina Huneeus, he was acting contrary to the university's interests. Mr. Larson told you that Coach Vavic did everything for the USC water polo team. But that's the point. He was acting for his team and his interests and not for the university's interests when he took money to his team. He didn't want it to go to the university, to the rest of the university. Listen to that August 3rd phone call. He actually complains about the fact that somebody gave money to the university and not to his team. He says, "Why didn't you give it to me?"

Day 20 Trial Tr. 234:5-17. There was no evidence in the record to suggest that Vavic was taking USC Water Polo team money for his own benefit; to the contrary, the government stipulated that there was no reason to believe that Vavic misused the university funds in the USC Water Polo gift account. The government's contrary argument—that funds to the USC Water Polo team that were not misused were sufficient to show harm to USC—underscores that the government conflated a payment to the USC Water Polo team with a payment to Vavic. Had the government argued that USC received less money through the "side-door" than it would have through VIP admissions or that Vavic misused the funds in the USC account, the arguments would have been consistent with the court's instruction. But where the government argued that a misrepresentation to Subco plus a payment to the USC Water Polo gift account was by definition contrary to USC's interests, the argument was not consistent with, but instead flatly ignored, the court's instruction.

The government presses further that "a donation to a person's favorite third-party charity," a family member, or "a candidate's political campaign" can constitute a bribe, and that it matters not that Vavic would not personally receive the promised payments. But those analogies are out of place. It is the entity to whom Vavic owed a duty of honest services, not a third party, that received Singer's funds. And, however distasteful, there is nothing inherently illegal about a private institution accepting money in exchange for a student's admission. Although the government argues that USC would not have accepted the donations had it known why they were being made, the money benefitted USC, and USC was content to accept the money at the time it was given, as evidenced by its thank-you notes to the Wilsons and other families. The government's argument is further undermined here where there was no suggestion that USC returned the money once the scheme was revealed. That the later federal criminal

investigations and resultant publicity of the practice may have caused reputational harm to USC does not change the fact that the money itself was paid to the institution. That Vavic may have gained a professional boost from bringing in the money cannot, without more, be the basis for an honest services fraud conviction. To find otherwise would be to resurrect the undisclosed self-dealing theory that the Supreme Court rejected in <u>Skilling</u> and make causing reputational harm to one's employer sufficient to support a criminal prosecution under section 1346.[14] The resulting prejudice, where the jury may have found a bribe or kickback based not on the tuition payments for Vavic's children but on the funds paid to the USC Water Polo gift account that the government concedes were not misused, warrants a new trial.

     C.     *Petrozziello* Ruling

A statement in furtherance of a conspiracy is admissible as an exception to the rule against hearsay if it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose." <u>United States v. Flores-Rivera</u>, 56 F.3d 319, 330 (1st Cir. 1995) (quoting <u>United States v. Fahey</u>, 769 F.2d 829, 839 (1st Cir. 1985)). Admissibility is determined by the trial judge by a preponderance of the evidence standard. <u>United States v. Petrozziello</u>, 548 F.2d 20, 23 (1st Cir. 1977). Where the court previously determined that the government had met that standard and concludes here that the government presented sufficient evidence for a reasonable jury to convict Vavic of the charged conspiracies, the court does not revisit its <u>Petrozziello</u> ruling. As discussed further below, however, the unreliability of some of the evidence introduced by the government under <u>Petrozziello</u> does weigh in favor of a new trial.

---

[14] Indeed, the government's insistence that the evidence here was sufficient to show bribes or kickbacks supports Vavic's view that the court's instruction was in error.

D.   *Government's Alleged Misstatements and Other Evidence Concerning Huneeus*

Vavic argues further that the prosecutor repeatedly stated that, during the August 3, 2018 phone call, Vavic agreed to recruit Agustina Huneeus in exchange for $100,000 where there was no evidence to support that assertion. In his rebuttal argument mocking Vavic's "spectacularly bad luck," government counsel stated:

> But the luck gets worse. Because then, he's caught on a wiretap agreeing to recruit a student, whose name he doesn't even know, in exchange for another $100,000 to his water polo program, a student he is told is a fake water polo player. Guess what? Donna Heinel, it's pretty undisputed, doesn't recruit water polo -- water polo players. He does . . . . So he knows she's not actually going to play water polo, but he agrees to recruit her for $100,000.

Day 20 Trial Tr. 210:20-211:4. Government counsel then referenced the August 3 call again as the "call [where] he talks about recruiting a girl whose name he doesn't know, for $100,000" and asserted that the recording was "basically a confession." Id. at 238:15-19.

