# United States Court of Appeals
## For the First Circuit

No. 22-1787

UNITED STATES OF AMERICA,

Appellant,

v.

JOVAN VAVIC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Gelpí, Thompson, and Rikelman,
Circuit Judges.

Alexia R. De Vincentis, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellant.

Sarah M. Harris, with whom Katherine A. Trefz, Ashwin G. Shandilya, Jeffrey G. Ho, and Williams & Connolly, LLP were on brief, for appellee.

Joy Longnecker, Kian Hudson, Jeanine Kerridge, Eric Sussman, Barnes & Thornburg LLP, Sara Silva, and Silva Kettlewell & Pignatelli LLP, on brief for Massachusetts Association of Criminal Defense Lawyers, amicus curiae.

May 30, 2025

**RIKELMAN**, <u>Circuit Judge</u>.    This appeal concerns the high-stakes world of college admissions.    Jovan Vavic was an award-winning head coach of the men's and women's water polo teams at the University of Southern California (USC).    As head coach, he was responsible for recruiting elite high school players and fundraising for his teams.    In 2019, he was indicted for his role in the nationwide "Varsity Blues" college admissions scandal, orchestrated by college consultant Rick Singer.    According to the government, Vavic agreed to facilitate the admission of undergraduate applicants to USC as fake athletic recruits in exchange for payment from Singer and his clients.

A jury ultimately convicted Vavic, but the district court granted a new trial after concluding that certain statements in the government's rebuttal closing amounted to prosecutorial misconduct.    The United States now appeals the new trial order as to two of its charges against Vavic: honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 and conspiracy to commit federal programs bribery in violation of 18 U.S.C. § 371.    While this appeal was pending, we issued our decision in <u>United States</u> v. <u>Abdelaziz</u>, 68 F.4th 1 (1st Cir. 2023), another Varsity Blues case, and concluded that payments to university accounts generally could not support a conviction for honest services wire fraud but could support a conviction for federal programs bribery.    We now reverse the order in this case in part: We affirm the district

court's grant of a new trial on the honest services fraud charge but reinstate Vavic's conviction on the federal programs bribery conspiracy charge.

## I.    BACKGROUND

We recount only those facts that are relevant to the complex issues in this appeal.  In doing so, we keep in mind that "[w]hen reviewing a claim of prosecutorial misconduct, we take a balanced view of the evidence in the record."  United States v. Rodríguez-De Jesús, 202 F.3d 482, 485 (1st Cir. 2000).

### A.    Relevant Facts

#### 1.    USC Admissions and Singer's Scheme

While Vavic was a coach at USC, the university admitted undergraduates through three different processes: (i) general admissions; (ii) athletic recruits; and (iii) the "VIP" list.  On the general admissions track, about 12 to 16 percent of applicants secured admission.  By contrast, the admissions rate for recruited athletes was much higher.  "Subco" was the subcommittee of the admissions department responsible for evaluating athletic recruits, and about 85 to 90 percent of athletic recruits presented to Subco were admitted.  Finally, USC also compiled a VIP or "special interest" list, and members of the admissions department gave a particularly close look at applicants with "philanthropic potential."  These three processes were supposed to proceed on separate tracks.

Under the Subco process, a coach would first identify a potential recruit and put together a package that included the recruit's grades, test scores, and an athletic profile detailing the recruit's athletic ability.  That information would then be forwarded to Donna Heinel, the athletics department administrator who acted as a liaison between USC's coaches and Subco.  Because USC sought to maintain award-winning sports teams, it was willing to admit talented athletic recruits with grades and test scores that were lower than those of students admitted through the general admissions process.  Subco rarely questioned the information provided by coaches and Heinel.  Rather, it relied on the information's accuracy and expected that recruits would contribute as athletes to USC's teams, not just as team managers or practice players.[1]

A recruit's philanthropic potential played a role in USC admissions.  A USC admissions officer testified generally that USC does not "offer admissions in exchange for money."  At the same time, head coaches like Vavic were responsible for fundraising for their sports teams under an express obligation in their employment contracts.  According to the evidence at trial, at least some USC

---

[1] Based on the evidence at trial, "team managers" were students who assisted with paperwork and team logistics.  And "practice players" were athletes who did not start in games or matches.  These players generally supported the team's development and participated in team practices with the possibility of starting in games or matches in future years.

coaches did consider the philanthropic potential of their recruits. For instance, one coach testified that he "frequently" used Zillow to look up the value of a potential recruit's parents' home to "assess their wealth." That said, once a coach proposed a recruit to Subco, Subco did not consider an applicant's philanthropic potential. Admissions decisions based on philanthropic potential were reserved for the VIP process.

Apart from considering the philanthropic potential of an athletic recruit, the USC athletics department was actively involved in fundraising for the university. The athletics department had its own development staff, and the staff viewed the coaches as their partners in fundraising. The athletics development staff even told Vavic once that he and his team were not "fully committed to fundraising" for a USC-wide capital project and encouraged him to become more involved. In recognition of the realities of budget constraints, Vavic wrote at one point that "we absolutely need some players that have [USC] ties that we do not need to spend [scholarship] money on."

Enter Rick Singer. Singer ran a California-based college counseling business called "The Key" and a sham charity called "The Key Worldwide Foundation" (KWF). Among other services, some of which were legitimate college counseling activities, he offered clients a "side door" option. Admission through the side door meant that his clients' children were admitted as athletic

recruits, regardless of whether or how well they played the sport for which they were "recruited." Side door clients paid both Singer and the target university, and sometimes the payments to the university were donated through the Key or KWF on the parents' behalf.

In 2008, Singer approached Ali Khosroshahin, USC's women's soccer coach, about participating in the side door scheme. Khosroshahin testified that after he initially declined to participate, Singer said that he had worked with Vavic in the past and that he was providing donations to Vavic's water polo program. Singer told Khosroshahin to speak with Vavic, and when he did, Vavic allegedly responded, "Fuck 'em. Just do it. And tell them that they're the best players you've seen." Khosroshahin understood Vavic to mean that he should lie about Singer's applicants' athletic abilities in order to help them gain admission to USC. After speaking with Vavic, Khosroshahin agreed to join the scheme and later brought Laura Janke, the assistant women's soccer coach at USC, and Rudy Meredith, Yale's women's soccer coach, into Singer's network.

Vavic's trial included testimony by coaches and parents who had never interacted with him, and who were not even associated with USC. For example, although Meredith (the Yale soccer coach) had never worked with Vavic, the government called him to the stand to illustrate how coaches were brought into Singer's scheme.

Meredith testified that Singer connected with coaches at different colleges and claimed that Singer was a "salesperson" who "liked to throw out a lot of names." The government also called Bruce Isackson, whose daughter was admitted to UCLA as a fake athletic recruit after Khosroshahin convinced its women's soccer coach to join the conspiracy (which, Khosroshahin testified, earned him $25,000 for adding another coach to the network). Isackson testified that Singer helped another one of his daughters to falsify her standardized test scores for college admission. But Isackson had never spoken with Vavic, and Vavic was not involved in Singer's work with either of Isackson's daughters.

The trial also focused on three particular recruits to the USC water polo teams: Johnny Wilson, Vanessa Feiwell, and Agustina Huneeus.[2]

### 2.    Johnny Wilson

In 2013, John Wilson sought to secure admission to USC for his son, Johnny, using Singer's side door services. Johnny was a capable high school water polo player, but he did not play at the level of USC's award-winning team. Wilson knew that his son would be "a clear misfit" on USC's team and thus engaged Singer. Singer later sent Johnny's transcript and test scores to Vavic, and Vavic responded that he "need[ed] his resume, needs to

---

[2] To avoid confusion, we refer to the recruits by first name and to their parents by last name.

be a good resume." Singer relayed to Wilson that "Jovan has Johnny's stuff and asked me to embellish his profile more, which I am doing."

The next year, Vavic agreed to present Johnny to Subco with his "top walk ons" and forwarded Singer's fictitious and embellished athletic information for Johnny to Casey Moon, Vavic's assistant coach. Moon prepared the materials for presentation to Subco. Subco admitted Johnny as a water polo recruit later in 2014, and Wilson wired $220,000 to the Key, KWF, and Singer in April. The Key then issued a $100,000 check to USC men's water polo noting "Wilson family" as the "purpose/remitter."

The parties dispute the extent of Johnny's participation on the water polo team once he started at USC. Vavic did not reply to Johnny's email asking when the team would start practice, and his father asked for Vavic's number so that Johnny could get in touch. In any event, Johnny was not as strong a water polo player as his athletic profile had claimed, and he quit the team after his first semester.

### 3.   Vanessa Feiwell

Next was Vanessa Feiwell. In September 2015, Singer asked Janke, who had left USC by then and started working for him, to prepare an athletic profile for Vanessa. He also told Janke that he and Vavic had already spoken. Singer later forwarded Janke's prepared profile to Vanessa. He instructed her to email

it to Vavic and note in the email body that the email was "per our discussion."  Vanessa had played water polo as a junior varsity player but had quit after her sophomore year, and nearly all of the athletic information in her profile was false.

Vavic forwarded Vanessa's email to Moon and directed him to add Vanessa for recruitment through Subco because the team needed another goalie.  Moon prepared her Subco materials, which noted that she was a "top ten goalie in the 2016 recruiting class" and would be "a great addition" to the team.  At trial, Moon testified that the description was Vavic's own assessment of Vanessa, although he did not know how Vavic arrived at that conclusion.

By 2016, Singer and Heinel (the athletics department administrator) had developed a working relationship of their own, and Singer was going to her directly in order to admit fake athletic recruits.  Heinel had previously worked with Janke to secure the admission of Vanessa's older sister in exchange for payment to the Women's Athletic Board, a USC account that Heinel controlled.  So despite Vavic's initial involvement with Vanessa's recruitment, Singer turned to Heinel once it came time to present Vanessa to Subco in early 2016.  Vanessa was ultimately admitted as a water polo recruit, and in a text to Janke, Singer stated that Vanessa would receive a minor athletics scholarship "from

Jovan." Vanessa's father issued a $50,000 check to the Women's Athletic Board after her admission.