In that call, Vavic stated that he was "right now $100,000 in the freaking hole . . . with my fundraising," that he therefore actually had to fundraise, and that this was a good opportunity for Singer if he had any water polo players. Ex. 532. Vavic and Singer discussed a possible candidate that could result in funding for Vavic, and Vavic responded that that "would be something that would help me . . . ." Id. The government's argument that he was agreeing to recruit a student for money to his water polo program was supported by this evidence. But the assertion that the agreement was for $100,000 was not supported by any evidence.[15]

---

[15] The statement that "it's pretty undisputed" that Heinel doesn't recruit athletes was also misleading, for although it was undisputed that it was not Heinel's job to recruit athletes, the uncontroverted evidence was that at least as of 2017, Heinel was presenting candidates to Subco without coaches. Ex. 707. Indeed, as the government's brief opposing the present motion acknowledges, Singer "had Heinel facilitate Agustina's admission as a purported water polo recruit, and it was Heinel, not Vavic, who got paid." Gov't Opp. 15 [Doc. No. 1320].

Taken alone, the misstatement as to an agreement for a $100,000 payment from Huneeus may not be sufficiently prejudicial to warrant a new trial. But the misstatement was compounded by the possibility that any conclusions the jury reached regarding the Huneeus transaction were also based on false statements by Singer the government introduced under the Petrozziello ruling. Contrary to all other evidence in the record or allegations in the Indictment, Singer stated to Augustin Huneeus:

> I've have actually helped all of [Vavic's] kids get in to college all over the country. So I've helped all four kids. At no cost to him.
>
> . . . .
>
> What Jovan usually does is I subsidize his staffs' salaries.
>
> . . . .
>
> Because it's too expensive to stay down there, so I put two of his staff members on my books as contractors.
>
> . . . .
>
> And then I pay them throughout the year um more mo—additional salary than they normally get. And they'll be a certain percentage where he'll send me an invoice 'cause he'll take his team to Hungary or Serbia and play, and he'll send me another $100,000 invoice and I'll pay that . . . .

Ex. 550. The government presumably introduced Singer's statements to show how Singer solicited parents as part of the scheme. But where the government made no disclaimer or acknowledgement to the jury that it was not offering Singer's statements about Vavic for their truth, there is a substantial risk that the jury reached a decision based on false evidence.[16]

---

[16] Vavic's remaining arguments regarding misstatements of the evidence and improper voucher are not persuasive.

Vavic's first charge of prosecutorial misconduct is that government counsel improperly directed Moon to proffer counterfactual testimony about the sequence of several key emails. The court finds no prejudice, however, where that counterfactual was corrected through cross examination and a government stipulation.

Vavic next argues that the government misstated Moon's testimony regarding Johnny Wilson's attendance record at the pool: Moon stated that he could not remember Wilson showing up after day one, but the government contended that Wilson had not in fact shown up after the first day.

## IV.    Conclusion

For the foregoing reasons, the court DENIES Vavic's <u>Renewed Motion for Judgment of Acquittal</u> and GRANTS his <u>Alternative Motion for New Trial</u>.

IT IS SO ORDERED.

September 15, 2022                                  /s/ Indira Talwani
                                                   United States District Judge

---

However, the government went on to say that "Moon's uncontroverted testimony, is that after that first day, he doesn't remember ever seeing [Wilson] at practice. He talked about all the freshman players in the back row . . . He could tell you about each and every one of them. But he testified he couldn't remember Johnny ever showing up to practice after that first day." Day 20 Trial Tr. 226:19-227:1. The court finds no prejudice where the government corrected its misstatement and where the court specifically instructed the jury that the closing arguments were not evidence and that it was required to rely on the testimony and evidence presented in reaching its decision.

Third, Vavic contends that the prosecutor improperly vouched for Khosroshahin's and Moon's credibility. Improper vouching encompasses statements by the prosecutor that "place[ ] the prestige of [the prosecutor's] office behind the government's case." <u>United States v. Pérez-Ruiz</u>, 353 F.3d 1, 9 (1st Cir. 2003). The precise line between improper vouching and permissible argument is "hazy." <u>United States v. Vizcarrondo-Casanova</u>, 763 F.3d 89, 96 (1st Cir. 2014). It is permissible, however, for the government to offer specific "reasons why a witness ought to be accepted as truthful by the jury." <u>United States v. Rodríguez</u>, 215 F.3d 110, 123 (1st Cir. 2000). And the First Circuit permits the government even greater "latitude in responding to defense counsel's allegations of fabrication." <u>United States v. Vazquez-Rivera</u>, 407 F.3d 476, 484 (1st Cir. 2005). The court concludes that the remarks to which Vavic objects were not statements that Khosroshahin's and Moon's testimony was truthful but rather suggestions that the jury could draw inferences of credibility. The remarks therefore did not cross the line into improper vouching.

Fourth, Vavic points to the prosecutor's attempt in rebuttal to reference a purported admission regarding Vanessa Feiwell made during defense counsel's opening statement. The court agrees that such a reference was improper. But where the court did not permit the government to introduce that concession, the court finds no prejudice.