After enrolling at USC, Vanessa never participated in practice or played any role on the water polo team. She met Vavic and Moon on campus the summer before her freshman year, but when Vavic asked her to participate in blocking shots in the pool during practice, she declined and said that she would be uncomfortable doing so. She never spoke with Vavic or Moon again.

Just weeks before Singer directed Janke to create a false profile for Vanessa, his sham charity, KWF, issued scholarships to two of Vavic's sons to cover their high school tuition for the 2015-2016 school year, nearly $40,000. KWF had otherwise represented in its Internal Revenue Service filings that it did not offer scholarships. Singer, through KWF, paid for two years of Vavic's older son's tuition and all four years of his younger son's tuition, adding up to about $119,000 in total.

### 4.    Agustina Huneeus

The final water polo recruit featured at trial was Agustina Huneeus. By the summer of 2018, the government had begun investigating Singer, and much of the evidence relating to Agustina's recruitment came from two wiretapped calls, which the government presented at trial. The first call, dated August 3, 2018, was between Vavic and Singer. Vavic said that he was "$100,000 in the freaking hole" and that it was a "good time, when

you . . . were helping me out, and I had like $400,000 in my
endowment." He also told Singer "that's . . . good news for you,
. . . if you have anybody out there, . . . that's a water polo
player." Singer did not immediately respond but later stated that
there "is a girl . . . and she plays at . . . Marin Academy,"
referring to Agustina. He explained that he was initially planning
to go through Heinel "but if you'd prefer, I can just say, I'm
gonna go through you. And then you can present her to Donna,
instead of me just giving her to Donna and then Donna can present
her. And then that way, um, I can have money funded to you."

Vavic asked a few follow-up questions and then
complained of an unrelated incident when he was barred from
recruiting a "decent water polo player" with poor grades whose
father was planning to donate $150,000. Singer then told Vavic
that Agustina "has like a 3.6, 3.7, uh, 3.8 GPA" and SAT scores in
the mid- to high 1300s, to which Vavic replied, "Okay, so that's
not bad." Vavic cautioned that "they are being very, very careful
now, about checking out all the resumes and crap like that, so
it's becoming more difficult, but it would be easier for me to
squeeze her in possibly November, when I squeeze in all of my top
7-8 kids, so maybe she can kind of get lost in the shuffle."
Singer stated that "if there's an issue, Jovan, actually Donna and
I have created a great relationship. I don't think Donna will
push back on you." Vavic then responded, "let's get her name, and

info." And when Singer said that he would do so and that he "won't tell Donna about this girl" so that Vavic "can get funded," Vavic replied, "that would be good."

A few weeks later, Singer emailed Agustin Huneeus, Agustina's father, asking for "an unofficial transcript, pdf of test scores and an action water polo photo of [Agustina]." The second wiretapped call, this time between Singer and Huneeus, followed on August 30, 2018. Singer explained the side door scheme to Huneeus and told him that Vavic is "my guy" and "is totally supporting our applications." Singer also made other representations to Huneeus, including that he had "actually helped all of [Vavic's] kids get in to college all over the country . . . [a]t no cost to him," and that he had "subsidize[d] [Vavic's] staffs' salaries" and paid for his teams' trips abroad. The parties agree that those three representations by Singer were lies.

Singer ultimately worked with Heinel, not Vavic, to submit Agustina's application through Subco, and Subco approved her admission as a water polo recruit. Huneeus paid $50,000 to the Women's Athletic Board following Agustina's admission. Once enrolled at USC, Agustina never showed up for water polo practice.

### 5. January 2019 Call Between Vavic and Singer

The Federal Bureau of Investigation (FBI) approached Singer in September 2018, and Singer eventually agreed to cooperate with the investigation into his nationwide college admissions

scheme.  On January 2, 2019, Singer called Vavic from a hotel room in Boston at the government's direction.  The two men shared the following exchange, which Vavic did not know was being recorded:

> SINGER: I just wanna make sure that . . . if I come across somebody that's a water polo player . . . , then um, it's still ok for me to holler at you because essentially what we have done in the past with the scholarships for your boys.  Correct?

> VAVIC: Absolutely, absolutely. . . . [W]e just have to find the right person. [B]ecause the way [U]SC's now doing everything Rick is um, um, when you get a walk on, uh, I used to be able to get 'em in much easier, now the walk-on uh, is required to have decent grades and he has to have some kind of a resume.  He can't just be a []total nobody. . . . [S]omething that . . . I can show that this guy is a legit or girl is a legit player.

Two months later, the FBI arrested Vavic.  Meanwhile, Singer pleaded guilty in a different case to multiple conspiracy charges related to the side-door scheme.[3]  Singer's culpability is well-established and not at issue in this case.

### B.    Procedural History

#### 1.    Indictment

The operative indictment in this case, returned by a Massachusetts federal grand jury, named Vavic, Heinel, and two

---

[3] Singer pleaded guilty to conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d), conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), obstruction of justice in violation of 18 U.S.C. § 1512(c)(2), and conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

coaches at Georgetown and Wake Forest Universities as defendants. Following extensive pretrial litigation, the indictment was narrowed to three counts: Count Two, conspiracy to commit mail and wire fraud and honest services mail and wire fraud in connection with multiple universities in violation of 18 U.S.C. § 1349; Count Three, conspiracy to commit federal programs bribery in violation of 18 U.S.C. § 371, which was limited to USC; and Count Sixteen, wire fraud and honest services wire fraud based on the January 2, 2019 call between Vavic and Singer, in violation of 18 U.S.C. §§ 1343 and 1346.

### 2.    Trial and Jury Instructions

The parties proceeded to trial, which spanned 21 days, 11 witnesses, and more than 200 exhibits.

At the close of trial, the district court instructed the jury on the elements of the charged offenses.  It began by describing the elements of honest services fraud.  The court told the jury, in relevant part, that honest services fraud required that the scheme to defraud someone of their right to honest services be "a bribery or kickback scheme."  It instructed the jury that "bribery" requires the exchange of "something of value."  That "thing of value," the court explained, may include either a payment to a third party or a payment to an employer that is contrary to the employer's interests.  The court also stated that, as to the interstate-wire element of honest services wire fraud,

the wire needed to further the scheme to defraud but did "not itself have to be essential to the scheme."

The district court then instructed the jury on the elements of federal programs bribery.  One of the elements the government had to prove, it explained, was that "in his role as an agent of USC, Mr. Vavic, with corrupt intent, solicited or demanded or accepted or agreed to accept something of value from Singer or Singer's clients."  The court told the jury that the "same requirements" of "a quid pro quo, corrupt intent, and bribe" in honest services fraud applied to the crime of federal programs bribery.

The jury convicted Vavic on all three counts.[4]

### 3.   Post-Trial Motions

Vavic moved for a judgment of acquittal or, in the alternative, a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure.  He argued that because the government failed to prove the nationwide and USC-specific conspiracies alleged in Counts Two and Three of the indictment, the resulting admission of "inflammatory evidence about conduct by others" in the alleged conspiracies warranted vacating all three counts.  He also lodged constructive amendment and prejudicial variance

---

[4] As we discuss in greater detail below, presumably in light of our decision in <u>Abdelaziz</u>, 68 F.4th 1, the government is no longer pursuing the charge against Vavic included in Count Two.

challenges against Count Two.  Separately, Vavic contended that the government's misconduct in closing arguments required a new trial.  He argued that the government improperly vouched for the credibility of Moon and Khosroshahin and misstated the evidence and applicable law in closing, resulting in incurable prejudice against him in the final moments of his trial.

The district court denied Vavic's motion for a judgment of acquittal.  See United States v. Vavic, 628 F. Supp. 3d 330, 337 (D. Mass. 2022).  The court first concluded that there was no constructive amendment of the Count Two conspiracy because "the charging terms of the indictment" were not "altered, either literally or in effect, by [the] prosecution or court" at trial. Id. at 359 (quoting United States v. Fisher, 3 F.3d 456, 462-63 (1st Cir. 1993)); see also id. at 360.  The court next explained that there was no prejudicial variance as to the same conspiracy because the "facts prove[n] at trial" were not "different from those alleged in the indictment," and even if they were, any alleged variance would not have "affected [Vavic's] 'substantial rights.'"  Id. at 359 (quoting Fisher, 3 F.3d at 462-63); see also id. at 360-61.  The court then held that sufficient evidence supported the jury's verdict on Counts Two and Three.  See id. at 361-65.

The district court nevertheless granted Vavic's alternative motion for a new trial.  See id. at 366-70.  It held

at the outset that it would conduct its analysis of the new trial motion under the plain-error standard because Vavic did not contemporaneously object to any of the government's disputed statements during closing arguments. See id. at 366.

The district court first concluded that the government made four misstatements of law in its rebuttal closing that suggested to the jury that payments to the USC water polo account alone were enough to convict Vavic (together, "Statements 1 through 4"). The statements were:

1. If you conclude that Jovan Vavic lied to [S]ubco about why he was recruiting Johnny Wilson and misled USC to benefit his own program financially, I submit to you[,] you can convict him for that alone.

2. And that brings us to Agustina Huneeus . . . . Ladies and gentlemen, that call by itself, even without everything else, I submit to you, is enough to convict him. There's no recruitment. He doesn't even know her name. He doesn't even know anything about her, except that she's not really going to play water polo and that her parents are going to give him $100,000 for his team.

3. If a math professor sells an A plus to a student who deserves a D and lies to the registrar about it and puts the money in the math department fund, that's honest services fraud.

4. And you know that when he was taking money to the water polo team in exchange for recruiting Johnny Wilson and when he agreed to take money to the water polo team to recruit Agustina Huneeus, he was acting contrary to the university's

> interests.  Mr. Larson told you that
> Coach Vavic did everything for the USC
> water polo team.  But that's the point.
> He was acting for his team and his
> interests and not for the university's
> interests when he took money to his team.
> He didn't want it to go to the
> university, to the rest of the
> university.  Listen to that August 3rd
> phone call.  He actually complains about
> the fact that somebody gave money to the
> university and not to his team.  He says,
> "Why didn't you give it to me?"

See id. at 366-67.  These statements, the court reasoned, contradicted the jury instructions on honest services fraud requiring the government "to show that the payments served the defendants' interests and harmed the university's." Id. at 367-68. "Had the government argued that USC received less money through the 'side-door' than it would have through VIP admissions or that Vavic misused the funds in the USC account, the arguments would have been consistent with the court's instruction." Id. at 368. But the government's argument relied only on evidence of "a misrepresentation to Subco plus a payment to the USC Water Polo gift account," so the court concluded that it was insufficient to satisfy the contrary-to-interests requirement. Id.  The court ruled that to accept more speculative theories of Vavic's interests, like his desire to gain a reputational boost, "would be to resurrect the undisclosed self-dealing theory" of honest services fraud rejected by the Supreme Court.  Id. at 363, 368 (citing Skilling v. United States, 561 U.S. 358, 407 (2010)).

The district court then held that the government misstated the facts twice in its rebuttal closing by suggesting to the jury that Vavic agreed to a $100,000 payment in exchange for Agustina's recruitment (together, "Statements 5 and 6").  The statements were:

> 5.   But the luck gets worse.  Because then, he's caught on a wiretap agreeing to recruit a student, whose name he doesn't even know, in exchange for another $100,000 to his water polo program, a student he is told is a fake water polo player. . . . Guess what? Donna Heinel, it's pretty undisputed, doesn't recruit . . . water polo players.  He does . . . . So he knows she's not actually going to play water polo, but he agrees to recruit her for $100,000.

> 6.   That August 3rd recording is basically a confession.  In the same call that he talks about recruiting a girl whose name he doesn't know, for $100,000, he says, "You don't need to pay me ever[y] time, because you're helping me enough with my program and with my kids."

The court ruled that the "assertion that the agreement was for $100,000 was not supported by any evidence." Id. at 369.  Although that misstatement was not sufficiently prejudicial "[t]aken alone," prejudice was "compounded by the possibility that any conclusions the jury reached regarding the Huneeus transaction were also based on false statements by Singer the government introduced" earlier at trial.  Id.  The court held that Singer's lies in his August 30, 2018 phone call with Huneeus -- specifically

about (i) helping all four of Vavic's sons get into college, (ii) subsidizing the salaries of Vavic's staff, and (iii) paying for Vavic's teams' travel expenses -- posed "a substantial risk that the jury reached a decision based on false evidence." Id. at 369–70.

The government timely appealed the new trial order but only as to Counts Three and Sixteen. It is no longer challenging the district court's decision to vacate Vavic's conviction on Count Two.

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over the government's appeal of the district court's order granting a new trial. See 18 U.S.C. § 3731.[5]

Under Federal Rule of Criminal Procedure 33(a), a district court may "grant a new trial if the interest of justice so requires." Where, as here, "the trial judge revisits the case to pass upon the new trial motion," we owe "an appreciable measure of respect" to the "presider's sense of the ebb and flow of the recently concluded trial." United States v. Connolly, 504 F.3d

---

[5] Vavic initially cross-appealed the district court's denial of his motion for a judgment of acquittal but later moved to dismiss his cross-appeal without prejudice. We granted his motion. We leave review of that decision to any subsequent appeal from final judgment. See United States v. Carpenter, 494 F.3d 13, 28–29 (1st Cir. 2007) (concluding that the court lacked jurisdiction under 28 U.S.C. § 1291 to hear the defendant's cross-appeal from the denial of his motion for a judgment of acquittal where, like here, the government appealed the grant of his motion for new trial).

206, 211 (1st Cir. 2007) (quotation marks and citation omitted).
Thus, we will reverse a district court's order for a new trial
only if its decision constitutes an abuse of discretion.  See
United States v. Carpenter, 736 F.3d 619, 626 (1st Cir. 2013).

"[A] district court abuses its discretion whenever it
predicates its ruling on an erroneous view of the law," which we
review de novo.  Connolly, 504 F.3d at 211-12.  Whether the
district court "applied an incorrect standard" in analyzing the
issues at stake is a question of law.  Id. at 212.  So too is
whether the "underlying comments in the [government's] closing
argument were improper."  Carpenter, 736 F.3d at 626.

### III.  DISCUSSION

The government argues that the district court abused its
discretion in granting a new trial for prosecutorial misconduct
because it did not correctly apply the plain-error standard to
Vavic's unpreserved objections.  Under the correct analysis, the
government contends, its statements during closing were not plain
error.  Vavic responds that the district court correctly applied
the plain-error standard and was right to conclude that it was
"likely that the [government's] misconduct [in rebuttal] affected
the trial's outcome."  United States v. Canty, 37 F.4th 775, 790
(1st Cir. 2022).

Vavic also advances three alternative grounds for
affirming the district court's new trial order.  First, he argues

that his conviction for a USC-specific conspiracy under Count Three should be vacated because the government's proof at trial amounted to a prejudicial variance from the conduct charged in the indictment.  In support, he cites to our intervening decision in Abdelaziz, 68 F.4th 1, which granted a new trial in a related Varsity Blues case on prejudicial-variance grounds.  Second, Vavic contends that his Count Sixteen conviction for honest services fraud should be vacated because the jury might have rested its decision on a theory of bribery that, after Abdelaziz, is no longer legally supportable.  And third, Vavic requests that we vacate the convictions for both Counts Three and Sixteen because the government introduced into evidence statements by Singer that it knew to be false, thereby posing an impermissibly high risk of conviction on false evidence.

We sift through the parties' arguments count by count. We begin with the honest services fraud conviction under Count Sixteen and conclude that Vavic's alternative ground for affirming the district court's new trial order has merit.  Our recent decision in Abdelaziz invalidated the legal theory that payments made to USC, the victim of the scheme to defraud, could be actionable bribes under honest services fraud.  Thus, we affirm the grant of a new trial as to Count Sixteen because it is impossible to tell if the jury reached the verdict on an invalid legal theory, and the error is not harmless.  See Yates v. United

States, 354 U.S. 298, 312 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1 (1978).

Next, we turn to Count Three -- the conspiracy to commit federal programs bribery charge. Under de novo review, we conclude that the government's statements in rebuttal did not result in plain error. We then reject Vavic's alternative grounds for affirming the new trial order on Count Three, holding that the government's introduction of Singer's false statements does not require vacating his conviction and there was no prejudicial variance.

Thus, we affirm the district court's new trial order as to Count Sixteen and reverse as to Count Three.

### A.    Count Sixteen

Vavic argues that a new trial is required as to Count Sixteen because, as a result of our intervening decision in Abdelaziz, it is impossible to tell whether the jury's conviction rests on a now-unsupportable legal theory for honest services fraud. We agree.

### 1.    Legal Background

Before proceeding to the merits of Vavic's argument, we lay out the applicable legal framework on honest services fraud as it applies to this case.

Count Sixteen charges Vavic with honest services fraud under 18 U.S.C. §§ 1343 and 1346. The wire fraud statute prohibits

the use of interstate wires to advance a "scheme or artifice to defraud." 18 U.S.C. § 1343. That "scheme or artifice to defraud" includes "a scheme or artifice to deprive another of the intangible right of honest services." Id. § 1346.

In United States v. Skilling, however, the Supreme Court explained that § 1346 criminalizes only those "scheme[s] . . . to defraud" involving bribes or kickbacks in violation of the defendant's fiduciary duty. See 561 U.S. at 407-09. Schemes involving "undisclosed self-dealing" by an employee -- in particular, "the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty" -- are not, without more, a bribe or kickback scheme falling within § 1346's sweep. Id. at 409-11.

The government sought to prove that Vavic deprived USC of its right to honest services by accepting two types of bribes in exchange for helping to admit fake athletic recruits: tuition payments for his sons and payments to the USC water polo account. The parties have consistently agreed that the first type of bribe alleged, the tuition payments, falls within the "bribe-and-kickback core" of § 1346. Id. at 409. But the parties fiercely disputed at trial whether the second type of bribe, the payments to USC, could be prosecuted under § 1346, or whether it was a form of "undisclosed self-dealing" that Skilling rejected.

Our ruling in United States v. Abdelaziz, which was decided after the district court's new trial order, puts the parties' dispute about the university payments to rest.  In that related Varsity Blues case, defendants Gamal Abdelaziz and John Wilson[6] -- parents who sought to secure college admission for their children using Singer's services -- appealed their convictions for honest services fraud, among other crimes.  See Abdelaziz, 68 F.4th at 11-12.  Abdelaziz and Wilson had donated to university athletic programs, and there was no dispute on appeal that their money went only to "university-owned accounts."  Id. at 15, 19.

We vacated their honest services fraud convictions.  As we explained, "their payments to the universities," which were "the [very] parties whose interests were purportedly betrayed by their agents, cannot constitute bribes under Skilling's interpretation of § 1346."  Id. at 29.  The defendants' payments differed from "traditional bribery fact patterns" -- for example, where an agent was paid and the principal (here, a university) happened to benefit financially -- that fell within the statute's bribe-and-kickback core.  Id. at 30.[7]  Thus, because there was no

_____

[6] This was a separate prosecution against Johnny Wilson's father for his efforts to secure side door admissions for Johnny and his two sisters.  See Abdelaziz, 68 F.4th at 16-18.

[7] We were also careful to note that payments made to purportedly betrayed parties (here, the universities) could still constitute bribes under federal programs bribery and other federal anti-bribery statutes.  See id. at 21-26, 31.

other theory of bribery on which their honest services fraud convictions were premised, we vacated their convictions.

### 2.    **Yates** Error

Having set out the legal framework, we turn to the merits of Vavic's challenge.  The parties agree that, under Abdelaziz, Vavic cannot be convicted on a theory of honest services fraud premised on payments to USC.  The payments to the water polo account went to the "purportedly betrayed party" -- here, USC -- and thus fail under Abdelaziz.  Id.  Where the parties disagree, however, is how Abdelaziz affects the Count Sixteen conviction overall.

A verdict may be set aside "in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." Yates, 354 U.S. at 312.  The Yates rule applies only where, as here, "'a particular theory of conviction submitted to [the jury] is contrary to law,' and not where one of several alternative bases for conviction is legally sound but supported by insufficient evidence." Abdelaziz, 68 F.4th at 65 (quoting Griffin v. United States, 502 U.S. 46, 59 (1991)).  As a result, a Yates error must be grounded in some feature of "the indictment or the jury instructions that would lead a juror" to rely on a legally impermissible theory.  Id. at 65-66; see also Skilling, 561 U.S. at 414 (explaining that a Yates "error occurs when a jury is

instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory" (emphasis added)); United States v. Nieves-Burgos, 62 F.3d 431, 436 (1st Cir. 1995) (discussing the history of the Yates rule).

But not all Yates errors affecting a conviction require a new trial. Yates errors are constitutional errors subject to harmless-error review. See Hedgpeth v. Pulido, 555 U.S. 57, 60-62 (2008) (per curiam); see also Skilling, 561 U.S. at 414 & n.46. Thus, we can sustain a conviction "if we conclude 'beyond a reasonable doubt' that 'the jury verdict would have been the same absent the error.'" United States v. Zhen Zhou Wu, 711 F.3d 1, 30 (1st Cir. 2013) (quoting Neder v. United States, 527 U.S. 1, 17 (1999)).[8]

We conclude that the Yates error here requires a new trial on Count Sixteen. The district court instructed the jury that a bribery scheme for purposes of honest services fraud required proof of an exchange of a "thing of value." That "thing

---

[8] Vavic contends that "vacatur is automatic" even if "overwhelming evidence supported another ground" for convicting on Count Sixteen. To the extent that he suggests that Yates errors are structural errors not subject to harmless error review, the Supreme Court has held otherwise. See Hedgpeth, 555 U.S. at 60-62.

We also pause to note that the government does not press us to review Vavic's Yates argument for plain error. See United States v. Rodríguez-Santos, 56 F.4th 206, 219 (1st Cir. 2022) (holding that unpreserved Yates errors are subject to plain-error review). We agree. Vavic timely objected to the inclusion of the university-account theory of bribery in the jury instructions.

of value," the court explained, could be a payment to a third party, like Vavic's sons' private school (the first bribery theory). Or the "thing of value" could be a payment to the bank account for the USC water polo team (the second bribery theory). The court explained to the jury the relevant law on the two bribery theories in this way:

> Payment made to a third party may constitute a thing of value to an employee based on the subjective value placed on it by the employee.

> Payment made to a university to which the employee owes a duty of honest services may constitute a thing of value to the employee based on the value placed on it by the employee only . . . if . . . the payments are made for the employee's own interests and receipt of the payments is contrary to the university's interest.[9]

And, crucially, the jury needed to find that the government had proven only one of the two bribery theories beyond a reasonable doubt. Thus, the jury was "instructed on alternative theories of guilt" as to Count Sixteen. United States v. Rodríguez-Santos, 56 F.4th 206, 218 (1st Cir. 2022) (quoting Hedgpeth, 555 U.S. at 58). And because the jury returned only a general verdict form, it is

_____

[9] The court also instructed the jury that a payment to USC could be a "thing of value" if "the employee use[d] those funds for his or her personal use rather than the entity's use." But the parties stipulated that there was no evidence that Vavic misused any of the money in the USC water polo account. Thus, we focus on the court's instruction that payments to USC could be bribes if they were "made for the employee's own interests and receipt of the payments [was] contrary to the university's interest."

impossible to tell whether the jury relied on the theory of guilt that is now unsupportable under Abdelaziz.  See Skilling, 561 U.S. at 414 (noting that the error occurs where the jury returns a "general verdict").

Notwithstanding those indicia of error, the government argues that we can determine which of the two bribery theories the jury selected.  The indictment identifies the interstate wire underlying Count Sixteen as the January 2, 2019, phone call, in which Singer and Vavic discussed Singer's payments for Vavic's sons' tuition.  The key exchange in the call is, in relevant part:

> SINGER: I just wanna make sure that . . . if I come across somebody that's a water polo player . . . , then um, it's still ok for me to holler at you because essentially what we have done in the past with the scholarships for your boys.  Correct?
>
> VAVIC: Absolutely, absolutely.

The phone call makes no mention of Singer's payments to any USC account.  So, the government's theory goes, a conviction on Count Sixteen is necessarily limited to a scheme where Vavic accepted tuition payments as bribes in exchange for Vanessa's admission.

We are unconvinced.  The district court told the jury repeatedly that the wire must be either "for the purpose of executing the scheme," "in the furtherance of the scheme," or "in the course of the scheme."  And it further instructed that the wire "does not itself have to be essential to the scheme," and

that the wire's use did not need to be "intended as the specific or exclusive means of accomplishing the alleged fraud."

In light of that language, it is impossible to tell which "scheme" underlying Count Sixteen the jury credited.  A reasonable jury could have concluded that the evidence about Johnny's and Agustina's admissions established that Vavic committed honest services fraud beyond a reasonable doubt, but that the evidence about Vanessa's admission did not.[10]  In that event, Singer's reference to "holler[ing]" at Vavic, and Vavic's response of "[a]bsolutely," would still have been enough for a reasonable jury applying the court's instructions to conclude that the call was "for the purpose of," "in the furtherance of," or "in the course of" any scheme to defraud USC of honest services.  And the tuition payments mentioned in the call would not be, again under the court's instructions, "essential" or "intended as the specific or exclusive means of accomplishing the alleged fraud."  Thus, we cannot hold that Count Sixteen necessarily required the jury to find that Vavic accepted personal bribes, and we conclude that the conviction suffers from a <u>Yates</u> error.[11]

---

[10] As we explain later when evaluating harmlessness, a reasonable jury could have found that Vavic did not knowingly participate in an admissions scheme involving Vanessa or that Vavic did not act with the intent to deprive USC of honest services.

[11] Neither the government nor Vavic alleges that the jury instructions were in error.  And we must presume that jurors, "conscious of the gravity of their task, attend closely the

Next we turn to harmlessness.  The government argues that the Yates error was harmless because there was overwhelming evidence to convict Vavic on a personal-bribe theory.  In particular, the government presses the fact that Vavic initiated Vanessa's recruitment a little less than a month after Singer's first tuition payment.

The Yates error here was not harmless.  Invalidating the university-payment theory would reduce the number of relevant student admissions from three (Johnny, Vanessa, and Agustina) to one (just Vanessa).  And contrary to the government's arguments, there was not overwhelming evidence to support its theory that Vavic arranged for Vanessa's admission in exchange for payments for his sons' private school tuition.  It was Heinel, not Vavic, who ultimately facilitated Vanessa's admission.  And Vanessa's father sent a $50,000 check to the Women's Athletic Board -- the fund that Heinel controlled -- after she was admitted. Alternatively, a reasonable jury could have concluded that Vavic did not have the requisite intent to defraud USC.  Janke falsified Vanessa's credentials before Vavic saw them, and Vavic asked

---

particular language of the trial court's instructions." Abdelaziz, 68 F.4th at 66 (quoting United States v. Olano, 507 U.S. 725, 740 (1993)).  Further, the jury instructions mirror our case law, which does not require the overly restrictive nexus between the interstate wire and scheme to defraud that the government appears to suggest.  See United States v. O'Donovan, 126 F.4th 17, 33-34 (1st Cir. 2025).

Vanessa to jump in the pool to block some shots after she was recruited at USC.  Also, Vavic had at one point emailed the USC ethics office about the high school tuition payments to confirm he was not in violation of NCAA rules.  Thus, the government has not carried its burden to establish "beyond a reasonable doubt" that the jury would have convicted Vavic of honest services fraud even if its university-payments theory had been excised from the case. Zhen Zhou Wu, 711 F.3d at 30 (quoting Neder, 527 U.S. at 17).

　　　　We therefore affirm the district court's new trial order as to Count Sixteen on Yates grounds as a result of our intervening decision in Abdelaziz.  And because we affirm the new trial order as to Count Sixteen on that basis, we do not need to reach the parties' other arguments about this count.

### B.    Count Three

　　　　We now tackle Count Three.  The government contends that it did not misstate the law or facts in its rebuttal closing and that, even if it did, those misstatements did not rise to the level of plain error warranting a new trial.  Vavic, for his part, offers two alternative grounds for affirming the new trial order.  First, Vavic argues that the government's reliance on Singer's false statements warrants a new trial under Napue v. Illinois, 360 U.S. 264 (1959).  Second, Vavic contends that, at most, the government proved significantly narrower conspiracies at trial than it

alleged in Counts Two and Three, resulting in a prejudicial variance.

We agree with the government that its misstatements did not constitute plain error, and we reject Vavic's alternative grounds for affirming the new trial order. Accordingly, we reverse the district court's new trial order as to Count Three and reinstate Vavic's conviction on that count.

### 1.    The Government's Statements During Closing Arguments

We begin with the district court's ruling that the government's statements during its rebuttal closing amounted to prosecutorial misconduct. Where, as here, the defendant does not contemporaneously object to any of the government's comments, the plain-error standard applies. See Canty, 37 F.4th at 790. That standard is notoriously difficult to meet. As we have explained, "plain error review is ordinarily limited to blockbusters and does not consider the ordinary backfires -- whether or not harmful to a litigant's cause -- which may mar a trial record." United States v. Henderson, 320 F.3d 92, 105 (1st Cir. 2003) (quotation marks and citation omitted).

We will find plain error only if four familiar prongs are met. They are: (1) "an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Canty, 37 F.4th at

790 (quoting <u>United States</u> v. <u>Solís-Vásquez</u>, 10 F.4th 59, 64 (1st Cir. 2021)).

Further, when determining whether an error of prosecutorial misconduct "affected the defendant's substantial rights," we ask "whether the prosecutor's misconduct so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial." <u>Id.</u> at 791 (quoting <u>United States</u> v. <u>Azubike</u>, 504 F.3d 30, 39 (1st Cir. 2007)). The inquiry of whether the trial's outcome was "likely affected" in turn requires that we consider several non-exclusive factors: "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant." <u>Id.</u> (cleaned up) (quoting <u>United States</u> v. <u>Vázquez-Larrauri</u>, 778 F.3d 276, 283 (1st Cir. 2015)).

### a. Alleged Misstatements of Law

The government first contends that its statements in rebuttal were not contrary to the jury instructions on bribery and, in turn, do not rise to the level of plain error warranting a new trial. Focusing our analysis on Count Three, we agree.

Recall that the district court held that Statements 1 through 4 in the government's rebuttal closing contravened the

jury instructions on the definition of a bribe.[12]  See Vavic, 628 F. Supp. 3d at 366-68; see also supra section I.B.3.  The federal programs bribery statute makes it unlawful for anyone "being an agent of an organization" receiving federal funding in excess of $10,000 (like USC) to:

> corruptly solicit[] or demand[] for the benefit of any person, or accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more.

18 U.S.C. § 666(a)(1)(B).  The district court instructed the jury on each element of the offense, including that Vavic must have, "with corrupt intent, solicited or demanded or accepted or agreed to accept something of value."  The court then stated that the "same requirements" with "respect to honest services fraud on the requirements for a quid pro quo, corrupt intent, and bribe" applied to the crime of federal programs bribery.  And under the honest services fraud instructions, payments constituted a bribe only if, as relevant here, "the payments [were] made for the employee's own

---

[12] We note that the district court ordered a new trial for Counts Two (conspiracy to commit honest services fraud), Three (conspiracy to commit federal programs bribery), and Sixteen (substantive honest services fraud) without distinguishing between the counts.  We take its reasoning on the misstatements of law to apply to all three counts.

interests and the receipt of the payments [was] contrary to the university's interests."

We conclude that there was no error by the district court, let alone plain error, in not striking Statements 1 through 4 as they applied to Count Three. None of the statements contravened the jury instructions on federal programs bribery. In Statement 1, the government invited the jury to convict Vavic because he "misled USC to benefit his own [water polo] program financially." So too in Statement 2, the government argued that Agustina's parents were "going to give [Vavic] $100,000 for his team." Then, in Statement 3, the government analogized the case to a math professor misleading the rest of the university so that the professor's "department fund" would benefit. And finally, in Statement 4, the government made its point most clearly: Vavic "was acting for his team and his interests and not for the university's interests when he took money to his team. He didn't want it to go to the university, to the rest of the university." That language was consistent with the instruction that the bribes be "made for [Vavic's] own interests" and the "receipt of the payment" be "contrary to the university's interests."

Although we proceed with caution in overturning the district court's order, and we acknowledge and respect its intimate familiarity with the trial, its decision focused exclusively on honest services fraud and did not explain why Count Three, the

federal programs bribery charge, required a new trial. The court held that the government's statements in rebuttal violated the jury instructions because, contrary to what Statements 1 through 4 might have suggested, Vavic's "professional boost from bringing in the money" was not a cognizable personal interest and the "reputational harm to one's employer" was not a cognizable university interest. <u>Vavic</u>, 628 F. Supp. 3d at 368.[13]  But the sole authority that it cited for that holding was <u>Skilling</u>, which is an honest services fraud case. <u>See id.</u> (explaining that "[t]o find otherwise would be to resurrect the undisclosed self-dealing theory that the Supreme Court rejected in <u>Skilling</u>").  As it turns out, the district court was entirely right to doubt the government's honest services fraud theory. <u>See Abdelaziz</u>, 68 F.4th

---

[13] The parties dispute this aspect of the district court's reasoning at length.  The government argues that its rebuttal closing "could only be found to have misstated the contrary-to-interests requirement if measured against an instruction the court did not give," and that the district court effectively rewrote the jury instructions in its new trial order. By contrast, Vavic contends that Statements 1 through 4 violated the jury instructions as written because the government incorrectly suggested that all misrepresentations to USC were "contrary to the university's interest" for purposes of defining a "bribe."

Because we affirm the new trial order as to Count Sixteen on alternative grounds, we do not opine on the district court's treatment of the jury instructions as they applied to honest services fraud.  The district court did note, however, that "the government's insistence that the evidence here was sufficient to show bribes or kickbacks supports Vavic's view that the court's [honest services] instruction was in error." <u>Vavic</u>, 628 F. Supp. 3d at 368 n.14.

at 29 (holding that payments to "parties whose interests were purportedly betrayed by their agents" do not "constitute bribes under Skilling's interpretation of § 1346").  But the court made no mention of the separate federal programs bribery charge in its analysis.

Vavic's arguments on appeal also do not persuade us that he is entitled to a new trial as to Count Three.  Vavic's challenge to Statements 1 through 4 mostly focuses on the honest services fraud count, arguing that the government's statements in rebuttal effectively "collapse[d]" the misrepresentation and bribery elements of that offense.  In his view, the government's rebuttal closing "pressed the jury to convict just by finding that Vavic made misrepresentations to USC" and suggested that "those donations were necessarily contrary to USC's interests because Vavic allegedly misrepresented students' athletic prowess."  But as to Count Three, the jury was never instructed that the crime of federal programs bribery required a "misrepresentation," just that Vavic must have acted "with corrupt intent."

Vavic does make a passing attempt to tailor his appellate argument to Count Three, but we are unconvinced.  The federal programs bribery statute makes it unlawful for employees to "corruptly" accept anything of value, 18 U.S.C. § 666(a)(1)(B), so Vavic contends that Statements 1 through 4 misconstrued the "corruptly" element, which "requires more than an abstract bad

intent or violation of employment policies." But despite suggesting that the "corruptly" element in federal programs bribery is coextensive with the "misrepresentation" element in honest services fraud, Vavic does not explain why either his (or the district court's) honest services fraud analysis should extend into the federal programs bribery context. And, to the contrary, Abdelaziz held that payments to an alleged victim (here, USC) could constitute actionable bribes under the federal programs bribery statute. See 68 F.4th at 26.[14]

Accordingly, we conclude that there was no error, let alone plain error, as to Count Three resulting from the inclusion of Statements 1 through 4 in the government's rebuttal closing. Thus, Statements 1 through 4 do not justify a new trial as to Count Three.

**b.   Alleged Misstatements of Fact**

The government next argues that its factual statements in rebuttal were not contrary to the evidence and, in turn, do not rise to the level of plain error warranting a new trial. In our

---

[14]   To Vavic's credit, it is true that evidence of misrepresentation or omission, which is not required under federal programs bribery, can be evidence of corrupt intent. See United States v. DeQuattro, 118 F.4th 424, 446 (1st Cir. 2024) ("[T]he extent to which the parties went to conceal their bribes is powerful evidence of their corrupt intent." (quoting United States v. McNair, 605 F.3d 1152, 1197 (11th Cir. 2010))). But his suggestion that the elements of these two different offenses are equivalent is undeveloped, particularly considering that the two statutes criminalize different types of bribery.

view, although the statements inaccurately represented certain facts, their inclusion in the rebuttal did not prejudice Vavic's substantial rights as to Count Three, thus failing to satisfy the third prong of the plain-error test.

The district court determined that Statements 5 and 6 in the government's rebuttal closing misstated the evidence.  See supra section I.B.3.  In particular, the court held that there was no basis in the August 3, 2018 call to assert, as the government did in Statements 5 and 6, that Vavic agreed to assist with Agustina's recruitment in exchange for $100,000.  See Vavic, 628 F. Supp. 3d at 369.

Under the first prong of plain error, we agree with the district court that the government's inclusion of Statements 5 and 6 was error.  All Vavic said on the August 3 call was that he was "$100,000 in the freaking hole," that it was "good news" for Singer, and that it was a "good time[] when you actually were . . . helping me out."  The call suggested that Vavic's budget had a $100,000 deficit, not that he had agreed to a $100,000 bribe in exchange for Agustina's recruitment.  Nor does any inferential step from Vavic's use of the term "deficit" to bribe seem reasonable.  The two men never referenced the $100,000 figure again after Vavic's "in the hole" comment, and Agustina's father ended up paying $50,000 to Heinel's fund.  Thus, the government's

"assertion" in Statements 5 and 6 "that the agreement was for $100,000 was not supported by any evidence." Id. at 369.

Next, the error was clear and obvious, satisfying prong two of the plain-error test. To be clear and obvious, an error must be "indisputable" in light of controlling law, such as binding in-circuit precedent. United States v. Langston, 110 F.4th 408, 419 (1st Cir. 2024) (quoting United States v. Correa-Osorio, 784 F.3d 11, 22 (1st Cir. 2015)). Our precedent is clear that it is error for the government to "inaccurately restat[e] trial testimony." United States v. Lowe, 145 F.3d 45, 50 (1st Cir. 1998).

Under the third prong, however, we disagree with the district court that the error was prejudicial. Considering each of the "non-exclusive factors" under the poison-the-well test enumerated in Canty, we conclude that Vavic has not carried his heavy burden of showing that the error was "likely" to have "affected the trial's outcome" as to Count Three. 37 F.4th at 791.

The first non-exclusive factor is whether the government's misconduct was deliberate or accidental. See id. Although the government referenced the $100,000 figure repeatedly during its rebuttal, Vavic does not argue, nor did the district court conclude, that the government's misconduct was intended to deliberately mislead the jury. Unlike other cases where the

government has hammered a misstatement from opening argument to closing argument to rebuttal, see id. at 792, there is "no evidence" here "that the misstatement was anything other than unintentional," United States v. Allen, 469 F.3d 11, 16 (1st Cir. 2006).

The second non-exclusive factor is the context of the government's misstatements.  See Canty, 37 F.4th at 791. Generally, "[w]e view problematic statements during rebuttal with particular scrutiny, because the government's rebuttal argument offers the last word before the jury begins deliberations." United States v. Torres-Colón, 790 F.3d 26, 34 (1st Cir. 2015).  But here the government's statements were "isolated and, in relation to the body of evidence received during trial, relatively insignificant." United States v. Morales-Cartagena, 987 F.2d 849, 854 (1st Cir. 1993); see also Allen, 469 F.3d at 16 (isolated statement did not rise to level of plain error).  Vavic argues that "by insisting that [he] agreed to recruit an unknown student 'for $100,000,'" Statements 5 and 6 sought to "firm up a supposed quid pro quo." But even he appears to agree that the actual sum offered in exchange for Agustina's recruitment -- whether it was $100,000 or some lesser amount -- was legally irrelevant to the verdict.[15]  And

---

[15] Although the jury was instructed that the payment must have been at least $5,000 to constitute federal programs bribery, no party disputed that the payment accepted for Agustina's recruitment met the statutory minimum.

Vavic does not dispute that the government properly suggested that a reasonable juror could view the August 3 call as evidence of a quid pro quo for Agustina's recruitment, even if not for $100,000.

The third non-exclusive factor is whether the district court's jury instructions were curative. See Canty, 37 F.4th at 792. The district court included the standard instruction that closing arguments are not evidence, and we conclude that nothing more was necessary here, given that the value of the payment for Agustina's recruitment was legally irrelevant. See id. (suggesting that the standard instruction is "'adequate to dispel any prejudice from improper remarks'" where the improper remarks are not "particularly severe or pervasive, and [do not] go to issues central to the case" (quoting United States v. Ayala-García, 574 F.3d 5, 21 (1st Cir. 2009))).

The fourth non-exclusive factor is the strength of the government's evidence. See id. at 793. Vavic's only argument under this factor is that Statements 5 and 6 were prejudicial "[e]specially given [the] broader context" of "Singer's repeat falsehoods" throughout the trial. The district court agreed, holding that the prejudice resulting from Statements 5 and 6 was "compounded by the possibility that any conclusions the jury reached regarding the Huneeus transaction were also based on false statements by Singer the government introduced" at trial. Vavic,

628 F. Supp. 3d at 369.[16]  But as we conclude in the next section, see infra section III.B.2, the near-immediate correction following each of Singer's lies introduced at trial, the strategic choices made by Vavic, and the government's decision not to reference the challenged statements in closing argument all minimized the prejudicial effect of Singer's false statements.

With none of the four "non-exclusive factors" weighing in his favor, Vavic has not carried his heavy burden under prong three of the plain-error test to show that Statements 5 and 6 so "poisoned the well that the trial's outcome was likely affected." Canty, 37 F.4th at 791.  Indeed, we conclude that the government's misstatements as to the value of Agustina's recruitment, while error, were more akin to the "ordinary backfires . . . which may mar a trial record" rather than "blockbuster[]" misconduct warranting a new trial.  Henderson, 320 F.3d at 105 (quotation marks and citation omitted).

----

[16] These statements were admitted under the district court's "Petrozziello ruling." Id.  After the close of evidence and before instructing the jury, the court issued a ruling permitting the jury to consider certain out-of-court co-conspirator statements for their truth.  The court applied our decision in United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977), and concluded that a preponderance of the evidence at trial established a broad conspiracy involving Vavic and thirteen other co-conspirators from 2013 onward.  The court's ruling therefore permitted the jury to consider all out-of-court co-conspirator statements from 2013 onward for their truth as non-hearsay.  See Fed. R. Evid. 801(d)(2)(E).  Because no challenge to the Petrozziello ruling is currently on appeal, we do not review it.

### 2.    The Government's Reliance on Singer's False Statements

We turn next to Vavic's alternative grounds for a new trial.  Vavic argues that the admission of certain of Singer's lies into evidence runs afoul of the <u>Napue</u> rule that "a conviction obtained through use of false evidence" by the government violates due process.  <u>See</u> 360 U.S. at 269.  We disagree and conclude that no <u>Napue</u> error occurred.

### a.    Relevant Trial Proceedings

We first set the stage before proceeding to the merits. At trial, the government initially planned to enter a redacted version of the August 30, 2018 call between Singer and Huneeus into evidence.  The government proposed to redact, among other statements, the following three lies told by Singer:

> 1.    I have actually helped all of [Vavic's] kids get in to college all over the country.  So I've helped all four kids. At no cost to him.

> 2.    What Jovan usually does is I subsidize his staffs' salaries. . . .
>
> Because it's too expensive to stay down there, so I put two of his staff members on my books as contractors. . . .
>
> And then I pay them throughout the year um more []additional salary than they normally get.

> 3.    And they'll be a certain percentage where he'll send me an invoice 'cause he'll take his team to Hungary or Serbia and play, and he'll send me another $100,000 invoice and I'll pay that . . . .

<u>Vavic</u>, 628 F. Supp. 3d at 369-70.

Vavic's counsel objected to the admission of a redacted call, reasoning that the redaction "doesn't help us." She stated that, if the court admitted the call at all, Vavic intended to rely on the fact that Singer was a liar to show to the jury that Vavic did not necessarily know that Singer's water polo players were unqualified. So, his counsel argued, "[t]he false statements are actually helpful to us, as long as they're cleared up in real[-]time, because they show Mr. Singer is lying about our client in a very clear way that the Government knows is false."

After two lengthy discussions, the district court "caution[ed] [the government] as officers of the court, as well as government attorneys, that when they're putting something in that's a knowingly false statement, one would think that they would understand an immediate obligation to address it." The court also reasoned that it would be unacceptable for the government to use a redacted version excluding Singer's lies because the government should not "rely on the credibility of somebody whose remaining statements show that they're not credible." The next morning, the court instructed the jury to "keep [an] open mind" and not to consider out-of-court statements for their truth until told that they may do so.

The government later entered the relevant segments of the August 30, 2018 call into evidence through the testimony of

Keith Brown, an FBI Special Agent who was part of the investigation into Singer's nationwide scheme. The government played the audio of the August 30 call for the jury, segment by segment, and asked questions following each segment. When the segment contained a lie, the government elicited testimony that Brown had not seen any evidence to substantiate the lie.

For instance, the government asked Brown whether he had seen evidence suggesting that Singer had assisted all four of Vavic's sons with their college applications, and he said that he had not. The government then asked where Vavic's sons attended college, and Brown clarified that they all went to USC, not to schools all over the country. The government then proceeded to the next segment of the call and asked whether Brown had seen any evidence to suggest that Singer had subsidized Vavic's staff's salaries, that he had put USC water polo staff members on his books as contractors, or that Vavic had sent Singer an invoice. Brown answered no to each question.

Later in the trial, Vavic's counsel cross-examined Lauren George, the government's forensic auditor witness, about whether she had seen any evidence of Singer paying for Vavic's staff's salaries or adding Vavic's staff to his payroll as contractors. She replied no. Vavic's counsel then asked her whether "[t]hat appeared to be a lie that Rick Singer was saying about Coach Vavic," and she responded, "That does not appear to be

a truthful statement based on what I saw in the records."  The government did not replay any segments of the August 30 call containing the three lies during closing arguments, although the jury was able to replay the audio in the jury room.

In its new trial order, the district court acknowledged -- in the context of its holding on the government's alleged misconduct in rebuttal -- "the possibility that any conclusions the jury reached regarding the Huneeus transaction were also based on false statements by Singer the government introduced under the <u>Petrozziello</u> ruling." <u>Vavic</u>, 628 F. Supp. 3d at 369.  The court quoted Singer's three lies in the August 30 call, which it explained were "[c]ontrary to all other evidence in the record or allegations in the indictment." <u>Id.</u>  It held that "where the government made no disclaimer or acknowledgement to the jury that it was not offering Singer's statements about Vavic for their truth, there is a substantial risk that the jury reached a decision based on false evidence." <u>Id.</u> at 370.

### b.  <u>Napue</u> Error

Vavic contends that the admission of Singer's lies into evidence runs afoul of the rule that the government "'may not knowingly use false evidence, including false testimony, to obtain a tainted conviction' regardless of whether the prosecutor 'solicit[s] false evidence' or . . . 'allows [false evidence] to go uncorrected when it appears.'" <u>United States</u> v. <u>Mangual-Garcia</u>,

505 F.3d 1, 10 (1st Cir. 2007) (alterations in original) (quoting
Napue, 360 U.S. at 269).  "A new trial is required if the false
testimony could in any reasonable likelihood have affected the
judgment of the jury." Giglio v. United States, 405 U.S. 150, 154
(1972) (cleaned up).

We find no Napue error here for two reasons.  First,
Vavic's strategic choices at trial foreclose any Napue error.  A
defendant cannot establish a Napue error when he intentionally
does not object to or affirmatively elicits evidence that he knows
to be false.  See United States v. Flores-Rivera, 787 F.3d 1, 32
(1st Cir. 2015) (no error where defendant affirmatively elicited
false testimony), overruled by statute on other grounds as stated
in United States v. Smith, 954 F.3d 446, 448 (1st Cir. 2020); see
also United States v. Vega, 813 F.3d 386, 391 (1st Cir. 2016) (no
error in part because defendant failed to object to potentially
misleading testimony); Mangual-Garcia, 505 F.3d at 10-11 (no error
where the government knowingly failed to correct false testimony
because the defendant, also knowing it to be false, failed to
object).  Here, Vavic opposed the government's proposal to use a
redacted version of the August 30 call in order to support his

argument that Singer misled Vavic just as much as he misled everyone else.[17]   That strategic decision forecloses any error.

Second, the one case on which Vavic stakes his argument is easily distinguishable.   In United States v. Freeman, the Seventh Circuit affirmed the lower court's grant of a new trial because the government had relied on witness testimony it knew to be false.   See 650 F.3d 673, 680-82 (7th Cir. 2011).   That case involved a sweeping drug-trafficking conspiracy with defendant Freeman at its helm.   See id. at 676.   The government had one of Freeman's co-conspirators, Williams, testify that Freeman and another co-conspirator, Wilbourn, were "branding" their respective types of crack cocaine in a penthouse in 2003.   See id. at 677. The defense had told the prosecution before trial that Wilbourn was in prison from 2002 to 2005, but the government knowingly introduced the false testimony anyway.   See id.   And when Freeman's counsel sought to impeach Williams, the government objected and stated in the presence of the jury, "That's not true."   Id.   Twelve

---

[17] Vavic also argues that he did object to Singer's false statements because he moved to exclude the call in full and, in the alternative, to instruct the jury after each false statement. We still discern no Napue error.   None of our cases suggest that the Napue prohibition stretches so far as to require the remedy that Vavic effectively requests here, which is to exclude all statements by a witness who utters a false statement.   And to the extent that Vavic argues that the August 30 call is so unduly prejudicial that the district court erred in admitting it, or that the district court's limiting instructions did not cure the undue prejudice, he may make those evidentiary arguments on appeal from final judgment.

days later at the end of the trial, a stipulation was read to the jury that Wilbourn had been in prison from 2002 to 2005. Id. at 678. The government's closing argument nonetheless relied on Williams's testimony as to the drug branding, and the rebuttal argued that Williams's testimony was substantively true but confused as to time and place. See id. The district court granted a new trial, explaining that the government's improper objection rendered ineffectual the defendant's cross-examination seeking to impeach the government's faulty witness, and the parties' stipulation was too late to be sufficiently curative. See id. at 681. The Seventh Circuit affirmed that decision, finding no clear error. Id.

The facts here fall far short of Freeman's. Immediately after each of Singer's false statements in the call, the government elicited Brown's testimony on direct examination indicating that the statement was false. George's corrective testimony, again elicited by the government, further cinched the matter.[18] Also unlike the prosecutor in Freeman, the government here did not once reference Singer's three lies in its closing argument or rebuttal.

---

[18] Vavic also questions on appeal whether Brown's and George's testimonies about Singer's lies were effective safeguards, given that their testimony was necessarily limited to their lack of personal knowledge. But, again, that objection rings hollow given that Vavic's counsel asked to "clear[] up" the falsehoods "in realtime."

We tailor our holding to the facts before us.  Given the near-immediate correction following Singer's lies, Vavic's strategic choices at trial, and the government's decision not to reference the challenged statements in closing argument, we conclude that the inclusion of Singer's three lies does not give rise to a Napue error warranting a new trial.

### 3.    Prejudicial Variance

Finally, Vavic contends that we should vacate his Count Three conviction because the government proved multiple smaller conspiracies rather than the overarching conspiracies charged in Counts Two and Three.  In his view, the resulting variance led to prejudicial spillover between the counts.  The government responds that we lack appellate jurisdiction to consider Vavic's prejudicial variance arguments and, in the alternative, that no prejudicial variance occurred as to either Counts Two or Three.

Construing Vavic's prejudicial variance argument as part of his Rule 33 motion for a new trial, we conclude that we have appellate jurisdiction to consider it.  On the merits, we hold that there was no variance as to Count Three.  We then reject his argument about prejudicial spillover from Count Two because it amounts to a claim of retroactive misjoinder, and Vavic has waived any such argument on appeal.

### a.    Jurisdiction

The government first argues that we lack jurisdiction to consider Vavic's prejudicial variance argument.  We disagree.

We have jurisdiction over the government's appeal of the district court's decision to grant Vavic's motion for a new trial under Federal Rule of Criminal Procedure 33.  See 18 U.S.C. § 3731. Our decision in United States v. Carpenter made clear, however, that we lack jurisdiction to decide any cross-appeal from the district court's ruling denying Vavic's motion for acquittal under Federal Rule of Criminal Procedure 29.  See 494 F.3d 13, 26 (1st Cir. 2007).

Although Vavic had framed his prejudicial variance argument to the district court as a ground for either acquittal or a new trial, the district court considered the argument only in the context of his Rule 29 motion for acquittal, at the government's urging.[19]  See Vavic, 628 F. Supp. 3d at 359-61.  Now the government contends that we lack jurisdiction because Vavic's prejudicial-variance argument is functionally an argument

---

[19] Vavic's motion before the district court argued that the prejudicial variance warranted acquittal or, in the alternative, a new trial.  It was the government, not Vavic, who framed the argument as a Rule 29 issue before the district court.  The district court's opinion adopted that framing, giving rise to this jurisdictional dispute.  Thus, Vavic timely raised and adequately preserved his prejudicial-variance challenge as a basis for a new trial under Rule 33.

challenging the sufficiency of the evidence under Rule 29, and therefore Carpenter forecloses our review.

We conclude that Vavic's prejudicial variance argument is properly before us. A claim of prejudicial variance is not a challenge to the sufficiency of the evidence, like other Rule 29 challenges. See United States v. Szpyt, 785 F.3d 31, 36, 40 (1st Cir. 2015) (distinguishing between error for "insufficiency of the evidence," which would bar retrial on double jeopardy grounds, and error for "material variance," which would not bar retrial). Prejudicial variance is instead a legal claim that requires a sufficiency inquiry as part of the analysis. See United States v. Falcón-Nieves, 79 F.4th 116, 132 (1st Cir. 2023) (rejecting "challenge to the sufficiency of the evidence" for a conspiracy conviction and instead vacating the conviction on prejudicial variance grounds). Indeed, a prejudicial variance error can result in either vacatur for a new trial or a judgment of acquittal. Compare Abdelaziz, 68 F.4th at 54-60 ("vacat[ing]" the convictions affected by prejudicial variance); Falcón-Nieves, 79 F.4th at 132-37 (1st Cir. 2023) (similar), with United States v. Glenn, 828 F.2d 855, 863 (1st Cir. 1987) (Breyer, J.) (ordering vacatur and dismissal of indictment); United States v. Dellosantos, 649 F.3d 109, 126 (1st Cir. 2011) (finding prejudicial variance, holding that district court erred in denying Rule 29 motions, and vacating conviction); see also United States v. Wozniak, 126 F.3d 105, 111

(2d Cir. 1997) (finding constructive amendment, vacating judgment, and remanding for a new trial "should the government decide to reprosecute").

Our jurisdiction extends to any claim of error for which a proper remedy is a new trial under Rule 33. See 18 U.S.C. § 3731. Accordingly, we can consider Vavic's prejudicial-variance argument as a potential independent ground for affirming the district court's new trial order.

### b.    Applicable Law

We will vacate a conviction on prejudicial variance grounds when "the scope of the conspiracy proved at trial varied from the conspiracy that was charged in the indictment," and the variance affected the defendant's substantial rights. Abdelaziz, 68 F.4th at 41. The doctrine is meant to safeguard the defendant's "right to have knowledge of the charge sufficient to prepare an effective defense and avoid surprise at trial, and the right to prevent a second prosecution for the same offense." United States v. Condron, 98 F.4th 1, 25 (1st Cir. 2024) (quoting United States v. Vega-Martínez, 949 F.3d 43, 51 (1st Cir. 2020)).

Three questions guide our prejudicial-variance inquiry. First, we ask whether the trial evidence was sufficient to prove the conspiracy as charged in the indictment. See Abdelaziz, 68 F.4th at 41 (citing Glenn, 828 F.2d at 858). If not, we next evaluate whether the trial evidence was sufficient to prove an

alternative conspiracy.  <u>See</u> <u>id.</u>  If so, a variance has occurred, and we assess whether the variance was prejudicial.  <u>See</u> <u>id.</u> at 41-42.  As to the first and second questions, we review the evidence de novo, drawing all factual inferences in the light most favorable to the verdict, to determine "whether the evidence sufficed for a rational juror to find" the charged conspiracy "beyond a reasonable doubt."  <u>Id.</u> at 42 (citing <u>Glenn</u>, 828 F.2d at 858).

The conspiracies charged in Counts Two and Three are classic hub-and-spoke conspiracies, with Singer as the hub at their center.  In these conspiracies, "the mere fact that a central person (the 'hub' of a wheel) is involved in multiple conspiracies (the wheel's 'spokes') does not mean that a defendant . . . who participated in a spoke conspiracy may be convicted of participating in an overarching conspiracy encompassing the entire wheel."  <u>Falcón-Nieves</u>, 79 F.4th at 134 (quoting <u>United States</u> v. <u>Monserrate-Valentín</u>, 729 F.3d 31, 44-45 (1st Cir. 2013)).  Thus, the evidence at trial must permit a jury to "reasonably infer that the spoke defendant [here Vavic] knew about and agreed to join any larger overarching conspiracy."  <u>Id.</u> (quoting <u>Monserrate-Valentín</u>, 729 F.3d at 45).

We rely on three factors to "determine whether a defendant knew about and agreed to join a single, broad conspiracy," <u>id.</u>, rather than "only a smaller, narrower one,"

Abdelaziz, 79 F.4th at 42.   They are: "(1) the existence of a common goal [among the alleged participants in the charged conspiracy], (2) interdependence among [the alleged] participants in the charged conspiracy, and (3) overlap among the [alleged] participants [in the charged conspiracy]."   Id.  (quoting Dellosantos, 649 F.3d at 117).   Further, a defendant's knowing agreement to conspire -- which may be express or tacit -- requires knowledge, "at a minimum," that the "other spokes are spokes." Falcón-Nieves, 79 F.4th at 134.   In evaluating these factors, we consider the "totality of the circumstances," and our analysis is "pragmatic" with none of the factors viewed as dispositive.   United States v. Fenton, 367 F.3d 14, 19 (1st Cir. 2004); see also Abdelaziz, 68 F.4th at 42.

### c.   Variance as to Count Three

Vavic argues that the indictment charged "overlapping conspiracies" -- one that spanned universities across the country (Count Two), and another that was limited to USC (Count Three) -- and that these conspiracies "were broader than anything the evidence showed, and the government intermingled all the evidence."   We divide his claim into two prejudicial-variance challenges tailored to each conspiracy.

Vavic's challenge to Count Three is up first.   Count Three charged that "Heinel and Vavic, being agents of USC, conspired with Singer and others known and unknown to the Grand

Jury to solicit and accept bribes in exchange for securing the admission of applicants to USC as purported athletic recruits." Thus, the conspiracy to commit federal programs bribery charged in this count focused on USC, and specifically Vavic and Heinel, and did not extend to other schools.

We conclude that there was no variance as to Count Three. Vavic's briefing focuses mostly on an alleged variance as to the broader Count Two conspiracy,[20] and we discern only a few arguments that relate to Count Three. We proceed through the factors and reject Vavic's contention that the USC-focused conspiracy was "broader than anything the evidence showed." Drawing all inferences in the light most favorable to the verdict, we hold that a jury could have concluded beyond a reasonable doubt that Vavic knowingly agreed to join a conspiracy involving him, Singer, and Heinel to admit fake athletic recruits to USC, as charged in the indictment.

To begin, we reject Vavic's argument that he lacked "knowledge of the overall scheme," Falcón-Nieves, 79 F.4th at 135 (quotation marks and citation omitted), because he "dealt solely with Singer" during the conspiracy. Under our precedent, Vavic can be convicted of conspiracy so long as he knew that "the other

---

[20] And as we explain in the next section, infra section III.B.3.d, the question of whether Count Two suffered from a prejudicial variance at trial is beside the point in this appeal.

spokes [were] spokes." Id. at 134; see also United States v. Cruz-Rodriguez, 541 F.3d 19, 28 (1st Cir. 2008) (holding that knowledge in a conspiracy may be proven without showing that "each conspirator knew of or had contact with all other members" or that "each conspirator knew of all the details of the conspiracy"). Here, a rational jury could have inferred such knowledge from the fact that it was Heinel, not Vavic, who ultimately facilitated Vanessa's and Agustina's fake recruitments. And on the August 3 call, Singer himself conveyed to Vavic that he had an independent relationship with Heinel. He told Vavic that Heinel had arranged for the Key Foundation to donate to USC, and that he initially "was gonna go through Donna" for Agustina's recruitment. Thus, a reasonable jury could have concluded that Vavic knew of Heinel's role in the conspiracy with Singer.

       Turning to the common goal factor, Vavic broadly argues that the conspiracies in this case are the same conspiracies that we held were insufficiently proven in Abdelaziz, but we disagree. The conspiracies charged in that case focused on parents, and we observed that the parents were competitors and never shared the "goal of getting children other than their own" into college. See Abdelaziz, 68 F.4th at 45 (emphasis omitted). Instead, we explained, the parents were "buyers" or "consumer[s]" of Singer's service rather than members of Singer's "core group." Id. at 45-46. Thus, we concluded that evidence of the parents' "mere

awareness that Singer and the core group had other parents enrolled" was not enough to establish that they "shared the goal of advancing the success of that broader conspiracy." Id. at 47. The Count Three conspiracy, by contrast, is limited to Singer and a "core group" of USC staff members -- Vavic and Heinel.

Also under the common goal factor, Vavic contends that "the government never showed that Vavic had any stake in enriching other coaches or administrators" at USC. But in Abdelaziz we noted that "Singer and others in his core group" could share the conspiratorial "goal of facilitating admissions into universities for the children of parents who sought the group's services, as the business model of the alleged scheme depended on their ability to secure those side doors." Id. at 45. And that is exactly what a jury could have concluded happened here. Take Vanessa's recruitment, for example. A rational jury could have found that Vavic reviewed her credentials and directed Moon to create her Subco materials, at which point Heinel presented her application to Subco. Similarly, a reasonable jury could have concluded that Singer, Vavic, and Heinel all worked toward a common goal of admitting the same applicant, and they all stood to benefit financially in maintaining the viability and secrecy of Singer's side-door scheme.

Next, there was ample evidence at trial of interdependence between Vavic and Heinel, even as they each worked

with Singer.  See id. at 49 (explaining that "interdependence must
exist between the spokes" of the conspiratorial wheel, "and not
simply between the hub and each spoke").  Heinel was the only
person who presented Vavic's choice of recruits to Subco, so he
would have needed to work through her to present any of Singer's
clients.  Consider, again, Vanessa's recruitment.  She was
recruited through Heinel, but Singer noted to Janke that Vanessa
would receive a minor scholarship "from Jovan," which suggested
that Vavic retained some level of involvement as the coach whose
team Vanessa would purportedly join.  Agustina's recruitment
illustrates a similar relationship.  In the August 3, 2018 call
between Singer and Vavic, Singer stated that he did not "think
Donna will push back on [Vavic]" for Agustina's fake recruitment,
suggesting that Heinel exercised some level of consent for each
recruit once her relationship with Singer was well underway.  Thus,
a rational jury could have concluded that interdependence existed
for the Count Three conspiracy.

     Vavic's only contention to the contrary is that there is
no interdependence (or common goal) where Vavic and Heinel competed
with one another for payment from Singer.  See id. at 46, 49
(explaining that competition among co-conspirators may counsel
against a finding of the common goal and interdependence prongs).
There is merit to his point.  Singer told Vavic that Heinel had
insisted that Singer stop "going around [her]" and "just come

directly to [her]."  And evidence that a co-conspirator was "engaged in serious competition" and "took steps to undercut" her co-conspirator can undermine the common goal and interdependence prongs.  United States v. Rivera Calderón, 578 F.3d 78, 92 & n.2 (1st Cir. 2009).

But Vavic's argument does not address the fact that a rational jury could have found that he still needed to rely on Heinel's cooperation to ensure the admission of Johnny, Vanessa, and Agustina.  Nor does it undermine a finding that, as we acknowledged in Abdelaziz, co-conspirators who were members of Singer's "core group" benefitted from one another's perpetuation of his profitable side-door scheme.  68 F.4th at 45.  Thus, a rational jury could have found that Vavic and Heinel depended on one another, despite some competition.  Or, put differently, the USC conspiracy was still "greater than the sum" of its competing co-conspirators.  Rivera Calderón, 578 F.3d at 92 & n.2 (holding that evidence of interdependence among owners of drug distribution points in a sprawling distribution conspiracy was not overcome by testimony alleging competition).

Finally, Vavic does not dispute that the overlap factor is met here.[21]  With all three factors weighing in the government's

---

[21] Vavic does not dispute that Singer was the clear "hub" of any charged conspiracy, thereby satisfying the third "overlap" factor.  See Dellosantos, 649 F.3d at 118 (explaining that "the

favor, we conclude that the evidence at trial was sufficient to establish the USC conspiracy charged in Count Three.  Thus, there was no variance, let alone a prejudicial variance, as to this count.  See Fenton, 367 F.3d at 20 n.1 (declining to further "inquire into the prejudice prong" if there is no variance).

### d.  Variance as to Count Two

We now turn to Vavic's argument that the government failed to prove the Count Two conspiracy, which was the "broader, overarching conspiracy supposedly involving dozens of coaches, parents, and Singer associates nationwide."  Vavic contends that the variance as to Count Two requires vacating his Count Three conviction because the evidentiary spillover from one count to another was prejudicial.

To begin, prejudicial variance is not the right doctrinal framework for Vavic's argument.  The government did not appeal the district court's new trial order as to Count Two.  And because the district court's decision to vacate the Count Two conviction is now final, concerns about fair notice and double jeopardy as to that count are not in play.  Cf. Condron, 98 F.4th at 25.

---

third factor, overlap among the participants, is satisfied by the pervasive involvement of a single core conspirator, or hub character" (quotation marks and citation omitted)); see also Abdelaziz, 68 F.4th at 53 (concluding that "Singer's and his associates' interactions with the parents" satisfied the "overlap" factor).

To the extent Vavic contends that prejudicial spillover from Count Two infected the jury's verdict on Count Three, his argument amounts to a claim of retroactive misjoinder. Retroactive misjoinder occurs where the joinder of charges in one trial "was proper initially because of a conspiracy allegation, but where later developments, such as [a] . . . court's decision . . . to set aside a defendant's conspiracy conviction, appear to render the initial joinder improper." United States v. Mubayyid, 658 F.3d 35, 72 n.39 (1st Cir. 2011) (quoting United States v. Deitz, 577 F.3d 672, 693 (6th Cir. 2009)). To prevail on a retroactive misjoinder claim based on prejudicial spillover, the defendant must "show prejudice so pervasive that a miscarriage of justice looms." Abdelaziz, 68 F.4th at 61 (quoting United States v. Correia, 55 F.4th 12, 36-37 (1st Cir. 2022)). In Abdelaziz, to evaluate prejudice, we considered whether the evidentiary spillover from the prejudicial variance of the separate conspiracy counts related to a "key issue" of the standalone count, as well as whether the jury returned a "discriminating verdict." See id. at 61 (quoting Correia, 55 F.4th at 38). We also applied a three-part test asking:

> (1) whether the evidence introduced in support of the vacated count 'was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant on the remaining counts,' (2) whether the dismissed count and the remaining counts were similar, and (3) whether the

> government's evidence on the remaining counts
> was weak or strong.

Id. at 62 (quoting United States v. Hamilton, 334 F.3d 170, 182 (2d Cir. 2003)).

But Vavic has waived any argument concerning retroactive misjoinder. He does not mention the doctrine in his appellate briefing, and his argument about prejudice resulting from Count Two focuses solely on an alleged variance. As a result, he does not apply the factors that we considered in Abdelaziz to the facts here and fails to explain how the prejudice in this case was so pervasive that vacatur of Count Three is warranted.[22] We thus apply the familiar rule "that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); see also Abdelaziz, 68 F.4th at 68 n.43 (holding that argument hinging on question of tax law was unsupported by "any legal authority" in the briefing and thus waived); Deitz, 577 F.3d at 693 (holding that the defendant's "undeveloped argument that he was prejudiced by the admission" of evidence from one count was

---

[22] What is more, Abdelaziz was clear that retroactive misjoinder is the proper doctrinal framework for Vavic's claim. Wilson, one of the parent-defendants in that case, contended that the evidentiary spillover resulting from the prejudicial variances as to his two conspiracy convictions required vacating his third standalone federal programs bribery conviction. See id. at 60-61. We held that his argument "effectively amount[ed] to a retroactive-misjoinder claim" and evaluated it under the framework described above. Id. at 61-62.

"insufficient to meet his heavy burden of demonstrating 'compelling prejudice'" under retroactive misjoinder).

Having rejected Vavic's alternative arguments related to his Count Three conviction, we reverse the district court's new trial order as to Count Three.

### IV.    CONCLUSION

For all these reasons, the district court's order for a new trial is **reversed** as to Count Three and **affirmed** as to Count Sixteen. We remand to the district court for further proceedings consistent with this opinion.